PUBLIC

## CASE NOS. 22-2220(L), 23-1096

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

DUKE ENERGY PROGRESS, LLC,

*Petitioner/Intervenor*

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA*,*

*Respondents,*

BELLSOUTH TELECOMMUNICATIONS, LLC,
d/b/a AT&T North Carolina, d/b/a AT&T South Carolina

*Intervenor/Petitioner,*

## ON APPEAL FROM THE FEDERAL COMMUNICATIONS COMMISSION

## PUBLIC (Redacted) PAGE-PROOF
## OPENING BRIEF OF PETITIONER/INTERVENOR

Eric B. Langley
Robin F. Bromberg
R. Rylee Zalanka
LANGLEY & BROMBERG LLC
2700 US Highway 280, Suite 350E
Birmingham, AL 35223
205-783-5750

*Counsel for Petitioner/Intervenor*
*Duke Energy Progress, LLC*

LANTAGNE LEGAL PRINTING
801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-2220__   Caption: __Duke Energy Progress, LLC v. Federal Communications Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Duke Energy Progress, LLC__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☑ YES ☐ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     Duke Energy Corporation

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☑ YES ☐ NO
     If yes, identify all such owners:

     Duke Energy Corporation

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric B. Langley                    Date:    December 12, 2022

Counsel for: Duke Energy Progress, LLC

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

<u>Page</u>

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY.........................................................................................ix

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE.................................................................2

SUMMARY OF THE ARGUMENT .....................................................10

STANDARD OF REVIEW ...................................................................16

ARGUMENT .....................................................................................18

    I.    By Retroactively Applying a New Standard to AT&T's Claim for Refunds under the *2011 Order*, the FCC Acted Arbitrarily, Capriciously, and Otherwise Contrary to the Law ...................................18

        A.    The FCC Changed the Legal Standard for Disputes Governed by the *2011 Order* After the Period Governed by the *2011 Order* Had Already Expired ...............................................18

        B.    The Retroactive Application of the FCC's New Legal Standard to Rate Disputes Governed by the *2011 Order* Is Impermissible.................................................................................22

        C.    The FCC Departed from Its Prior Standard *Sub Silentio* .................27

i

II.   The FCC Violated Section 224, Misapplied Its Own Precedent, and Acted Arbitrarily and Capriciously by Assigning the Cost of the Communication Worker Safety Zone to Duke .................................. 32

    A.   The Decision to Allocate the Cost of the Communication Worker Safety Zone to Duke Is at Odds with Foundational FCC Authority and the Act ............................................................ 33

        1.   The Justifications Underpinning the FCC's Historical Refusal to Allocate the Communication Worker Safety Zone to CATVs Do Not Apply to AT&T .................................. 33

        2.   The FCC Misapplied Its Own Precedent, Which Is Premised on the Fact that ILECs and Electric Utilities Historically Shared the Cost of the Communication Worker Safety Zone Under Joint Use Agreements .................... 37

        3.   The FCC's Decision to Not Allocate Any Portion of the Communication Worker Safety Zone to AT&T Is Premised on an Erroneous Interpretation of the Act ................. 38

III.   The FCC's Exercise of Jurisdiction Over the Rates AT&T Pays Duke under the Joint Use Agreement is *Ultra Vires* and/or Arbitrary and Capricious ........................................................ 40

    A.   The Act Does Not Apply to ILEC Attachments on Electric Utility Poles ......................................................... 40

        1.   The D.C. Circuit's Decision in *AEP v. FCC* Was Wrong .......... 40

        2.   This Case Magnifies the Error of the FCC's Assertion of Jurisdiction Over the Rates Paid by ILECs to Electric Utilities .................................................................. 46

    B.   Even if the FCC Has Jurisdiction Over the Rates Paid by AT&T, It was Arbitrary and Capricious to Exercise Jurisdiction Given the Lack of Jurisdiction Over the Rates Paid by Duke ............................................................ 49

CONCLUSION ...................................................................... 51

ii

REQUEST FOR ORAL ARGUMENT ...................................................52

CERTIFICATE OF COMPLIANCE ......................................................53

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Am. Elec. Power Serv. Corp. v. FCC*,
  708 F.3d 183 (D.C. Cir. 2013) .......................................................... 5, 14, 40, 42

*ARA Servs. v. NLRB*,
  71 F.3d 129 (4th Cir. 1995) ........................................................ 23, 27

*Cavalier Telephone, LLC v. Verizon Virginia, Inc.*,
  330 F.3d 176 (4th Cir. 2003) ................................................................ 44

*Chamber of Commerce of the United States v. NLRB*,
  721 F.3d 152 (4th Cir. 2013) ........................................................ 17, 43

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ................................................................ 16, 17

*Clark-Cowlitz Joint Operating Agency v. Fed. Energy Regul. Com.*,
  826 F.2d 1074 (D.C. Cir. 1987) ........................................................ 26

*Conway Corp. v. Fed. Power Com.*,
  510 F.2d 1264 (D.C. Cir. 1975) ........................................................ 49

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ........................................................ 17, 27, 31

*Epilepsy Found. v. NLRB*,
  268 F.3d 1095 (D.C. Cir. 2001) ........................................................ 24

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................ 28

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ................................................................ 16

*Halbig v. Sebelius*,
  27 F. Supp. 3d 1 (D.D.C. 2014) ........................................................ 41

*Jimenez-Cedillo v. Sessions*,
  885 F.3d 292 (4th Cir. 2018) ........................................................ 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................ 16, 28

*Mozilla Corp. v. FCC,*
    940 F.3d 1 (D.C. Cir. 2019) ............................................................ 50

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007) ...................................................................... 49

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ...................................................................... 41

*New Cingular Wireless PCS, LLC v. Finley,*
    674 F.3d 225 (4th Cir. 2012) ......................................................... 44

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,*
    416 U.S. 267 (1974) ...................................................................... 25

*Northeast Hospital Corp. v. Sebelius,*
    657 F.3d 1 (D.C. Cir. 2011) ...................................................... 42-43

*Port Auth. of N.Y. & N.J. v. DOT,*
    479 F.3d 21 (D.C. Cir. 2007) ......................................................... 41

*Retail, Wholesale & Department Store Union v. NLRB,*
    466 F.2d 380 (D.C. Cir. 1972) ................................................ *passim*

*Smiley v. Citibank (South Dakota), N.A,*
    517 U.S. 735 (1996) ...................................................................... 28

*Southern Co. v. FCC,*
    293 F.3d 1338 (11th Cir. 2002) ................................................. 41-42

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019) ......................................................... 16

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ...................................................................... 44

## Statutes

5 U.S.C. § 706 ............................................................................... 16

28 U.S.C. § 2342 ............................................................................. 1

28 U.S.C. § 2343 ............................................................................. 1

47 U.S.C. § 153 .......................................................... 15, 40, 41, 43

47 U.S.C. § 224 ..................................................................... *passim*

47 U.S.C. § 251 ................................................................... 40

47 U.S.C. § 402 ................................................................... 1

## FCC Authorities

*Adoption of Rules for the Regulation of Cable Television Pole Attachments*, First Report and Order, CC Docket No. 78-144, 68 F.C.C.2d 1585 (Aug. 11, 1978) (hereinafter, "*1978 Order*") .................................................. 27

*Adoption of Rules for the Regulation of Cable Television Pole Attachments*, Memorandum Opinion and Second Report and Order, FCC Docket NO. 78-144, 72 F.C.C.2d 59 (May 23, 1979) (hereinafter, "*1979 Order*") ............. 14, 34, 36, 37

*Adoption of Rules for the Regulation of Cable Television Pole Attachments*, Memorandum Opinion and Order, CC Docket No. 78-144, 77 F.C.C.2d 187 (Mar. 10, 1980) (hereinafter, "*1980 Order*") ........................................ 38

*Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Third Report and Order and Declaratory Ruling, WC Docket No. 17-84, WT Docket No. 17-79, 33 FCC Rcd 7705 (Aug. 3, 2018) (hereinafter, "*2018 Order*") ...................... 7, 26

*Amendment of Rules and Policies Governing Pole Attachments*, Report and Order, CS Docket No. 97-98, 15 FCC Rcd 6453 (Apr. 3, 2000) (hereinafter, "*2000 Order*") ........................................................ 10, 13

*BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Duke Energy Florida, LLC*, Memorandum Opinion and Order, Proceeding No. 20-276, Bureau ID No. EB-20-MD-003, 2021 FCC LEXIS 3240 (Aug. 27, 2021) (hereinafter, "*Duke Energy Florida*") ............................................. 26, 29

*BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Florida Power & Light Co.*, Memorandum Opinion and Order, Proceeding No. 19-187, Bureau ID No. EB-19-MD-006, 35 FCC Rcd 5321 (May 20, 2020) (hereinafter, "*Florida Power & Light*") ............................................. 24, 26, 29, 39

*Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*, Report and Order and Order on Reconsideration, WC Docket No. 07-245, GN Docket No. 09-51, 26 FCC Rcd 5240 (Apr. 7, 2011) (hereinafter, "*2011 Order*") ............................................................ *passim*

*Implementation of Section 224 of the Act*, Notice of Proposed Rulemaking, WC Docket No. 07-245, RM-11293, RM-11303, 22 FCC Rcd 20195 (Nov. 20, 2007) (hereinafter, "*2007 NPRM*") ........................................ 42

*Implementation of Section 703(e) of the Telecommunications Act of 1996; Amendment of the Commission's Rules and Policies Governing Pole Attachments*, Report and Order, CS Docket No. 97-151, 13 FCC Rcd 6777 (Feb. 6, 1998) (hereinafter, "*1998 Order*") ................................. 4, 42, 45

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order and Further Notice of Proposed Rulemaking, Fifth Report and Order and Memorandum Opinion and Order, Fourth Report and Order and Memorandum Opinion and Order, WT Docket No. 99-217, CC Docket No. 96-98, CC Docket No. 88-57, 15 FCC Rcd 22983 (Oct. 25, 2000) (hereinafter, "*2000 Order and FNPRM*") .... 45

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, Notice of Inquiry and Third Further Notice of Proposed Rulemaking, WT Docket No. 99-217, CC Docket No. 96-98, 14 FCC Rcd 12673 (hereinafter, "*1999 NPRM*")...............45

*Verizon Florida LLC v. Florida Power & Light Co.*, Memorandum Opinion and Order, Docket No. 14-216, File No. EB-14-MD-003, 30 FCC Rcd 1140 (Feb. 11, 2015) (hereinafter, "*Verizon Florida*") ........................................... *passim*

*Verizon Maryland LLC v. Potomac Edison Co.*, Memorandum Opinion and Order, Proceeding No. 19-355, Bureau ID No. EB-19-MD-009, 35 FCC Rcd 13607 (Nov. 23, 2020) (hereinafter, "*Potomac Edison*") ..... 26, 29, 47

## Other Authorities

47 C.F.R. § 1.1410 (1981) ...................................................................... 27

123 Cong. Rec. 35,006 (1977) .............................................................. 45

Institute of Electrical and Electronics Engineers, Inc., 2017 NESC Handbook,
Premier Edition (2016) (hereinafter, "*NESC Handbook*") ............................. 10, 32

S. Rep. No. 95-580 (1977) ......................................................... 48

S. Rep. No. 104-23 (1995) ......................................................... 45

## GLOSSARY

| | |
|---|---|
| Act | This term refers to the Pole Attachments Act, 47 U.S.C. § 224, as amended. |
| Answer | This term refers to the November 13, 2020 answer that Duke filed with the FCC in response to AT&T's complaint. |
| AT&T | This term refers to BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and AT&T South Carolina.  AT&T was the complainant in the proceeding below, an intervenor in Proceeding No. 22-2220 and the petitioner in Proceeding No. 23-1096. |
| CATV | This term refers to cable television system.  Originally, the Act only applied to attachments made by CATVs to poles owned by telephone and electric utilities. |
| CLEC | This term refers to competitive local exchange carriers (i.e., non-ILEC telecommunications carriers). |
| Communication Worker Safety Zone | This term comes from the NESC and refers to the separation space (typically 40") required between the lowest electric facility and the highest communications attachment on a pole. The communication worker safety zone is sometimes called the "safety space." |
| Complaint | This term refers to the pole attachment complaint that AT&T filed with the FCC on September 1, 2020.  The Complaint alleges, inter alia, that the rate AT&T pays for making pole attachments on Duke's poles is not "just and reasonable." |
| Duke | This term refers to Duke Energy Progress, LLC.  Duke is the petitioner in Proceeding No. 22-2220 and an intervenor in Proceeding No. 23-1096. |
| EB Order | The September 21, 2021 memorandum opinion and order issued by the FCC's Enforcement Bureau in the complaint proceeding underlying this appeal. |
| FCC | This term refers to the Federal Communications Commission. |
| ILEC | This term refers to incumbent local exchange carriers, as defined by 47 U.S.C. § 251(h).  ILECs are essentially legacy telephone companies and include former Bell telephone companies, such as AT&T. |
| NESC | National Electric Safety Code, Institute of Electrical and Electronics Engineers, Inc. (2017). |

| New Telecom Rate | The annual pole attachment rate applicable to attachments made by non-ILEC telecommunications carriers, pursuant to 47 U.S.C. § 224(e), for the period following the effective date of the 2011 Order. |
|---|---|
| Old Telecom Rate | The annual pole attachment rate applicable to attachments made by non-ILEC telecommunications carriers, pursuant to 47 U.S.C. § 224(e), for the period preceding the effective date of the 2011 Order.  The Old Telecom Rate is higher than the New Telecom Rate. |
| Order | The November 17, 2022 order on reconsideration and review entered by the FCC in the complaint proceeding underlying this appeal. |

## JURISDICTIONAL STATEMENT

This Petition, which Duke filed on November 28, 2022, seeks review of the Order, a final, appealable agency action that was adopted by the FCC on November 17, 2022 and released on November 18, 2022.  Because the Petition challenges a final order entered by the FCC, the Court has subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 2342 and 47 U.S.C. § 402(a).  Venue in this Court is proper pursuant to 28 U.S.C. § 2343 because Duke has its principal place of business in North Carolina.

## STATEMENT OF THE ISSUES

I.    Whether the FCC acted arbitrarily, capriciously or otherwise contrary to law by awarding AT&T a refund for periods governed by the *2011 Order* based on the retroactive application of a new legal standard that directly contradicts the legal standard that existed during the entire period governed by the *2011 Order*?

II.   Whether the FCC acted arbitrarily, capriciously or otherwise contrary to law, by assigning the cost of the communication worker safety zone to Duke when the uncontroverted testimony demonstrates that the communication worker safety zone would not exist on Duke's poles but for the presence of AT&T and other communications attachments?

1

**III.** Whether the FCC acted in violation of 47 U.S.C. § 224, arbitrarily or capriciously by exercising jurisdiction over AT&T's pole attachment complaint, given that:

**A.** AT&T is an ILEC, and ILECs are expressly excluded from the definition of "telecommunications carrier" with rights under Section 224; and

**B.** The FCC lacks jurisdiction over the rates for attachments by Duke to utility poles owned by AT&T, which makes it impossible for the FCC to provide complete relief in this dispute?

## STATEMENT OF THE CASE

Since the advent of their respective services, telephone and electric utilities have shared pole networks. The arrangements between telephone and electric utilities are typically embodied in privately negotiated "joint use agreements," pursuant to which each party has access to the other party's poles in their overlapping service areas. Joint use agreements eliminated the need for each party to build its own pole network, saving each party (and their customers) money and sparing the public from the aesthetic nuisance of redundant networks.

Duke and AT&T have been parties to a joint use agreement for many decades. The most recently executed joint use agreement between the parties is dated October 20, 2000. During all time periods relevant to this proceeding, the parties shared space on approximately 179,000 utility poles in North Carolina and South Carolina,

2

with approximately 148,000 of them owned by Duke and approximately 31,000 owned by AT&T.  The parties share the cost of this jointly used network through a contractual rental rate methodology.  The per-pole annual rate each party pays the other—and the manner in which the rate adjusts on an annual basis—is expressly set forth in the joint use agreement.  At the end of each year, the amounts owed by each party are netted out, and the party to whom net rentals are owed sends an invoice to the other party.  For the 2017-2019 period, the contractual per pole rates were as follows:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| AT&T on Duke Poles | $ ███ | $ ███ | $ ███ |
| Duke on AT&T Poles | $ ███ | $ ███ | $ ███ |

Until 2011, the FCC did not exercise jurisdiction over any aspect of the joint use relationship between Duke and AT&T—or between any electric utility and ILEC.

The Pole Attachments Act, as first enacted by Congress in 1978, gave the FCC authority to regulate the rates, terms, and conditions for CATV attachments to telephone and electric utility poles. The Telecommunications Act of 1996 amended the Pole Attachments Act in two important ways:  (1) Congress added a new entity entitled to specific regulatory protections—the "telecommunications carrier" (which, for purposes of the Act, specifically excludes ILECs—*i.e.* the incumbent telephone utilities whose poles were subject to the FCC's jurisdiction); and (2)

Congress added attachments by a "provider of telecommunications service" to the definition of "pole attachment." 47 U.S.C. § 224(a)(4) & (5).

In an early rulemaking implementing the 1996 amendments, the FCC stated: "Because, for purposes of Section 224, an ILEC is a utility but is not a telecommunications carrier, an ILEC must grant other telecommunications carriers and cable operators access to its poles, **even though the ILEC has no rights under Section 224 with respect to the poles of other utilities**." *1998 Order*, 13 FCC Rcd at 6781, ¶ 5 (emphasis added). This was the FCC's consistent view until 2011 when it concluded:

> [ILECs] are entitled to rates, terms and conditions that are "just and reasonable" in accordance with section 224(b)(1).
>
> We therefore allow [ILECs] to file complaints with the Commission challenging the rates, terms and conditions of pole attachment agreements with other utilities.

*2011 Order*, 26 FCC Rcd at 5328, ¶¶ 202-03. The FCC reasoned that under Section 224, the terms "telecommunications carrier" and "provider of telecommunications service" meant two different things. *See id.* at 5331-332, ¶¶ 209-211. According to the FCC, an ILEC is not a "telecommunications carrier" under Section 224 but is nonetheless a "provider of telecommunications service" as the phrase is used within the definition of "pole attachments." Because the FCC's jurisdiction under Section 224(b) extends to "the rates, terms and conditions for pole attachments," the FCC

reasoned that it thus has jurisdiction over the rates, terms, and conditions for ILEC attachments to electric utility poles. *See id.*

The D.C. Circuit—in a facial challenge brought by numerous electric utilities—upheld the FCC's *2011 Order*. *Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 187-88 (D.C. Cir. 2013) ("*AEP*"). The FCC has used this authority, here, to award AT&T significant rate reductions and massive (though incalculable) refunds. Importantly, though, the FCC's jurisdiction does not extend to the rates paid by Duke for access to AT&T's poles. Because of this, the Order below adjusts the rate paid by AT&T and purports to order refunds, without addressing the offset to the annual net rental calculation—i.e., the rate paid by Duke to AT&T. This case presents the first opportunity for a court of appeals to pass judgment on this issue in an as-applied context.

In the *2011 Order*, the FCC stated that it was "unlikely to find the rates, terms and conditions in **existing** joint use agreements unjust or unreasonable." *2011 Order*, 26 FCC Rcd at 5335, ¶ 216 (emphasis added). The FCC applied a different standard to "**new**" joint use agreements—i.e., agreements executed after the release of the *2011 Order*. With respect to a "new" agreement, if an ILEC cannot demonstrate that it is "similarly situated" to comparable providers (i.e., CATVs and CLECs), then the *2011 Order* states that it is "reasonable to look to the preexisting,

high-end telecom rate [i.e., the Old Telecom Rate] as a reference point in complaint proceedings involving a pole owner and an [ILEC]…." *Id.* at 5336-37, ¶ 218.

Prior to a subsequent rule change in the *2018 Order*, the FCC issued only one order addressing a disputed rate under an "existing" joint use agreement: *Verizon Florida,* 30 FCC Rcd 1140 (2015). In *Verizon Florida*, the FCC rejected an ILEC's complaint that a $36.22 rate was unjust and unreasonable even though it exceeded the Old Telecom Rate by nearly 300%. Further, in *Verizon Florida*, the FCC reaffirmed that the Old Telecom Rate serves as a "reference point" only in rate disputes arising out of "new" agreements; the FCC specifically rejected reference to the Old Telecom Rate in disputes arising out of "existing" agreements. *Verizon Florida*, 30 FCC Rcd at 1149, ¶ 23.

*Verizon Florida* also further articulated the evidentiary standard applicable to rate disputes involving "existing" joint use agreements under the *2011 Order* by dismissing an ILEC's complaint (even where the contractual rates exceeded the Old Telecom Rate by more than 300%) because the ILEC had "not produced any evidence showing that the monetary value of those advantages is less than the difference between the Agreement Rates and the New or Old Telecom Rates over time." *See id.* at 1149-50, ¶ 24. For purposes of the case at bar, there is no dispute that: (a) the joint use agreement at issue is an "existing" agreement and (b) the *2011 Order* governs the rate dispute for the period preceding January 1, 2020.

6

Furthermore, like the complainant in *Verizon Florida*, AT&T did not "produce[] any evidence showing that the monetary value of those advantages is less than the difference between the Agreement Rates and the New or Old Telecom Rates over time."

In 2018, the FCC revised its rules relating to ILEC complaints against electric utilities in two important ways: (1) it flipped the burden of proof to electric utilities; and (2) it purported to establish the Old Telecom rate as a "hard cap" for all agreements rather than merely a "reference point" for "new" agreements. *See 2018 Order*, 33 FCC Rcd at 7767-71, ¶¶ 123-129. The relevant portion of the *2018 Order* took effect in March 2019.[1] The chart below compares the different standards applicable to ILEC complaint proceedings under the *2011 Order* and *2018 Order*:

| | *2011 Order* | *2018 Order* |
|---|---|---|
| **"New" Agreements** | • No "hard cap" on rate<br>• Old Telecom Rate serves as "reference point"<br>• Burden of proof on ILEC | • Old Telecom Rate serves as a "hard cap" on rate<br>• Burden of proof on electric utility |
| **"Existing" Agreements** | • No "hard cap" on rate<br>• Burden of proof on ILEC<br>• Old Telecom Rate does not serve as "reference point" (*Verizon Florida*)<br>• ILEC must demonstrate that "monetary value" of benefits does not justify rate under agreement (*Verizon Florida*) | • Upon first renewal following effective date of *2018 Order*, treated as a "new" agreement (see above) |

---

[1] The *2018 Order* makes clear that it only applies prospectively. *See 2018 Order*, 33 FCC Rcd at 7770, ¶ 127 & n.478.

AT&T first requested to renegotiate the rates in the joint use agreement in May 2019. At no time prior to May 2019 did AT&T question the rates, despite its rights under the *2011 Order*. In fact, for each year prior to 2019, AT&T sent its "Form 6407" to Duke indicating its agreement with the rates as calculated by Duke. [Answer_¶_23]. After receiving the "Form 6407" from AT&T, Duke sent the invoice to AT&T for annual rentals. AT&T paid, as invoiced, for all years through 2020.

In the complaint proceeding below, the FCC found that the "existing" joint use agreement "provides AT&T with benefits that give it a material advantage over [CLEC] and [CATV] attachers on the same poles." [Order_ ¶_14]. The FCC also found that AT&T failed to produce "a credible valuation of the advantages that AT&T receives under the [joint use agreement]." [Order_¶_26_n.97]. Nevertheless, the FCC determined that the rates paid by AT&T pursuant to the joint use agreement were unjust and unreasonable based upon a comparison of the rates in the joint use agreement to the Old Telecom Rate and the New Telecom Rate. [Order_¶_24]. Further, the FCC not only used the Old Telecom Rate as a "reference point" for determining the rate AT&T should have been charged for the periods governed by the *2011 Order*, but also applied the Old Telecom Rate as a "hard cap." [Order_¶_26]. In short, the FCC abdicated the standard established by the *2011 Order* and *Verizon Florida*, even while agreeing that the *2011 Order* applied to the

8

period prior to January 1, 2020. In doing so, the FCC created an entirely new standard and retroactively applied it to the joint use agreement to award AT&T a refund for the period governed by the *2011 Order*.[2]

In addition to its retroactive application of a new standard to the period governed by the *2011 Order*, the Order allocates the cost of the communication worker safety zone to Duke for all periods at issue. The communication worker safety zone is the separation space—typically 40" at the pole—required by the NESC between electric conductors and communications facilities:



The communication worker safety zone exists, as its name implies, to protect communication workers:

---

[2] Depending on yet-to-be-negotiated variables, the Old Telecom Rate for the period governed by the *2011 Order* is approximately 45% of the contractual rates for the same period. Stated otherwise, the contractual rates are approximately 225% higher than the Old Telecom Rate.

> The communication worker safety zone is required between the supply space and communication space when communication workers use communication work rules, tools, equipment, and methods. The communication worker safety zone creates headroom for communication workers. When communication workers keep all parts of their bodies below the lowest supply facility, this zone allows safe working space for communication workers observing communication work rules.

*NESC Handbook* at 428. The communication worker safety zone has long been deemed by the FCC to be part of the presumptive "usable" space on a pole, for ratemaking purposes. *See 2000 Order*, 15 FCC Rcd at 6467-68, ¶¶ 20-22.

The uncontroverted testimony was that Duke does not need and does not use the communication worker safety zone on its own poles. *See infra* Section II.A.1. The FCC's decision to allocate the cost of this space to Duke was not based upon the evidence in this case, but instead on the FCC's prior findings in other orders that the communication worker safety zone is "used" and "usable" by electric utilities. *See* [Order_¶_42]; *see also* [Order_¶_43 ("Duke attempts to relitigate these rulings by suggesting that 'whether space is usable and used by [Duke]…is an inherently factual inquiry' to be conducted in each dispute. We disagree.") (alterations in original)].

## SUMMARY OF THE ARGUMENT

### The Retroactivity Issue

The FCC erred in finding that AT&T is entitled to a refund for the portion of its claim governed by the *2011 Order* (i.e., the portion of AT&T's refund claim that

allegedly accrued before January 1, 2020). In reaching this finding, the FCC did not apply the legal standard that governed during the entire period that the *2011 Order* was in effect (the "prior standard"). Instead, the FCC retroactively applied a new standard that directly contradicted the prior standard (the "new standard").

For example, under the prior standard, the Old Telecom Rate was neither a "hard cap" nor a "reference point" for rate disputes under "existing" joint use agreements (i.e., agreements executed prior to the *2011 Order*). *See 2011 Order*, 26 FCC Rcd at 5336-37, ¶ 218; *Verizon Florida*, 30 FCC Rcd at 1149, ¶ 23. In the case at bar, however, the FCC not only used the Old Telecom Rate as a "reference point" but also as a "hard cap" to the rate charged to AT&T under the "existing" agreement. [Order_¶¶_26-27]. In addition, under the prior standard, ILECs were required to demonstrate that the "monetary value" of the benefits they receive under an "existing" joint use agreement does not justify the rates charged thereunder. *Verizon Florida*, 30 FCC Rcd at 1149-50, ¶ 24. There is no dispute that AT&T failed to quantify the "monetary value" of the benefits it receives under the "existing" agreement. [Order_¶_26_n.97]. But the FCC nonetheless found that AT&T met its burden by comparing the rate under the parties' "existing" agreement to, *inter alia*, the rate it would have paid under the New Telecom Rate and Old Telecom Rate (i.e., precisely what the FCC rejected in *Verizon Florida*). [Order_¶_24].

11

The FCC's retroactive application of the new standard was impermissible because: (1) the FCC abruptly departed from the prior standard and replaced it with a new standard that directly contradicts the prior standard; (2) Duke relied on the prior standard because the new standard was not even announced until after the period governed by the *2011 Order* had already expired; and (3) the FCC's retroactive application of the new standard significantly burdens Duke by saddling it with millions of dollars in refund liability for which it would not be responsible under the prior standard. *See Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972) (*"RWDSU"*) (identifying factors for determining whether new standard adopted through agency adjudication should be given retroactive effect).

Further, the FCC acted arbitrarily and capriciously by departing from the prior standard *sub silentio*. When Duke directly challenged the unexplained departure from the prior standard, the FCC pretended the prior standard never existed, refused to acknowledge any departure from the prior standard, and failed to provide a reasonable explanation for the change. This is not a reasoned departure from previous precedent—instead, it is an example of the FCC attempting to sweep a previous standard under the rug.

## The Communications Worker Safety Zone Issue

The FCC also erred in allocating the entire cost of the communication worker safety zone to Duke.  *See* [Order_¶¶_42-44].  The FCC ignored uncontroverted evidence that Duke does not need and does not use the communications worker safety zone and, instead, followed flawed "settled precedent" that is, in any event, inapposite to the facts here.  The FCC chiefly relies on its *2000 Order* finding that it is "the presence of the potentially hazardous electric lines that makes the safety space necessary and but for the presence of those lines, the space could be used by…attachers."  [Order_¶ 42 (citing *2000 Order*, 15 FCC Rcd at 6467, ¶ 22)].  As it relates to poles owned by electric utilities, this finding is absurd.  The whole purpose of the "communications worker safety zone," as its name implies, is to protect communications workers from live electrical wires.  But for third-party communications attachments, Duke would not have a communications worker safety zone on its poles.

Further, much of the precedent upon which the FCC relies arises from rulings excusing CATVs from sharing in the cost of the communication worker safety zone—reasons that are wholly inapplicable to ILECs.  In fact, the FCC orders excusing CATVs from any cost of the communication worker safety zone were premised upon the fact that the cost of that space was already shared between electric and telephone utilities pursuant to joint use agreements, like the agreement at issue

13

here.   The FCC also relied on precedent that electric utilities actually use the communication worker safety zone "by mounting street light support brackets, step-down distribution transformers, and grounded-shielded power conductors therein." *1979 Order*, 72 F.C.C.2d at 71, ¶ 24.   However, Duke presented testimony demonstrating that it does not mount transformers within the communication worker safety zone and only rarely mounts streetlights within that space.  [Answer_¶_25]. The FCC cannot ignore the evidence here simply because the FCC decided decades ago, on a different record involving different types of entities, that electric utilities use the communications worker safety zone.  This is akin to finding that a stop light was red in a car wreck case simply because a court found the stop light was red in a previous case.

**The ILEC Jurisdictional Issue**

The FCC also erred in asserting jurisdiction over the joint use rates paid by AT&T to Duke.   The D.C. Circuit's decision affirming the FCC's authority to determine just and reasonable rates for ILECs (as first asserted by the FCC in the *2011 Order*) was wrongly decided.  *See AEP*, 708 F.3d at 187-88.  And, in any event, this Court should not apply that decision under the specific facts here.

The *AEP* Court reasoned that Congress did not mean to exclude ILECs from the protections of the Act because it used the term "provider of telecommunications service" in Section 224(a)(4) (the subsection identifying those entities entitled to the

14

FCC's protections under the Act), rather than the term "telecommunications carrier," from which Congress expressly excluded ILECs in Section 224(a)(5). However, the usual rule that Congress intends different meanings when it uses different words applies only where Congress has not otherwise made clear that the two terms are interchangeable.

In Section 224(a)(5), by stating that a "telecommunications carrier" for purposes of Section 224 has the meaning given to it in 47 U.S.C. § 153 (which states that a "telecommunications carrier" "means any provider of telecommunications services"), Congress explicitly provided that the terms "provider of telecommunications service" and "telecommunications carrier" are interchangeable for purposes of Section 224. *See* 47 U.S.C. § 153(44). Congress' direct cross-reference to Section 153 thus overrides the presumption that Congress typically employs different words to connote different meanings.

Even assuming, *arguendo*, that *AEP* was correctly decided (on the facial challenge presented), the facts of this as-applied challenge make clear that the FCC lacks jurisdiction over the rate paid by AT&T to Duke. Here, under the joint use agreement, each party pays the other for use of the other party's poles. It is undisputed that the FCC lacks jurisdiction over the rates paid by Duke to AT&T. Congress expressed no intent for the FCC to regulate only one-half of the net rental

15

equation—i.e., the rates paid by AT&T to Duke—while leaving the rates to be paid by Duke to AT&T in a "regulatory gap."

## STANDARD OF REVIEW

Under the APA, final agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if it is in excess of statutory jurisdiction, authority, or limitations…." 5 U.S.C. § 706(2)(A), (C). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The Court's "review under the APA is not toothless…." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019). Agency action must be set aside if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Court's review of the FCC's interpretation of the Act is governed by the two-step analysis in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-45 (1984). First, the Court must determine "whether Congress has directly spoken to the precise question at issue," and if so "give effect

to the unambiguously expressed intent of Congress" and "reject administrative constructions which are contrary to clear congressional intent." *Id.* at 842-43. In undertaking this step, the Court must employ "the traditional tools of statutory construction to ascertain congressional intent." *Chamber of Commerce of the United States v. NLRB*, 721 F.3d 152, 160 (4th Cir. 2013); *see also id.* ("We thus look to the text of the statute, along with 'the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and…other relevant statutes.'").

Second, if the statute is silent or ambiguous, the Court must decide whether the agency's interpretation is a "permissible construction of the statute." *Chevron*, 467 U.S. at 843. While agencies may change their existing policies, "in doing so, they must provide a reasoned explanation for the change." *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) (internal quotation marks omitted). "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (internal quotation marks omitted).

## ARGUMENT

I.  **By Retroactively Applying a New Standard to AT&T's Claim for Refunds under the *2011 Order*, the FCC Acted Arbitrarily, Capriciously, and Otherwise Contrary to the Law.**

A. **The FCC Changed the Legal Standard for Disputes Governed by the *2011 Order* After the Period Governed by the *2011 Order* Had Already Expired.**

In the *2011 Order*, the FCC made clear that it was unlikely to exercise its newfound authority with respect to "existing" joint use agreements—i.e., agreements that were executed prior to the release of the *2011 Order*. The FCC stated:

> Although some [ILECs] express concerns about existing joint use agreements, these long-standing agreements generally were entered into at a time when [ILECs] concede they were in a more balanced negotiating position with electric utilities, at least based on pole ownership. As explained above, we question the need to second guess the negotiated resolution of arrangements entered into by parties with relatively equivalent bargaining power. Consistent with the foregoing, the Commission is unlikely to find the rates, terms and conditions in existing joint use agreements unjust or unreasonable.

*2011 Order*, 26 FCC Rcd at 5335, ¶ 216.

The *2011 Order* established a different standard applicable to "new" joint use agreements—i.e., agreements executed after the release of the *2011 Order*. If the "new" joint use agreement does not provide the ILEC with a competitive advantage, then the *2011 Order* explains that "competitive neutrality counsels in favor of affording [the ILEC] the same rate as the comparable provider…." *Id.* at 5336, ¶ 217. If, on the other hand, a "new" agreement provides the ILEC with competitive

18

advantages, then the *2011 Order* states that it is "reasonable to look to the [Old Telecom Rate] as a reference point in complaint proceedings involving a pole owner and an [ILEC]…." *Id.* at 5336-37, ¶ 218. Finally, regardless whether the agreement at issue is "existing" or "new," the *2011 Order* makes clear that the ILEC bears the burden of demonstrating that the rate it pays under the joint use agreement is not "just and reasonable." *See id.* at 5334-37, ¶¶ 215-18.

For purposes of this case, the parties agree that the *2011 Order* governs the rate dispute during the period preceding January 1, 2020. *See* [Order_¶_17]. During this timeframe, the FCC issued only one decision addressing a disputed rate under an "existing" joint use agreement: *Verizon Florida*. In *Verizon Florida*, the FCC rejected an ILEC's complaint that a $36.22 rate was unjust and unreasonable even though it exceeded the Old Telecom rate by nearly 300%. There are two critical takeaways from *Verizon Florida*. First, the FCC reaffirmed that the Old Telecom Rate serves as a "reference point" **only** in disputes arising out of "new" agreements—not "existing" agreements:

> In support of applying the Old Telecom Rate, Verizon cites the *Order's* statement that the Commission would consider the Old Telecom Rate "as a reference point" when determining a just and reasonable attachment rate for a "*new agreement*" between an [ILEC] and a utility. **The agreement at issue here is not a new agreement.** It is "an historical joint use agreement," which the Commission repeatedly distinguished from "new agreements."

*Verizon Florida*, 30 FCC Rcd at 1149, ¶ 23 (italics in original; bold/underline added).  Second, *Verizon Florida* further defined the evidentiary standard applicable to disputes involving "existing" joint use agreements:

> [W]e find that Verizon has adduced insufficient evidence to support a finding that the Agreement Rates are unreasonable, or for the Commission to set a just and reasonable rate.  Verizon concedes that it received and continues to receive benefits under the Agreement that are not provided to other attachers, but it has not produced any evidence showing that the monetary value of those advantages is less than the difference between the Agreement Rates and the New or Old Telecom Rates over time….  Absent such evidence, we are unable to determine whether the Agreement Rates are just and reasonable.

*See id.* at 1149-50, ¶ 24.  In other words, the FCC determined that to succeed in a rate dispute involving an "existing" agreement under the *2011 Order* where the agreement provides competitive advantages to the ILEC, the ILEC must demonstrate that the "monetary value" of those competitive advantages does not justify the rate the ILEC is charged under the joint use agreement.

In the case at bar, the FCC found that the parties' "existing" joint use agreement "provides AT&T with benefits that give it a material advantage over [CLEC] and [CATV] attachers on the same poles." [Order_¶_14].  The FCC also found that AT&T failed to produce "a credible valuation of the advantages that AT&T receives under the [joint use agreement]."  [Order_¶_26_n.97].  Under *Verizon Florida*, that should have ended the inquiry with respect to the period governed by the *2011 Order*.  However, instead of finding AT&T's failure to

produce "credible valuation" evidence to be fatal to its claim under the *2011 Order*, as it had done in *Verizon Florida*, the FCC applied an entirely different evidentiary standard. In the Order below, the FCC stated:

> The Bureau correctly found that AT&T established a *prima facie* case that the [joint use agreement] rates are unreasonable. The ruling was based in part on evidence that the [joint use agreement] rates are: (1) ▮▮▮▮ higher than both the Old and New Telecom Rates; (2) ▮▮▮▮ higher than the rates that AT&T charges competitive LECs and cable companies to attach to AT&T's poles; and (3) disproportionate to the amount of space AT&T and Duke each uses on the poles.

[Order_¶_24]. This finding does not just depart from *Verizon Florida*—it directly conflicts with *Verizon Florida*. *See* 30 FCC Rcd at 1140-41, ¶¶ 2-3 (finding that ILEC failed to meet its burden of proof under the *2011 Order* by comparing the rate it paid under an "existing" agreement with the rate it would have paid under either the Old Telecom Rate or New Telecom Rate formulas).

Second, in the case at bar, the FCC used the Old Telecom Rate as a "hard cap" for determining the rate AT&T should have been charged for the periods governed by the *2011 Order*. [Order_¶¶_26-27]. But the *2011 Order* and *Verizon Florida* make clear that the Old Telecom Rate serves as a "reference point" only in rate disputes involving "new" agreements—not "existing" agreements. *See 2011 Order*, 26 FCC Rcd at 5336-37, ¶ 218 (noting that the Old Telecom Rate only serves as a "reference point" for "new" joint use agreements); *Verizon Florida*, 30 FCC Rcd at 1149, ¶ 23. Nevertheless, the FCC determined that AT&T was entitled to a refund

21

of the amount AT&T paid in excess of the Old Telecom Rate for the period governed by the *2011 Order*.  *See* [EB_Order_¶_64].

### B. The Retroactive Application of the FCC's New Legal Standard to Rate Disputes Governed by the *2011 Order* Is Impermissible.

Had the FCC applied the prior standard, as established in the *2011 Order* and as further articulated in *Verizon Florida*, the FCC would have dismissed AT&T's claim for relief under the *2011 Order*.  Instead, the FCC retroactively applied a new legal standard—one that was formulated **__after__** the period governed by the *2011 Order* had already expired.  The chart below provides a contrast of those standards with respect to "existing" agreements under the *2011 Order*:

| Prior Standard | New Standard |
|---|---|
| • Burden of proof on ILEC<br>• ILEC must demonstrate that "monetary value" of benefits does not justify rate under agreement (*Verizon Florida*)<br>• Old Telecom Rate does not serve as "reference point" (*Verizon Florida*)<br>• No "hard cap" on rate | • Ostensibly placed burden of proof on ILEC but…<br>• Used Old Telecom Rate as "reference point" in determining ILEC met its burden of proof<br>• Did not require ILEC to demonstrate that "monetary value" of benefits did not justify rate under agreement<br>• Applied Old Telecom Rate as "hard cap" on rate |

The FCC's retroactive application of a new legal standard to AT&T's refund claim under the *2011 Order* is impermissible and should be set aside.[3]

---

[3] The retroactivity issue is not immediately apparent in the FCC's Order because, as explained in Section I.C. *infra*, the FCC refused to acknowledge in the Order that it applied a different standard than existed during the period governed by the *2011 Order*.

Courts weigh five factors when determining whether it is permissible to give

a new rule or policy adopted through an agency adjudication retroactive effect:

> (1) whether the particular case is one of first impression, (2) whether
> the new rule represents an abrupt departure from well established
> practice or merely attempts to fill a void in an unsettled area of law, (3)
> the extent to which the party against whom the new rule is applied relied
> on the former rule, (4) the degree of the burden which a retroactive
> order imposes on a party, and (5) the statutory interest in applying a
> new rule despite the reliance of a party on the old standard.

*RWDSU*, 466 F.2d at 390; *see ARA Servs. v. NLRB*, 71 F.3d 129, 135 (4th Cir. 1995)

(applying the *RWDSU* factors to determine whether it was permissible for a new

standard adopted during an adjudication to be given retroactive effect).  Whether a

new standard should be applied retroactively is a "question of law, resolvable by

reviewing courts with no overriding obligation of deference to the agency decision;

and courts have not infrequently declined to enforce administrative orders when in

their view the inequity of retroactive application has not been counterbalanced by

sufficiently significant statutory interests."  *RWDSU*, 466 F.2d at 390 (internal

citation omitted).

The *RWDSU* factor that "has been given primary importance" is whether the

new rule represents an "abrupt break with well settled policy or is merely an attempt

to fill an unsettled area of the law."  *ARA Servs.*, 71 F.3d at 135 (internal quotation

marks omitted).  "[N]otions of equity and fairness militate strongly against

retroactive application of [an agency's] substitution of a new law for old law that

was reasonably clear." *Epilepsy Found. v. NLRB*, 268 F.3d 1095, 1102 (D.C. Cir. 2001) (internal citations and quotation marks omitted).  The prior standard under the *2011 Order* and *Verizon Florida* was clear.  In determining that AT&T met its burden of proof, though, the FCC entirely neglected the prior standard.  Instead, the FCC determined that AT&T met its burden by comparing the rate under the "existing" agreement to, *inter alia*, the rate it would have paid under the Old Telecom Rate and New Telecom Rate formulas.  *See* [Order_¶_24].  In other words, the FCC found that AT&T met its burden of proof by doing the exact same thing as the unsuccessful ILEC complainant in *Verizon Florida*.

The *RWDSU* factors also look at "the extent to which the party against whom the new rule is applied relied on the former rule."  *RWDSU*, 466 F.2d at 390.  This factor also weighs against retroactive application of the FCC's new standard.  The *2011 Order* governed any rate disputes between the parties from June 8, 2011 (i.e., the effective date of the *2011 Order*) through December 31, 2019.  The FCC first applied the new standard (without identifying it as such) on May 20, 2020—i.e., well after the period governed by the *2011 Order* expired.  *See Florida Power & Light*, 35 FCC Rcd 5321, 5327-5331 at ¶¶ 13-17 (finding that AT&T met its burden of proof under the *2011 Order*, even though it did not quantify the "monetary value" of the benefits it received under its "existing" joint use agreement).  The *2011 Order*

24

and *Verizon Florida* were the only guidance provided by the FCC regarding "existing" agreements during the period governed by the *2011 Order*. Because the FCC made it clear that it "was unlikely to find the rates…in existing joint use agreements unjust or unreasonable," because the FCC imposed a relatively high evidentiary standard on ILECs challenging rates within "existing" agreements, and because the FCC made clear that the Old Telecom Rate was not a "reference point" (let alone as a "hard cap") for rates under "existing" agreements, Duke had no reason to question the reasonableness of the negotiated rate within the parties' "existing" joint use agreement or mitigate against potential refund liability for periods governed by the *2011 Order*.[4] Thus, this is a case "in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on [the FCC's] pronouncements." *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 295 (1974).

Next, the *RWDSU* factors look at "the degree of the burden which a retroactive order imposes on a party." *RWDSU*, 466 F.2d at 390. The FCC's retroactive

---

[4] For all it appears, AT&T also thought the agreement rates were consistent with the *2011 Order*. AT&T did not even request to renegotiate rates until May 22, 2019. *See* [Answer_Exh._A_DEP000257]. Moreover, AT&T not only submitted payment to Duke without objection each year until 2019, but AT&T also expressly affirmed the correctness of the rate each year through the submission of a "Form 6407." *See id*.

application of the new standard has imposed a significant financial burden on Duke.[5]
In particular, it has saddled Duke with millions of dollars of refund liability for the
period governed by the *2011 Order*—refund liability that would not have existed
under the prior standard.

The *RWDSU* factors also ask, "whether the particular case is one of first
impression." *RWDSU*, 466 F.2d at 390. "[B]y granting the benefit of a change in
the law to those whose efforts may have helped bring about the change, retroactive
application of a new principle encourages parties to 'advance new theories
or...challenge outworn doctrines.'"). *Clark-Cowlitz Joint Operating Agency v.
FERC*, 826 F.2d 1074, 1082 (D.C. Cir. 1987). This is not a case of first, but of
**fourth** impression. *See Florida Power & Light*, 35 FCC Rcd 5321 (applying new
standard for first time); *accord Potomac Edison*, 35 FCC Rcd 13607; *Duke Energy
Florida*, 2021 FCC LEXIS 3240. Moreover, AT&T did not "advance new theories"
or "challenge outworn doctrines" in the underlying complaint proceeding: the

---

[5] *See* Petition_for_Reconsideration_pp._23-24 (explaining that because Duke had
no reason to question the rate under the parties' "existing" agreement, under
generally accepted accounting principles (GAAP), Duke could not reserve for the
contingent liability of refunds for the period governed by the *2011 Order*) (citing
Ex Parte Letter from Dan Woodall, Director of Customer Delivery Grid & Asset
Programs, Duke Energy Corporation, to Marlene Dortch, Secretary, FCC,
*Accelerating Wireline Broadband Deployment by Removing Barriers to
Infrastructure Investment*, WC Docket No. 17-84, at 5-6 (filed Aug. 23, 2021)).

change in standard was an unearned gift from the FCC. Accordingly, this factor weighs against retroactive application of the FCC's new standard.

The final factor under *RWDSU* is "the statutory interest in applying a new rule despite the reliance of a party on the old standard." *RWDSU*, 466 F.2d at 390. There is minimal statutory interest in retroactively applying the new standard. The new standard lowers the threshold for refund claims under the *2011 Order*. The Act, however, does not mention refunds or provide the FCC with express authority to give retroactive effect to new rules or policies. In fact, the FCC long interpreted the Act as allowing only prospective, as opposed to retroactive, relief. *See* 47 C.F.R. § 1.1410(c) (1981) (allowing refunds, but only "from the date the complaint, as acceptable, was filed"); *1978 Order*, 68 F.C.C.2d 1585, 1600 at ¶ 45 (rejecting calls for refunds for periods predating filing of a complaint and stating that "refunds from the date of the complaint are entirely appropriate in a complainant form of regulation"). Moreover, as discussed in Section III *infra*, the FCC's authority over the rates for AT&T's use of Duke's poles is questionable. *See ARA Servs.*, 71 F.3d at 136 ("It is enough to note that there exists a question as to the new standard's statutory validity, a factor that weighs against its retroactive application.").

## C. The FCC Departed from Its Prior Standard *Sub Silentio*.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC*, 579 U.S. at 221; *see*

27

*also Motor Vehicles Mfrs. Ass'n,* 463 U.S. at 43 (stating that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks omitted).  When an agency changes its existing position, it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC*, 579 U.S. at 221 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  There are instances, however, when a change in an agency's position requires a more detailed justification: "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account."  *Fox Television Stations, Inc.*, 556 U.S. at 515 (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

The FCC has not provided adequate reasons, let alone a detailed justification, for changing the standard it applies to rate disputes under "existing" joint use agreements for periods governed by the *2011 Order*.  In fact, the FCC has not even "display[ed] awareness" that it has changed the standard.  Instead, beginning with the *Florida Power & Light* decision, the FCC—*sub silentio*—simply: (1) stopped requiring ILECs to demonstrate that the "monetary value" of the benefits they receive under "existing" joint use agreements is less than the difference between the

rates charged under their "existing" agreements and the rates they would have been charged under the Old Telecom Rate Formula; and (2) started capping rates under "existing" agreements at the Old Telecom Rate.  *See Florida Power & Light,* 35 FCC Rcd 5321, 5327-5331 at ¶¶ 13-17 (applying new standard for first time); *accord Potomac Edison*, 35 FCC Rcd 13607; *Duke Energy Florida*, 2021 FCC LEXIS 3240. And even after Duke squarely challenged the new standard in its petition for reconsideration, *see* [Petition_for_Reconsideration_pp._2-6], the FCC failed to provide a reasonable, let alone detailed, justification for switching from the prior standard to the new standard.

In dispensing with the evidentiary burden under the prior standard, the FCC stated:

> We reject Duke's further contention that in order to establish that the [joint use agreement] rates are unjust and unreasonable, AT&T had to prove that the "'monetary value of the benefits under the [joint use agreement] does not justify the difference between the 'rate' AT&T paid under the [joint use agreement] and the Old Telecom Rate.'"  To support that position, Duke relies on the Bureau's decision in *Verizon Florida*.  But as we recently explained, to the extent *Verizon Florida* "can be read to require a party in a pole attachment complaint proceeding…to quantify the value of individual benefits an [ILEC] receives under a joint use agreement, we reject that interpretation as impracticable, especially in the absence of any rules prescribing a methodology for valuing such benefits.'"

[Order_¶_25].  Instead of acknowledging and providing a reasoned explanation for its departure from the prior evidentiary standard, the FCC instead framed the requirement that ILECs quantify the "monetary" value of the benefits they receive

29

under "existing" agreements as but one possible interpretation of *Verizon Florida*. This is an untenable position. *Verizon Florida* explicitly found that, without a valuation of the benefits the ILEC received under the "existing" agreement, the FCC could not: (1) determine whether the rate under the joint use agreement was unreasonable; or (2) otherwise "set a just and reasonable rate." *Verizon Florida*, 30 FCC Rcd at 1140-41, ¶¶ 2-3. This finding was not dicta—it was dispositive of the ILEC's complaint in *Verizon Florida*. The FCC has not explained how it can now determine the "justness and reasonableness" of a rate under an "existing" agreement without a quantification of the "monetary value" of the benefits that an ILEC receives thereunder.

With respect to applying the Old Telecom Rate (as both a "reference point" and a "hard cap"), the FCC stated:

> *First*, Duke maintains that the Old Telecom Rate may not serve as a reference point for existing joint use agreements that pre-date the *2011 Order*. We disagree. In *Verizon Maryland*, the Commission, as here, addressed an existing joint use agreement executed before the *2011 Order* that provided the [ILEC] with material advantages over competitive attachers. The Commission noted that "the *2011 Order* indicates that the Commission would look to the Old Telecom Rate in complaint proceedings involving a new agreement between an [ILEC] and pole owner when the [ILEC] is not 'similarly situated' to competitive LECs or cable attachers on the same poles." It then decided to "apply this guidance" to the case before it, and ruled that the [ILEC] was "entitled to a rate no greater than the Old Telecom Rate for the…timeframe…covered by the *2011 Order*.

[Order_¶_27 (italics in original)].  As noted above, the FCC glossed over the fact that its application of the Old Telecom Rate as a "reference point" to the parties' "existing" agreement represented a stark departure from the *2011 Order*, which made clear that the Old Telecom Rate only served as a "reference point" for "new" agreements.   In addition, in lieu of providing a reasoned explanation for its application of the Old Telecom Rate as a "reference point," the FCC stated:

> The Commission explained in the 2011 Order that "identify[ing] a specific rate to be used as a reference point" in complaint proceedings would "enable better informed pole attachment negotiations" and "provide[] parties clearer expectations regarding the potential outcomes of formal complaints."  The Commission found "it more administrable to look to [the Old Telecom Rate], which historically has been used in the marketplace, than to attempt to develop in this Order an entirely new rate for this context."

[Order_¶_28 (alterations in original)].  In other words, the FCC sought to explain its application of the Old Telecom Rate as a "reference point" and "hard cap" on the rate charged under the parties' "existing" agreement through liberal quotation of a portion of the *2011 Order* that established the Old Telecom Rate as a "reference point" solely for "new" agreements.

Because the FCC's new standard "cannot carry the force of law," *Encino Motorcars, LLC*, 579 U.S. at 224, and because the FCC's factual findings demonstrate that AT&T is not entitled to relief under the *2011 Order*, *see* [Order_¶_26_n.97], the Court should set aside the FCC's determination that AT&T is entitled to a refund for the period governed by the *2011 Order*.

## II. The FCC Violated Section 224, Misapplied Its Own Precedent, and Acted Arbitrarily and Capriciously by Assigning the Cost of the Communication Worker Safety Zone to Duke.

The communication worker safety zone is the separation space—typically 40"—between electric conductors and communications facilities required by the NESC. As its name implies, the communication worker safety zone exists for the protection of communication workers:

> The communication worker safety zone is required between the supply space and communication space when communication workers use communication work rules, tools, equipment, and methods.

*NESC Handbook* at 428. The uncontroverted testimony establishes that: (1) Duke does not need the communication worker safety zone on its own poles; and (2) the communication worker safety zone would not exist on Duke's poles but for the presence of communication attachments. *See infra*, Section II.A.1.

The Order, though, allocates the entire cost of the communication worker safety zone to Duke. *See* [Order_¶¶_42-44]. The FCC's basis for this allocation has nothing to do with the evidence in this case. Instead, the FCC based its decision on its prior findings in other orders that the communication worker safety zone is "used and usable" by electric utilities. *See* [Order_¶¶_42-44]; *see also* [Order_¶_43 ("Duke attempts to relitigate these rulings by suggesting that 'whether space is usable and used by [Duke]…is an inherently factual inquiry' to be conducted in each dispute. We disagree.") (alteration in original)]. Though it is questionable whether

the FCC's prior orders constituted rational agency decision-making, those prior orders have minimal bearing on the question of whether it was proper to allocate the cost of the communication worker safety zone to Duke in this case.

**A. The Decision to Allocate the Cost of the Communication Worker Safety Zone to Duke Is at Odds with Foundational FCC Authority and the Act.**

**1. The Justifications Underpinning the FCC's Historical Refusal to Allocate the Communication Worker Safety Zone to CATVs Do Not Apply to AT&T.**

The Order, in rejecting Duke's argument, simply relied upon what it deemed to be "settled precedent." *See* [Order_¶_42]. The Order states, in relevant part:

> In 2000, the Commission explained that the cost of the space is attributed to the utility because "[i]t is the presence of the potentially hazardous electric lines that makes the safety space necessary and but for the presence of those lines, the space could be used by . . . attachers." Because the safety space "would otherwise be usable space" but for the presence of the electric lines, the Commission held that "the safety space is effectively usable space occupied by" the electric lines.   The Commission affirmed this holding on reconsideration in 2001.

[Order_¶_42 (alterations in original)].  There are at least three major flaws with this analysis.

First, it is not rational agency decision-making to find that the communication worker safety zone would be usable "but for the presence of the electric lines."  The space is only required on Duke's poles because of communications facilities.  *See* [Answer_¶_25].    But for the presence of communications facilities, the

33

communication worker safety zone would not exist on Duke's poles. *See* [Answer_Exh._A_DEP00252]; [Answer_Exh._C_DEP000296-297].

Second, the "settled precedent" upon which the FCC relies is inapposite. In 1979, shortly after Congress passed the Pole Attachments Act, the FCC issued an order addressing the communication worker safety zone. *See 1979 Order*, 72 F.C.C.2d 59, 70-71 at ¶¶ 22-25. The FCC found that "all users benefit from the inclusion of" the communication worker safety zone, and therefore, requiring all users to share in the cost of the communication worker safety zone "may seem at first blush to be an equitable approach." *Id.* at 70, ¶ 24. Nevertheless, the FCC ultimately determined that CATVs—the only type of entity protected by the Pole Attachments Act at that time—should not bear the cost of the communication worker safety zone for three specific reasons.

The first reason turned on the language of the Act addressing how the rate for CATVs should be calculated: "Section 224(d)(1) of the Act specifies that the maximum just and reasonable pole attachment rate shall be determined by 'multiplying the percentage of total usable space…*which is occupied by the pole attachment*…by the sum of operating expenses and actual capital costs of the utility attributable to the entire pole….'" *Id.* (quoting 47 U.S.C. § 224(d)(1)) (emphasis in original). Thus, even though the FCC acknowledged that CATVs benefitted from the communication worker safety zone, because CATVs did not physically occupy

34

the communication worker safety zone, the FCC found that it could not allocate any of the communication worker safety zone to CATVs under Section 224(d)(1). As an ILEC, however, AT&T is not entitled to a rate calculated pursuant to Section 224(d)(1). To the extent AT&T is entitled to a regulated rate at all, it would be a rate calculated pursuant to Section 224(e). Section 224(e)—unlike 224(d)(1)— does not limit the amount of usable space that can be allocated to an entity based on the space it actually occupies. Section 224(e)(3) states: "A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space **required** for each entity." 47 U.S.C. § 224(e)(3) (emphasis added). The space "required for" an entity is less restrictive than the space "occupied by" an entity. In other words, the alleged statutory constraints underlying the *1979 Order* are not applicable to rates calculated pursuant to Section 224(e).

The second reason for not allocating the communication worker safety zone to CATVs was the FCC's finding that CATVs generally bore the cost of ensuring the presence of the communication worker safety zone. Specifically, the FCC found that CATVs—through their license agreements with electric utilities and telephone companies—were "responsible for all pole replacement costs necessitated by subsequent installation of additional electric or telephone lines that reduce available safety space to less than 40 inches." *Id.* at 71, ¶ 24. This rationale does not apply to AT&T because the "risk of maintaining the [communication worker safety zone]

35

falls on either Duke or a subsequent attaching entity who is required to pay for make-ready in order to maintain the [communication worker safety zone]." [Answer_¶_25].[6]

The third reason for not allocating the communication worker safety zone to CATVs was that the FCC found—based on the record before it—that it was "the common practice of electric utility companies to make resourceful use of [the communication worker safety zone] by mounting street light support brackets, step-down distribution transformers, and grounded-shielded power conductors therein." *1979 Order*, 72 F.C.C.2d at 71, ¶ 24. However, the record in this proceeding makes clear that Duke does not make "common" or "resourceful use" of the communication worker safety zone. *See* [Answer_Exh._A_DEP00252 ("[Duke] does not need and does not use the safety space on its own poles.")]; [Answer_Exh._C_DEP00296].

Duke presented testimony showing that it does not mount transformers within the communication worker safety zone. *See* [Answer_Exh._C_DEP00297]. Further, Duke presented evidence showing that: (1) streetlights do not require—and can be mounted outside of—the communication worker safety zone; and (2) the practice of mounting of streetlights within the communication worker safety zone is rare (and certainly not "common"). *See* [Answer_Exh._C_DEP00297].

---

[6] AT&T never disputed the fact that—due to the joint use agreement—it was not required to bear the cost of ensuring the presence of the communication worker safety zone.

Extrapolating Duke's installation of streetlights within the communication worker safety zone on a handful of poles into a finding that Duke uses the communication worker safety zone on all 179,000 poles in the parties' joint use network is a textbook case of arbitrary agency action.  *See* [Answer_¶_3].  Moreover, neither AT&T nor the FCC contends that the presence of vertical shielded conductors in the communication worker safety zone constitutes utilization of that space.[7]  On this record, it was arbitrary and capricious for the FCC to assign the entire 40" (3.33 feet) of communication worker safety zone to Duke.

### 2. The FCC Misapplied Its Own Precedent, Which Is Premised on the Fact that ILECs and Electric Utilities Historically Shared the Cost of the Communication Worker Safety Zone Under Joint Use Agreements.

The FCC's original decision to excuse CATVs from sharing in the cost of the communication worker safety zone was based, in part, on the fact that the cost of this space was already addressed in joint use agreements: "In joint-use agreements that involve the assignment of muniments of ownership and use between electric and telephone utilities, sharing responsibility for the safety space may be an issue."  *See 1979 Order*, 72 F.C.C.2d at 71, ¶ 25.  Following the *1979 Order*, the ILECs (then known simply as "telephone companies") sought reconsideration of the FCC's

---

[7] If the presence of vertical shielded conductors constituted "use" of space, then communications attachments with risers to the bottom of the pole would, in effect, be "using" the entire pole.  *See* [Answer_¶_25_&_n.114].

treatment of the communication worker safety zone, arguing that it required them to bear the entire cost of the communication worker safety zone on their poles. The FCC rejected the ILECs' request for reconsideration and stated:

> [A]s the record shows, telephone companies in the past have worked out their own agreements with the electric companies as to how much of the remaining space is to be allocated to each utility. Under these circumstances, the claim by telephone companies that they are bearing responsibility for the entire safety space is simply untenable.

*1980 Order*, 77 F.C.C.2d 187, 190 at ¶ 9. In other words, a significant part of the FCC's original rationale for not assigning any part of the communication worker safety zone to CATVs was the fact that the cost of this space was already shared in joint use agreements between telephone companies and electric utilities. It is the ultimate regulatory bootstrap to excuse AT&T from any cost of the communication worker safety zone based upon authority that was premised upon AT&T's obligation to share in the cost of the communication worker safety zone.

### 3. The FCC's Decision to Not Allocate Any Portion of the Communication Worker Safety Zone to AT&T Is Premised on an Erroneous Interpretation of the Act.

In refusing to allocate any portion of the communication worker safety zone to AT&T, the FCC stated: "[A]ttributing a share of the [communication worker safety zone] to AT&T…lacks merit because 'under the Commission's rate formula, space occupied means space that is actually occupied, and AT&T's attachments do not actually occupy the [communication worker safety zone].'" [Order_¶_42_n.158

(citing *Florida Power & Light*, 35 FCC Rcd at 5330, ¶ 16)]. However, as explained above, this "actual occupancy" concept is statutorily confined to Section 224(d)(1), which applies only to CATV attachments—it does not apply to ILEC attachments.

To the extent AT&T is entitled to a regulated rate at all, AT&T would only be entitled to the Section 224(e) rate. The Act prescribes a different methodology for allocating usable space under Section 224(e):

> A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space **required for** each entity.

47 U.S.C. § 224(e)(3) (emphasis added). Notably, Section 224(e)(3)—in contrast to Section 224(d)—does not tie the allocation of usable space to the amount of space "occupied by" an attachment. Section 224(e)(3) ties the allocation of usable space to the amount of usable space "required for" an attachment. This divergence in statutory language matters. Even if AT&T does not physically "occupy" the communication worker safety zone, this space is nonetheless "required" by the presence of communications attachments on Duke's poles. Applying the correct statutory language necessitates that AT&T pay for at least a portion of the communication worker safety zone, and the FCC erred in finding otherwise.

III.   **The FCC's Exercise of Jurisdiction Over the Rates AT&T Pays Duke under the Joint Use Agreement is *Ultra Vires* and/or Arbitrary and Capricious.**

   A. **The Act Does Not Apply to ILEC Attachments on Electric Utility Poles.**

   1.   **The D.C. Circuit's Decision in *AEP v. FCC* Was Wrong**.

In 2013, the D.C. Circuit upheld "the Commission's view that ILECs are 'providers of telecommunications services' for purposes of § 224(a)(4)" even though: (1) ILECs are expressly excluded from the definition of "telecommunications carrier" in Section 224(a)(5); (2) Section 224(a)(5) expressly incorporates the definition of "telecommunications carrier" found in Section 153(51); and (3) Section 153(51) provides that "[t]he term 'telecommunications carrier' means 'any provider of telecommunications services.'" *AEP*, 708 F.3d at 188; 47 U.S.C. §§ 153(51), 224(a)(4)-(5).  The D.C. Circuit cited two reasons for upholding the FCC's assertion of jurisdiction.

First, the D.C. Circuit found that petitioners erred because:

They take the first definition, § 153(51), and insert into it § 224(a)(5)'s exclusion of ILECs, but fail to note that § 153(51) is the general definition of telecommunications carrier, not the one tailored to § 224. Thus, they take § 153(51)'s equation TC = PTS and claim to find TC224 = PTS.  But Congress never said the latter.

*AEP*, 708 F.3d at 187.  Congress, though, **did** say: "For purposes of [Section 224], the term 'telecommunications carrier' (as defined in §153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this

40

title." 47 U.S.C. § 224(a)(5). Because of the cross-reference to Section 153 in Section 224(a)(5), for purposes of Section 224, the terms "telecommunications carrier" and "provider of telecommunications service" are interchangeable. Thus, the exclusion of ILECs from the term "telecommunications carrier" necessarily excludes them from the term "provider of telecommunications service" for purposes of Section 224. *See Port Auth. of N.Y. & N.J. v. DOT*, 479 F.3d 21, 32 (D.C. Cir. 2007) ("It can hardly have been Congress's intention to include this cross-reference...only to have the DOT disregard the definition. Thus, the cross-reference...is determinative...."); *Halbig v. Sebelius*, 27 F. Supp. 3d 1, 23 (D.D.C. 2014) (finding that cross-referenced sections in statutory language at issue made "the intent of Congress...clear at *Chevron* step one.").

The synonymity of the terms "telecommunications carrier" and "provider of telecommunications service" has been recognized by the Supreme Court. *See NCTA v. Brand X*, 545 U.S. 967, 977 (2005) (noting that "'[t]elecommunications carrier[s]'—those subjected to mandatory Title II common-carrier regulation—are defined as 'provider[s] of telecommunications services'") (alterations in original) (quoting 47 U.S.C. § 153). Specifically in the pole attachment context, courts have used the two terms interchangeably. *See, e.g.*, *Southern Co. v. FCC*, 293 F.3d 1338, 1342 n.1 (11th Cir. 2002) ("The 1996 Telecommunications Act added telecommunications carriers to the class of entities entitled to regulated rates for pole

attachments and granted them the same access rights given cable companies."). Further, from the adoption of the 1996 Act until its about-face in the *2011 Order*, the FCC consistently and repeatedly read the terms "telecommunications carrier" and "provider of telecommunications" service as synonymous. S*ee 1998 Order*, 13 FCC Rcd at 6781, ¶ 5 ("Because, for purposes of Section 224, an ILEC is a utility but is not a telecommunications carrier…the ILEC has no rights under Section 224 with respect to the poles of other utilities."); *2007 NPRM*, 22 FCC Rcd at 20204, ¶ 23 ("[T]he Commission interpreted the exclusion of [ILECs] from the term 'telecommunications carrier'…to mean that section 224 does not apply to attachment rates paid by [ILECs].").

Second, the D.C. Circuit reasoned:

> Congress's uses of the two terms (telecommunications carrier, provider of telecommunications services) conform readily to the understanding we have just sketched out. Section 224(a)(4), defining pole attachment to include an attachment by a "provider of telecommunications services," is cheek by jowl with § 224(a)(5), with its restricted definition of telecommunication carrier. This proximity suggests an entirely intentional character in § 224(a)(4)'s use of the broader term.

*AEP*, 708 F.3d at 187. However, the usual rule that Congress intends different meanings when it uses different words applies only where Congress has not otherwise made clear that the two terms are interchangeable. For example, in *Northeast Hospital Corp. v. Sebelius*, the D.C. Circuit found that two different terms had the same meaning:

Moreover, the usual rule that Congress intends different meanings when it uses different words has little weight here…. "Congress has, throughout the various Medicare and Medicaid statutory provisions, consistently used the words 'eligible' to refer to potential Medicaid beneficiaries and 'entitled' to refer to potential Medicare beneficiaries for no reason whatever that anyone…has been able to divine." …[I]t would be a mistake to read too much into the difference in nomenclature.

657 F.3d 1, 12-13 (D.C. Cir. 2011). Congress' direct cross-reference to Section 153 within Section 224(a)(5) thus overrides any presumption that Congress typically employs different words to connote different meanings.

Further, the D.C. Circuit in *AEP* erred by considering the text of Sections 224(a)(4) and 224(a)(5) in a vacuum, and by ignoring the essential legislative history of the 1996 Act. *See Chamber of Commerce of the United States*, 721 F.3d at 160 ("Under Chevron's first step, we must use the 'traditional tools of statutory construction' to ascertain congressional intent. We thus look to the text of the statute, along with 'the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area….'") (internal citation omitted).

The primary purpose of the 1996 Act, which added the language in Sections 224(a)(4) and 224(a)(5) at issue, was to create competition in the telephony market by imposing various obligations (as opposed to benefits) on ILECs. Under the 1996 Act, ILECs were required, for the first time, to allow competitors access to their facilities on just and reasonable rates, terms, and conditions. As this Court wrote in

43

*Cavalier Telephone, LLC v. Verizon Virginia, Inc.* when explaining the purpose of the 1996 Act:

> Once it is recognized that the creation of competition in local markets through enforcement of the antitrust laws could be slow and inefficient, then Congress' adoption of the Telecommunications Act as a parallel but distinctly different approach to jump-start and accelerate competition can be understood.

330 F.3d 176, 188 (4th Cir. 2003); *see also New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225, 229-30 (4th Cir. 2012) ("The Telecommunications Act of 1996 aims to transition the [telecommunications] industry from regulated monopoly to unregulated competition. To achieve this goal, the Act seeks to 'clear[] away the obstacles to new entry' for new competitors and requires [ILECs], specifically, to assist new competitors entering the market.") (alterations in original). In light of the 1996 Act's overarching purpose—to protect new entrants against ILECs—it is incomprehensible to read the 1996 amendments to Section 224 as indicating Congressional intent to override joint use agreements through rate protections to ILECs. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress…does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

The framework of the Pole Attachments Act, both as originally enacted in 1978 and as amended in 1996, establishes a dichotomy between pole-owning utilities

(telephone and electric utilities) and certain entities seeking access to those poles (initially, CATVs; then later, both CATVs and CLECs). *See* 123 Cong. Rec. 35,006 ("H.R. 7442 will resolve a longstanding problem in the relationship of cable television companies on the one hand, and power and telephone utilities on the other."); S. Rep. No. 104-23, at 40 (1995) ("Section 224…requires the FCC to ensure that the rates, terms, and conditions for attachments by cable television systems to poles, ducts, conduits, and rights-of-way owned or controlled by utilities, including telephone companies, are just and reasonable.").

The FCC, in the period immediately following the adoption of the 1996 Act, clearly understood that the 1996 Act imposed **obligations** on ILECs, as distinct from other providers of telecommunications services (like CLECs) that were granted the **protections** of the Act. *1998 Order*, 13 FCC Rcd at 6781, ¶ 5 ("Because, for purposes of Section 224, an ILEC is a utility but is not a telecommunications carrier…**the ILEC has no rights under Section 224 with respect to the poles of other utilities**.") (emphasis added); *1999 NPRM*, 14 FCC Rcd at 12692, ¶ 36 ("The rights and obligations created under section 224 run between utilities, on the one hand, and cable television systems and telecommunications carriers, on the other hand."); *2000 Order and FNPRM*, 15 FCC Rcd at 23015, ¶ 71 ("While previously the protections of Section 224 had applied only to cable operators, the 1996 Act extended those protections to telecommunications carriers as well."); *id.* at 23015, ¶

45

72 ("Section 224…specifically **excludes [ILECs] from the definition of telecommunications carriers with rights as pole attachers**.") (emphasis added).

### 2. This Case Magnifies the Error of the FCC's Assertion of Jurisdiction Over the Rates Paid by ILECs to Electric Utilities.

Unlike in *AEP*, which was a facial challenge, the dispute here involves an actual joint use agreement between Duke and AT&T. Under this agreement, each party pays the other a per pole rental rate which results in annual net rental payments being owed by one party to the other. It is undisputed that the FCC lacks jurisdiction over the rate Duke pays AT&T. And, in fact, the FCC made no findings with respect to the rate paid by Duke to AT&T. The most the FCC could muster was a half-hearted order for the parties to "negotiate…proportional reciprocal rates for Duke's attachments to AT&T's poles." [EB_Order_¶_64].

This pretense of minding the other half of the net rental calculation stems directly from statutory limitations. Section 224 gives the FCC jurisdiction over "the rates, terms, and conditions for **pole attachments**." 47 U.S.C. § 224(b)(1) (emphasis added). Under Section 224(a)(4), a "pole attachment" is defined as "any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility." 47 U.S.C. § 224(a)(4). Duke is neither a cable television system nor a provider of telecommunications service; thus, Duke's attachments to AT&T's poles are not "pole attachments" within the scope of the FCC's jurisdiction.

The FCC has been cagey about its lack of jurisdiction from the outset.  In the *2011 Order*, the FCC mused: "[W]e would be skeptical of a complaint by an [ILEC] seeking a proportionately lower rate to attach to an electric utility's poles than the rate the incumbent LEC is charging the electric utility to attach to its poles." *2011 Order*, 26 FCC Rcd at 5337, ¶ 218.  In the first complaint proceeding where the FCC was forced to respond to an argument by an electric utility that it would be improper for the FCC to calculate the rate to be paid by the ILEC where the FCC lacked jurisdiction to determine the rate to be paid by the electric utility, the FCC wrote:

> Finally, we disagree that it would be improper to calculate a rate Verizon should be charged for each year of the relevant statute of limitations unless the Commission also calculates the reciprocal rate that Potomac Edison should have paid Verizon during that timeframe.  Identifying the rate Verizon pays will enable better informed negotiations between the parties to resolve their dispute.

*Potomac Edison*, 35 FCC Rcd at 13629-13630, ¶ 51.  Further, the FCC went out of its way to state: "We make no determination about the validity or accuracy of Verizon's calculation of an appropriate proportionate rate [to be paid by Potomac Edison]." *Id.* at 13630, ¶ 51 n.185.

In the case at bar, the FCC ordered the parties to: (1) "negotiate" a new joint use agreement "that reflects proportional reciprocal rates for Duke's attachments to AT&T's poles," and (2) "negotiate in good faith to reach an agreement on the amount of AT&T's refund." *See* [EB_Order_¶_64].  The FCC did not find that the

rates AT&T charged Duke were unjust and unreasonable, nor did it not opine on the

formula for calculating those rates.  The FCC further skirted the issue by stating:

> Further, Duke's argument about the rate it currently pays AT&T overlooks that the *Order* directed the parties to negotiate a new reciprocal [joint use agreement] that reflects proportional reciprocal rates for Duke's attachments to AT&T's poles, and AT&T has committed to making appropriate adjustments to [Duke's] rate for all years covered by the statute of limitations if AT&T's complaint is granted.

[Order_¶_24_n.88 (second alteration in original) (internal citation omitted)].[8]

The FCC's unwillingness to adjudicate the rate that electric utilities pay for

access to ILEC poles makes clear that the FCC appreciates (a) its lack of jurisdiction

over such rates, and (b) how that lack of jurisdiction imperils its exercise of

jurisdiction over the rates paid by ILECs for access to electric utility poles.  The

FCC's apparent concern is well-founded.  There is no indication in the Act that

Congress intended to create the sort of regulatory gap that the FCC has purported to

create here.

Since the first iteration of the Pole Attachments Act in 1978, Congress was

well aware that electric utilities and ILECs were parties to joint use agreements

whereby each party made attachments to the other party's poles.[9]  Given this, it is

---

[8] If the FCC's solution to this jurisdictional gap is simply to rely on AT&T's "commit[ment] to making appropriate adjustments," this isn't just arbitrary and capricious—it is naïve and reckless.

[9] *See, e.g.,* S. Rep. No. 95-580, at 12 (1977) ("These poles, ducts, and conduits are usually owned by telephone and electric power utility companies, which often have

not rational to assume that Congress intended for the FCC to have jurisdiction over the rates paid by one of the parties to joint use agreements (ILECs), but not over the rates paid by the other party (electric utilities).  *See Conway Corp. v. Fed. Power Com.*, 510 F.2d 1264, 1272 (D.C. Cir. 1975) ("A legislative intention to achieve such a regulatory gap is not to be presumed unless expressly presented.").   Because Congress did not expressly indicate in Section 224 that it intended for the FCC to regulate the rates paid by ILECs under joint use agreements, but not the rates paid by electric utilities to ILECs, there can be no presumption that it intended to create such a regulatory gap.  This demonstrates that the FCC likewise lacks jurisdiction over the rates electric utilities charge ILECs for attachments.

### B. Even if the FCC Has Jurisdiction Over the Rates Paid by AT&T, It was Arbitrary and Capricious to Exercise Jurisdiction Given the Lack of Jurisdiction Over the Rates Paid by Duke.

The FCC's assertion of jurisdiction over the rate paid by AT&T is also arbitrary and capricious because the FCC "entirely failed to consider an important aspect of the problem"—namely, its lack of jurisdiction over the rate paid by Duke. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007). The FCC was "required to grapple with" its lack of jurisdiction over the other half of the net rental equation, but instead it "seemed to whistle past the graveyard" by

---

entered into joint use or joint ownership agreements for the use of each other's poles. It is estimated that approximately 70% of all utility poles owned by either telephone or electric utilities are actually jointly used.").

glossing over its inability to provide full relief over the parties' entire dispute. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 66, 67 (D.C. Cir. 2019) (finding that FCC acted arbitrarily and capriciously where it failed to exhibit "reasoned consideration" of the impact on broadband pole attachments of reclassifying broadband internet as an information service and only "offered, at best, scattered and unreasoned observations" on that issue).

Here, the parties' relationship is governed by a joint use agreement under which net rental is exchanged. Because the FCC lacks jurisdiction over the rate Duke pays to AT&T under the joint use agreement, the FCC cannot resolve either the amount of refund owed or the going-forward net rental methodology. The FCC is thus incapable of providing the parties with a full resolution of their dispute. This is an unjust, unreasonable, arbitrary, and capricious result.

Another "important aspect of the problem" that the FCC "entirely failed to consider" is the disparity between Duke's pole costs and AT&T's pole costs—i.e., the cost bases for any calculation of cost-based rates. The parties' respective annual pole costs for the 2017-2019 period are as follows:

| | **2017** | **2018** | **2019** |
|---|---|---|---|
| Duke Annual Pole Cost | $ ▮ | $ ▮ | $ ▮ |
| AT&T (North Carolina) Annual Pole Cost | $ ▮ | $ ▮ | $ ▮ |
| AT&T (South Carolina) Annual Pole Cost | $ ▮ | $ ▮ | $ ▮ |

*See* [Answer_¶_22]; [Answer_Exh._D_DEP000305]; [EB_Order_¶_56 (adjusting components of Duke's annual pole cost calculations)]. Though the FCC ordered the

parties to negotiate "proportional reciprocal rates for Duke's attachments to AT&T's poles," [Order_¶_64], the FCC failed to "grapple with" how proportionality is impacted by **disproportionate** cost bases. Making matters worse, in determining that the rates paid by AT&T were unjust and unreasonable, the FCC relied, in part, on its observation that "[t]he rate AT&T pays Duke under the joint use agreement is about 75 percent of the rate Duke pays AT&T, even though Duke's attachments occupy much more space on the poles." [EB_Order_¶_42]. The FCC's reasoning presumes a "one for one" cost comparison, which, as the chart above reveals, is not just inaccurate but wildly inaccurate.

## CONCLUSION

For the reasons set forth in Section III *supra*, the Court should find that the FCC lacks jurisdiction over the rate charged under the parties' joint use agreement and set aside the Order in its entirety. In the alternative, the Court should find that, for the reasons set forth in Sections I and II *supra*, the FCC acted arbitrarily, capriciously, in violation of the Act and/or otherwise in violation of the law and set aside the FCC's findings that: (1) AT&T is entitled to a refund for the period governed by the *2011 Order*; and (2) Duke should bear the entire cost of the communication worker safety zone.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34(a), Petitioner Duke Energy Progress, LLC respectfully requests oral argument. This case involves complicated legal and factual issues, as well as several issues of first impression.

Respectfully submitted,

/s/ Eric B. Langley
Eric B. Langley
Robin F. Bromberg
R. Rylee Zalanka
LANGLEY & BROMBERG LLC
2700 U.S. Highway 280, Suite 350E
Birmingham, Alabama 35223
(205) 783-5750
eric@langleybromberg.com
robin@langleybromberg.com
rylee@langleybromberg.com

*Counsel for Petitioner,*
*Duke Energy Progress, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Opening Brief of Petitioner Duke Energy Progress, LLC ("Opening Brief") complies with the type-volume requirement set forth in Federal Rule of Appellate Procedure 32.  The word count feature in Microsoft Word reports that the Opening Brief contains 12,560 words, excluding the items exempted under Federal Rule of Appellate Procedure 32(f).

The Opening Brief also complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.

/s/ Eric B. Langley
Eric B. Langley

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on April 10, 2023, I electronically filed the foregoing Page-Proof

Opening Brief of Appellant with the Clerk of the Court for the United States Court

of Appeals for the Fourth Circuit by using the CM/ECF system. The participants in

the case are registered CM/ECF users and service will be accomplished by the

appellate CM/ECF system.

I further certify, that on April 10, 2023, I served the Sealed version of the

foregoing brief, via USPS, on counsel listed below:

Claire J. Evans
Christopher Huther
WILEY REIN, LLP
2050 M Street, NW
Washington, DC 20036
*Counsel for Intervenor/Petitioner Bellsouth Telecommunications, LLC*

Maureen K. Flood
Jacob M. Lewis
FEDERAL COMMUNICATIONS COMMISSION
Office of General Counsel
45 L Street, NE
Washington, DC 20554
*Counsel for Respondent Federal Communications Commission*

Daniel Edward Haar
Robert B. Nicholson
Robert J. Wiggers
U. S. DEPARTMENT OF JUSTICE
Antitrust Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
*Counsel for Respondent United States of America*

/s/ Eric B. Langley
LANGLEY & BROMBERG LLC
2700 U.S. Highway 280, Suite 350E
Birmingham, Alabama 35223

*Counsel for Petitioner,*
*Duke Energy Progress, LLC*

# ADDENDUM

## <u>ADDENDUM TABLE OF CONTENTS</u>

<u>Page</u>

Pole Attachments Act, 47 U.S.C. § 224............................................................Add. 1

Excerpt from NESC Handbook ...................................................................... Add. 4

47 C.F.R. § 1.1410 (1981) (revised in 2018 and
    redesignated as 47 C.F.R. § 1.1407)....................................................Add. 6

Excerpt from S. Rep. No. 104-23 (1995)...........................................................Add. 7

Excerpt from 123 Cong. Rec. 35,006 (1977)....................................................Add. 9

Excerpt from S. Rep. No. 95-580 (1977).......................................................Add. 13


mission who is designated by the Commission for such purposes, or

''(ii) by the Commission after appropriate administrative proceedings.

''(4) The Attorney General may bring a suit in the appropriate district court of the United States to enjoin any act or practice which violates paragraph (1)(A) or (1)(B). An injunction may be granted in accordance with the Federal Rules of Civil Procedure.''

Pub. L. 100–297, in par. (1)(A), struck out ''under eighteen years of age or to any other person without that person's consent'' after ''to any person'', redesignated par. (3) as (2) and struck out former par. (2) which read as follows: ''It is a defense to a prosecution under this subsection that the defendant restricted access to the prohibited communication to persons eighteen years of age or older in accordance with procedures which the Commission shall prescribe by regulation.'', redesignated par. (4) as (3) and substituted ''under paragraphs (1) and (2)'' for ''under paragraphs (1) and (3)'', and redesignated par. (5) as (4).

1983—Subsec. (a). Pub. L. 98–214, § 8(a)(1), (2), designated existing provisions as subsec. (a) and substituted ''$50,000'' for ''$500'' in provisions after par. (2).

Subsec. (a)(2). Pub. L. 98–214, § 8(b), inserted ''facility'' after ''telephone''.

Subsec. (b). Pub. L. 98–214, § 8(a)(3), added subsec. (b).

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1998 AMENDMENTS

Pub. L. 105–277, div. C, title XIV, § 1406, Oct. 21, 1998, 112 Stat. 2681–741, provided that: ''This title [enacting section 231 of this title, amending this section and section 230 of this title, and enacting provisions set out as notes under sections 231 and 609 of this title] and the amendments made by this title shall take effect 30 days after the date of enactment of this Act [Oct. 21, 1998].''

Amendment by Pub. L. 105–244 effective Oct. 1, 1998, except as otherwise provided in Pub. L. 105–244, see section 3 of Pub. L. 105–244, set out as a note under section 1001 of Title 20, Education.

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by Pub. L. 101–166 effective 120 days after Nov. 21, 1989, see section 521(3) of Pub. L. 101–166, set out as a note under section 152 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–297 effective July 1, 1988, see section 6303 of Pub. L. 100–297, set out as a note under section 1071 of Title 20, Education.

CONSTRUCTION OF 2006 AMENDMENT

Pub. L. 109–162, title I, § 113(b), Jan. 5, 2006, 119 Stat. 2987, provided that: ''This section [amending this section] and the amendment made by this section may not be construed to affect the meaning given the term 'telecommunications device' in section 223(h)(1) of the Communications Act of 1934 [47 U.S.C. 223(h)(1)], as in effect before the date of the enactment of this section [Jan. 5, 2006].''

EXPEDITED REVIEW

Pub. L. 104–104, title V, § 561, Feb. 8, 1996, 110 Stat. 142, provided that:

''(a) THREE-JUDGE DISTRICT COURT HEARING.—Notwithstanding any other provision of law, any civil action challenging the constitutionality, on its face, of this title [see Short Title of 1996 Amendment note set out under section 609 of this title] or any amendment made by this title, or any provision thereof, shall be heard by a district court of 3 judges convened pursuant to the provisions of section 2284 of title 28, United States Code.

''(b) APPELLATE REVIEW.—Notwithstanding any other provision of law, an interlocutory or final judgment, decree, or order of the court of 3 judges in an action under subsection (a) holding this title or an amendment made by this title, or any provision thereof, unconstitutional shall be reviewable as a matter of right by direct appeal to the Supreme Court. Any such appeal shall be filed not more than 20 days after entry of such judgment, decree, or order.''

REGULATIONS; DISPOSITION OF COMPLAINTS PENDING ON DECEMBER 8, 1983

Pub. L. 98–214, §§ 8(c), (d), Dec. 8, 1983, 97 Stat. 1470, provided that the Federal Communications Commission (FCC) issue regulations pursuant to subsec. (b)(2) of this section not later than 180 days after Dec. 8, 1983, and that the FCC was to act on all complaints alleging violation of this section pending on Dec. 8, 1983, within 90 days of that date.

## § 224. Pole attachments

### (a) Definitions

As used in this section:

(1) The term ''utility'' means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State.

(2) The term ''Federal Government'' means the Government of the United States or any agency or instrumentality thereof.

(3) The term ''State'' means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

(4) The term ''pole attachment'' means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

(5) For purposes of this section, the term ''telecommunications carrier'' (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title.

### (b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of this title.

(2) The Commission shall prescribe by rule regulations to carry out the provisions of this section.

### (c) State regulatory authority over rates, terms, and conditions; preemption; certification; circumstances constituting State regulation

(1) Nothing in this section shall be construed to apply to, or to give the Commission jurisdic-

tion with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f), for pole attachments in any case where such matters are regulated by a State.

(2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the Commission that—

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

(3) For purposes of this subsection, a State shall not be considered to regulate the rates, terms, and conditions for pole attachments—

(A) unless the State has issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments; and

(B) with respect to any individual matter, unless the State takes final action on a complaint regarding such matter—

(i) within 180 days after the complaint is filed with the State, or

(ii) within the applicable period prescribed for such final action in such rules and regulations of the State, if the prescribed period does not extend beyond 360 days after the filing of such complaint.

**(d) Determination of just and reasonable rates; "usable space" defined**

(1) For purposes of subsection (b) of this section, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(2) As used in this subsection, the term "usable space" means the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment.

(3) This subsection shall apply to the rate for any pole attachment used by a cable television system solely to provide cable service. Until the effective date of the regulations required under subsection (e), this subsection shall also apply to the rate for any pole attachment used by a cable system or any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) to provide any telecommunications service.

**(e) Regulations governing charges; apportionment of costs of providing space**

(1) The Commission shall, no later than 2 years after February 8, 1996, prescribe regulations in accordance with this subsection to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges. Such regulations shall ensure that a utility charges just, reasonable, and nondiscriminatory rates for pole attachments.

(2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

(3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

(4) The regulations required under paragraph (1) shall become effective 5 years after February 8, 1996. Any increase in the rates for pole attachments that result from the adoption of the regulations required by this subsection shall be phased in equal annual increments over a period of 5 years beginning on the effective date of such regulations.

**(f) Nondiscriminatory access**

(1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.

(2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory[1] basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

**(g) Imputation to costs of pole attachment rate**

A utility that engages in the provision of telecommunications services or cable services shall impute to its costs of providing such services (and charge any affiliate, subsidiary, or associate company engaged in the provision of such services) an equal amount to the pole attachment rate for which such company would be liable under this section.

**(h) Modification or alteration of pole, duct, conduit, or right-of-way**

Whenever the owner of a pole, duct, conduit, or right-of-way intends to modify or alter such pole, duct, conduit, or right-of-way, the owner shall provide written notification of such action to any entity that has obtained an attachment to such conduit or right-of-way so that such entity may have a reasonable opportunity to add to or modify its existing attachment. Any entity that adds to or modifies its existing attachment after receiving such notification shall bear a proportionate share of the costs incurred by the owner in making such pole, duct, conduit, or right-of-way accessible.

**(i) Costs of rearranging or replacing attachment**

An entity that obtains an attachment to a pole, conduit, or right-of-way shall not be required to bear any of the costs of rearranging or replacing its attachment, if such rearrangement

---

[1] So in original. Probably should be "nondiscriminatory".

or replacement is required as a result of an additional attachment or the modification of an existing attachment sought by any other entity (including the owner of such pole, duct, conduit, or right-of-way).

(June 19, 1934, ch. 652, title II, §224, as added Pub. L. 95–234, §6, Feb. 21, 1978, 92 Stat. 35; amended Pub. L. 97–259, title I, §106, Sept. 13, 1982, 96 Stat. 1091; Pub. L. 98–549, §4, Oct. 30, 1984, 98 Stat. 2801; Pub. L. 103–414, title III, §304(a)(7), Oct. 25, 1994, 108 Stat. 4297; Pub. L. 104–104, title VII, §703, Feb. 8, 1996, 110 Stat. 149.)

#### Editorial Notes

##### AMENDMENTS

1996—Subsec. (a)(1). Pub. L. 104–104, §703(1), inserted first sentence and struck out former first sentence which read as follows: "The term 'utility' means any person whose rates or charges are regulated by the Federal Government or a State and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for wire communication."

Subsec. (a)(4). Pub. L. 104–104, §703(2), inserted "or provider of telecommunications service" after "system".

Subsec. (a)(5). Pub. L. 104–104, §703(3), added par. (5).

Subsec. (c)(1). Pub. L. 104–104, §703(4), inserted ", or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f)," after "conditions".

Subsec. (c)(2)(B). Pub. L. 104–104, §703(5), substituted "the services offered via such attachments" for "cable television services".

Subsec. (d)(3). Pub. L. 104–104, §703(6), added par. (3).

Subsecs. (e) to (i). Pub. L. 104–104, §703(7), added subsecs. (e) to (i).

1994—Subsec. (b)(2). Pub. L. 103–414 substituted "The Commission" for "Within 180 days from February 21, 1978, the Commission".

1984—Subsec. (c)(3). Pub. L. 98–549 added par. (3).

1982—Subsec. (e). Pub. L. 97–259 struck out subsec. (e) which provided that, upon expiration of 5-year period that began on Feb. 21, 1978, provisions of subsec. (d) of this section would cease to have any effect.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–549 effective 60 days after Oct. 30, 1984, except where otherwise provided, see section 9(a) of Pub. L. 98–549, set out as a note under section 521 of this title.

##### EFFECTIVE DATE

Section effective on thirtieth day after Feb. 21, 1978, see section 7 of Pub. L. 95–234, set out as an Effective Date of 1978 Amendment note under section 152 of this title.

### § 225. Telecommunications services for hearing-impaired and speech-impaired individuals

#### (a) Definitions

As used in this section—

##### (1) Common carrier or carrier

The term "common carrier" or "carrier" includes any common carrier engaged in interstate communication by wire or radio as defined in section 153 of this title and any common carrier engaged in intrastate communication by wire or radio, notwithstanding sections 152(b) and 221(b) of this title.

##### (2) TDD

The term "TDD" means a Telecommunications Device for the Deaf, which is a ma-

chine that employs graphic communication in the transmission of coded signals through a wire or radio communication system.

##### (3) Telecommunications relay services

The term "telecommunications relay services" means telephone transmission services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio with one or more individuals, in a manner that is functionally equivalent to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio.

#### (b) Availability of telecommunications relay services

##### (1) In general

In order to carry out the purposes established under section 151 of this title, to make available to all individuals in the United States a rapid, efficient nationwide communication service, and to increase the utility of the telephone system of the Nation, the Commission shall ensure that interstate and intrastate telecommunications relay services are available, to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals in the United States.

##### (2) Use of general authority and remedies

For the purposes of administering and enforcing the provisions of this section and the regulations prescribed thereunder, the Commission shall have the same authority, power, and functions with respect to common carriers engaged in intrastate communication as the Commission has in administering and enforcing the provisions of this subchapter with respect to any common carrier engaged in interstate communication. Any violation of this section by any common carrier engaged in intrastate communication shall be subject to the same remedies, penalties, and procedures as are applicable to a violation of this chapter by a common carrier engaged in interstate communication.

#### (c) Provision of services

Each common carrier providing telephone voice transmission services shall, not later than 3 years after July 26, 1990, provide in compliance with the regulations prescribed under this section, throughout the area in which it offers service, telecommunications relay services, individually, through designees, through a competitively selected vendor, or in concert with other carriers. A common carrier shall be considered to be in compliance with such regulations—

(1) with respect to intrastate telecommunications relay services in any State that does not have a certified program under subsection (f) and with respect to interstate telecommunications relay services, if such common carrier (or other entity through which the carrier is providing such relay services) is in compliance with the Commission's regulations under subsection (d); or

(2) with respect to intrastate telecommunications relay services in any State that has a

C.  Clearances for span wires or brackets

Span wires or brackets carrying luminaires, traffic signals, or trolley conductors shall have vertical clearances from communications lines and equipment not less than the values specified in Table 238-2.

**Table 238-2—Vertical clearance of span wires and brackets
from communication lines and equipment**
(See also Rule 238C.)

|  | Carrying luminaires, traffic signals, or trolley conductors | | | |
| --- | --- | --- | --- | --- |
|  | Not effectively grounded | | Effectively grounded | |
|  | (mm) | (in) | (mm) | (in) |
| Above communication support arms | 1000 | 40 | 500 | 20 ① |
| Below communication support arms | 1000 | 40 | 600 | 24 |
| Above messengers carrying communication cables | 1000 | 40 | 100 | 4 |
| Below messengers carrying communication cables | 1000 | 40 | 100 | 4 |
| From terminal box of communication cable | 1000 | 40 | 100 | 4 |
| From communication brackets, bridle wire rings, or drive hooks | 1000 | 40 | 100 | 4 |

① This may be reduced to 300 mm (12 in) for either span wires or metal parts of brackets at points 1.0 m (40 in) or more from the structure surface.

D.  Clearance of drip loops associated with luminaires and traffic signals

If a drip loop of conductors entering a luminaire, a luminaire bracket, or a traffic signal bracket is above a communication cable, the lowest point of the loop shall be not less than 300 mm (12 in) above the highest (1) communication cable or (2) through bolt or other equipment.

*EXCEPTION:* The above clearance may be reduced to 75 mm (3 in) if the loop is covered by a suitable nonmetallic covering that extends at least 50 mm (2 in) beyond the loop.

E.  Communication worker safety zone

The clearances specified in Rules 235C and 238 create a communication worker safety zone between the facilities located in the supply space and facilities located in the communication space, both at the structure and in the span between structures. Except as allowed by Rules 238C, 238D, and 239, no supply or communication facility shall be located in the communication worker safety zone.

**Rule 238E.** *(New in the 2002 Code.)*
See the companion discussion of Rule 235C4 and Rule 224A. The communication worker safety zone is required between the supply space and communication space when communication workers use communication work rules, tools, equipment, and methods. The communication worker safety zone creates headroom for communication workers. When communication workers keep all parts of their bodies below the lowest supply facility, this zone allows safe working space for communication workers observing communication work rules.

Copyright © 2016 IEEE. All rights reserved.

Authorized licensed use limited to: Southern Company Services. Downloaded on January 18,2017 at 21:11:25 UTC from IEEE Xplore.  Restrictions apply.

Add. 4

If communication workers are *authorized* to work in the supply space; *use supply work rules and methods, insulated buckets, insulating tools and insulating personal protective gear; and otherwise meet Rule 224A*, there is no requirement for a separate communication space and communication worker safety zone.

However, if communication is not authorized in the supply space or communication workers choose not to use supply work rules and methods, insulated buckets, etc., a separate communication space is required. No supply or communication lines or equipment are allowed in the communication worker safety zone except those allowed by Rule 238C, Rule 238D, or Rule 239.

Although a luminaire or traffic signal bracket or span wire is allowed in the safety zone by Rule 238C and Rule 238D (when required to meet operation height requirements), packet radio antennas (as shown in Figure H238E) cannot be mounted on such devices when they are in the communication worker safety zone; they must be mounted outside of the communication worker safety zone. The 2012 Code emphasized this requirement by specifically adding antennas into the list of items considered as *equipment* for purposes of Rule 238. Antennas are intentionally not listed in Rules 238C, 238D, or 239 and are not allowed in the *cwsz*.



**Figure H238E**
**Antennas not allowed in communication worker safety zone**

## 239. Clearance of vertical and lateral facilities from other facilities and surfaces on the same supporting structure

Vertical and lateral conductors shall have the clearances required by this rule from other facilities or surfaces on the same supporting structure.

**Rule 239.** In many places throughout this rule, the word *structure* was substituted in the 1977 Code for the word *pole* to make the rule apply to poles, towers, H-frames, etc. *EXCEPTION 1* in the beginning of this rule in the 1987 Code and prior editions was relaxed to permit the use of conduits other than iron pipe, because there seems little need for the special properties of iron pipe in this situation. *EXCEPTION 4* in the 1987 Code and prior editions was changed to agree with the change in Rule 220B2.

The overall portion of Rule 239 was revised for clarity in the 1990 Code: the previous wording was in effect before the use of plastic conduits and had not been updated to reflect modern practice. This led to an even more extensive revision in the 1997 Code to increase the clarity and streamline the rule.

Copyright © 2016 IEEE. All rights reserved.

Authorized licensed use limited to: Southern Company Services. Downloaded on January 18,2017 at 21:11:25 UTC from IEEE Xplore.  Restrictions apply.
Add. 5

# 1981 47 CFR 1.1410

1981 Code of Federal Regulations Archive

*Title 47--Telecommunication;  >  CHAPTER I--FEDERAL COMMUNICATIONS COMMISSION  > SUBCHAPTER A--GENERAL  >  PART 1--PRACTICE AND PROCEDURE  >  Subpart J--Pole Attachment Complaint Procedures*

## § 1.1410 Remedies.

If the Commission determines that the rate, term, or condition complained of is not just and reasonable, it may prescribe a just and reasonable rate, term, or condition and may:

(a) Terminate the unjust and unreasonable rate, term, or condition;

(b) Substitute in the pole attachment agreement the just and reasonable rate, term, or condition established by the Commission; and

(c) Order a refund, or payment, if appropriate.  The refund or payment will normally be the difference between the amount paid under the unjust and/or unreasonable rate, term, or condition and the amount that would have been paid under the rate, term, or condition established by the Commission from the date that the complaint, as acceptable, was filed, plus interest.

## Statutory Authority

**AUTHORITY:**

 Secs. 4, 303, 48 Stat. 1066, 1082, as amended; 47 U.S.C. 154, 303.  Implement, 5 U.S.C. 552.

## History

SOURCE: 44 FR 31650, June 1, 1979

End of Document

1

**Calendar No. 45**

| 104th Congress 1st Session | SENATE | S. RPT. 104–23 |
| --- | --- | --- |

**TELECOMMUNICATIONS COMPETITION AND DEREGULATION ACT OF 1995**

————————

R E P O R T

OF THE

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

ON

S. 652



MARCH 30 (legislative day, MARCH 27), 1995.—Ordered to be printed

————

U.S. GOVERNMENT PRINTING OFFICE

99–010                    WASHINGTON : 1995

40

rate increases. Consumer groups note that cable operators borrowed more money in 1994 than they borrowed in 1993, and they note that the major cable companies recently spent millions of dollars in the auctions for new Personal Communications Services (PCS). Consumers also point out that the vast majority of consumers subscribe to expanded tiers of cable service in addition to the basic tier.

The bill adopted by the Committee adopts a compromise on cable rate regulation. Paragraph (1) amends the rate regulation provisions of section 623 of the 1934 Act for the expanded tier. First, it eliminates the ability of a single subscriber to initiate a rate complaint proceeding at the FCC. Franchising authorities and other relevant State and local government entities still retain the ability to initiate a rate proceeding. Second, rates for cable programming services will only be considered unreasonable, and subject to regulation, if the rates substantially exceed the national average rates for comparable cable programming services. This means that the "bad actors" will be rate-regulated, while the "good actors" will not be subject to Commission-imposed rates.

Paragraph (2) amends section 623(l)(1). Section 623(l)(1) provides cable operators subject to effective competition are not subject to rate regulation, including regulation of the basic tier. The amendment to the definition of effective competition contained in the bill allows the provision of video services by a local exchange carrier, either through a common carrier video platform, or as a cable operator, in an unaffiliated cable operator's franchise area to satisfy the effective competition test. In other words, under the bill, if a telephone company offers video services in a cable operator's franchise area, the cable operator's basic and expanded tiers of service will not be regulated.

Subsection (b) of section 204 of the bill amends section 628(c)(2)(B)(iii) of the 1934 Act by eliminating "other direct legitimate economic benefit" from the permissible reasons for discrimination in the price charged for the distribution of video programming to cable operators and other multichannel video carriers.

Subsection (c) of section 204 provides that the provisions of this section take effect on the date of enactment.

*Sec. 205. Pole attachments*

Section 205 of the reported bill amends section 224 of the 1934 Act, the pole attachment provisions. Section 224., which was added to the 1934 Act in 1978, requires the FCC to ensure that the rates, terms, and conditions for attachments by cable television systems to poles, ducts, conduits, and rights-of-way owned or controlled by utilities, including telephone companies, are just and reasonable.

Section 205 modifies section 224 of the 1934 Act to require that access to utility poles be granted to cable operators, whether the attachment is used to provide cable services or telecommunications services.

Section 205 requires the FCC to prescribe regulations, within 1 year of the date of enactment, to ensure that utilities charge just, reasonable, and nondiscriminatory rates for attachments used to provide telecommunication services, including attachments used to provide cable services.

35006     CONGRESSIONAL RECORD — HOUSE     *October 25, 1977*

clear during the past year that the 1976 act changes do not adequately deal with the problems of Americans working abroad.

The problems with the exclusion are primarily caused by the dramatic increases in living costs in certain areas overseas. In the Mideast, for instance, an apartment may rent for as much as $20,000 or $30,000 a year or more. The $15,000 exclusion provided for in the 1976 act is simply not adequate to cover the additional costs for housing, education, and the like which are incurred by Americans working in these high-cost foreign areas.

In the last Congress, as Chairman of the Task Force on Foreign Source Income of the Committee on Ways and Means, I became very concerned about the problems encountered by Americans working abroad. While the Task Force felt that the 1976 Act changes substantially dealt with certain problems that arose under prior law, it also felt that a reexamination of the exclusion for private individuals would nevertheless be appropriate. In particular, the task force felt that, in conjunction with an examination of the exclusion for overseas allowances provided governmental employees, there should be an examination of the appropriateness of extending to private employees any exclusions for excess foreign living costs which are provided to Government employees. On the basis of the additional information that has come to light in the past year and a half since the task force met, I feel even more strongly that Congress should seriously consider converting the present flat amount exclusion to a more equitable exclusion based on the excess living costs incurred by the taxpayer.

As Chairman ULLMAN has pointed out, the postponement of the effective date of the 1976 act changes will give the committee the opportunity to review the alternative proposals for modifying the taxation of Americans working abroad. I believe that it is very important that we seize this opportunity to adopt a more equitable system of taxing Americans working abroad which would take into account their actual excess foreign living costs.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from Oregon (Mr. ULLMAN) that the House suspend the rules and pass the bill H.R. 9251, as amended.

The question was taken.

Mr. STEIGER. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The SPEAKER pro tempore. Pursuant to the provisions of clause 3, rule XXVII, and the Chair's prior announcement, further proceedings on this motion will be postponed.

## PERMISSION FOR COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE TO FILE SUPPLEMENTAL REPORT ON H.R. 7442, MAKING TECHNICAL AND OTHER CONFORMING CHANGES

Mr. WIRTH. Mr. Speaker, I ask unanimous consent that the Committee on Interstate and Foreign Commerce may be permitted to file a supplemental report on H.R. 7442, making technical and other conforming changes.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Colorado?

There was no objection.

## UTILITY POLE ATTACHMENTS

Mr. WIRTH. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 7442) to amend the Communications Act of 1934 to provide for the regulation of utility pole attachments, as amended.

The Clerk read as follows:

### H.R. 7442

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end thereof the following new section:

"UTILITY POLE ATTACHMENTS

"SEC. 224. (a) As used in this section:

"(1) The term 'utility' means any person who provides telephone service or electric energy to the public and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for wire communication. Such term does not include any corporation or other similar entity owned by the Federal Government.

"(2) The term 'State authority' means the government of any State, any political subdivision, agency, or instrumentality of a State, and any public utility district or other similar special purpose district established under State law.

"(3) The term 'Federal Government' means the Government of the United States or any agency or instrumentality thereof.

"(4) The term 'pole attachment' means any attachment for wire communication on a pole, duct, conduit, or other right-of-way owned or controlled by a utility.

"(5) The term 'usable space' means the space on a utility pole above the minimum grade level which can be used for the attachment of wires and cables.

"(b) (1) The Commission shall regulate the rates, terms, and conditions for pole attachments in any case in which such rates, terms, and conditions are not regulated by any State authority. Any such State authority may act at any time to regulate such rates, terms, and conditions. Any such regulations prescribed by the Commission or by any State authority shall assure that rates for pole attachments are just and reasonable.

"(2) A just and reasonable rate, whether prescribed by the Commission or by State authority, shall assure the utility the recovery of not less than the additional costs of providing pole attachments nor more than the actual capital and operating expenses of the utility attributable to that portion of the pole, duct, or conduit used by the pole attachment. Such portion shall be the percentage of the total usable space on a pole, or the total capacity of the duct or conduit, that is occupied by the pole attachment.".

SEC. 2. Upon the expiration of the 5-year period that begins on the date of the enactment of this Act—

(1) section 224(a)(4) of the Communications Act of 1934, as added by the first section of this Act, is repealed;

(2) section 224(b)(2) of such Act, as added by the first section of this Act, is repealed; and

(3) section 224(b)(1) of such Act, as added by the first section of this Act, is redesignated as section 224(b).

The SPEAKER pro tempore. Is a second demanded?

Mr. FREY. Mr. Speaker, I demand a second.

Mr. BAUMAN. Mr. Speaker, I object to unanimously ordering the second and I demand that it be ordered by tellers.

The SPEAKER pro tempore. The question is, will a second be ordered?

Tellers were ordered, and the Speaker pro tempore appointed as tellers Mr. WIRTH and Mr. BAUMAN.

The House divided, and the tellers reported that there were—ayes 14, noes 4.

Mr. BAUMAN. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 389, nays 7, answered "present" 2, not voting 36, as follows:

[Roll No. 684]

YEAS—389

| | | |
|---|---|---|
| Abdnor | Clay | Giaimo |
| Addabbo | Cleveland | Gibbons |
| Akaka | Cochran | Gilman |
| Alexander | Cohen | Ginn |
| Allen | Coleman | Glickman |
| Ambro | Collins, Tex. | Goldwater |
| Ammerman | Conable | Gonzalez |
| Anderson, | Conte | Goodling |
|   Calif. | Conyers | Gore |
| Anderson, Ill. | Corcoran | Gradison |
| Andrews, N.C. | Corman | Gudger |
| Annunzio | Cornell | Guyer |
| Applegate | Cornwell | Hagedorn |
| Archer | Cotter | Hall |
| Armstrong | Coughlin | Hamilton |
| Ashley | Crane | Hammer- |
| Aspin | Daniel, Dan |   schmidt |
| AuCoin | Daniel, R. W. | Hanley |
| Badham | Danielson | Hannaford |
| Badillo | Davis | Harkin |
| Bafalis | Delaney | Harrington |
| Baldus | Dent | Harris |
| Barnard | Derrick | Harsha |
| Baucus | Derwinski | Hawkins |
| Beard, R.I. | Devine | Heckler |
| Beard, Tenn. | Dickinson | Hefner |
| Bedell | Dicks | Heftel |
| Beilenson | Dingell | Hightower |
| Benjamin | Dodd | Hillis |
| Bennett | Dornan | Holland |
| Bevill | Downey | Hollenbeck |
| Biaggi | Drinan | Holt |
| Bingham | Duncan, Oreg. | Holtzman |
| Blanchard | Duncan, Tenn. | Howard |
| Boggs | Early | Hubbard |
| Boland | Eckhardt | Huckaby |
| Bolling | Edgar | Hughes |
| Bonior | Edwards, Ala. | Hyde |
| Bonker | Edwards, Calif. | Ichord |
| Bowen | Edwards, Okla. | Ireland |
| Brademas | Eilberg | Jacobs |
| Breaux | Emery | Jeffords |
| Brinkley | English | Jenkins |
| Brodhead | Erlenborn | Jenrette |
| Brooks | Ertel | Johnson, Calif. |
| Broomfield | Evans, Colo. | Johnson, Colo. |
| Brown, Calif. | Evans, Del. | Jones, N.C. |
| Brown, Mich. | Evans, Ga. | Jones, Okla. |
| Brown, Ohio | Evans, Ind. | Jones, Tenn. |
| Broyhill | Fary | Jordan |
| Buchanan | Fascell | Kasten |
| Burgener | Fenwick | Kastenmeier |
| Burke, Calif. | Findley | Kazen |
| Burke, Fla. | Fish | Kelly |
| Burke, Mass. | Fisher | Kemp |
| Burleson, Tex. | Fithian | Ketchum |
| Burlison, Mo. | Flippo | Keys |
| Burton, Phillip | Flood | Kildee |
| Butler | Florio | Kindness |
| Byron | Flynt | Kostmayer |
| Caputo | Foley | Krebs |
| Carney | Ford, Mich. | Krueger |
| Carr | Ford, Tenn. | LaFalce |
| Carter | Forsythe | Lagomarsino |
| Cavanaugh | Fountain | Latta |
| Cederberg | Frenzel | Le Fante |
| Chappell | Frey | Leach |
| Chisholm | Fuqua | Lederer |
| Clausen, | Ganmage | Leggett |
|   Don H. | Gaydos | Lehman |
| Clawson, Del | Gephardt | Lent |

*October 25, 1977*     **CONGRESSIONAL RECORD — HOUSE**     **35007**

| | | |
|---|---|---|
| Levitas | Nowak | Slack |
| Livingston | O'Brien | Smith, Iowa |
| Lloyd, Calif. | Oakar | Smith, Nebr. |
| Lloyd, Tenn. | Oberstar | Snyder |
| Long, La. | Obey | Solarz |
| Long, Md. | Ottinger | Spellman |
| Lott | Panetta | Spence |
| Lujan | Patten | St Germain |
| Lundine | Patterson | Staggers |
| McClory | Pattison | Stangeland |
| McCloskey | Pease | Stanton |
| McCormack | Perkins | Stark |
| McDade | Pettis | Steed |
| McFall | Pickle | Steers |
| McHugh | Poage | Steiger |
| McKay | Pressler | Stockman |
| McKinney | Preyer | Stokes |
| Madigan | Price | Studds |
| Maguire | Pritchard | Stump |
| Mahon | Pursell | Taylor |
| Mann | Quayle | Teague |
| Markey | Quie | Thompson |
| Marks | Quillen | Thone |
| Marlenee | Railsback | Thornton |
| Martin | Rangel | Traxler |
| Mazzoli | Regula | Treen |
| Meeds | Reuss | Trible |
| Metcalfe | Rhodes | Tsongas |
| Michel | Rinaldo | Tucker |
| Mikulski | Risenhoover | Udall |
| Mikva | Roberts | Ullman |
| Milford | Robinson | Vander Jagt |
| Miller, Calif. | Rodino | Vanik |
| Miller, Ohio | Roe | Vento |
| Mineta | Rogers | Waggonner |
| Minish | Rooney | Walker |
| Mitchell, Md. | Rosenthal | Walsh |
| Mitchell, N.Y. | Rostenkowski | Wampler |
| Moakley | Rousselot | Watkins |
| Moffett | Roybal | Waxman |
| Mollohan | Rudd | Weaver |
| Montgomery | Runnels | Weiss |
| Moore | Ruppe | White |
| Moorhead, | Russo | Whitehurst |
| Calif. | Ryan | Whitley |
| Moorhead, Pa. | Santini | Whitten |
| Moss | Sarasin | Wiggins |
| Mottl | Satterfield | Wilson, Bob |
| Murphy, Ill. | Sawyer | Wilson, C. H. |
| Murphy, N.Y. | Scheuer | Wilson, Tex. |
| Murphy, Pa. | Sebelius | Wirth |
| Murtha | Seiberling | Wright |
| Myers, Gary | Sharp | Wydler |
| Myers, John | Shipley | Wylie |
| Myers, Michael | Shuster | Yates |
| Natcher | Sikes | Yatron |
| Neal | Simon | Young, Fla. |
| Nedzi | Sisk | Young, Tex. |
| Nichols | Skelton | Zablocki |
| Nix | Skubitz | Zeferetti |

**NAYS—7**

| | | |
|---|---|---|
| Ashbrook | Grassley | Volkmer |
| Bauman | Hansen | |
| Cunningham | Symms | |

**ANSWERED "PRESENT"—2**

| | |
|---|---|
| Flowers | Pike |

**NOT VOTING—36**

| | | |
|---|---|---|
| Andrews, | Koch | Rose |
| N. Dak. | Luken | Schroeder |
| Blouin | McDonald | Schulze |
| Breckinridge | McEwen | Stratton |
| Burton, John | Marriott | Van Deerlin |
| Collins, Ill. | Mathis | Walgren |
| D'Amours | Mattox | Whalen |
| de la Garza | Meyner | Winn |
| Dellums | Nolan | Wolff |
| Diggs | Pepper | Young, Alaska |
| Fowler | Rahall | Young, Mo. |
| Fraser | Richmond | |
| Horton | Roncalio | |

So a second was ordered.

The result of the vote was announced as above recorded.

The SPEAKER pro tempore. The gentleman from Colorado (Mr. WIRTH) will be recognized for 20 minutes, and the gentleman from Florida (Mr. FREY) will be recognized for 20 minutes.

The Chair recognizes the gentleman from Colorado (Mr. WIRTH).

Mr. WIRTH. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, first let me compliment Mr. VAN DEERLIN, the chairman of the Communications Subcommittee, for the excellent job he has done shepherding this legislation through hearings and markup. His reputation for diplomacy and knowledge of communications is obviously well earned.

Mr. Speaker, I also wish to compliment the ranking minority member, the gentleman from Florida (Mr. FREY), and particularly the gentleman from North Carolina (Mr. BROYHILL), who brought this legislation from some significant disagreement 2 years ago to the point of consensus at which we are today.

As you know, Mr. Speaker, the regulation of CATV pole attachments is unfinished business. The Commerce Committee reported a pole attachment bill to the House at the end of the last Congress, but due to the press of business it was not considered.

That is why the present legislation is before you today. H.R. 7442 will resolve a longstanding problem in the relationship of cable television companies on the one hand, and power and telephone utilities on the other.

The Subcommittee on Communications held hearings on the pole attachment question in both the 94th and 95th Congresses. It heard from the FCC, the CATV companies, the State regulators and the utilities.

The subcommittee found that few States regulate pole rates even though poles are almost always a utility monopoly. Moreover, we found numerous abuses of this monopoly power. Many utilities were charging extremely high rates, unrelated to the costs of the attachments. Cable companies had no choice but to pay these rates; they had nowhere to go to get a fair hearing.

Mr. Speaker, perhaps the most interesting aspect of this bill is its innovative approach to balancing State and Federal regulatory roles. The concept of the "zone of reasonableness" within which any regulatory authority may operate provides a regulatory compromise between State and Federal interests while protecting the public interest in the face of a monopoly service.

This legislation is the product of lengthy negotiations and successful compromises. Under the skilled and diplomatic leadership of Chairman VAN DEERLIN, what last year was a controversial issue, this year is a consensus bill. H.R. 7442 is supported by both the National Association of Regulatory Utility Commissioners (NARUC), representing the State utility commissioners, and the National Cable Television Association because it strikes a fair balance between States' rights and Federal regulation.

Mr. Speaker, H.R. 7442 was reported unanimously by both the Subcommittee on Communications and the full Interstate and Foreign Commerce Committee. I urge its adoption by the House of Representatives.

H.R. 7442 has three major provisions: First, it requires the Federal Communications Commission to regulate the rates, terms and conditions of pole attachments if they are not being regulated by a state or other nonfederal authority. It further provides that a non-federal authority may pre-empt the FCC's jurisdiction at any time. The Committee did not wish to require federal regulation where a state or locality was prepared to assume the responsibility.

H.R. 7442 does not establish procedures for adjudicating complaints or promulgating regulations. The Administrative Procedure Act provides sufficient guidelines for the FCC in this regard. More important, we have sought to solve this pole attachment problem with a minimum of bureaucracy and expense. Thus, the FCC should quickly establish regulations to implement this legislation, but should not oversee all pole attachment rates on its own initiative. We expect that the Commission will normally only take action in individual disputes after the complaint of one of the parties.

Second, H.R. 7442 provides that regulations written by, and proceedings conducted by the FCC or a non-federal authority shall assure that the rates for pole attachments are "just and reasonable." A just and reasonable rate is defined as one which falls within a zone of reasonableness set forth in the bill.

The floor of this zone is incremental cost: additional costs which the utility would not have had but for the CATV cable attached to its pole. This floor will ensure that a utility will not lose money by having CATV cable on its poles. Because CATV companies almost invariably are using otherwise unused space, even this floor will provide an added benefit to utilities.

The upper end of the range allows a charge to the CATV pole user of its proportionate share of the total costs of the pole, such total costs being the recurring operating expenses, and capital costs attributable to the utility pole for the period covered by the rate.

Once these expense items and capital costs are known, the formula provides a method for determining the maximum portion of these total pole costs which may be assigned to the CATV system. The allocation formula provides that a cable system may be required to bear a proportionate share of the total pole costs in exactly the same proportion that its attachment and attendant clearances take up usable space. By way of example, on a typical utility pole 35 feet in length there are 11 feet of usable space (that space above a minimum grade level clearance usable for attaching cable, telephone, and electric wires and associated equipment). By what is virtually a uniform practice throughout the United States, cable television is assigned approximately one foot out of the 11 feet of usable space. (While cable only physically occupies approximately one inch of this space, half the clearance spaces between CATV cable and the next adjacent pole users are attributed to CATV.) In this example, therefore, cable's share of the total capital costs and operating expenses for the entire 35-foot pole would be one-eleventh.

Cable would pay its share of not just the cost of the 11 feet of usable space but of the total costs of the entire pole, including the unusable portion. This allocation formula reflects the concept of relative use of the entire facility.

The bill does not set specific rules for determining whether terms and conditions of pole attachment contracts are "just and reasonable." These usually include matters relating to inspections, extent and duration of use license, liability for a portion of future capital costs, insurance, surety bonds, lease revocation, and like matters. The fairness of any such terms and conditions cannot be precisely translated into statutory language because they will have to be viewed in the context of other contractual provisions, the prevailing practice in the industry, and the proposed pole attachment rate. The "just and reasonable" standard is sufficiently precise for the regulatory bodies to make a proper determination when presented with specific contractual provisions which are allegedly unfair.

Third, under the sunset provision contained in the legislation, the bills required zone of reasonableness will be repealed five years after the bill is enacted. While a zone is necessary in view of present circumstances we do not wish to restrict the discretion of the FCC and the states indefinitely. Therefore, Chairman Van Deerlin wisely suggested that the zone be eliminated after five years. This sunset provision will afford the FCC and non-federal authorities greater leeway to select a more appropriate rate making standard should experience and changed conditions so dictate. After five years, these regulatory bodies will only be guided by the "just and reasonable" standard.

While this range of reasonable rates is appropriate for cable television pole attachments, it is not the Committee's intent to imply it favors this standard for any other aspect of domestic common carrier or other communications regulation. As you know, Mr. Speaker, under Chairman Van Deerlin's able direction, the Communications Subcommittee is undertaking an in-depth review of the Communications Act of 1934. An important aspect of that review is to determine the proper ratemaking criteria to be used for common carrier regulation. It would thus be premature to imply that this standard would be appropriate for any other area of communications price regulation.

In conclusion, let me again compliment both Mr. Van Deerlin and the ranking minority member of the Communications Subcommittee, Mr. Frey, for their able leadership on this legislation. As a result of their work a problem which was brought to the attention of the Subcommittee less than two years ago should soon be resolved.

Mr. FREY. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I support passage of H.R. 7442, a bill that addresses a long standing problem for the cable television industry.

There are very few States in which there is a forum for cable television operators and utilities to present their respective positions in a dispute over the rates, terms, or conditions for pole attachments. As a result, the cable operators have often faced a take it or leave it situation in a dispute over a contract that they could neither afford to take nor leave. Unless the cable operator can attach his wires to poles, he may not be able to operate. If he agrees, and he may have no other choice, to an extremely high rental fee, his economic viability may be threatened.

Unlike the bill passed by our committee last year, this bill has the effect of establishing a nationwide standard for pole attachment rates. While I have in the past been uncomfortable with that concept, I view this bill as an interim relief measure since the rate standards expire after 5 years.

I would also note that our subcommittee will revisit this issue next year during our revision of the Communications Act.

Mr. Speaker, I yield such time as he may consume to the gentleman from North Carolina (Mr. BROYHILL).

Mr. BROYHILL. Mr. Speaker, as a primary sponsor of the utility pole attachment bill, H.R. 7442, I am pleased that this needed legislation has finally reached the House floor for a vote. As a result of considerable discussion over the past several months H.R. 7442 is a relatively noncontroversial bill which focuses on a major controversy that has

been the subject of extensive hearings last year, and this year by the Communications Subcommittee. I am glad that a workable compromise has been worked out.

H.R. 7442 represents a needed and appropriate legislative remedy to settle disputes between the cable television industry, and utility companies over the rates, terms and conditions of cable pole attachments. Disputes have centered around who has regulatory authority over utility pole attachments. The Federal Communications Commission has stated that it does not have the authority to regulate pole attachment rates. To further complicate this problem, only three States—California, Rhode Island, and Connecticut—have asserted jurisdiction in regulating pole attachment disputes.

The cable television industry has traditionally relied on telephone and power companies to provide space on poles for the attachment of CATV cables. Primarily because of environmental concerns, local governments have prohibited cable operators from constructing their own poles.

Accordingly, cable operators are virtually dependent on the telephone and power companies to provide cable television service to millions of existing as well as potential, new subscribers. Some utilities have taken advantage of their position over the cable operators. The result has been unreasonable attachment charges and the forced interruption of services to consumers currently subscribing to cable television. As of July, there were 27 States in which pole attachment disputes existed. In some cases utilities had increased rates by an average of 61 percent over previous years. In my State of North Carolina, service was disrupted for 3 days to approximately 1,200 cable subscribers when a dispute arose over a rate increase proposed by a utility company. For 9 years the cable industry has sought a resolution of this untenable situation. A situation, I might add, that is troublesome to both the cable industry and the power and telephone companies.

This is why I am particularly pleased with the legislation that is currently before the House for consideration. H.R. 7442 represents the efforts of both the cable television industry and the utilities in working out a legislative remedy that will provide a badly needed forum for the resolution of rates, terms, and conditions of utility pole attachments. This legislation will authorize the Federal Communications Commission to adjudicate disputes relative to the rates, terms, and conditions of pole attachments. Additionally, the bill provides that any State may preempt the FCC and assume jurisdiction at any time. The legislation also provides that regulations prescribed by the FCC, or the appropriate State authority, assure that the rates for pole attachments are just and reasonable. Just and reasonable rates shall not be less than the incremental costs to the utility of providing the attachment, and not more than the actual capital and operating expenses associated with the pole attachment to the utility company.

H.R. 7442 represents a fair and balanced approach which will protect the interests of both utility companies and the 12 million Americans who currently subscribe to cable television in over 7,600 communities throughout the United States. The two principal parties in this matter, the National Cable Television Association and the National Association of Regulatory Utility Commissioners have formally approved of H.R. 7442. Therefore, I hope that my colleagues will join with me in supporting this needed legislation, and thereby providing an appropriate resolution of the pole attachment controversy.

Mr. FREY. Mr. Speaker, I have no further requests for time.

Mr. WIRTH. Mr. Speaker, I yield 2 minutes to the gentleman from Tennessee (Mr. GORE).

Mr. GORE. Mr. Speaker, I would like to direct a question to the author of the bill, the gentleman from Colorado (Mr. WIRTH). As I read the language defining State authority, it would appear to me that rural electric cooperatives are included in the exemption stated by that language. Is that the intention of the author of the bill?

Mr. WIRTH. The gentleman is correct; yes.

Mr. Speaker, I yield back the remainder of my time.

Mr. LUKEN. Mr. Speaker, I rise in support of H.R. 7442, a bill which I cosponsored, which would amend the Communications Act of 1934 to provide for the regulation of utility pole attachments.

The cable television industry brings broadcast signals and other entertainment and information to the subscribers by attaching its wires to existing utility company poles.

It has been brought to the attention of the Subcommittee on Communications that utility pole owners are now in a position to charge cable television companies almost any rates they choose for the rights to attach their equipment to the utility poles. Cable television owners do not have the leverage necessary to negotiate for a fair price. This places an unreasonable burden on the cable companies and their subscribers.

This bill would give either the Federal Communications Commission, or any State or local authority which so desired it, the authority to assure that attachment rates are just and reasonable. It further defines a just and reasonable rate as one which will assure the utility of recovery of not less than the additional cost of providing the pole attachment. The upper limit of such a rate must assure that the utility will not recover more than the actual capital and operating expenses of the utility attributable to the percentage of the total usable space on the pole occupied by the pole attachment.

It is important to note that 5 years from the date of the enactment of this bill the definition of what is a just and reasonable rate is repealed. This "sunset" provision insures that a definition which properly reflects today's market realities does not lock the regulatory authorities into what may, in the future, become an antiquated standard as new technolo-

gies and new competitive relationships develop.

It is also important to point out that this bill gives the FCC authority to assure that rates are just and reasonable only in cases where State or local authorities do not wish to accept this responsibility.

Mr. Speaker, this is a good bill. It addresses a specific problem that has been brought to the attention of Congress. It does so, in what I believe, is a simple and straightforward manner without creating a large new Federal bureaucracy.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from Colorado (Mr. WIRTH) that the House suspend the rules and pass the bill H.R. 7442, as amended.

The question was taken; and (two-thirds having voted in favor thereof), the rules were suspended and the bill, as amended, was passed.

A motion to reconsider was laid on the table.

## MARINER TRADE-IN BILL

Mr. BIAGGI. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 7278) to amend section 10 of the Merchant Marine Act, 1936, as amended.

The Clerk read as follows:

H.R. 7278

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That subsection 510(1) of the Merchant Marine Act, 1936 (46 U.S.C. 1160(1)) is hereby amended to read as follows:

"(1) The Secretary of Commerce is authorized to acquire mariner class vessels constructed under title VII of this Act and Public Law 911, Eighty-first Congress, and other suitable vessels, constructed in the United States, which have never been under foreign documentation, in exchange for obsolete vessels in the National Defense Reserve Fleet. For purposes of this subsection, the trade-in and trade-out vessels shall be valued at the higher of their scrap value in domestic or foreign markets as of the date of the exchange: *Provided,* That in any exchange transactions, the value assigned to the traded-in and traded-out vessels will be determined on the same basis. The value of the traded-out vessels shall be as nearly as possible equal to the value of the traded-in vessel plus the fair value of the cost of towing the traded-out vessel to the place of scrapping. To the extent the value of the traded-out vessel exceeds the value of the traded-in vessel plus the fair value of the cost of towing, the owner of the traded-in vessel shall pay the excess to the Secretary of Commerce in cash at the time of exchange. This excess shall be deposited into the Vessel Operations Revolving Fund and all costs incident to the lay-up of the vessels acquired under this Act may be paid from balances in the Fund. No payments shall be made by the Secretary of Commerce to the owner of any traded-in vessel, in connection with any exchange under this subsection. Notwithstanding the provisions of sections 9 and 37 of the Shipping Act, 1916, vessels traded out under this subsection may be scrapped in approved foreign markets. The provision of this subsection (1) as it read prior to the 1976 amendment shall govern all transactions made thereunder prior to that amendment.".

The SPEAKER pro tempore. Is a second demanded?

Mr. RUPPE. Mr. Speaker, I demand a second.

The SPEAKER pro tempore. Without objection, a second will be considered as ordered.

There was no objection.

The SPEAKER pro tempore. The gentleman from New York (Mr. BIAGGI) will be recognized for 20 minutes, and the gentleman from Michigan (Mr. RUPPE) will be recognized for 20 minutes.

The Chair recognizes the gentleman from New York (Mr. BIAGGI).

Mr. BIAGGI. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise in support of H.R. 7278, a bill to upgrade our National Defense Reserve Fleet by authorizing the Secretary of Commerce to acquire Mariner class and other suitable vessels in exchange for obsolete vessels in that fleet scheduled for scrapping.

As the Members know, the Secretary of Commerce has the responsibility to provide merchant shipping during times of national emergency. One of the most available sources of merchant shipping available to the Secretary for this purpose are the vessels which are laid up in the National Defense Reserve Fleet. Unfortunately, most of these vessels date back to World War II. By relative standards, they are slow, and have small carrying capacity.

In former years, U.S.-flag break-bulk vessels were readily available from both the scheduled liner service—both subsidized and nonsubsidized—and so-called tramp, or unscheduled shipping. The tramp fleet, once a large source of contingency surge capability is almost nonexistent. Since the U.S.-flag tramp fleet is no longer available, the National Defense Reserve Fleet is more important than ever.

Unfortunately, there are now only about 130 merchant vessels in the National Defense Reserve Fleet with any shipping utility. The remaining vessels are ready for scrapping.

Clearly, something must be done to upgrade this vital national security asset. And H.R. 7278 would just do that.

H.R. 7278 would authorize the Secretary of Commerce to acquire Mariner class and other suitable vessels, constructed in the United States, which have never been under foreign documentation, in exchange for obsolete vessels in the National Defense Reserve Fleet. A "suitable vessel" would be any oceangoing vessel determined by the Secretary of Commerce to be suitable for upgrading the National Defense Reserve Fleet. Any criteria to be used in determining whether a vessel is suitable would be set forth in regulations promulgated by the Maritime Administration of the Department of Commerce.

In acquiring such vessels, the traded-in and traded-out vessels would be valued on the same basis; at the higher of their scrap value in domestic or foreign markets on the date of the exchange. The value of the traded-out vessel would be as nearly as possible equal to the value of the traded-in vessel, plus the fair value of the cost of towing the traded-out vessel to the place of scrapping. The fair value of such towing is included because if the owner of such traded-in vessel was to scrap it abroad, he would be able to carry cargo to an area near where the vessel would be scrapped.

To the extent that the value of the traded-out vessel exceeds the value of the traded-in vessel, plus the towing cost, the owner of the traded-in vessel would pay the excess to the Secretary of Commerce in cash at the time of exchange for deposit into the Vessel Operations Revolving Fund, and all costs incident to the layup of the traded-in vessel would be paid from balances in the fund. No payments would be made by the Secretary of Commerce to the owner of any traded-in vessel.

Finally, H.R. 7278 provides that, notwithstanding the provisions of sections 9 and 37 of the Shipping Act of 1916, which prohibits the transfer of American-flag vessels to foreign ownership without the consent of the Secretary of Commerce, vessels traded out under the bill may be scrapped in approved foreign markets.

Mr. Speaker, the witness for the Department of Defense stressed that the opportunity afforded by H.R. 7278 to rejuvenate our National Defense Reserve Fleet by the acquisition of relatively modern cargo ships must not be lost, as such vessels are particularly well suited to the Department of Defense in wartime. The reported bill would provide for a most efficient method of accomplishing this objective with adequate safeguards for the Government.

I strongly urge the House to support H.R. 2787, so that we have the opportunity to upgrade the National Defense Reserve Fleet.

Mr. RUPPE. Mr. Speaker, I rise in support of H.R. 7278, a bill which allows the Secretary of Commerce to exchange obsolete vessels in the National Defense Reserve Fleet for newer vessels. This legislation basically extends, and makes permanent, a law which expired on January 2, 1977. I support it because it would permit the improvement of our National Defense Reserve Fleet at no expense to the taxpayer.

Because of containerization and other technological improvements in the U.S. merchant marine, many standard general cargo ships built in the 1950's and 1960's have become commercially obsolete and therefore subject to scrapping by their private owners. However, these vessels which are relatively fast and have self-sustaining cargo loading and discharging capacity are useful for military purposes. H.R. 7278 allows the Secretary of Commerce to obtain these vessels by exchanging them for vessels in the National Defense Reserve Fleet which are obsolete in every respect. Thus the Government gets a newer vessel, and the private owner gets equivalent scrap value.

The bill requires that trade-in and trade-out vessels be valued on the same basis, at the higher of their scrap value in the domestic or foreign markets on the date of exchange. The value of the trade-out vessel is to be, as nearly as possible, equal to the sum of the trade-in vessel plus the cost of towing the trade-out vessel to the scrapping yard. Thus the private operator need only bear the cost of delivering his vessel to the National Defense Reserve Fleet facility; he does not have to bear the cost of delivery to the scrap yard, which in many cases will be in a foreign country.

# Calendar No. 534

| 95TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 95–580 |
|---|---|---|

COMMUNICATIONS ACT AMENDMENTS—PENALITIES AND FORFEIT-URES AUTHORITY AND REGULATION OF CABLE TELEVISION POLE ATTACHMENTS BY THE FEDERAL COMMUNICATIONS COMMISSION

---

NOVEMBER 2 (Legislative day, NOVEMBER 1), 1977.—Ordered to be printed

---

Mr. HOLLINGS, from the Committee on Commerce, Science, and Transportation submitted the following

# REPORT

### [To accompany S. 1547]

The Committee on Commerce, Science, and Transportation, to which was referred the bill (S. 1547) to amend the Communications Act of 1934, as amended, with respect to penalties and forfeitures, and to authorize the Federal Communications Commission to regulate pole attachments, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

## SUMMARY AND PURPOSE

The bill (S. 1547) serves two purposes :
(1) To unify, simplify, and enlarge the scope of the forfeiture provisions of the Communications Act of 1934; and
(2) To establish jurisdiction within the Federal Communications Commission (FCC) to regulate the provision by utilities to cable television systems of space on utility poles, ducts, conduits, or other rights-of-way owned or controlled by those utilities.

## PENALTIES AND FORFEITURES

S. 1547, as reported, would unify and simplify the forfeiture provisions in the Communications Act of 1934, enlarge their scope to cover all persons subject to the act, provide more practical limitations periods and more effective deterrent levels of forfeiture authority, and would generally afford the Federal Communications Commission greater flexibility in the enforcement of the Communications Act and rules and regulations promulgated thereunder.

29–010

2

The Communications Act of 1934 now imposes monetary civil penalties on certain individuals who fail to comply with the Communications Act, FCC regulations, or related matters. These civil liabilities include the forfeiture provisions in section 503(b) (relating to the broadcast services) and section 510 (applicable to nonbroadcast radio stations). S. 1547 would enlarge the scope of forfeiture liability under these sections to cover other persons subject to the Communications Act—such as cable television systems, users of experimental or medical equipment emitting electromagnetic radiation, persons operating without a valid radio station or operator's license, and some communications equipment manufacturers.

S. 1547, as reported, would make three alterations in the existing forfeiture provisions. First, it would extend the limitations period within which notices of liability must be issued: for persons not previously subject to forfeiture liability, 1 year; for nonbroadcast licensees, from the present 90 days to 1 year; and for broadcast licensees, from the present 1 year to 1 year or the current license term, whichever is longer, not to exceed 3 years. Second, the maximum forfeiture that could be imposed for a single violation would be raised to $2,000; for multiple violations, within any single notice of liability, $20,000 for a common carrier, broadcast licensee, or cable system operator, and $5,000 in the case of all other persons. Third, the bill would authorize the Commission to mitigate or remit common carrier forfeitures in the same way as it now may with respect to all other forfeitures. Furthermore, the Commission would be given its choice of using the traditional "show cause" procedure for imposing a forfeiture or alternatively holding an adjudicatory hearing under section 554 of the Administrative Procedure Act.

### POLE ATTACHMENT REGULATION

S. 1547, as reported, would empower the Commission to hear and resolve complaints regarding the arrangements between cable television systems and the owners or controllers of utility poles. A pole attachment, for purposes of this bill, is the occupation of space on a utility pole by the distribution facilities of a cable television system—coaxial cable and associated equipment—under contractual arrangements whereby a CATV system rents available space for an annual or other periodic fee from the owner or controller of the pole—usually a telephone or electric power company. The Commission would prescribe regulations to provide that the rates, terms, and conditions for pole attachments are just and reasonable. For a period of 5 years after enactment of this act, the Commission would employ a specified rate-setting formula in determining whether a particular pole attachment rate is just and reasonable. The formula describes a range between marginal and a proportionate share of fully allocated costs within which pole rates are to fall.

Any State which chooses to regulate pole attachments may do so at any time, and will preempt the Commission's involvement in pole attachment arrangements in that State simply by notifying the FCC that it regulates the rates, terms, and conditions for such attachments. S. 1547 in no way limits or restricts the powers of the several States to regulate pole attachments.

12

fering with the right of nonsubscribers to the quiet enjoyment of their own radio and television reception. And, unlike the service a system provides to its own subscribers, there are few, if any, marketplace incentives for such leakage to be repaired. The individual subject to the interference may have no idea that the poor quality picture he receives is anything other than the result of natural propagation difficulties and general radio noise. While there may well be cable operators in rural areas and backwoods hills and hollows whose radiation seems at this time to cause no injury to anyone, we see no practical way of differentiating in the rules between this minority and the majority of cable operations whose leakage has a potential for creating real reception problems.

The FCC's present enforcement tools of cease and desist and revocation of certificates of compliance are totally inadequate in the cable television area. The forfeiture alternative is essential. The purpose of S. 1547, as reported, is to treat all parties subject to the Communications Act equitably and fairly and is not exclusively aimed at CATV. Any exception for CATV would work great unfairness on other industries which are less likely than cable operators to be familiar with FCC rules and regulations but are nevertheless subject to forfeiture authority.

The committee notes that S. 1547, as reported, is prospective in its effect for cable operators. Section 7 of the bill, as reported by the committee, specifically provides that any act or omission which occurs prior to the effective date of this act shall incur liability under the provisions of existing forfeiture authority as then in effect. Therefore, cable operators will not be subject retroactively to increased forfeitures for violations which occurred prior to the effective date of S. 1547.

### POLE ATTACHMENT REGULATION

It is the general practice of the cable television (CATV) industry in the construction and maintenance of a cable system to lease space on existing utility poles for the attachment of cable distribution facilities (coaxial cable and associated equipment). These leasing agreements typically involve the rental of a portion of the communications space on a pole for an annual or other periodic fee as well as reimbursement to the utility for all costs associated with preparing the pole for the CATV attachment. The FCC estimates that there are currently over 7,800 CATV pole attachment agreements in effect. Approximately 95 percent of all CATV cables are strung above ground on utility poles, the remainder being placed underground in ducts, conduits, or trenches. These poles, ducts, and conduits are usually owned by telephone and electric power utility companies, which often have entered into joint use or joint ownership agreements for the use of each other's poles. It is estimated that approximately 70 percent of all utility poles owned by either telephone or electric utilities are actually jointly used. These joint utility agreements commonly reserve a portion of each pole for the use of communications services (telephone, telegraph, CATV, traffic signaling, municipal fire and police alarm systems, et cetera). This communications pole space is usually under the control of the telephone company.

13

Owing to a variety of factors, including environmental or zoning restrictions and the costs of erecting separate CATV poles or entrenching CATV cables underground, there is often no practical alternative to a CATV system operator except to utilize available space on existing poles. The number of poles owned or controlled by cable companies is insignificant, estimated to be less than 10,000, as compared to the over 10 million utility-owned or controlled poles to which CATV lines are attached.

Sharing arrangements minimize unnecessary and costly duplication of plant for all pole users, utilities as well as cable companies. Nevertheless, pole attachment agreements between utilities which own and maintain pole lines, and cable television systems which lease available space have generated considerable debate. Conflict arises, understandably, from efforts by each type of firm to minimize its share of the total fixed costs of jointly used facilities. Of the more than 10 million poles on which cable operators lease space, fewer than half are controlled by telephone companies, while 53 percent are controlled by power utilities, public and private. Most CATV systems lease space from more than one utility. An estimated 72 percent of all cable systems lease pole space from Bell Telephone operating companies, approximately 65 percent have agreements with investor-owned power companies, an additional 21 percent lease space from independent telephone companies, while 10 percent attach to poles owned by REA cooperatives and 14 percent acquire space from utilities owned by municipalities.

Due to the local monpoly in ownership or control of poles to which cable system operators, out of necessity or business convenience, must attach their distribution facilities, it is contended that the utilities enjoy a superior bargaining position over CATV systems in negotiating the rates, terms and conditions for pole attachments. It has been alleged by representatives of the cable television industry that some utilities have abused their superior bargaining position by demanding exorbitant rental fees and other unfair terms in return for the right to lease pole space. Cable operators, it is claimed, are compelled to concede to these demands under duress. The Commission's Office of Plans and Policy, in a staff report released in August 1977, concluded that, "[a]lthough the reasonableness of current pole attachment rates remains open to question, public utilities by virtue of their size and exclusive control over access to pole lines, are unquestionably in a position to extract monopoly rents from cable TV systems in the form of unreasonably high pole attachment rates" (page 34).

The committee received testimony that the introduction of broadband cable services may pose a competitive threat to telephone companies, and that the pole attachment practices of telephone companies could, if unchecked, present realistic dangers of competitive restraint in the future. The Commission has investigated the competitive interrelationships of telephone and cable companies in various proceedings and contexts, and has taken action to curtail potential anticompetitive practices in several instances. (See for example, *Common Carrier Tariffs for CATV Systems*, 4 FCC 2d 257 (1966) ; *General Telephone Co. of California*, 13 FCC 2d 448, af'd. 413 F. 2d 390 D.C. Cir. *cert. denied*, 396 U.S. 888 (1969). See also, *General Telephone Co. of the Southwest* v. *United States*, 449 F. 2d 846, 857 (5th cir. 1971).)

**14**

The pole attachment policies and practices of utilities owning or controlling poles are generally unregulated at the present time. Currently only one State—Connecticut—actually regulates pole attachment arrangements, while in another eight States, regulatory authority apparently exists but has not been exercised—California, Hawaii, Nevada, Alaska, Rhode Island, Vermont, New Jersey, and New York. According to a recent survey conducted by the Commission's Cable Television Bureau, entitled "Cable Television Pole Attachment—State Law and Court Cases," very few States have specific statutory provisions governing attachments to utility poles. Only 15 States, including the District of Columbia, appear to have enacted statutory authority which may be of sufficient breadth to permit regulation by an appropriate State body.

### JURISDICTIONAL BASIS FOR FCC REGULATION

Moreover, the Federal Communications Commission has recently decided that it has no jurisdiction under the Communications Act of 1934, as amended, to regulate pole attachment and conduit rental arrangements between CATV systems and nontelephone or telephone utilities. (*California Water and Telephone Co.*, *et al.*, 40 R.R. 2d 419 (1977).) This decision was the result of over 10 years of proceedings in which the Commission examined the extent and nature of its jurisdiction over CATV pole attachments. The Commission's decision noted that, while the Communications Act conferred upon it expansive powers to regulate all forms of electrical communication, whether by telephone, telegraph, cable or radio, CATV pole attachment arrangements do not constitute "communication by wire or radio," and are thus beyond the scope of FCC authority. The Commission reasoned:

> The fact that cable operators have found in-place facilities convenient or even necessary for their businesses is not sufficient basis for finding that the leasing of those facilities is wire or radio communications. If such were the case, we might be called upon to regulate access and charges for use of public and private roads and right of ways essential for the laying of wire, or even access and rents for antenna sites.

In addition the Commission concluded that there was no reason to separate resolution of the purely legal question of jurisdiction on the basis of whether the party owning or controlling the pole was a telephone or nontelephone company.

The committee believes that S. 1547, as reported, will resolve this jurisdictional impasse, by creating within the FCC an administrative forum for the resolution of CATV pole attachments disputes and by prompting the several States, should they wish to involve themselves in these matters, to develop their own plans free of Federal prescriptions.

The committee believes that Federal involvement in pole attachment arrangements should serve two specific, interrelated purposes: To establish a mechanism whereby unfair pole attachment practices may come under review and sanction, and to minimize the effect of unjust or unreasonable pole attachment practices on the wider development of cable television service to the public.