# Case Nos. 22-2220(L), 23-1096

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DUKE ENERGY PROGRESS, LLC,

*Petitioner/Intervenor,*

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,

*Respondents,*

BELLSOUTH TELECOMMUNICATIONS, LLC,
d/b/a AT&T NORTH CAROLINA AND d/b/a AT&T SOUTH CAROLINA,

*Intervenor/Petitioner.*

*On Petitions for Review of an Order of the Federal Communications Commission*

## PUBLIC PAGE-PROOF
## OPENING/RESPONSE BRIEF OF INTERVENOR/PETITIONER

Christopher S. Huther
Claire J. Evans
Frank Scaduto
**WILEY REIN LLP**
2050 M Street N.W.
Washington, D.C. 20036
202.719.7000
chuther@wiley.law
cevans@wiley.law
fscaduto@wiley.law

*Counsel for Intervenor/Petitioner*
*BellSouth Telecommunications, LLC,*
*d/b/a AT&T North Carolina and d/b/a*
*AT&T South Carolina*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-2220L__    Caption: __Duke Energy Progress, LLC v. FCC et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina__
(name of party/amicus)

_____

 who is _____Intervenor/Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.  Does party/amicus have any parent corporations?  ☑YES ☐NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    BellSouth, LLC; AT&T DataComm, LLC; AT&T DataComm Holdings, LLC;
    BellSouth Mobile Data, Inc.; AT&T Inc.


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☑YES ☐NO
    If yes, identify all such owners:

    AT&T Inc. (NYSE ticker symbol: T)


i

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?            ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?            ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Christopher S. Huther                     Date:        5/22/2023

Counsel for: BellSouth Telecommunications, LLC

Print to PDF for Filing

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................i

TABLE OF CONTENTS.......................................................................iii

TABLE OF AUTHORITIES ..................................................................v

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .........................................................4

STATEMENT OF THE ISSUES.............................................................5

    A.    Issues Raised by AT&T's Petition for Review ....................................5

    B.    Issues Raised by Duke's Petition for Review .....................................5

STATEMENT OF THE CASE.................................................................6

    A.    Historical Background..........................................................................6

    B.    Regulatory Background......................................................................11

    C.    Procedural History.............................................................................14

SUMMARY OF THE ARGUMENT .....................................................17

STANDARD OF REVIEW ...................................................................23

ARGUMENT ........................................................................................24

I.    The Commission Erred When It Created an Artificial and Unwarranted Rate Disparity Between AT&T and AT&T's Competitors...........................24

    A.    The FCC Incorrectly Adopted The Old Telecom Rate Formula. .......24

        1.    The FCC Erred When It Found That Immutable Characteristics of ILECs Justify an Old Telecom Rate. ...........25

        2.    The FCC Erred When It Limited Its Comparative Analysis of Relevant Pole Attachment Rights.........................31

        3.    The FCC Erred When It Failed to Enforce the Evidentiary Standard in Its Regulation. ....................................34

iii

B.     The Commission Adopted the Wrong "Number of Attaching Entities" Input to the Old Telecom Rate Formula. ...........................41

II.    Duke's Challenges to the FCC's Order Are Meritless. .................................47

A.     The FCC Did *Not* Apply An Impermissibly Retroactive Standard to Pre-2020 Time Periods. ...................................47

B.     The FCC's Decision About the "Safety Space" on a Utility Pole Is Grounded in Settled Precedent. ...................................52

C.     The FCC Has Jurisdiction—and a Statutory Obligation—to Ensure Just and Reasonable Rates for AT&T's Use of Duke's Poles. ...................................58

CONCLUSION ...................................63

REQUEST FOR ORAL ARGUMENT ...................................64

CERTIFICATE OF COMPLIANCE ...................................65

CERTIFICATE OF SERVICE ...................................66

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Elec. Power Serv. Corp. v. FCC*,
708 F.3d 183 (D.C. Cir. 2013) ("*AEP*") ......................................................*passim*

*Ameren Corp. v. FCC*,
865 F.3d 1009 (8th Cir. 2017) .................................................................................9

*Ass'n of Accredited Cosmetology Sch. v. Alexander*,
979 F.2d 859 (D.C. Cir. 1992)..............................................................................54

*Baltimore Gas & Elec. Co. v. Heintz*,
760 F.2d 1408 (4th Cir. 1985) ..............................................................................52

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986)..............................................................................31

*Cavazos v. Haaland*,
579 F. Supp. 3d 141 (D.D.C. 2022).......................................................................54

*Chen Zhou Chai v. Carroll*,
48 F.3d 1331 (4th Cir. 1995) ................................................................................28

*City of Portland v. United States*,
969 F.3d 1020 (9th Cir. 2020) ........................................................................6, 57

*Clay v. United States*,
537 U.S. 522 (2003)..............................................................................................59

*Comcast Corp. v. FCC*,
526 F.3d 763 (D.C. Cir. 2008)..............................................................................47

*De Leon v. Holder*,
761 F.3d 336 (4th Cir. 2014) ................................................................................29

*Dickenson-Russell Coal Co., LLC v. Sec'y of Lab.*,
747 F.3d 251 (4th Cir. 2014) .........................................................................31, 32

*Edd Potter Coal Co. v. Dir., Off. of Workers' Comp. Programs*,
43 F. App'x 540 (4th Cir. 2002) ...........................................................................23

*Etelson v. OPM*,
    684 F.2d 918 (D.C. Cir. 1982) ........................................................... 44

*FCC v. Fla. Power Corp.*,
    480 U.S. 245 (1987) ........................................................................... 8

*Fuller v. Winter*,
    538 F. Supp. 2d 179 (D.D.C. 2008) ................................................. 43

*Gulf Power Co. v. FCC*,
    669 F.3d 320 (D.C. Cir. 2012) ........................................................... 9

*Humane Soc'y of United States v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ......................................................... 34

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
    92 F.3d 1248 (D.C. Cir. 1996) ......................................................... 45

*Jimenez-Cedillo v. Sessions*,
    885 F.3d 292 (4th Cir. 2018) ........................................................... 33

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162 (2016) ......................................................................... 60

*Knox v. U.S. Dep't of Lab.*,
    434 F.3d 721 (4th Cir. 2006) ..................................................... 22, 28

*Loc. 23, Am. Fed'n of Musicians v. NLRB*,
    12 F.4th 778 (D.C. Cir. 2021) ......................................................... 35

*Maine Cmty. Health Options v. United States*,
    140 S. Ct. 1308 (2020) ..................................................................... 60

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
    Co.*,
    463 U.S. 29 (1983) ..................................................................... 29, 43

*NCTA v. Gulf Power Co.*,
    534 U.S. 327 (2002) ........................................................................... 8

*Redeemed Christian Church of God (Victory Temple) Bowie, Md. v.
    Prince George's Cnty., Md.*,
    17 F.4th 497 (4th Cir. 2021) ........................................................... 60

*Sierra Club v. W.Va. Dep't of Env't Prot.*,
   64 F.4th 487 (4th Cir. 2023) ...................................................................22

*SNR Wireless LicenseCo, LLC v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017) ..............................................................47

*Stewart v. Azar*,
   366 F. Supp. 3d 125 (D.D.C. 2019) ........................................................33

*United States v. Lin*,
   101 F.3d 760 (D.C. Cir. 1996) .................................................................59

**Statutes and Regulations**

47 U.S.C. § 224 ..............................................................................*passim*

47 U.S.C. § 402 ........................................................................................4

47 U.S.C. § 1302 ....................................................................................61

47 U.S.C. § 1305 ....................................................................................10

28 U.S.C. § 2112 ......................................................................................4

28 U.S.C. § 2342 ......................................................................................4

28 U.S.C. § 2343 ......................................................................................4

47 C.F.R. § 1.1402 ...........................................................................37, 40

47 C.F.R. § 1.1406 ....................................................................8, 12, 41

47 C.F.R. § 1.1407 ................................................................................14

47 C.F.R. § 1.1409 .....................................................................20, 40, 41

47 C.F.R. § 1.1411 ................................................................................37

47 C.F.R. § 1.1413 ........................................................................*passim*

## FCC Authorities

*Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investments*,
   33 FCC Rcd 7705 (2018) ("*2018 Order*").................................................*passim*

*Adoption of Rules for the Regul. of Cable Television Pole Attachments*,
   72 F.C.C.2d 59 (1979) ("*1979 Order*") .......................................................*passim*

*Amend. of Rules & Policies Governing Pole Attachments*,
   15 FCC Rcd 6453 (2000) ("*2000 Order*").............................................52, 53, 54

*Connecting America: The Nat'l Broadband Plan*,
   2010 WL 972375 (FCC 2010) ("*Nat'l Broadband Plan*").................9, 10, 24, 30

*Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*,
   30 FCC Rcd 13731 (2015) ("*2015 Order*")...............................................*passim*

*Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*,
   26 FCC Rcd 5240 (2011) ("*2011 Order*")...................................................*passim*

*Implementation of Section 703(e) of The Telecommunications Act of 1996*,
   16 FCC Rcd 12103 (2001)...................................................................................36

*Implementation of Section 703(e) of the Telecommunications Act of 1996*,
   13 FCC Rcd 6777 (1998) ("*1998 Order*")...................................................33, 41

*Implementation of Section 703(e) of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking,
   12 FCC Rcd 11725 (1997)...................................................................................42

*Verizon Florida LLC v. Fla. Power and Light Co.*,
   30 FCC Rcd 1140 (EB 2015)...............................................................47, 48, 49

**Other Authorities**

S. Rep. No. 95-580 (1977) .............................................................................1

S. Conf. Rep. 104-230 (1996) ....................................................41, 60, 61

**INTRODUCTION**

These consolidated Petitions for Review arise from an FCC Order[1] in a pole attachment rate dispute between BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina ("AT&T"), a telecommunications provider, and Duke Energy Progress, LLC ("Duke"), an electric utility pole owner. AT&T's network, like the networks of other communications providers, depends on cables attached to electric utility poles, including poles owned by Duke. Pole attachment rates are the annual rental amounts Duke and other utilities charge communications providers for use of space on their poles. Federal law requires those rates to be "just and reasonable"[2] because the use of utility poles is essential to the provision of communications services, and electric utilities are "'in a position to extract monopoly rents … in the form of unreasonably high pole attachment rates.'"[3]

For more than a decade, the Federal Communications Commission ("FCC" or "Commission") has ordered utilities to eliminate outdated disparities in the pole attachment rates they charge various types of communications providers. These

---

[1] *BellSouth Telecomm., LLC d/b/a AT&T N.C. and d/b/a AT&T S.C. v. Duke Energy Progress, LLC*, Proceeding No. 20-293, Bureau ID EB-20-MD-004, Order on Reconsideration and Review (Nov. 18, 2022) ("Order").

[2] 47 U.S.C. § 224.

[3] S. Rep. No. 95-580, at 13 (1977).

1

rate disparities are a vestige of history, resulting primarily from the FCC's decision decades ago to set different pole attachment rates based on the regulatory classification of the communications provider.  Now, the FCC recognizes that these rate distinctions are unfounded in today's converged communications marketplace, where providers of all regulatory classifications compete to deliver telephone, video, broadband, and other advanced services to the same customers using cables and related facilities that occupy a similar amount of space on the same poles.  Moreover, the rate disparities impede competition and undermine efforts by Congress and the FCC to "ensure that consumers in all regions of the country have access to advanced telecommunications and information services at rates that are just, reasonable and affordable."[4]  As a result, in 2011 and again in 2018, the FCC ordered electric utilities like Duke to charge traditional telephone companies like AT&T competitively neutral "just and reasonable" pole attachment rates, which should typically be the same "just and reasonable" rate charged their competitors.  At most, the "just and reasonable" rate may be slightly higher than the competitors' rate (and still far lower than electric utilities' traditionally

---

[4] *Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*, 26 FCC Rcd 5240, 5241-42 (¶¶ 2-3) (2011) ("*2011 Order*"), *aff'd, Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183 (D.C. Cir. 2013).

exorbitant rates) if the evidence proves the traditional telephone company receives pole attachment terms that materially advantage it relative to its competitors.

Despite AT&T's entreaties following those orders, Duke refused to reduce the $██ per pole annual rate it charges AT&T, an amount that far exceeds the approximately $██ per pole annual "just and reasonable" rate paid by AT&T's competitors for use of the same poles. With AT&T facilities attached to over 148,000 Duke poles, this extraordinary $██ rate disparity subjected AT&T to a ████████-dollar annual competitive disadvantage. AT&T, as a result, filed a pole attachment complaint at the FCC against Duke seeking the just and reasonable rates and refunds required by federal law.

The FCC resolved AT&T's complaint in the Order on review. The Order correctly invalidates Duke's rates as unjustly and unreasonably high and orders Duke to refund its overcharges to AT&T, consistent with the statute of limitations. But the Order does not go far enough, as it fails to *eliminate* the rate disparity between AT&T and its competitors. The Order requires AT&T to pay Duke about $██ per pole annually while AT&T's competitors remain entitled to an approximately $██ per pole annual rate for use of comparable space on the exact same poles. The FCC reached this incorrect result by finding AT&T is materially advantaged over its competitors due to traits shared by all traditional telephone companies, such as the standard location of their cables on poles and their

contractual pole access rights, and by allowing Duke to manipulate an input to the pole attachment rate formula solely to achieve a higher rate for AT&T.  These findings cement rate disparities based on regulatory classifications and contradict the Federal pole attachment statute and FCC regulations, precedent, and policy.

Duke, for its part, refuses to reduce its rates even to the $█ level, arguing that the FCC should have walked away from decades of precedent to preserve Duke's unreasonably high rates.  The FCC correctly rejected Duke's continued resistance to the statute and established FCC law and policy.  This Court should deny Duke's Petition, grant AT&T's Petition, and direct the FCC to confirm that the same "just and reasonable" pole attachment rate applies to both AT&T and its competitors.

## JURISDICTIONAL STATEMENT

This Court consolidated Duke's and AT&T's Petitions for Review of the FCC's Order, which was adopted on November 17, 2022 and released on November 18, 2022.  Duke's Petition for Review was filed in this Court on November 28, 2022, and AT&T's Petition for Review was filed on January 17, 2023 in the United States Court of Appeals for the D.C. Circuit and transferred to this Court on January 26, 2023.  This Court has subject matter jurisdiction over the consolidated Petitions for Review under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a) because the Order is a final, reviewable FCC order.  Venue in this Court

4

is proper under 28 U.S.C. §§ 2112(a) and 2343 because Duke's principal place of business is in North Carolina and the administrative record was first filed in this Court.

## STATEMENT OF THE ISSUES

### A.  Issues Raised by AT&T's Petition for Review

1.  Whether it was arbitrary, capricious, lacking substantial evidence, or otherwise contrary to law for the FCC to find that the just and reasonable rate for AT&T's use of space on Duke's utility poles is far higher than the just and reasonable rate for AT&T's competitors' use of comparable space on the same utility poles.

2.  Whether it was arbitrary, capricious, or otherwise contrary to law for the FCC to adopt a different "number of attaching entities" input when calculating rates for AT&T's use of Duke's poles than Duke uses when calculating rates for AT&T's competitors' use of the same poles.

### B.  Issues Raised by Duke's Petition for Review

1.  Whether it was unlawfully retroactive or arbitrary or capricious for the FCC to review the rates Duke charged AT&T during an approximately 2-year period covered by the statute of limitations (September 1, 2017 to December 31, 2019) under a standard the FCC adopted in 2011—six years *before* the relevant time period.

2.    Whether it was arbitrary, capricious, or otherwise contrary to law for the FCC to apply settled precedent that Duke may only charge AT&T for space AT&T actually occupies on Duke's poles, so may not charge AT&T for "safety space" on a pole where AT&T does not, and cannot, attach cables or facilities because of the risks posed by Duke's charged electrical facilities.

3.    Whether it was arbitrary, capricious, or otherwise contrary to law for the FCC to apply settled precedent that 47 U.S.C. § 224 requires the FCC to ensure just and reasonable rates for AT&T's use of Duke's poles.

## STATEMENT OF THE CASE

Pole attachment rates are the annual rental amounts utilities charge, and communications companies pay, to use space on utility poles.  The FCC has a statutory duty to ensure that these pole attachment rates are "just and reasonable." 47 U.S.C. § 224(b).[5]  This appeal concerns the FCC's decision in a pole attachment complaint proceeding AT&T filed against Duke to secure these just and reasonable rates.

### A.    Historical Background

For more than a decade, the FCC has directed electric utilities to eliminate "outdated rate disparities" in the pole attachment rates they charge

---

[5] 47 U.S.C. § 224 includes some exceptions that are not relevant here.  It does not apply to poles owned by railroads, electric cooperatives, or municipal utilities, *id.* § 224(a)(1), or in States that have "reverse-preempted" the statute, *id.* § 224(c).

6

communications companies, which are entitled to a "just and reasonable" rate under federal law.[6]  These rate disparities resulted primarily from the FCC's adoption of pole attachment regulations over the course of several decades as new types of communications companies entered the market.

Initially, before cable television or Internet, utility poles were primarily owned and used by just two companies: electric utilities and traditional telephone companies known as incumbent local exchange carriers ("ILECs").  AT&T is an ILEC.  *See* Order ¶ 1.  Because local governments and residents generally preferred a single pole line, the electric utility and ILEC typically entered into a joint use agreement ("JUA") that allowed each company to attach cables and related facilities to each other's poles.  *See, e.g.*, *2011 Order*, 26 FCC Rcd at 5334 (¶ 216 n.651).  Over time, electric utilities acquired the vast majority of poles, shifting the balance of pole ownership and giving electric utilities tremendous leverage to force ILECs to pay exceptionally high pole attachment rates.  *See, e.g.*, *id.* at 5327 (¶ 199); *2018 Order*, 33 FCC Rcd at 7768-69 (¶¶ 124-25).  Duke, for example, has a "substantial five-to-one pole ownership advantage" over AT&T,

---

[6] *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investments*, 33 FCC Rcd 7705, 7767 (¶ 123) (2018) ("*2018 Order*"), *aff'd*, *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020); *see also 2011 Order*, 26 FCC Rcd at 5243 (¶ 6).

which provides Duke the ability to impose and perpetuate unjust and unreasonable rates. *See* Order ¶ 22.[7]

With the advent of cable television, cable companies needed to attach their cables and related facilities to utility poles, and there was typically space for them to attach between the existing communications and electrical cables. Cable attachments typically occurred pursuant to "license agreements" between the utility and the cable company. License agreements do not require cable companies to own poles or bear the associated costs and responsibilities of pole ownership that ILECs must shoulder under JUAs.

In 1978, following reports that some electric utilities were charging cable companies "monopoly rents" for use of pole space, Congress passed the Pole Attachment Act to guarantee cable companies "just and reasonable" pole attachment rates, terms, and conditions. *See NCTA v. Gulf Power Co.*, 534 U.S. 327, 330 (2002); 47 U.S.C. § 224(b). The FCC then adopted a regulatory formula, with presumptive default inputs to that formula, to derive the maximum "just and reasonable" pole rental rate utilities could charge a cable company, *i.e.*, the "cable rate." *See* 47 C.F.R. § 1.1406(d)(1). The U.S. Supreme Court agreed that the

---

[7] *See also BellSouth Telecomm., LLC d/b/a AT&T N.C. and d/b/a AT&T S.C. v. Duke Energy Progress, LLC*, Proceeding No. 20-293, Bureau ID EB-20-MD-004, 36 FCC Rcd 13684, 13700-13703 (¶¶ 37-39) (EB Sept. 21, 2021) ("EB Order").

resulting "cable rate" fully compensates the pole owner.  *See FCC v. Fla. Power Corp.*, 480 U.S. 245, 254 (1987).

In 1996, Congress passed the groundbreaking Telecommunications Act ("the 1996 Act"), introducing competition to the local telephone market.  The resulting influx of new communications companies significantly increased the demand for space on utility poles.  The 1996 Act gave these new communications companies, known as competitive local exchange carriers ("CLECs"), and cable companies a guaranteed right of access to utility poles.  *See* 47 U.S.C. § 224(f).  This means that CLECs and cable companies must be allowed to use space on a utility pole that is available or can be made available by rearranging the existing cables and related facilities.  *See Gulf Power Co. v. FCC*, 669 F.3d 320, 324-25 (D.C. Cir. 2012).  Congress did not extend this guaranteed access right to ILECs, which must continue to rely on negotiated terms in JUAs to use space on electric company utility poles.  *See 2011 Order*, 26 FCC Rcd at 5329-30 (¶ 207).

The 1996 Act also extended the right to "just and reasonable" pole attachment rates to all "provider[s] of telecommunications service."  *See* 47 U.S.C. §§ 224(a)(4), (b)(1).  And, as it did for cable companies, the FCC again adopted a formula, with presumptive default inputs, to establish the maximum "just and reasonable" rate for telecommunications providers, *i.e.*, the "telecom rate," but gave this rate protection *only* to CLECs, not to ILECs.  *2011 Order*, 26 FCC Rcd at

5328 (¶ 205).  The "telecom rate" for CLECs produced "significantly higher pole rental rates than rates derived from the cable rate formula."[8]  So at that point, cable company attachers paid the lowest rates (the "cable rate"), CLEC attachers paid the next highest rates (the "telecom rate"), and ILEC attachers continued to pay the highest rates of all.  *Connecting America: The National Broadband Plan*, 2010 WL 972375, at *97 (2010) ("*Nat'l Broadband Plan*").

It has long been Congress's goal to "ensure that all people of the United States have access to broadband capability" at affordable prices.  *See* 47 U.S.C. § 1305(k)(2).  At Congress's direction, *id.*, the FCC developed a 2010 National Broadband Plan, which recommended further action to ensure broadband providers (like AT&T) can access utility pole infrastructure "efficiently and at fair prices," *Nat'l Broadband Plan*, 2010 WL 972375, at *4.  The Plan explained that ILECs, CLECs, and cable companies all offer competitive voice, data, broadband, and video services using similar facilities, but "the rental rates paid by communications companies to attach to a utility pole vary widely."  *Id.* at *97.  To wit: the same space on a pole may cost a cable company $7 per year, a CLEC $10 per year, and an ILEC more than $20 per year.  *Id.*  Yet the FCC recognized that the lowest of

---

[8] *See Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*, 30 FCC Rcd 13731, 13734 (¶ 7) (2015) ("*2015 Order*"), *aff'd*, *Ameren Corp. v. FCC*, 865 F.3d 1009 (8th Cir. 2017).

these three rates—the cable rate—is "'just and reasonable' and fully compensatory" for the pole owner. *Id.* (citation omitted). The Plan thus recommended that the FCC set "rental rates for pole attachments … as low and close to uniform as possible, consistent with Section 224 of the Communications Act of 1934, as amended, to promote broadband deployment." *Id.*

**B.  Regulatory Background**

In 2011, the FCC amended its regulations to harmonize pole attachment rates among communications providers because "widely disparate pole rental rates distort infrastructure investment decisions and in turn could negatively affect the availability of advanced services and broadband." *2011 Order*, 26 FCC Rcd at 5243 (¶ 6). *First*, the FCC revised its telecom rate formula to produce a lower rate that approximates the cable rate. *See, e.g.*, *id.* at 5305 (¶ 149). The revised formula is called the "new telecom rate" formula; the pre-2011 replaced formula is known as the "old telecom rate" formula. *See* Order ¶ 3.[9] With this revision (and further refinements to the formula in 2015), the FCC ensured that CLECs and cable companies are guaranteed essentially the same pole attachment rate. *See, e.g.*, *2015 Order*, 30 FCC Rcd at 13733 (¶ 4).

---

[9] The *2011 Order* refers to the "old telecom rate" as the "the preexisting, high-end telecom rate." *2011 Order*, 26 FCC Rcd at 5337 (¶ 218). "For ease of reference," the Order refers to this rate as the "old telecom rate," *see* Order ¶ 3 n.11, so this brief does as well.

*Second*, the FCC reviewed the language of the 1996 Act and confirmed that ILECs are "providers of telecommunications services" entitled to "just and reasonable" pole attachment rates. *See 2011 Order*, 26 FCC Rcd at 5328 (¶¶ 202-03); *see also* 47 U.S.C. §§ 224(a)(4), (b)(1). But the FCC did not adopt a universal rate formula to set rates for ILECs, as it had with CLECs and cable companies. Instead, the FCC directed electric utilities to charge ILECs that occupy space on utility poles "just and reasonable" rates that are competitively neutral. *See 2011 Order*, 26 FCC Rcd at 5336-37 (¶¶ 217-218). The FCC explained that this means that if an ILEC attaches to an electric utility's "poles on terms and conditions that are comparable to those that apply to a [CLEC] or a cable operator," the ILEC should pay "the same rate as the comparable provider." *Id.* at 5336 (¶ 217). Conversely, if the JUA terms and conditions provide the ILEC a net material advantage as compared to its CLEC and cable competitors, the old telecom rate should be a "reference point" for the "just and reasonable" rate. *Id.* at 5336-37 (¶ 218). The old telecom rate formula using FCC presumed default inputs results in a rate that is about 1.5 times the new telecom rate.[10]

---

[10] In Duke's urban service area, the new telecom rate is 0.66 times the old telecom rate calculated with default inputs. *See 2011 Order*, 26 FCC Rcd at 5304 (¶ 149); 47 C.F.R. § 1.1406(d). Conversely, the old telecom rate is 1.51 times the new telecom rate (1/0.66).

The FCC expected that its *2011 Order* would result in significant rate reductions for ILECs, which it found had been forced to pay up to $350 million more *annually* than they would have paid at new telecom or cable rates. *Id.* at 5330-31 (¶ 208). But the expected rate reductions did not come. Initially, electric utilities challenged the *2011 Order*, arguing (as Duke continues to do here) that the FCC should not have found that ILECs are entitled to just and reasonable rates. The D.C. Circuit rejected that challenge. *Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 188 (D.C. Cir. 2013) ("*AEP*"). Nonetheless, with bargaining leverage from their pole ownership numbers, electric utilities continued to ignore the *2011 Order*, "perpetuat[ing] the status quo and refus[ing] reductions to [their] unjust and unreasonable rates." EB Order ¶ 39.

In 2017—six years after the *2011 Order*—ILECs were paying higher rates than they had before the *2011 Order*, while CLECs were paying reduced rates in line with the rates cable companies paid. *2018 Order*, 33 FCC Rcd at 7769 (¶ 125). So in 2018, the FCC took further action to "eliminate [these] outdated disparities." *Id.* at 7707 (¶ 3). It established a presumption: ILECs are comparable to their competitors and entitled to the <u>same</u> just and reasonable rate guaranteed their competitors (*i.e.*, the new telecom rate) under agreements that—like AT&T's JUA with Duke—renewed after the presumption's effective date. *See* 47 C.F.R. § 1.1413(b); Order ¶ 10. An electric utility can rebut the presumption with clear

and convincing evidence that the ILEC "receives benefits under its pole attachment agreement with [the] utility that materially advantage[ ] the [ILEC] over other telecommunications carriers or cable television systems providing telecommunications services on the same poles." 47 C.F.R. § 1.1413(b). If the electric utility rebuts the presumption, it can charge the ILEC rates higher than the new telecom rate, but no higher than the old telecom rate. *2018 Order*, 33 FCC Rcd at 7771 (¶ 129). In other words, the old telecom rate is no longer a reference point but, instead, the "maximum rate" the electric utility may charge the ILEC. *Id.*

## C.    Procedural History

Despite lengthy negotiations, Duke refused to reduce the $██ annual per pole rate it charged AT&T. *See* Order ¶ 1; EB Order ¶¶ 6, 38-39. This forced AT&T to file a pole attachment complaint at the FCC seeking just and reasonable rates and refunds of its prior overpayments, consistent with the Commission's regulations and the applicable 3-year statute of limitations. *See* EB Order ¶ 7; 47 C.F.R. § 1.1407(a).

The FCC's Enforcement Bureau granted AT&T's complaint in part. EB Order ¶ 1. The Enforcement Bureau found that Duke has long charged AT&T unjust and unreasonable rates and that AT&T is entitled to a refund of amounts Duke collected in violation of law, consistent with the applicable 3-year statute of

14

limitations.  *See id.*  The Enforcement Bureau, however, decided that Duke *may* still continue to charge AT&T far higher pole attachment rates than Duke charges AT&T's competitors, making two findings.

*First*, the Enforcement Bureau found that the JUA includes terms and conditions that materially advantage AT&T over its competitors that attach to the same poles, requiring AT&T to pay Duke the *old telecom rate* rather than the lower *new telecom rate* paid by those competitors.  EB Order ¶ 8.  The Enforcement Bureau acknowledged that Duke sought to collect higher rates based on "hypothetical scenarios" that were "at odds with precedent," "AT&T's historical status as the first communications attacher on Duke's poles," and costs AT&T already incurs.  *Id.* ¶¶ 43-46.  But the Enforcement Bureau concluded that the "record" nonetheless justified AT&T's paying the old telecom rate.  *Id.* ¶ 16.

*Second*, the Enforcement Bureau allowed Duke to calculate rates for AT&T using an input to the old telecom rate formula, specifically the "number of attaching entities" on Duke's poles, that is lower than the value Duke uses for the same input when calculating rates for AT&T's competitors that are attached to the same poles.  *See id.* ¶¶ 52-53.  Because this input is used to divide the cost of unusable pole space among the pole's "attaching entities," using a lower number for AT&T requires AT&T to pay for a proportionately greater portion of that unusable space and increases its resulting rate.

15

Although the Enforcement Bureau did not show its rate calculation in its decision, the inputs to the formula it adopted, including the number of attaching entities input unique to AT&T, produced an old telecom rate of "around $█/pole." *See* Opp'n to AT&T App. for Review at 24 (Nov. 5, 2021). Yet, AT&T's competitors remain statutorily entitled to a new telecom rate that has averaged about $███ per pole. *See* Joint Statement ¶ 21 (Jan. 8, 2021). The difference between these rates, when applied to more than 148,000 Duke poles to which AT&T is attached, will competitively disadvantage AT&T relative to its competitors by nearly $████████ annually.

AT&T sought review by the full Commission, pointing out that the Enforcement Bureau's decision unjustifiably perpetuated a competitive rate disparity by applying the wrong standard to conclude that the old telecom rate formula should apply, and improperly allowing Duke to calculate AT&T's rates using the wrong number of attaching entities. Duke also sought review of the Enforcement Bureau's Order and filed a petition for reconsideration with the Enforcement Bureau. Duke's petition was referred to the full Commission, which denied both requests for further review in the Order on review. *See* Order ¶ 1.[11] These consolidated Petitions for Review followed.

---

[11] The FCC granted a request for clarification that AT&T included with its request for further review. *See* Order ¶ 1. Duke does not challenge the clarification here.

16

## SUMMARY OF THE ARGUMENT

Section 224 of the Communications Act requires the FCC to enforce AT&T's right to "just and reasonable" rates for use of space on Duke's utility poles. 47 U.S.C. § 224(b). In 2011, the FCC interpreted this statutory language and held that ILECs, including AT&T, are entitled to "the same rate as [a] comparable provider" when they attach to an electric utility's poles pursuant to materially comparable terms and conditions. *2011 Order*, 26 FCC Rcd at 5336 (¶ 217). This makes sense—AT&T competes with CLECs and cable companies that are guaranteed a new telecom rate; provides telephone, video, broadband, and other advanced services using cables and related facilities that occupy a similar amount of space on poles as these competitors; and is protected by the same right under 47 U.S.C. § 224 to "just and reasonable" rates. And "[b]y keeping pole attachment rates unified and low, [the FCC] further[s its] overarching goal to accelerate deployment of broadband by removing barriers to infrastructure investment and promoting competition." *2015 Order*, 30 FCC Rcd at 13733 (¶ 4).

Faced with resistance to the required rate reductions from electric utilities, the FCC adopted a presumption in 2018 that ILECs are comparable to their competitors and entitled to the same new telecom rate. 47 C.F.R. § 1.1413(b). Although AT&T is entitled to that presumption, Duke still refused to comply with

law and reduce the $██ per pole rate it charges AT&T to mirror the approximately $██ new telecom rate that Duke charges AT&T's competitors.

In the Order on review, the FCC correctly found that Duke charged AT&T unjust and unreasonable pole attachment rates and must refund amounts it unlawfully collected. But, contrary to its decade-long effort to eliminate the artificial and outdated rate disparities that have unjustifiably forced ILECs to pay rates far higher than their competitors, the FCC set approximately $██ per pole rates for AT&T that competitively disadvantage AT&T.

*First*, the FCC found, for reasons at odds with its regulation, precedent, and policy, that AT&T must pay rates calculated using the old telecom rate formula, far higher than the new telecom rates its competitors pay. The FCC reached this conclusion by finding that the JUA between AT&T and Duke granted AT&T material benefits not available to AT&T's competitors. But JUA terms that the FCC found constituted benefits are the very traits that constitute an ILEC. Defining "benefits" to include these ILEC characteristics predetermines the outcome of the analysis—it precludes ILECs from *ever* qualifying for the new telecom rate and contravenes the FCC's express presumption that ILECs (which, definitionally, have these features) are comparable to—and should pay the same pole attachment rates as—their competitors.

Also, when comparing the rights and responsibilities of AT&T to its competitors, the FCC deemed irrelevant the statutory and regulatory pole attachment rights those competitors receive, but that have been withheld from ILECs. The FCC thus created an upside-down analysis that looked at only a piece of the puzzle, comparing traits of ILECs that it considered "benefits" and ignoring significant legal guarantees provided to CLECs and cable attachers. By doing so, the FCC created a preordained result that AT&T is materially and competitively advantaged by differences that, in fact, set AT&T at a material competitive *dis*advantage.

Indeed, the FCC's finding that AT&T received a competitive advantage disregarded the burden FCC regulations and precedent place on *Duke* to prove by clear and convincing evidence that it provides AT&T net material competitive advantages under the parties' JUA that justify *Duke*'s collection of a rate as high as the old telecom rate. Duke's evidence was neither clear nor convincing; Duke was not even able to accurately quantify a single cost that it incurs because of the alleged advantages. *See* EB Order ¶ 43 (finding Duke's "calculations are speculative and unsupported by reliable evidence"). Yet the FCC authorized Duke to collect nearly ███████ dollars from AT&T annually in excess of the new telecom rate. The FCC's decision cannot stand consonant with its regulations, precedent, and insistence that it must eliminate "artificial, non-cost-based

19

differences" in pole attachment rates that "are bound to distort competition." *AEP*, 708 F.3d at 190.

*Second*, the FCC found that AT&T must pay rates that far exceed even the default old telecom rate (*i.e.*, 1.5 times the new telecom rate) under the FCC's regulations, which is itself "sufficiently high that it hinders important statutory objectives." *See 2011 Order*, 26 FCC Rcd at 5303 (¶ 147). The FCC achieved this result by allowing Duke to calculate pole attachment rates for AT&T using a "number of attaching entities" input into the rate formula that is lower than the input Duke uses to calculate rates for AT&T's competitors located on the same poles. This is confounding, since the number of attaching entities physically attached on any pole does not change based on which attacher's rates are being calculated; it should not change as a formula input either. Allowing Duke to selectively vary that input and use a lower value to artificially inflate the pole attachment rate AT&T pays is contrary to principles of competitive neutrality. It also violates the FCC's statute and regulation, which require "an equal apportionment" of the relevant "costs among all attaching entities." *See* 47 U.S.C. § 224(e)(2); *see also* 47 C.F.R. § 1.1409(a).

The FCC decision to set rates for AT&T using the old telecom rate formula and a uniquely-applied number of attaching entities input created the very type of competitive rate disparity the FCC has long said it was eliminating. Without

20

explanation for this obvious disconnect, the FCC set AT&T's rates at about ▆▆ per pole, far above the approximately $▆▆ new telecom rates AT&T's competitors pay to use the exact same poles. Duke challenges even this rate reduction, returning to arguments the FCC and courts have repeatedly rejected. This Court should continue to reject these recurrent challenges.

*First*, Duke tries to create a retroactivity claim by mischaracterizing the evidentiary standard the FCC adopted in 2011. In Duke's view, ILECs should be denied relief from JUA rates under the standard the FCC adopted in its *2011 Order* unless they prove the exact value of competitive advantages, *including those the ILEC does not believe exist*. The FCC never adopted such an impossible "prove the negative" standard. Instead, the FCC adopted an evidentiary standard in its *2011 Order* that it applied in this case to rates Duke charged AT&T beginning in 2017. There can be no retroactivity concern.

*Second*, Duke seeks to overturn 40 years of FCC precedent holding that electric utilities cannot charge communications providers for the 40 inches of "safety space" on a utility pole—space that is required because of "the potentially lethal voltage carried by the electric lines." *See* Order ¶ 42 n.160 (citation omitted). "[L]ong-standing Commission precedent holds that [a communications] attacher can only be assessed for space it *actually occupies*." *Id.* ¶ 25 n.91 (emphasis in original). AT&T's attachments do not occupy any of the safety

space.  EB Order ¶ 51.  Indeed, communications attachers cannot occupy the safety space because of "the presence of the potentially hazardous electric lines."  Order ¶ 42.  The FCC, therefore, held—"based on settled precedent"—that "because AT&T's attachments do not occupy the safety space, Duke may not charge AT&T for that space."  *Id.*; EB Order ¶ 51.  This holding—consistent with four decades of precedent—was not "contrary to law" as Duke contends.

*Finally*, Duke argues that the D.C. Circuit incorrectly affirmed the FCC's exercise of jurisdiction over the pole attachment rates paid by ILECs.  Rehashing arguments Duke's parent corporation made to the D.C. Circuit a decade ago, Duke is still unable to identify any flaw in the FCC's straightforward reading of the statutory language.  By statute, the FCC "shall regulate the rates … for *pole attachments* to provide that such rates … are just and reasonable."  47 U.S.C. § 224(b)(1) (emphasis added).  "Pole attachments" include the attachments of "*provider[s] of telecommunications service*.  *Id.* § 224(a)(4) (emphasis added).  It is undisputed that ILECs are providers of telecommunications service.  Thus, the FCC correctly concluded that they are entitled to just and reasonable rates.  *AEP*, 708 F.3d at 188.

The Court should grant AT&T's Petition, deny Duke's Petition, and remand with instructions for the FCC to set the same just and reasonable new telecom rate for AT&T's use of Duke's poles that Duke charges AT&T's competitors.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), this Court will set aside agency action that "is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,' or 'unsupported by substantial evidence.'" *Knox v. U.S. Dep't of Lab.*, 434 F.3d 721, 723 (4th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A), (E)).  An agency's decision is arbitrary and capricious if the agency "relie[d] on factors outside those Congress intended it to consider; failed to consider an important part of the problem; offered an explanation contradicted by the evidence before the agency; or 'is so implausible that it could not be ascribed to a difference in view on the product of agency expertise.'" *Sierra Club v. W.Va. Dep't of Env't Prot.*, 64 F.4th 487, 501 (4th Cir. 2023) (citations omitted).  While "this standard is highly deferential," the Court "will not 'rubber stamp' an agency's decision" as it "must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action."  *Id.* (citations omitted). "Substantial evidence is "more than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Edd Potter Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 43 F. App'x 540, 542 (4th Cir. 2002).

**ARGUMENT**

## I.      The Commission Erred When It Created an Artificial and Unwarranted Rate Disparity Between AT&T and AT&T's Competitors.

In contravention of FCC regulations and orders requiring "consistent, cross-industry attachment rates" to promote broadband deployment, *see, e.g.*, *2015 Order*, 30 FCC Rcd at 13738 (¶ 16), the FCC *approved* a competitive rate disparity that will require AT&T to pay Duke about $█ per pole while AT&T's competitors pay about $█ for use of comparable space on the same poles.[12]  The Commission arrived at this anticompetitive result by (A) adopting the wrong rate formula, and (B) adopting an incorrect input to that rate formula.  The Court should grant AT&T's Petition and direct the FCC to set the same "just and reasonable" rate for AT&T's use of Duke's poles that Duke charges AT&T's competitors for use of the same poles.

### A.      The FCC Incorrectly Adopted The Old Telecom Rate Formula.

AT&T and its competitors attach cables and related facilities to the same poles and are protected by the same statutory right to "just and reasonable" rates. *See* 47 U.S.C. § 224(b).  But the FCC found that AT&T must pay an old telecom rate while its competitors pay a significantly lower new telecom rate.  The FCC's

---

[12] *See* Order ¶ 1 (denying AT&T's Application for Review in relevant part); Opp'n to AT&T App. for Review at 24 (stating that the Enforcement Bureau's Order requires AT&T to pay "around $█/pole"); Joint Statement ¶ 21 (listing new telecom rates Duke charged AT&T's competitors, which averaged about $█).

approval of Duke charging AT&T pole attachment rates based on the old telecom rate formula is incompatible with its regulations and precedent, unsupported by substantial evidence, and is arbitrary and capricious.

### 1.    The FCC Erred When It Found That Immutable Characteristics of ILECs Justify an Old Telecom Rate.

Over a decade ago, and in repeated decisions since, the FCC has found that comparable communications providers are statutorily guaranteed *the same* "just and reasonable" rate irrespective of their regulatory classification. *See 2018 Order*, 33 FCC Rcd at 7767 (¶ 123); *2015 Order*, 30 FCC Rcd at 13738 (¶ 16); *2011 Order*, 26 FCC Rcd at 5336 (¶ 217); *Nat'l Broadband Plan*, 2010 WL 972375, at *97. Indeed, charging "[d]ifferent rates for virtually the same resource (space on a pole), based solely on the regulatory classification of the attaching provider," is neither just nor reasonable. *Nat'l Broadband Plan*, 2010 WL 972375, at *97. It creates "arbitrary price differentials" among competitors, *AEP*, 708 F.3d at 190, and "distort[s] infrastructure investment decisions," which "could negatively affect the availability of advanced services and broadband," *2011 Order*, 26 FCC Rcd at 5243 (¶ 6). It also overcompensates electric utilities because lower rates—calculated using the new telecom rate formula—"fully compensate the pole owner for costs caused by third-party attachments." *2011 Order*, 26 FCC Rcd at 5324 (¶ 191).

The FCC's *2011 Order*, as a result, held that the "just and reasonable" rate an ILEC should pay is "the same rate" paid by a "comparable provider," *i.e.*, the new telecom rate. *Id.* at 5336 (¶ 217). In its *2018 Order*, the FCC converted the standard from the *2011 Order* into a *presumption* that ILECs are comparable to their competitors and entitled to the same new telecom rate. *2018 Order*, 33 FCC Rcd at 7767-68 (¶ 123); *see also* 47 C.F.R. § 1.1413(b). Rebutting this presumption requires an electric utility to provide "clear and convincing evidence" that the ILEC "receives benefits under its pole attachment agreement with [the] utility that materially advantage[ ] the [ILEC] over other telecommunications carriers or cable television systems providing telecommunications services on the same poles." 47 C.F.R. § 1.1413(b).

Under this presumption, rates higher than the new telecom rate should be the exception. And they cannot be justified based on alleged "benefits" that reflect an ILEC's "historical status as an [I]LEC" or its "historical status as the first attacher on Duke's poles." *See* Order ¶ 32 n.114; EB Order ¶ 44. For example, because an ILEC historically had (and still has) no statutory right to pole access, it had to and must still obtain access to poles pursuant to contract terms. *See* 47 U.S.C. § 224(f). And because an ILEC historically was the first (and only) communications attacher on poles, its attachments are typically placed the lowest due to standard construction practices that existed then and must continue now given the "physical

damage that would result if [communications] facilities crisscrossed mid-span." *See* EB Order ¶ 33 n.98; *see also* Compl. Ex. C, Peters Aff. ¶ 21 (Aug. 31, 2020).

The Enforcement Bureau recognized the conflict if historical, unchangeable ILEC characteristics determine an ILEC's pole attachment rate, explaining, "if an [I]LEC's status as the first attacher were enough to justify higher rates, there would be little need" for the comparative analysis the FCC adopted in 2011 and reinforced in 2018. EB Order ¶ 44 n.146. In other words, if immutable characteristics shared by ILECs are enough to justify higher rates, ILECs will never—as the FCC intended—pay the "same rate" as their competitors. *See 2011 Order*, 26 FCC Rcd at 5336 (¶ 217); 47 C.F.R. § 1.1413(b).

The FCC thus violated its regulations and precedent when it relied on the very definitional characteristics of ILECs to find that AT&T must pay an old telecom rate while its competitors pay a far lower new telecom rate. Specifically, the FCC found that AT&T is competitively advantaged because it obtains "pole access" by contract rather than by a statutory right of access, *see* Order ¶¶ 47-49, and because AT&T's facilities are typically affixed at "the bottom of the communications space" where ILEC facilities are typically located, *id.* ¶ 53. AT&T disagrees that these facts provide it a material advantage over its competitors and they are, in fact, a liability. *See* Section I.A.3, *infra*. But, even if they provided some theoretical benefit, they are common to all ILECs; AT&T

27

cannot require Congress to provide it a statutory right of access any more than it can move all of its attachments on all the poles throughout the Carolinas to a higher location on the pole (and force the other communications attachers to move their facilities lower on each pole), which would result in astronomical cost and disruption to all communications providers, local governments, and residents.  If an ILEC's contractual access and its location on the pole are sufficient to rebut the presumption that ILECs are comparable to their competitors, the presumption is a nullity.  It will always be rebutted, no ILEC will *ever* pay the same pole attachment rate as its competitors, and the competitive disparate treatment of ILECs will persist.

The FCC did not adopt such an illusory presumption.  Rather, it intended most ILECs to pay the new telecom rate as of 2011, which the FCC found would further its deployment goals by providing up to $350 million in annual pole attachment rental reductions for ILECs.  *See 2011 Order*, 26 FCC Rcd at 5331 (¶ 208).  And when the FCC learned that electric utilities were resisting those rate reductions, it adopted its presumption in 2018 in order to finally "*eliminate* [the] outdated disparities." *2018 Order*, 33 FCC Rcd at 7707 (¶ 3) (emphasis added).  The FCC was fully cognizant of ILEC traits and historical operations when it adopted this presumption that ILECs are comparable to their competitors.  *See id.* at 7718 (¶ 22) ("the lowest attacher on the pole [is] usually the [I]LEC"); *2011*

28

*Order*, 26 FCC Rcd at 5334 (¶ 216) ("[I]LECs frequently have access to pole attachments pursuant to joint use agreements today").  Clearly, the FCC found that ILECs—with their immutable traits—should still receive "*the same rate* as [a] comparable provider." *2011 Order*, 26 FCC Rcd at 5336 (¶ 217) (emphasis added); *see also 2018 Order*, 33 FCC Rcd at 7769 (¶ 126).

The FCC's reliance on unchangeable ILEC characteristics to increase AT&T's rate is thus squarely incompatible with its regulations and precedent.  And an "agency must be required to apply in fact the clearly understood legal standards that it enunciates in principle." *Knox*, 434 F.3d at 724 (citation omitted).  It cannot, as it did here, effectively delete the presumption from its rules and the principle of competitive neutrality from its precedent.  *See, e.g.*, *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340 (4th Cir. 1995) (citation omitted) ("An agency of the government must scrupulously observe rules, regulations, or procedures which it has established.  When it fails to do so, its action cannot stand and courts will strike it down.").

Relying on immutable ILEC characteristics was also arbitrary and capricious because the FCC failed to acknowledge that it was effectively crystallizing the competitive rate disparities it has long sought to eliminate.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (finding agency action is "arbitrary and capricious if the agency … entirely failed

to consider an important aspect of the problem"). In response to AT&T's argument that the Enforcement Bureau had relied on "immutable traits of [I]LECs" to rebut the presumption, the FCC simply claimed it was relying on "express terms" in the parties' JUA. *See* Order ¶ 46 n.183. That analysis dodges the issue because those traits upon which the FCC relied remain immutable. And in any event, reliance on express terms in the JUA actually underscores that they are immutable ILEC traits—because ILECs, with no statutory pole access rights, necessarily rely on rights long ago negotiated by contract. *See, e.g.*, *id.* ¶ 3 n.13. The FCC's reliance on an ILEC's contractual access to poles and its historical location on a pole to rebut its presumption still nullifies the presumption.

An agency may not depart from its established policy unless "it offers a 'reasoned explanation' for doing so." *De Leon v. Holder*, 761 F.3d 336, 344 (4th Cir. 2014) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)). Here, the FCC failed to provide any reason—let alone a rational and reasoned explanation, *see id.*—for its decision to justify the artificial rate disparities it has sought to eliminate for more than a decade. *See, e.g.*, *Nat'l Broadband Plan*, 2010 WL 972375, at *97 ("Different rates for virtually the same resource (space on a pole), based solely on the regulatory classification of the attaching provider" is "arcane" and must be eliminated). The Court should vacate the FCC's finding that the old telecom rate formula applies.

30

### 2.    The FCC Erred When It Limited Its Comparative Analysis of Relevant Pole Attachment Rights.

The FCC also violated its regulations and precedent when it compared "the contractual rights afforded [AT&T]" with *only* the contractual rights "afforded other attachers"—but expressly ignored those attachers' undisputed fulsome statutory and regulatory rights. *See* Order ¶ 48; *see also id.* ¶ 52 & n.208. Neither the FCC's *2011 Order,* its *2018 Order*, nor implementing regulations, permit such a selective and incomplete comparison.

In the *2011 Order*, the FCC found that the new telecom rate is the just and reasonable rate for an ILEC whose "arrangement" with the electric utility does not provide the ILEC a net "material advantage … relative to cable operators or telecommunications carriers." *2011 Order*, 26 FCC Rcd at 5336 (¶ 217). The FCC's regulation implementing its *2018 Order* is similarly broad, requiring the new telecom rate unless an electric utility provides "clear and convincing evidence" that the ILEC "receives benefits under its pole attachment agreement … that materially advantage[ ] the [ILEC] over other telecommunications carriers or cable television systems providing telecommunications services on the same poles." 47 C.F.R. § 1.1413(b); *see also 2018 Order*, 33 FCC Rcd at 7768 (¶ 123) ("The utility can rebut the presumption with clear and convincing evidence that the [I]LEC receives net benefits under its pole attachment agreement with the utility that materially advantage the [I]LEC over other telecommunications attachers.").

31

While these standards define an ILEC's rights based on the terms of its agreement with the electric utility, *i.e.*, the JUA, they do not explicitly or implicitly define other attachers' rights and benefits in that limited manner. Rather, they require comparisons to other attachers "providing telecommunications services on the same poles[,]" inclusive of all of the statutory, regulatory, and contractual rights and benefits they have to use that pole. *See* 47 C.F.R. § 1.1413(b). The FCC cannot selectively redefine this standard to ignore some attacher rights and benefits. The FCC's standards must be enforced as written. *See, e.g.*, *Dickenson-Russell Coal Co., LLC v. Sec'y of Lab.*, 747 F.3d 251, 256-57 (4th Cir. 2014) (enforcing plain language of a regulation where its "language permits no exceptions"); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) ("It is axiomatic that an agency must adhere to its own regulations."). Any other result "would permit the [FCC], under the guise of interpreting a regulation, to create *de facto* a new regulation." *Dickenson-Russell Coal Co.*, 747 F.3d at 257 (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)).

The FCC's *2011 Order* and *2018 Order* articulate good reasons to compare ILECs' contractual rights with *all* CLECs' and cable companies' rights, not just those provided by contract. The FCC adopted its standard of competitive neutrality for pole attachment rates to "remove market distortions that affect attachers' deployment decisions." *2011 Order*, 26 FCC Rcd at 5295 (¶ 126). It is

impossible to eliminate "market distortions" without considering *all* market conditions, including rights created by statute and regulations. This is especially true in the pole attachment context because CLECs and cable companies enjoy significant statutory and regulatory rights *not* afforded ILECs, such as the "statutory right of access" to utility poles, *see* Order ¶ 48, and, among others, make-ready operational rights that save "time in gaining access to poles" and "substantial costs," *see* Order ¶ 52 & n.208; *see also 2018 Order*, 33 FCC Rcd at 7714 (¶ 16). By ignoring CLECs' and cable companies' many statutory and regulatory rights, the FCC took a myopic view of market conditions, leading to an incorrect conclusion that AT&T is competitively advantaged and should pay the old telecom rate.

The FCC's narrow market conditions analysis was also arbitrary and capricious because it is inconsistent with the pro-competition and pro-deployment purposes of the statute. *See, e.g.*, *Implementation of Section 703(e) of the Telecommunications Act of 1996*, 13 FCC Rcd 6777, 6780 (¶ 2) (1998) ("*1998 Order*") (discussing the "pro-competitive goals of Section 224"); *see also 2011 Order*, 26 FCC Rcd at 5241 (¶ 2) ("Congress directed the Commission to 'encourage the deployment … of advanced telecommunications capability to all Americans' by removing barriers to infrastructure investment"). The FCC has held that artificial rate disparities are "inconsistent with Congress' policies" and must be

33

removed.  *2011 Order*, 26 FCC Rcd at 5308-09 (¶ 157); *see also AEP*, 708 F.3d at

190.  It has previously taken special care to eliminate "differences [in pole

attachment rates] that would arise artificially purely as a result of [the FCC's] pole

attachment regulations."  *2015 Order*, 30 FCC Rcd at 13742 (¶ 22 n.88).

Yet, in this case the FCC is ensuring that artificial rate distinctions persist by

adopting a standard that ignores undisputed and valuable pole attachment rights

enjoyed by AT&T's competitors.  The FCC did not try to justify its skewed

standard based on competitive neutrality principles, and thus departed from its

regulation, precedent, and policy "without reasonable explanation for doing so."

*See Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018).  Indeed, its

"[f]ailure to adequately consider … central objectives" of the FCC's statutory

mandate and ensure consistency with them is a "major shortcoming" of its Order

that requires vacatur or reversal.  *Stewart v. Azar*, 366 F. Supp. 3d 125, 155

(D.D.C. 2019) (citing cases); *see also, e.g.*, *Humane Soc'y of United States v.*

*Zinke*, 865 F.3d 585, 607 (D.C. Cir. 2017) (finding failure to address "[a]n

important factor—the possible enduring consequences of [its decision]"—was

arbitrary and capricious).

### 3.    The FCC Erred When It Failed to Enforce the Evidentiary Standard in Its Regulation.

The FCC also departed from its precedent and regulation when it did not

require *Duke* to prove with "clear and convincing evidence" that it provides AT&T

benefits under the parties' agreement that "materially advantage[ ]" AT&T over other communications companies using the same poles, 47 C.F.R. § 1.1413(b), or even to justify its rates with credible evidence under the standard adopted in 2011. Duke's evidence was neither clear nor convincing; indeed, Duke was unable to prove it incurs a single unreimbursed cost because of the alleged advantages. *See* EB Order ¶ 43 ("Duke attempts to calculate the monetary value of the advantages that the JUA provides to AT&T, but its calculations are speculative and unsupported by reliable evidence"). Absent this proof, the FCC should have set the new telecom rate as the just and reasonable rate. *See* 47 C.F.R. § 1.1413(b).

Instead, the FCC conducted a skewed, and at times internally inconsistent, analysis and decided that AT&T should pay the old telecom rate due to five purported "competitive advantages." *See* Order ¶¶ 47-53. But the FCC's findings of "competitive advantage" lack substantial evidence, give Duke the benefit of the doubt, rest on internally inconsistent standards, and depart from precedent. *See Loc. 23, Am. Fed'n of Musicians v. NLRB*, 12 F.4th 778, 784 (D.C. Cir. 2021) (finding "decision internally inconsistent, and, as a result, arbitrary").

*First*, the FCC found that AT&T's contractual access to Duke's poles is a material advantage. The FCC made this finding by ignoring the statutorily-guaranteed access rights of AT&T's competitors and the admission of Duke's witness that an ILEC's contractual access is "a material *disadvantage* compared to

35

[the statutory access rights of] CLECs and [cable companies]." *See* Answer Ex. E, Metcalfe Decl. ¶ 9 (Nov. 12, 2020) (emphasis added). In the alternative, the FCC seemingly compared contractual versus statutory access and concluded that AT&T's contractual access is better. But the reasons the FCC relied upon are unsupportable. The FCC first stated that statutory access is limited by exceptions, Order ¶ 48, but then acknowledged that Duke can also deny AT&T access to the same poles for the very same reasons allowed by those exceptions, Order ¶ 49 n.193. The FCC then disregarded a well-known competitive disadvantage—specifically, at any time Duke may terminate AT&T's right to deploy facilities on future pole lines—by speculating that Duke would be "unlikely" to do so. *See* Order ¶ 49. But that is not the standard. FCC precedent requires an analysis of the terms of the JUA, not the imagined or potential likelihood that the electric utility may enforce those terms. The FCC has no basis to *assume* Duke will not exercise its contractual rights to deny AT&T pole access.

*Second*, the FCC found that AT&T enjoys a competitive advantage because it pays the same JUA rate per pole regardless of how much space it occupies, while AT&T's competitors pay FCC rates based on the space they in fact occupy.[13]

---

[13] Although the FCC referred to the rates paid by "competitive attachers" as "per attachment rates," Order ¶ 50, it was necessarily referring to the new telecom rate, which "determine[s] the maximum just and reasonable rate *per pole*" for AT&T's

Order ¶ 50.  But the FCC *invalidated the JUA rate* and ordered AT&T to pay an FCC rate that is based on the space it occupies—just like its competitors.  *See* Order ¶¶ 14, 26; EB Order ¶¶ 49-51, 64.  The FCC cannot simultaneously invalidate a term of the JUA and then consider that invalidated term an advantage to AT&T.  There is no competitive advantage here.

*Third*, the FCC found that AT&T is competitively advantaged because it pays Duke to perform certain work based on "scheduled," rather than actual, costs, which, Duke claimed, differed.  Order ¶ 51.  But the FCC recognized Duke's claim was "not documented and rest[ed] on the uncorroborated testimony of a single witness."  *Id.* ¶ 35.  The FCC further acknowledged that "the record contains insufficient evidence to determine the value of the scheduled cost benefit."  *Id.* ¶ 36.  Absent that evidence, the FCC cannot conclude that "scheduled" costs in fact exceed the actual costs for the work, or that there is any advantage (let alone a material advantage) to AT&T from its payment of such costs to Duke.

*Fourth*, the FCC found "that the JUA benefits AT&T by allowing it to place attachments on Duke poles without seeking prior approval or paying a permitting fee."  Order ¶ 52.  The FCC reasoned that these JUA terms allow AT&T "immediate access to Duke's poles."  *Id.*  But there is no evidence to support this

---

competitors, *see Implementation of Section 703(e) of The Telecommunications Act of 1996*, 16 FCC Rcd 12103, 12122 (¶ 31) (2001) (emphasis added).

claim. The JUA does not guarantee AT&T any quicker access to Duke's poles than its competitors. The FCC instead speculated that AT&T has faster access based on findings in its *2018 Order* that "the [attachment] process takes less time and costs less money" when the attacher is in control of the process, which means the attacher uses the one-touch make-ready process adopted in that *2018 Order*. *Id.* ¶ 52 & n.208 (citing *2018 Order*, 33 FCC Rcd at 7711-19 (¶¶ 13-24)). The FCC's reliance on these findings from its *2018 Order* is misplaced because ILECs like AT&T do *not* enjoy the benefits of that one-touch make-ready process. It is available *only* to AT&T's competitors. *See* 47 C.F.R. § 1.1411(a)(2), (j) (extending one-touch make-ready rights to "new attachers," which are cable companies and "telecommunications carriers"); *Id.* § 1.1402(h) (defining "telecommunications carrier" to exclude ILECs).

AT&T pointed out this conflict to the FCC, which rejected AT&T's argument on the basis that AT&T did not "sufficiently explain" the "delays" it encounters during the make-ready process. Order ¶ 52 n.208. But that incorrectly shifted the burden to AT&T to demonstrate it is *not* advantaged rather than placing the burden where it belongs—on Duke to demonstrate by clear and convincing evidence that the JUA provides net material competitive benefits to AT&T. Again, there is no competitive advantage here.

*Fifth*, the FCC found that AT&T's typical location lowest on the pole is a competitive advantage. *See* Order ¶ 53. In reaching its conclusion, the FCC again flipped the burden of proof, finding that *AT&T* failed to prove that the location is a competitive *disadvantage*. *See id.* (finding AT&T's argument "'mostly unsupported' by evidence"). But *Duke* had the burden of proof, and it conceded that AT&T bears "costs and risks attendant to the lowest position" on Duke's poles. *See* Answer ¶ 19. AT&T also substantiated some of those costs by submitting aerial damage reports showing that its location on the pole is, among other things, more vulnerable to vandalism and damage. *See, e.g.*, Compl. Ex. C, Peters Aff. ¶¶ 22-23; Compl. Ex. 18 at ATT00234-236. The FCC nonetheless found AT&T is competitively advantaged based on its belief that "a consistent and predictable space on each pole" provides a competitive advantage. Order ¶ 53, AT&T's competitors, however, also enjoy a consistent and predictable location on the pole so that communications facilities do not "crisscross[] mid-span." *See* EB Order ¶ 33 n.98.

In summary, the FCC failed to identify substantial evidence that the JUA terms, in fact, provide AT&T with net *material* advantages compared to its competitors. But the FCC found AT&T competitively advantaged anyway, relying primarily on claims that it *found* certain allegations rise to the level of material competitive advantages in its *2011* and *2018 Orders*. *See, e.g.*, *Order* ¶ 47 n.185;

*id.* ¶¶ 52-53.  This was an abrupt turnabout.  In the *2011 Order*, the FCC

"decline[d] … to adopt comprehensive rules governing [I]LECs' pole attachments,

finding it more appropriate to proceed on a case-by-case basis."  *2011 Order*, 26

FCC Rcd at 5334 (¶ 214).  And, while it acknowledged that "some commenters

*contend* that joint use agreements give [I]LECs advantages," it deferred decision

on those allegations for individual complaint proceedings.  *Id.* at 5335 (¶ 216

n.654) (emphasis added); *id.* at 5336-37 (¶¶ 217-218).  Then in its *2018 Order*, the

Commission decided to require electric utilities to substantiate the allegations with

clear and convincing evidence in complaint proceedings.  *See 2018 Order*, 33 FCC

Rcd at 7770-71 (¶ 128).

In the Order on review, the FCC baldly converted these allegations into fact,

claiming that it had "recognized" they were "material advantage[s]" in the *2011*

and *2018 Orders*.  *See* Order ¶ 47 n.185 (quoting *2011 Order*, 26 FCC Rcd at 5334

(¶ 216 n.654)); *id.* ¶ 52 (citing *2018 Order*, 33 FCC Rcd at 7771 (¶ 128)); *id.* ¶ 53

(citing *2018 Order*, 33 FCC Rcd at 7771 (¶ 128)).  If so, the FCC's commitment to

investigate the allegations and "resolve [I]LEC complaints 'on a case-by-case

basis'" was a mere charade.  *See id.* ¶ 4 n.17 (quoting *2011 Order*, 26 FCC Rcd at

5334 (¶ 214)).  The FCC's failure to follow its precedent and regulation when

adopting the old telecom rate was unexplained, arbitrary, and capricious.  The

Court should vacate the old telecom rate finding.

**B.    The Commission Adopted the Wrong "Number of Attaching Entities" Input to the Old Telecom Rate Formula.**

The FCC rubberstamped artificially-inflated pole attachment rates by letting Duke use a different "number of attaching entities" input in the rate formula when calculating AT&T's rate than it uses when calculating rates for AT&T's competitors <u>using the very same poles</u>.  Puzzling as that is, it is also antithetical to the statute and the FCC's regulations and principle of competitive neutrality.

The Commission's new telecom rate formula and old telecom rate formula include an input for "number of attaching entities" on a pole, which divides the costs of unusable space on a pole among "all attaching entities."[14]  *See* 47 C.F.R. §§ 1.1406(d)(2), 1.1409(a).  The number of attaching entities is an important formula component because as its value decreases, an attacher's portion of the unusable space costs increases and vice versa.  *See 1998 Order*, 13 FCC Rcd at 6800 (¶ 45).

FCC regulations give utilities two ways to set the value of the number of attaching entities rate formula input: either use FCC "established presumptions" or rebut the presumptive value for "all attaching entities" with "probative direct

---

[14] The "unusable space" is "the space on a utility pole below the usable space, including the amount required to set the depth of the pole" underground.  47 C.F.R. § 1.1402(l).  The "usable space" is "the space on a utility pole above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment, and which includes space occupied by the utility."  *Id.* § 1.1402(c).

41

evidence." *See* 47 C.F.R. § 1.1409(c)-(d); *see also* Order ¶ 55. In either case, the statute and regulation require "an *equal* apportionment of" two-thirds of the unusable space costs "among *all* attaching entities" on a particular pole. 47 U.S.C. § 224(e)(2) (emphases added); *see also* 47 C.F.R. § 1.1409(a); *1998 Order*, 13 FCC Rcd at 6777 (¶¶ 43, 49) ("Congress concluded that the unusable space 'is of equal benefit to all entities attaching to the pole' and intended that the associated costs be apportioned '*equally* among all such attachments.'") (quoting S. Conf. Rep. 104-23, at 206 (1996)) (emphasis added).

The only way to derive pole attachment rates that *equally* apportion the cost of unusable space on a pole among multiple communications attachers on that pole is to use the same number of attaching entities input when calculating all of their rates, whether that is the FCC presumptive input *or* the actual value based on probative evidence. Conjuring one number of attaching entities when calculating rates for one attacher yet asserting the same pole has a different number of attaching entities when calculating rates for a different attacher, as Duke did, apportions the costs of unusable space on a pole unequally among attachers to the same pole, in violation of the statutory requirement. *See, e.g.*, Webster's Dictionary (defining "equal" as "of the same measure, quantity, amount, or number as another").

42

Here, the FCC allowed Duke to use ███ attaching entities[15] to calculate rates for AT&T, thus dividing the relevant costs by ███ Had the FCC required Duke to use the same presumptive 5 attaching entities input that Duke uses to calculate rates for AT&T's competitors, the relevant costs would have been divided by 5. *See* Order ¶ 55. This improper use of the lower input thus unequally allocates the unusable space costs *and* significantly increases AT&T's pole attachment rental rate by requiring it to pay a proportionately greater amount.[16] *See, e.g.*, *2011 Order*, 26 FCC Rcd at 5314 (¶ 169 n.517) ("the telecom rate … decline[s] as the number of attachers increase[s]"); *Implementation of Section 703(e) of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, 12 FCC Rcd 11725, 11735 (¶ 22) (1997) ("The more attaching entities there are, the more widely the costs relating to the unusable space are spread."). Instead of an old telecom rate that is about 1.5 times the new telecom rate (when calculated with 5 attaching entities), changing this one input lets Duke charge AT&T rates that are up to ██ *times* the new telecom rate. *See, e.g.*, *2011 Order*, 26 FCC Rcd at 5297 (¶ 131 n.399)); *see also* AT&T App. for Review at 1, 20 (Oct. 21, 2021).

---

[15] Setting the number of attaching entities by survey rather than by FCC presumption can produce a non-whole number value. *2015 Order*, 30 FCC Rcd at 13748 (¶ 37).

[16] Dividing by ███ assigns AT&T ██% of the relevant costs, while dividing by 5 would assign 20%.

The FCC's decision not only violated the statute; it also was arbitrary and capricious because the FCC never addressed AT&T's argument that Duke must use the same input for all attachers to the same pole because the statute and regulation require the costs of the unusable space be equally apportioned. *See* AT&T's Initial Supp. Br. at 20-21 (Apr. 8, 2021); AT&T App. for Review at 19-20; *but see* Order ¶ 55. As a result, the FCC's decision could *not* have been "based on a consideration of the relevant factors" or considered all "important aspect[s] of the problem." *See State Farm*, 463 U.S. at 43 (citation omitted). The FCC's decision neither cited the statutory language in its analysis of the attaching entities input nor provided a reasoned basis for how its decision comported with the equal apportionment requirement. Its "silence in this instance renders [its] ultimate decision arbitrary and capricious." *See Fuller v. Winter*, 538 F. Supp. 2d 179, 192 (D.D.C. 2008).

The FCC acknowledged that Duke had singled AT&T out for a lower number of attaching entities than Duke applies to others attached to the same poles. *See* Order ¶ 55. Surprisingly, it concluded that Duke was free to single AT&T out for a unique number of attaching entities input based on survey data because Duke could save "time and money" not deriving the same data for AT&T's competitors. In other words, Duke could use a different number of attaching entities input for

AT&T specifically because it would have the effect of allowing Duke to charge

AT&T higher pole attachment rates.  This finding is itself problematic.

*First*, the FCC treated AT&T differently from its competitors attached to the

same poles, even though "[g]overnment is at its most arbitrary when it treats

similarly situated people differently."  *Etelson v. OPM*, 684 F.2d 918, 926 (D.C.

Cir. 1982).  As the FCC acknowledged, it took action in 2015 when it learned that

electric utilities were inflating rates *for AT&T's competitors* by up to 70 percent by

relying on survey data to reduce the attaching entities input.  *See* Order ¶ 55 &

n.228 (citing *2015 Order*, 30 FCC 13732-33 (¶ 3)).  The FCC concluded that this

use of survey data improperly "introduce[d] material artificial distortions" to rental

rates and "frustrate[d] the Commission's policy goals by artificially and

incrementally deterring investment" in broadband and other advanced services.

*See 2015 Order*, 30 FCC Rcd at 13741-42 (¶ 22 & n.88).  Yet when confronted

with Duke's use of survey data to inflate rates *for AT&T* in this case, the FCC

approved the practice *because* it so "significant[ly]" increases the old telecom rate

AT&T would pay.  Order ¶ 55.  The FCC thus approved and incentivized the very

conduct it found unreasonable when calculating rates for AT&T's competitors.

*See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1259 (D.C. Cir. 1996)

(Where an agency "fail[s] to give a sufficient nonarbitrary reason for treating the

two … differently," its decision is "arbitrary and capricious").

*Second*, the FCC made no effort to align its decision with more than a decade of FCC precedent *eliminating* "artificial, non-cost-based differences" in pole attachment rates that "are bound to distort competition."  *See AEP*, 708 F.3d at 190.  In its *2011 Order* and *2018 Order*, the Commission found that an old telecom rate calculated using default inputs—at about 1.5 times the new telecom rate—would capture all possible "arrangements that provide net advantages to [I]LECs relative to cable operators or telecommunications carriers."  *See 2011 Order*, 26 FCC Rcd at 5337 (¶ 218); *2018 Order*, 33 FCC Rcd at 7771 (¶ 129); *see also* Order ¶ 15.  By departing from the presumptive input, the FCC set old telecom rates that are ███ *times* the rates Duke charged AT&T's competitors.  The value of net material competitive advantages provided by a JUA (even if they existed) would not change based on the number of attaching entities on a pole; neither should the old telecom rate.  Yet, the FCC signed off on Duke singling AT&T out for a "significant[ly]" higher rate.  *See* Order ¶ 55.

The Court should vacate this use of the number of attaching entities input to artificially inflate rates and direct the FCC to set the same "just and reasonable" rate for AT&T's use of Duke's poles—calculated using the same number of attaching entities input—that Duke calculates for AT&T's competitors using the same poles.

## II.      Duke's Challenges to the FCC's Order Are Meritless.

Unlike AT&T, which seeks to enforce existing law, Duke asks the Court to change longstanding precedent so Duke can continue to profit from the ▮ per pole rate it charges AT&T.  This is not the proper vehicle for changing the law; the FCC's consistency with longstanding precedent confirms its lawfulness.  The Court should summarily reject Duke's Petition.

### A.      The FCC Did *Not* Apply An Impermissibly Retroactive Standard to Pre-2020 Time Periods.

Duke's first argument purports to be about retroactivity, but in fact asks the Court to find that the FCC should have adopted a different evidentiary standard in its *2011 Order*.  The FCC reviewed about two years of overcharges under its *2011 Order* standard because they predate the applicability of the new telecom rate presumption adopted in the *2018 Order*.  *See* Order ¶ 17; Duke Br. at 19.  Even though the FCC expressly applied its *2011 Order* to this September 1, 2017 through December 31, 2019 time period, *see* Order ¶¶ 17-37, according to Duke, the FCC silently adopted a new evidentiary standard and applied it retroactively, *see* Duke Br. at 22 n.3 (stating that the issue "is not immediately apparent in the FCC's Order").  To make this through-the-looking-glass claim, Duke asks the Court to find that the *2011 Order* adopted a completely different standard—of its crafting—that Duke would prefer.

47

Duke's preferred standard relies on its dubious interpretation of a 2015 case-specific decision issued by the FCC's Enforcement Bureau in *Verizon Florida v. Fla. Power and Light Co.*, 30 FCC Rcd 1140 (EB 2015). According to Duke, the FCC "defined the evidentiary standard" in the *Verizon Florida* decision, and then failed to follow it in this case. *See* Duke Br. at 20. That is not true.

The FCC did not issue the *Verizon Florida* decision; its Enforcement Bureau did. And orders from the FCC's Bureaus, while "binding on the parties to the proceeding," are "*not* Commission precedent, and agency actions contrary to those decisions *cannot* be deemed arbitrary and capricious." *Comcast Corp. v. FCC*, 526 F.3d 763, 770 (D.C. Cir. 2008) (emphases added). Indeed, "[t]here is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level." *Id.* at 769; *see also SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1037 (D.C. Cir. 2017) ("the reasoning behind unchallenged [FCC] Bureau actions cannot be attributed to the agency unless and until the agency has endorsed those actions") (citation omitted). Thus, the FCC could *not* have "defined the evidentiary standard" applicable to this dispute in the *Verizon Florida* decision, *see* Duke Br. at 20, because the FCC did not issue the *Verizon Florida* decision.

Nor has Duke identified any disconnect between the standard applied in this case and the standard adopted in the *2011 Order* and applied in *Verizon Florida*.

Instead, Duke relies on three alleged "contrasts" between the various documents that are belied by the documents themselves. *See* Duke Br. at 22.

*First*, Duke claims that the FCC found Duke's rates unjust and unreasonable in this case simply because they exceed the old telecom rate, which Duke says contradicts *Verizon Florida* because the decision sought proof that the "'monetary value' of … competitive advantages does not justify the rate the ILEC is charged under the joint use agreement." Duke Br. at 20; *see also id.* at 21, 22, 24. But the FCC did *not* find Duke's rates unjust and unreasonable in this case *solely* because they exceed the old telecom rate. The FCC affirmed the Enforcement Bureau's conclusion that the rates are unjust and unreasonable for several reasons, including AT&T's "show[ing] that the [alleged] material advantages it receives under the JUA do not justify the JUA rates." EB Order ¶ 42; *see also* Order ¶ 24 (stating the Enforcement Bureau's decision was based "*in part* on evidence that the JUA rates are … multiples higher than both the Old and New Telecom Rates") (emphasis added). The FCC thus decided the very issue Duke says it failed to consider—*i.e.*, whether competitive advantages justify the joint use agreement rates Duke charges.

*Second*, Duke claims that the FCC failed to follow *Verizon Florida* because it did not require AT&T to submit a "credible valuation" of the exact "monetary value" of alleged competitive advantages. *See* Duke Br. at 20, 22. This argument rests on a misreading of *Verizon Florida*. As the FCC explained, "to the extent

*Verizon Florida* 'can be read to require a party … to quantify the value of individual benefits an [I]LEC receives under a joint use agreement, we reject that interpretation…"  Order ¶ 25 (citation omitted).  Indeed, the FCC has never required an ILEC to both dispute the existence of an alleged competitive advantage *and* prove its non-existent value.  *See 2011 Order*, 26 FCC Rcd at 5336-37 (¶¶ 216-17).  *Verizon Florida* did not (and could not) add that requirement; instead, the Enforcement Bureau requested additional information in a case where it found the ILEC "concede[d] that it received and continues to receive benefits under the Agreement that are not provided to other attachers."  *Verizon Fla.*, 30 FCC Rcd at 1149 (¶ 24).  That case-specific request did not impose a requirement on AT&T or any other ILEC to quantify the precise value of alleged benefits they do not think exist, "especially in the absence of any rules prescribing a methodology for valuing such benefits."  *See* Order ¶ 25 (citation omitted).

*Third*, Duke claims that the FCC applied the old telecom rate as a "hard cap" on the just and reasonable rate for the pre-2020 time period, when Duke thinks *Verizon Florida* held that if an agreement pre-dates the *2011 Order* the old telecom rate cannot even be considered a "reference point."  *See* Duke Br. at 19, 21-22. This argument defies reality.  The FCC did not treat the old telecom rate as a "hard cap" for pre-2020 time periods in this case; it "use[d] the established Old Telecom Rate as a reference point" for that period "rather than developing 'an entirely new

rate.'" *See* Order ¶ 29.  And this was consistent with the *2011 Order*, which states that the FCC would use "the [old] telecom rate as a reference point in complaint proceedings"—including complaint proceedings about agreements that pre-date the *2011 Order* and meet certain criteria for review that are satisfied here.  *See 2011 Order*, 26 FCC Rcd at 5334-35 (¶ 216); *id.* at 5337 (¶ 218); *see also* Order, Section B.1 ("The Bureau correctly concluded that the JUA is reviewable under the *2011 Order* for the period prior to January 1, 2020").

There can be no retroactivity concern in this case, therefore, because Duke has not identified a disconnect between the 2011 standard and the standard the FCC applied to rates charged beginning in September 2017.  Nor does Duke face any "new liability" that did not already exist during those years.  *See, e.g.*, Duke Br. at 25 (citing cases).  At all times since mid-2011, federal law has required Duke to charge AT&T just, reasonable, and competitively neutral pole attachment rates.  *See* 47 U.S.C. § 224(b); *see also 2011 Order*, 26 FCC Rcd at 5328 (¶ 202); *id.* at 5336 (¶ 217).  Duke refused to conform its rates to the requirements of the *2011 Order* and instead continued to charge AT&T $█ per pole rates while charging AT&T's competitors about $█ to use the same poles.[17]  The FCC correctly required Duke to refund all amounts it collected in violation of law,

---

[17] *See* EB Order ¶ 6; Joint Statement ¶ 21 (listing new telecom rates Duke charged AT&T's competitors, which averaged about █.

consistent with FCC regulations and a three-year statute of limitations.  *See* Order

¶¶ 38-41.[18]

### B.     The FCC's Decision About the "Safety Space" on a Utility Pole Is Grounded in Settled Precedent.

Duke's second argument—that AT&T should be allocated safety space on

the pole—would require the Court to reverse "long-standing Commission

precedent hold[ing] that an attacher can be assessed only for space it *actually*

occupies" on a utility pole.  Order ¶ 24 n.91 (emphasis in original).  Consistent

with this principle, the FCC has held for over 40 years that an electric utility

*cannot* lawfully charge a communications attacher for forty inches of "safety

space" that is required on a pole in order to separate charged electric facilities from

communications attachments.  *See id.* ¶¶ 42-44 (citing precedent, including *In the*

*Matter of Adoption of Rules for the Regul. of Cable Television Pole Attachments*,

72 F.C.C.2d 59, 70 (1979) ("*1979 Order*")).  Communications attachments,

including AT&T's attachments, cannot occupy the safety space because of "the

potentially lethal voltage carried by the electric lines."  *See Amend. of Rules &*

---

[18] Duke argues in a footnote that "[f]or all it appears, AT&T also thought the agreement rates were consistent with the *2011 Order*" based on the timing of AT&T's request for negotiations.  *See* Duke Br. at 25 n.4.  The FCC rejected this argument.  Order ¶ 41. As the Enforcement Bureau explained, "AT&T's ministerial act of certifying the accuracy of Duke's rate calculations, as required under the JUA, does not constitute proof that AT&T believed the rates were just and reasonable at the time, let alone that they were just and reasonable within the meaning of section 224(b)."  EB Order ¶ 38 n.123.

*Policies Governing Pole Attachments*, 15 FCC Rcd 6453, 6467 (¶ 20) (2000) ("*2000 Order*").  And "because AT&T's attachments do not occupy the safety space, Duke may not charge AT&T for that space."  EB Order ¶ 51; *see also* Order ¶ 42 ("We affirm the Bureau's holding, which was based on settled precedent.").

Duke concedes it cannot charge AT&T's competitors for the safety space under FCC precedent.  *See* Answer ¶ 12 n.38 ("[T]he Commission has already determined that [cable] and CLEC attachers should not bear this cost…").  Duke also admits the FCC reached that same conclusion in this case based "on its prior findings in other orders that the [safety space] is 'used and usable' by electric utilities."  Duke Br. at 32.  This itself is enough to reject Duke's challenge to the FCC's Order.  It is only "when an agency deviates from established precedent" that it must "provide a reasoned explanation for its failure to follow its own precedents."  *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1418 (4th Cir. 1985).  Agency action that is *consistent* with 40 years of precedent is lawful agency action.

Nevertheless, Duke attacks the FCC's prior precedent, arguing it "is not rational decision-making to find that the [safety space] would be usable [space on a pole] 'but for the presence of the electrical lines.'"  Duke Br. at 33-34.  Duke proposes a different "but for"—claiming there would be no safety space "[b]ut for the presence of communications facilities."  *Id*.  This misses the point.  "'It is the

presence of the potentially hazardous *electric lines* that makes the safety space necessary" and prevents communications attachers from using it. *See* Order ¶ 42 (quoting *2000 Order*, 15 FCC Rcd at 6467 (¶ 22)) (emphasis added). It follows that the FCC has correctly—and rationally—held for decades that the "safety space is for the benefit of the electric utility, not communications attachers." *Id.* ¶ 42 n.159 (citation omitted).

Duke next argues that the FCC should have distinguished its prior precedent for four reasons that are also wrong. *First*, Duke argues that the FCC's initial 1979 safety space ruling was issued in the context of cable company attachers and that different statutory language applies when calculating rates for telecommunications providers. *See* Duke Br. at 34-35, 38-39. In particular, Duke notes that the statute discusses space "*occupied* by the pole attachment" in the context of cable rates and "space *required* for each entity" in the context of telecom rates. *See id.* (quoting 47 U.S.C. § 224(d)(1), (e)(3)) (emphases added). This difference in language, Duke reasons, removed the "alleged statutory constraints underlying the *1979 Order*" and allowed the FCC to conclude that AT&T "requires" the safety space. *Id.* at 35.

Duke never made this statutory argument below, so it fails at the outset. *See, e.g.*, *Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 862 (D.C. Cir. 1992) ("Although we have the discretion to entertain new legal theories on

54

appeal, 'the usual rule is that such theories will not be heard except in exceptional cases.'"); *Cavazos v. Haaland*, 579 F. Supp. 3d 141, 150 (D.D.C. 2022) ("Absent special circumstances, the Court is not to consider … arguments not raised before the agency."). Although, as these citations indicate, there are exceptions for "exceptional cases" or "special circumstances," this matter does not overcome that hurdle. Duke's argument is also wrong. For decades, the FCC has held that rates for telecommunications providers must be based on the space they *occupy* because they do not *require* additional space. *See, e.g.*, Order ¶ 24 n.91 ("long-standing Commission precedent holds that an attacher can only be assessed for space it *actually* occupies") (emphasis in original); *id.* ¶ 42 n.158 ("under the Commission's [telecom] rate formula, 'space occupied' means space that is 'actually occupied'") (citation omitted). In contrast, the FCC has recognized that electric utilities do *require* the safety space because of their "potentially hazardous electric lines." *2000 Order*, 15 FCC Rcd at 6467 (¶ 22); *see also 2011 Order*, 26 FCC Rcd at 5320 (¶ 180 & n.559) (reaffirming precedent that "the presence of the potentially hazardous electric lines … makes the safety space necessary").

*Second*, Duke claims that the FCC should have distinguished its *1979 Order*, which stated that cable attachers bear the "risk for maintaining th[e] safety space" because they must pay to replace a pole if it is not tall enough to hold a new attachment and still maintain 40 inches of safety space. *See* Opening Br. of

Petitioner/Intervenor at 35-36 ("Duke Br.") (quoting *1979 Order*, 72 F.C.C.2d at

71 (¶ 24)).  But the FCC found that AT&T *does pay* to replace Duke poles in this

exact scenario.  *See* Order ¶ 51; EB Order ¶ 24.[19]  Therefore, AT&T *also* bears the

"risk for maintaining th[e] safety space" through pole replacement costs,

eliminating any possible distinction between this case and the FCC's *1979 Order*.

72 F.C.C.2d at 71 (¶ 24).

　　　*Third*, Duke seeks to distinguish its practices from those considered in the

*1979 Order*, where the FCC recognized that electric utilities can, and often do,

place equipment in the safety space, such as "street light support brackets, step-

down distribution transformers, and grounded, shielded power conductors."  *See*

Duke Br. at 36 (quoting *1979 Order*, 72 F.C.C.2d at 71 (¶ 24)).  Duke argues that it

rarely mounts street lights in the safety space, and that there is no requirement that

it place them there.  *Id.* at 36-37.  This is beside the point.  "The Commission's

conclusion that the safety space is usable and used by the electric utility was based

on its determination that the existence of 'electric supply cable precludes other

attachments from occupying the safety space.'"  Order ¶ 43.  The "record evidence

showing that Duke mounts street lights in the safety space"—even if "only

_____

[19] Duke's claim that "AT&T never disputed the fact that—due to the joint use agreement—it was not required to bear the cost of ensuring the presence of the [safety space]" is belied by these contrary FCC findings and AT&T's denial of the cited paragraph in Duke's Answer.  *See* Duke Br. at 36 n.6; Reply to Answer ¶ 25.

'occasional[ly]'"—corroborates the FCC's prior precedent by confirming "that the space is usable by Duke and that [Duke] can, and does, use the safety space." *Id.* ¶ 43 n.167.

*Finally*, Duke argues that the FCC's *1979 Order* assumed that ILECs, such as AT&T, would bear the cost of the safety space, and that the FCC should not have reached a different conclusion here. *See* Duke Br. at 37-38. But Duke relies on language in the *1979 Order* stating only that allocation of the safety space "may be an issue" in joint use agreements that were not then subject to FCC oversight. *Id.* at 37 (quoting *1979 Order*, 72 F.C.C.2d at 71 (¶ 25)). And Duke acknowledges that the FCC later clarified that it did *not* think ILECs were "bearing responsibility for the entire safety space." *Id.* at 38 (quoting *Adoption of Rules for the Regul. of Cable Television Pole Attachments*, 77 F.C.C.2d 187, 191 (¶ 9) (1980)).

Perhaps more to the point, whether a communications attacher is an ILEC, a CLEC, or a cable company "does not alter the Commission's rationale—*i.e.*, the presence of hazardous electric lines—for attributing the safety space to the electric utility." Order ¶ 44. Indeed, the FCC reaffirmed its "prior ruling that the safety space is used and usable by electric utilities" in the same *2011 Order* where it "held that an [I]LEC should be charged the same pole attachment rate as competitive attachers where it is subject to 'comparable' terms and conditions." *Id.* Duke agrees that it cannot charge AT&T's competitors for use of the safety

space.  Answer ¶ 12 n.38.  The FCC correctly and reasonably held that Duke also

cannot charge AT&T for the safety space "because AT&T's attachments do not

occupy the safety space."  EB Order ¶ 51; Order ¶ 42.

### C.    The FCC Has Jurisdiction—and a Statutory Obligation—to Ensure Just and Reasonable Rates for AT&T's Use of Duke's Poles.

Duke's final argument—that the FCC is not authorized to regulate the pole

attachment rates Duke charges AT&T—has been rejected by both the Ninth and

D.C. Circuits, which have affirmed the FCC's jurisdiction over the pole attachment

rates charged ILECs.  *See City of Portland*, 969 F.3d at 1052; *AEP*, 708 F.3d at

188.  There is no basis for reaching a different conclusion here.  *See* Order ¶ 11

n.40 ("reject[ing] Duke's assertion that the Commission lacks jurisdiction" because

"two circuit courts of appeal have upheld the Commission's authority under

section 224 to set just and reasonable rates for [I]LECs").

Duke nonetheless argues that the D.C. Circuit "was wrong."  *See* Duke Br. at

40-46.  It was not.  By statute, the FCC "shall regulate the rates, terms, and

conditions for *pole attachments* to provide that such rates, terms, and conditions

are just and reasonable."  47 U.S.C. § 224(b)(1) (emphasis added).  "The term

'pole attachment' means any attachment by a cable television system or *provider

of telecommunications service* to a pole … owned or controlled by a utility."  *Id.*

§ 224(a)(4) (emphasis added).  Because ILECs are indisputably providers of

telecommunications services, the statute guarantees them just and reasonable rates. *See AEP*, 708 F.3d at 188 ("Given our analysis of the relevant language, we very much doubt if the [FCC's] prior interpretation [excluding ILECs from this protection] was reasonable"). Indeed, were there any ambiguity on this point, the FCC's interpretation of the statutory language is reasonable and backed by "good reasons." *Id.* (citing *Fox Television Stations*, 556 U.S. at 515).

Duke argues that the D.C. Circuit should have instead found that the term "provider of telecommunications service" *must* exclude ILECs. *See* Duke Br. at 40-43. Duke (like its parent company before the D.C. Circuit) relies on a different term—"telecommunications carrier"—which is defined to exclude ILECs, and argues that it should be read as synonymous with "provider of telecommunications service." *See id.* at 40-41 (citing 47 U.S.C. § 224(a)(5)); *see also AEP*, 708 F.3d at 187-88. But, as the D.C. Circuit held 10 years ago, Congress used both terms in the statute for different purposes. *AEP*, 708 F.3d at 187-88. The provision at issue here—Section 224(b)(1)—requires the regulation of "pole attachments," which include the attachments of all "providers of telecommunications service." 47 U.S.C. § 224(a)(4), (b)(1). Section 224(f)(1), in contrast, uses a different term when it requires pole owners to provide nondiscriminatory pole access to "telecommunications carrier[s]." 47 U.S.C. § 224(f)(1). When Congress includes different language in adjacent provisions, it must be presumed intentional. *See*

59

*Clay v. United States*, 537 U.S. 522, 529 (2003).  The D.C. Circuit, therefore, correctly found that the statute provides ILECs "the benefits of Section 224(b)" just and reasonable rates because they are "providers of telecommunications service," but does not provide them an "explicit right to nondiscriminatory access" as a "telecommunications carrier."  *AEP*, 708 F.3d at 188.

Duke's arguments mostly rehash meritless arguments already made to the D.C. Circuit.  It claims, for example, that the terms "telecommunications carrier" and "provider of telecommunications service" have been used interchangeably in other contexts.  *See* Duke Br. at 41-42.  But, as the D.C. Circuit noted, the FCC appropriately based its jurisdiction under Section 224 on language "tailored to § 224."  *AEP*, 708 F.3d at 187.  Duke also claims that the statute was intended to protect new "entities seeking access to ... poles (initially, CATVs; then later, both CATVs and CLECs)" and so *must* be read to exclude ILECs.  *See* Duke Br. at 43-45.  But the text of Section 224 includes no such limitation.  And even if "resort to legislative history" were proper, *United States v. Lin*, 101 F.3d 760, 765 (D.C. Cir. 1996), the purpose of the amendment was "to remedy the inequity of charges for pole attachments among providers of telecommunications services," S. Conf. Rep. 104-230, at 206 (1996).  There was no carve-out for ILECs.

Finally, Duke relies on the as-applied nature of this case, arguing that it somehow "magnifies the error" of the FCC's assertion of jurisdiction over the rates

ILECs pay electric utilities. *See* Duke Br. at 51. Duke's argument is foreclosed by statute. In its view, the FCC should not have jurisdiction over the rates ILECs pay electric utilities if it does not also have jurisdiction over the rates electric utilities pay ILECs. *See* Duke Br. at 46-51. Congress reached a different conclusion. By statute, the FCC "*shall regulate*" AT&T's rates for use of Duke's poles to ensure they are just and reasonable. 47 U.S.C. § 224(b)(1) (emphasis added). Use of the word "shall" creates a "mandatory" obligation. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016); *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'") (citation omitted). And when "the [statutory] language at issue has a plain and unambiguous meaning with regard to the particular dispute, that meaning controls." *Redeemed Christian Church of God (Victory Temple) Bowie , Md. v. Prince George's Cnty.*, 17 F.4th 497, 508 (4th Cir. 2021) (citation omitted). Duke's disagreement with Congress's decision to *only* regulate the rates paid by communications providers is unavailing and irrelevant.

Duke is also wrong when it claims that this regulatory regime is "not rational." *See* Duke Br. at 48-49. Congress has long regulated pole attachment rates charged communications companies in order to remove barriers to *telecommunications* investment and promote the deployment of "advanced

*telecommunications* and information technologies and services to all Americans."
S. Conf. Rep. 104-230, at 1 (emphases added); *see also, e.g.*, 47 U.S.C. § 1302(a)
("The Commission … shall encourage the deployment on a reasonable and timely
basis of advanced *telecommunications* capability to all Americans") (emphasis
added).  These goals can be furthered through the regulation of rates charged
*communications* providers, not electric utilities.

Duke's concerns about the rates it will pay AT&T are also misplaced.  *See*
Duke Br. at 46-51.  As Duke concedes, it does not have a federal right to "just and
reasonable" pole attachment rates for use of AT&T's poles.  *Id.*  Therefore, the
parties' agreement sets its rate.  Yet rather than bind Duke to its contract rate,
AT&T *agreed to reduce* the rate Duke pays so that it is proportional to the rate the
FCC set for AT&T, accounting for the greater amount of space Duke uses on a
pole.  *See* Order ¶ 24 n.88.  The FCC acknowledged AT&T's commitment and
directed the parties to negotiate these "proportional reciprocal rates for Duke's
attachments to AT&T's poles."  *Id.*; *see also* EB Order ¶ 64(b).  The FCC *could*
have provided "the parties with a full resolution of their dispute" as Duke now
seeks, *see* Duke Br. at 50, by enforcing AT&T's right to just and reasonable rates
and leaving Duke's contract rates untouched.  Duke thus resists a decision that was
*better for it*, confirming that its as-applied challenge to the FCC's jurisdiction is
just as flawed as the facial challenge its parent company pursued before the D.C.

Circuit a decade ago. "ILECs are 'providers of telecommunications services' for purposes of § 224" and, as such, are entitled to "just and reasonable" rates. *AEP*, 708 F.3d at 188.

## CONCLUSION

For the foregoing reasons, the Court should deny Duke's Petition, grant AT&T's Petition, and direct the FCC to set the "just and reasonable" rate for AT&T's use of Duke's poles that is the same as Duke charges AT&T's competitors on the same poles.

## REQUEST FOR ORAL ARGUMENT

AT&T disagrees that Duke's Petition for Review "involves complicated legal and factual issues" or "issues of first impression" requiring oral argument. *See* Duke Br. at 52.  However, should the Court set oral argument in this case, AT&T requests that the issues raised in AT&T's Petition for Review be included.

Respectfully submitted,

/s/ Christopher S. Huther
Christopher S. Huther
Claire J. Evans
Frank Scaduto
**WILEY REIN LLP**
2050 M Street, N.W.
Washington, D.C. 20036
(202) 719-7000 Telephone
(202) 719-7049 Facsimile
chuther@wiley.law
cevans@wiley.law
fscaduto@wiley.law

*Attorneys for Intervenor/Petitioner*
*BellSouth Telecommunications, LLC,*
*d/b/a AT&T North Carolina and*
*d/b/a AT&T South Carolina*

May 22, 2023

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume requirements of Federal Rules of Appellate Procedure 28.1(e) and 32(a)(7) because it contains 15,164 words, as determined by the word count feature of Microsoft Word, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

/s/ Christopher S. Huther
Christopher S. Huther

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Opening/Response Brief of

Intervenor/Petitioner to be filed electronically with the Clerk of the Court for the

United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF

system on May 22, 2023. The participants in the case are registered CM/ECF

users and service will be accomplished by the appellate CM/ECF system.

I further certify that, on May 22, 2023, I caused a copy of the Sealed version

of the foregoing brief to be service via USPS on counsel listed below:

Maureen Katherine Flood
Jacob Matthew Lewis
FEDERAL COMMUNICATIONS COMMISSION
Office of General Counsel
45 L Street, NE
Washington, DC 20554
*Counsel for Respondent Federal Communications Commission*

Daniel Edward Haar
Robert B. Nicholson
Robert J. Wiggers
U.S. DEPARTMENT OF JUSTICE
Antitrust Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
*Counsel of Record for Respondent United States of America*

Eric B. Langley
Robin F. Bromberg
R. Rylee Zalanka
LANGLEY & BROMBERG LLC
2700 US Highway 280, Suite 350E
Birmingham, AL 35223
*Counsel for Petitioner/Intervenor Duke Energy Progress, LLC*

/s/ Frank Scaduto
Frank Scaduto