CASE NOS. 22-2220(L), 23-1096

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

————

DUKE ENERGY PROGRESS, LLC,

PETITIONER/INTERVENOR,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS,

BELLSOUTH TELECOMMUNICATIONS, LLC, D/B/A AT&T
NORTH CAROLINA AND D/B/A AT&T SOUTH CAROLINA

INTERVENOR/PETITIONER.

————

On Petitions for Review of an Order of the
Federal Communications Commission

————

## PAGE-PROOF OPENING BRIEF OF RESPONDENTS

————

JONATHAN S. KANTER
ASSISTANT ATTORNEY GENERAL

ROBERT B. NICHOLSON
ROBERT J. WIGGERS
ATTORNEYS

UNITED STATES
    DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

MAUREEN K. FLOOD
COUNSEL

FEDERAL COMMUNICATIONS
    COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ......................................................5

ISSUES PRESENTED...........................................................................5

STATEMENT OF THE CASE .............................................................7

I.   THE COMMISSION'S AUTHORITY TO
     REGULATE POLE ATTACHMENTS .............................................7

   A.   Section 224 of the Communications Act ....................................7

   B.   The *2011 Order* .................................................................8

   C.   The *2018 Order* ...............................................................15

II.  THE PROCEEDINGS BELOW ......................................................18

   A.   The *Bureau Order* ..........................................................20

   B.   The *Order* on Review .....................................................27

      1.   Duke's Issues...............................................................27

      2.   AT&T's Issues .............................................................30

SUMMARY OF ARGUMENT ...........................................................33

STANDARD OF REVIEW ................................................................38

ARGUMENT .......................................................................................40

I.   SEVERAL OF DUKE'S CHALLENGES TO THE
     ORDER ARE NOT PROPERLY BEFORE THIS
     COURT; ALL LACK MERIT...................................................40

i

A.  The Commission Has Jurisdiction over the Pole Attachment Rates that ILECs Pay Utilities, and It Reasonably Exercised that Authority in Resolving AT&T's Complaint ...................................... 40

    1.  Issue Preclusion Bars Duke from Challenging the Commission's Jurisdiction over the Pole Attachment Rates Paid by ILECs ........................... 41

    2.  The Commission Has Jurisdiction over the Pole Attachment Rates that ILECs Pay Utilities ...................... 45

    3.  The Commission Reasonably Exercised Its Jurisdiction over the Pole Attachment Rates that Duke Charges AT&T ........................................ 54

B.  The Commission Did Not Retroactively Apply a New Standard in Resolving AT&T's Pole Attachment Complaint Against Duke ....................................... 56

    1.  The Commission Did Not Adopt a New Standard by Declining to Follow a Decision Issued by Its Staff ................................................... 57

    2.  The Commission Reasonably Declined to Follow an Earlier Staff-Level Decision and Fully Explained Its Decision Not to Do So ......................... 60

    3.  There Is No Basis to Depart from the Presumption that Adjudicatory Actions Are Retroactive .................................................................. 63

C.  The Commission Properly Allocated the Cost of the Safety Space to Duke ............................................. 67

    1.  The Commission Reasonably Determined that Duke Must Assume the Cost of the Safety Space ............................................................. 68

    2.  Duke's Statutory Argument Is Waived and Otherwise Lacks Merit ........................................... 70

ii

II.   AT&T'S CHALLENGES TO THE ORDER ARE
      MERITLESS ........................................................................74

   A.   The Commission Properly Determined that AT&T
        Should Pay the Old Telecom Rate Because It Is
        Not Similarly Situated to Other Entities with
        Attachments on Duke's Poles......................................74

      1.   Substantial Evidence Supports the
           Commission's Conclusion Regarding AT&T's
           Material Advantages over Other Attachers ........................74

      2.   The Commission Determined that AT&T Was
           Not Similarly Situated to Other Attachers on
           Duke's Poles Based on the Terms in the Joint
           Use Agreement, Not "ILEC Traits" ........................................87

      3.   The Commission Correctly Limited Its Analysis
           to a Comparison of Terms in Pole Attachment
           Agreements.................................................................................92

   B.   The Commission Reasonably Permitted Duke to
        Use the Actual "Number of Attaching Entities" on
        Its Poles in Calculating the Old Telecom Rate
        Paid by AT&T .................................................................95

## TABLE OF AUTHORITIES

### CASES

*Am. Electric Power Serv. Corp. v. FCC*, 708 F.3d 183 (D.C. Cir. 2013), *cert. denied*, 571 U.S. 940 ................................................................ *passim*

*Ameren Corp. v. FCC*, 865 F.3d 1009 (8th Cir. 2017) ...................................... 10, 98, 99, 101

*Amor Family Broad. Group v. FCC*, 918 F.2d 960 (D.C. Cir. 1990) ............................................ 62

*ARA Svcs., Inc. v. NLRB*, 71 F.3d 129 (4th Cir. 1995) ....................................................... 65, 67

*AT&T Corp. v. FCC*, 454 F.3d 329 (D.C. Cir. 2006) ................................................... 65, 66, 67

*Burgess v. United States*, 553 U.S. 124 (2008) ............................... 50

*Cassell v. FCC*, 154 F.3d 478 (D.C. Cir. 1998) ........................... 66, 67

*Ceres Marine Terminals, Inc. v. Green*, 656 F.3d 235 (4th Cir. 2011) ....................................... 41

*Chevron USA, Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837 (1984) ......................................... 40

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ................................ 41

*City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), *cert denied*, ____ U.S. ____, 141 S. Ct. 2855, 210 L.Ed.2d 962 (2021) ................................................................ *passim*

*Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C. Cir. 1987) ........................................ 67

*Collins v. Pond Creek Mining Co.*, 468 F.3d 213 (4th Cir. 2006) ......................................... 44

*Comcast Corp. v. FCC*, 526 F.3d 763 (D.C. Cir. 2008) ............................................. 61

*Consumer Electronics Ass'n v. FCC*, 347 F.3d 291 (D.C. Cir. 2003) .......................................... 52

iv

*Corley v. United States*, 556 U.S. 303 (2009) ..................................... 51

*Craig v. Chater*, 76 F.3d 585 (4th Cir.1996) ..................................... 41

*Dep't of Commerce v. New York*, —— U.S. ——
139 S. Ct. 2551 (2019) ..................................... 61

*FCC v. Fox Television Stations, Inc.*, 556 U.S.
502 (2009) ..................................... 52, 65

*Gulf Power Co. v. FCC*, 669 F.3d 320 (D.C.
Cir. 2012) ..................................... 46

*Herrera-Martinez v. Garland*, 22 F.4th 173
(4th Cir. 2022) ..................................... 41

*King v. Burwell*, 759 F.3d 358 (4th Cir.
2014), *aff'd*, 576 U.S. 473 (2015) ..................................... 39

*Montana v. United States*, 440 U.S. 147
(1979) ..................................... 43, 44

*Montgomery Cnty, Md. v. FCC*, 811 F.3d 121
(4th Cir. 2015) ..................................... 40, 75

*Mountain Valley Pipeline LLC v. N. Carolina
Dept. of Env't Quality*, 990 F.3d 818 (4th
Cir. 2021) ..................................... 101

*Nat'l Cable & Telecomms. Ass'n v. Brand X
Internet Svcs.*, 545 U.S. 967 (2005) ..................................... 40

*Nat'l Cable & Telecomms. Ass'n v. Gulf
Power Co.*, 534 U.S. 327 (2002) ..................................... 7

*Nat'l Fed. of the Blind v. U.S. Abilityone
Comm'n*, 421 F.Supp.3d 102 (D. Md. 2019) ..................................... 61

*New Hampshire v. Maine*, 532 U.S. 742
(2001) ..................................... 43

*NLRB v. Grand Canyon Min. Co.*, 116 F.3d
1039 (4th Cir. 1997) ..................................... 87

*NTCH, Inc. v. FCC*, 841 F.3d 497 (D.C. Cir.
2016) ..................................... 53, 56

*Ohio Valley Env't Coal. Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119 (4th Cir. 2013)...................................................................78

*Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs*, 828 F.3d 316 (4th Cir. 2016)...........................................................38, 39

*Saudi v. V. Ship Switzerland, S.A.*, 93 Fed.Appx. 516 (4th Cir. 2004).......................47

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947)...................................65

*SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017) .........................62

*Taylor v. Sturgill*, 553 U.S. 880 (2008) ....................................43, 45

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)...........................................57

*U.S. v. Mitchell*, 39 F.3d 465 (4th Cir. 1994)...................................51

*United States v. Lund*, 853 F.2d 242 (4th Cir. 1988)...........................................52

*Verizon Tel. Cos. v. FCC*, 269 F.3d 1098 (D.C. Cir. 2001) ...........................................65

*Vernal Enters., Inc. v. FCC*, 355 F.3d 650 (D.C. Cir. 2004)...........................................61

*Whitehead v. Viacom*, 233 F.Supp.2d 715 (D. Md. 2002) ...............................................46

**STATUTES**

5 U.S.C. § 706(2)(A) ...............................................38

5 U.S.C. § 706(2)(E) ...............................................38

28 U.S.C. § 2342(1) ...................................................5

47 U.S.C. § 153(51) ...............................................46

47 U.S.C. § 224....................................................7

47 U.S.C. § 224(a)(4) .......................................*passim*

47 U.S.C. § 224(a)(5) .......................................10, 46, 47

47 U.S.C. § 224(b)(1) ................................................. *passim*

47 U.S.C. § 224(d) ........................................................ 8

47 U.S.C. § 224(d)(1) ................................................... 9

47 U.S.C. § 224(e) ............................................... 8, 9, 49

47 U.S.C. § 224(e)(2) ................................................. 96

47 U.S.C. § 224(f)(1) .................................. 11, 49, 88, 95

47 U.S.C. § 251(h)(1) ................................................ 10

47 U.S.C. § 402(a) ....................................................... 5

47 U.S.C. § 405(a) ................................................. *passim*

Telecommunications Act of 1996, Pub. L. No.
  104-104, 110 Stat. 56 ............................................... 8

## REGULATIONS

47 C.F.R. § 1.115 ...................................................... 83

47 C.F.R. § 1.1402(d) ............................................... 53

47 C.F.R. § 1.1402(e) ................................................ 53

47 C.F.R. § 1.1406(d) ............................................... 97

47 C.F.R. § 1.1406(d)(1) ........................................... 73

47 C.F.R. § 1.1406(d)(2) ........................................... 73

47 C.F.R. § 1.1407(a)(2) (2018) ................................ 66

47 C.F.R. § 1.1409(c) ............................................... 26

47 C.F.R. § 1.1409(e)(2)(2011) .............................. 96, 97

47 C.F.R. § 1.1410 ............................................... 26, 69

47 C.F.R. § 1.1410(c) (2011) ..................................... 66

47 C.F.R. § 1.1413 ............................................... 21, 77

47 C.F.R. § 1.1413(b) ............................................ *passim*

47 C.F.R. § 1.1424 (2011) .................................. 14, 57, 91

## ADMINISTRATIVE MATERIALS

*Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd 7705 (2018) ........................................................... *passim*

*Adoption of Rules for the Regulation of Cable TV Pole Attachments*, 72 FCC 2d 59 (1979) ................................ 70

*Adoption of Rules for the Regulation of Cable TV Pole Attachments*, 77 FCC 2d 187 (1980) ........................................................................................ 70

*Amendment of Rules and Policies Governing Pole Attachments*, 15 FCC Rcd 6453 (2000) .................... 29, 68, 69

*Amendment of Rules and Policies Governing Pole Attachments*, 16 FCC Rcd 12103 (2001) ........................................................................................ 68

*BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Florida Power and Light Company*, 2022 WL 2104259 (2022) ........................... 76, 83, 84, 98

*BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Florida Power and Light*, 35 FCC Rcd 5321 (EB 2020) ....................................................... 71

*Implementation of Section 224 of the Act*, 26 FCC Rcd 5240 (2011), *aff'd, Am. Electric Power Serv. Corp. v. FCC*, 708 F.3d 183 (D.C. Cir. 2013), *cert. denied*, 571 U.S. 940 .......................... *passim*

*Implementation of Section 224 of the Act*, 30 FCC Rcd 13731, *aff'd, Ameren Corp. v. FCC*, 865 F.3d 1009 (8th Cir. 2017) ............................................ 10

*Implementation of Section 703(e) of the Telecommunications Act of 1996*, 13 FCC Rcd 6777 (1998) ...................................................... 10, 96

*KGAN Licensee*, 30 FCC Rcd 7664 (2015) ....................................... 83

*Verizon Florida LLC v. Florida Power and Light Company*, 30 FCC Rcd 1140 (EB 2015)................................................................*passim*

*Verizon Maryland LLC v. The Potomac Edison Co.,* 2022 WL 990572 (2022)......................................*passim*

*Verizon Maryland LLC v. The Potomac Edison Co.*, 35 FCC Rcd 13607 (2020)........................53, 55, 61, 62

## OTHER MATERIALS

Brief of Petitioners, *American Electric Power Service Corporation et al. v. FCC*, D.C. Cir. No. 11-1146 (filed Jan. 13, 2012) ...................................43

Duke Power Corporation 2023 SEC 10-K........................................45

Joint Opening Brief of Petitioners, *American Electric Service Power Corporation et al. v. FCC*, 9th Cir. No. 18-72689(L), 19-70490 (filed June 24, 2019) .......................................44

## INTRODUCTION

Pole attachment rates are charges that owners of utility poles, including electric utility companies, impose on companies that attach lines and other equipment to their poles. Congress has vested the Federal Communications Commission with the authority to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable" and to "hear and resolve complaints concerning such rates, terms, and conditions." 47 U.S.C. § 224(b)(1).

In the order on review, the Commission resolved a pole attachment complaint filed by AT&T, a telephone company, against Duke Energy Progress, an electric utility. AT&T and Duke are parties to a joint use agreement that contains the rates, terms, and conditions for each party's use of the other's utility poles in North Carolina and South Carolina.

Acting on authority delegated by the Commission, the FCC's Enforcement Bureau decided that the pole attachment rate Duke was charging AT&T was unjust and unreasonable, because it was

higher than the rate Duke charges attaching cable providers as
well as telecommunications carriers that, unlike AT&T, are not
incumbent local exchange carriers ("ILECs"). But the Bureau also
determined that, under AT&T's agreement with Duke, AT&T had
the right to attach its lines and equipment to Duke's poles on terms
that afforded AT&T material advantages over other entities with
attachments on Duke's poles. To account for those benefits, the
Bureau determined that AT&T should pay a pole attachment rate
that is lower than the rate in the joint use agreement but higher
than the rate paid by other companies that attach their lines to
Duke's poles. It also ordered Duke to refund the difference between
the rate in the joint use agreement and the Bureau-determined
just and reasonable rate for the period covered by the three-year
statute of limitations. The Commission on review upheld the
Bureau's decisions.

Duke and AT&T petition for review of the *Order* on separate
grounds.

Duke asserts that the Commission lacks jurisdiction over the
rates utilities charge ILECs. That argument is barred by principles

of issue preclusion. More than a decade ago, Duke's corporate parent raised the same argument before the United States Court of Appeals for the District of Columbia Circuit, which squarely rejected it. Duke's jurisdictional objection also fails on the merits: As the D.C. Circuit explained, the Commission reasonably interpreted the Act as authorizing it to regulate the pole attachment rates that ILECs pay utilities. The United States Court of Appeals for the Ninth Circuit agreed. There is no basis for revisiting those decisions here.

The Commission reasonably exercised its statutory authority in this case. The agency properly applied its regulations and precedent in deciding that the rates Duke charged AT&T were unjust and unreasonable. The single staff decision upon which Duke relies did not, under well-established precedent, bind the Commission. Moreover, the Order did not harm any reliance interest of Duke's. During the period covered by the complaint, Duke had notice that it might have to issue a refund if an ILEC, like AT&T, established that Duke's pole attachment rates were unjust and unreasonable.

The Commission correctly required Duke, not AT&T, to assume the cost of the 40-inch safety space on Duke's poles. For decades, the Commission has assigned the safety space to the electric utility, rather than entities with attachments on its poles, because it is the utility that needs that space to protect its electric lines, and the utility is the only entity that can make productive use of it.

The Commission reasonably determined that AT&T should pay a higher rate than other attachers (although not as high as that specified in the joint use agreement) because it enjoys material advantages that are not available to other attachers on Duke's poles. Although AT&T interprets the evidence differently, the Commission's decision was based on substantial evidence, including the terms in AT&T's joint use agreement, not "ILEC traits." Also, consistent with the Commission's regulations and precedent, the Commission only compared contract terms, not other attachers' statutory and regulatory rights. The Commission also reasonably permitted Duke to use different inputs in the

different formulas used to calculate the different rates paid by AT&T and other attachers on Duke's poles.

## JURISDICTIONAL STATEMENT

The Commission released the Order on November 18, 2022. *BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and d/b/a AT&T South Carolina v. Duke Energy Progress, LLC*, 2022 WL 17100973 (rel. Nov. 18, 2022) (*Order*) [_____] Duke filed a petition for review in this Court on November 28, 2022. AT&T filed a petition for review on January 17, 2023, in the United States Court of Appeals for the D.C. Circuit, which transferred AT&T's case to this Court on January 26, 2023. The petitions were then consolidated. This Court has subject matter jurisdiction over the consolidated petitions under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). Venue is proper because Duke has its principal place of business in North Carolina.

## ISSUES PRESENTED

The following issues are raised by Duke's petition for review:

Whether the Commission reasonably applied settled precedent affirming its authority under section 224 of the Act to

ensure just and reasonable pole attachment rates for incumbent local exchange carriers ("ILECs") like AT&T?

Whether the Commission reasonably applied the correct legal standard in reviewing the pole attachment rates that Duke charged AT&T between September 1, 2017, and December 31, 2019?

Whether the Commission reasonably applied settled precedent in determining that Duke may not charge AT&T for "safety space" on Duke's poles in calculating AT&T's just and reasonable pole attachment rate?

The following issues are raised by AT&T's petition for review:

Whether the Commission reasonably determined that AT&T's agreement with Duke provides it material advantages relative to other entities attaching to Duke's electric poles, and to account for those benefits, AT&T should pay a higher just and reasonable pole attachment rate?

Whether the Commission reasonably permitted Duke to use different "numbers of attaching entities" in calculating the pole attachment rate paid by AT&T and the rate paid by other entities

attaching to Duke's poles—which are derived from different rate formulas—because that number only has a significant effect on AT&T's calculated rate.

## STATEMENT OF THE CASE

## I. THE COMMISSION'S AUTHORITY TO REGULATE POLE ATTACHMENTS

### A. Section 224 of the Communications Act

Utility poles provide an often essential means for communications providers to deploy the lines, wires, and other network equipment they need to reach customers. Concerned that owners of utility poles—generally electric utilities—were abusing their market power by charging cable television providers "monopoly rents" to attach wires to their poles, *see Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 330 (2002), Congress in 1978 added section 224 to the Communications Act of 1934, 47 U.S.C. § 224. That provision grants the Commission authority to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable" and to "hear and resolve complaints concerning rates, terms, and conditions." 47 U.S.C. § 224(b)(1). As

originally enacted, section 224 applied only to attachments by cable television system operators ("cable providers").

Congress expanded the reach of section 224 in the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (the "1996 Act"). As amended, section 224 empowers the Commission (absent state regulation) to regulate the rates, terms, and conditions for "any attachment by a cable television system *or provider of telecommunications services* to a pole, duct, conduit, or right-of-way owned or controlled by a utility." 47 U.S.C. § 224(a)(4) (defining "pole attachment") (emphasis added).

Section 224, as amended, includes two separate rate formulas for setting pole attachment rates: One for rates paid by cable providers, 47 U.S.C. § 224(d), and another for rates paid by telecommunications carriers, 47 U.S.C. § 224(e).

### B.  The *2011 Order*

As initially implemented by the Commission, the rate paid by telecommunications carriers (hereafter, the Old Telecom Rate) was almost always higher than the rate paid by cable providers (the Cable Rate). *See Implementation of Section 224 of the Act*, 26 FCC

Rcd 5240, 5297, ¶ 131 (2011) (*2011 Order*), *aff'd, Am. Electric Power Serv. Corp. v. FCC*, 708 F.3d 183 (D.C. Cir. 2013), *cert. denied*, 571 U.S. 940. The discrepancy between the two rates largely stemmed from the different ways that the two statutory formulas "allocate the costs associated with the unusable portion of the pole"—*i.e.*, the space on the pole that "cannot be used for attachments." *2011 Order*, 26 FCC Rcd at 5297, ¶ 131 n.397. Whereas the cable rate formula allocates such costs "based on the fraction of the usable space that an attachment occupies," *see* 47 U.S.C. § 224(d)(1), the telecom rate formula apportions the cost of the unusable space among the attachers on the pole, 47 U.S.C. § 224(e). *Id.*

Concerned that this rate disparity created "marketplace distortions and barriers to the availability of new broadband facilities and services," *2011 Order*, 26 FCC Rcd at 5305, ¶ 151, the Commission in 2011 adopted a New Telecom Rate formula that lowered the telecom rate so that it would generally "recover the same portion of pole costs as the current cable rate." *Id.* at 5244, ¶ 8. To achieve that result, the Commission reinterpreted the term

"cost" in section 224(e)(2) by defining the "cost" for an urban-area pole as 66 percent of the pole's fully allocated costs, and for a non-urban-area pole as 44 percent of the pole's fully allocated costs. *2011 Order*, 26 FCC Rcd at 5304, ¶ 149. On reconsideration, the Commission made further adjustments to its telecom rate rule "to bring cable and telecom rates for pole attachments into parity at the cable-rate level." *Implementation of Section 224 of the Act*, 30 FCC Rcd 13731, 13738, ¶ 16 (*2015 Order*), *aff'd, Ameren Corp. v. FCC*, 865 F.3d 1009 (8th Cir. 2017).

In its initial implementation of section 224, the Commission had determined that ILECs—as defined in 47 U.S.C. § 251(h)(1)—have "no rights under Section 224 with respect to the poles of [electric] utilities." *Implementation of Section 703(e) of the Telecommunications Act of 1996*, 13 FCC Rcd 6777, 6781, ¶ 5 (1998) (*1998 Order*). It based that conclusion on section 224(a)(5), which provides that "[f]or purposes of this section, the term 'telecommunications carrier'…does not include any [ILEC]." 47 U.S.C. § 224(a)(5). However, in 2011, the Commission reconsidered its reading of the statute, finding that although ILECs are not

10

among the "telecommunications carriers" that have a right of
access to utilities poles pursuant to section 224(f)(1), 47 U.S.C.
§ 224(f)(1),[1] ILECs that obtain such access are entitled to rates,
terms, and conditions that are "just and reasonable" in accordance
with section 224(b)(1). *2011 Order*, 26 FCC Rcd at 5327-33, ¶¶ 199-
213.

   The Commission based its revised reading on the statute's
definition of "pole attachment," which includes "any attachment"
by a "provider of telecommunications service." 47 U.S.C.
§ 224(a)(4). The Commission determined that the phrase "provider
of telecommunication service" was "distinct from
'telecommunications carrier' for purposes of section 224." *2011
Order*, 26 FCC Rcd at 5332, ¶ 210. It reasoned that because ILECs
"are 'providers of telecommunications service,' 'pole attachment' as

---

[1] Section 224(f)(1) requires a utility to "provide a cable television
system or any telecommunications carrier with nondiscriminatory
access to any pole, duct, conduit, or right-of-way owned or
controlled by" the utility. 47 U.S.C. § 224(f)(1). The
telecommunications carriers that have a statutory right of access
under section 224(f)(1) are commonly referred to as competitive
local exchange carriers, or CLECs.

defined in section 224(a)(4) includes attachments of [ILECs]." *Id.* at
5332, ¶ 211. And because section 224(b) requires the Commission
to "regulate the rates, terms, and conditions for pole attachments,"
47 U.S.C. § 224(b)(1), the Commission found that under its revised
reading of the definition of "pole attachment," it "has a statutory
obligation to regulate" the rates, terms, and conditions for ILECs'
attachments to utilities' poles. *2011 Order*, 26 FCC Rcd at 5332,
¶ 211.

However, the Commission "recognize[d] the need to exercise
that authority in a manner that accounts for the potential
differences between [ILECs] and [CLECs] or cable operator
attachers." *2011 Order*, 26 FCC Rcd at 5333, ¶ 214. It observed
that ILECs (like utilities) are pole owners, and they frequently
obtain access to electric utility poles through "joint use"
agreements. *Id.* Such agreements typically are structured as cost-
sharing arrangements, and they often provide ILECs benefits that
are not found in agreements between utilities and other attachers.
*Id.* With that recognition, the Commission provided guidance on its
approach to handling pole attachment complaints by ILECs. *Id.*

To start, the Commission distinguished "existing" and "new" pole attachment agreements between ILECs and utilities. The Commission observed that existing agreements (*i.e.*, those negotiated before the *2011 Order*) had generally been entered into when ILECs "were in a more balanced negotiating position with electric utilities, at least based on relative pole ownership." *Id.* at 5335, ¶ 216. For that reason, the Commission explained that it would be "unlikely to find the rates, terms, and conditions in existing joint use agreements unjust or unreasonable." *Id.* Nonetheless, "[t]o the extent that an [ILEC] can demonstrate that it genuinely lacks the ability to terminate an existing agreement and obtain a new agreement," the Commission determined that it could "consider that" evidence in a pole attachment complaint proceeding. *Id.*

With respect to new agreements (*i.e.*, those entered into after the *2011 Order*), the Commission determined that where ILECs attach to a utility's poles on terms and conditions that are "comparable" to those provided to other attachers on the utility's poles, "competitive neutrality counsels in favor of affording [ILECs]

13

the same rate" as those other attachers—*i.e.*, the New Telecom Rate. *Id.* at 5336, ¶ 217. In those circumstances, the Commission placed "the burden" on ILECs to show that they were "similarly situated" to other attachers and were therefore entitled to "comparable" rates, terms, and conditions. *See* 47 C.F.R. § 1.1424 (2011).

However, the Commission determined that an ILEC should pay a "different rate" if the record shows that a new agreement "materially advantages" the ILEC relative to other attachers, *2011 Order*, 26 FCC Rcd at 5336, ¶ 218. In that circumstance, the Commission decided to use the Old Telecom Rate as a "reference point." *Id.* at 5337. It reasoned that the Old Telecom Rate—which is higher than the New Telecom Rate—"helps account for" the advantages provided to ILECs relative to other attachers. *Id.* Using that "specific rate" as a reference point also would "better inform[] pole attachment negotiations," "reduce the number of disputes" brought to the Commission, and be "more administrable" than "develop[ing]…an entirely new rate." *Id.*

Several electric utilities, including Duke's corporate parent (Duke Energy Corporation), challenged the *2011 Order* in the U.S Court of Appeals for the D.C. Circuit. On review, that court held that the Commission reasonably construed the statute to authorize FCC regulation of ILEC pole attachments. *American Electric Power*, 708 F.3d at 186-88. The court found "an entirely intentional character" in section 224(a)(4)'s use of the broader term "provider of telecommunications services" and the "restricted definition of telecommunications carrier" in section 224(a)(5), 708 F.3d at 187, and on that basis, it concluded that the Commission reasonably determined that its authority to "regulate the rates, terms, and conditions for pole attachments" encompassed attachments by ILECs. *Id.* at 186-88.

### C.  The *2018 Order*

In 2018, the Commission reconsidered its earlier presumption that ILECs, as pole owners, are different from other attachers. Citing evidence showing that "[ILEC] pole ownership has declined and [ILEC] pole attachment rates have increased (while pole attachment rates for cable and telecommunications attachers have

decreased)," the Commission determined that "[ILEC] bargaining power vis-à-vis utilities had eroded since 2011." *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd 7705, 7769, ¶ 125 (2018) (*2018 Order*). In response to "these changed circumstances," the Commission adopted a rebuttable presumption that, "for new and newly-renewed pole attachment agreements" between ILECs and utilities, ILECs are "similarly situated" to "telecommunications attachers" and thus are entitled to "comparable" rates that are no higher than the New Telecom Rate. *Id.*

At the same time, the Commission acknowledged that "there may be some cases" in which ILECs "continue to possess greater bargaining power than other attachers." *Id.* In those instances, a utility "can rebut" the new presumption "with clear and convincing evidence that [an ILEC] receives net benefits under its pole attachment agreement with the utility that materially advantage the [ILEC] over other telecommunications attachers." *Id.* at 7768, ¶ 123; *see also* 47 C.F.R. § 1.1413(b).

16

If the presumption is rebutted, the utility and the ILEC may "negotiate the appropriate rate or tradeoffs to account for" any "additional benefits" that differentiate the ILEC from other attachers. *2018 Order*, 33 FCC Rcd at 7771, ¶ 128. In that case, the Old Telecom Rate "is the maximum rate that the utility and the [ILEC] may negotiate." *Id.* at 7771, ¶ 129. The Commission made this rate a hard cap to "provide further certainty within the pole attachment marketplace" and "limit pole attachment litigation." *Id.*

Recognizing that the new presumption "will impact privately-negotiated agreements," the Commission decided that it "will only apply, as it relates to existing contracts, upon renewal of those agreements." *Id.* at 7770, ¶ 127. The Commission thus determined that the Old Telecom Rate will continue to serve as a reference point in those circumstances where a pole attachment agreement entered into before the effective date of the *2018 Order* (March 11, 2019) "materially advantages" an ILEC over other attachers. *Id.* at 7770, n.478.

The Ninth Circuit Court of Appeals rejected challenges to the *2018 Order* by several utilities, including Duke's parent company.

*City of Portland v. United States*, 969 F.3d 1020, 1052-53 (9th Cir.

2020), *cert denied*, ____ U.S. ____, 141 S. Ct. 2855, 210 L.Ed.2d 962

(2021). That court upheld the Commission's authority under

section 224(b)(1) of the Act to ensure just and reasonable rates for

ILECs, observing that "[t]he FCC has interpreted section 224(b)(1)

this way since 2011, and the D.C. Circuit upheld this

interpretation some years ago." *Id.* It then found that the

Commission "provided an adequate justification for setting the

same presumptive rates for all telecommunications providers,"

noting record evidence showing continuing "rate disparities

between ILECs and CLECs" and the disappearance of the "historic

differences between" those carriers "that supported different rates."

*Id.* at 1052, 1053.

## II.    THE PROCEEDINGS BELOW

BellSouth Telecommunications, LLC d/b/a AT&T North

Carolina and AT&T South Carolina (collectively AT&T), an ILEC,

and Duke Energy Progress, an electric utility, are parties to a joint

use agreement executed in 2000, with an effective date of January

1, 2001. [*Bureau Order* n.6]. That agreement contains the rates,

terms, and conditions for each party's use of the other's utility poles. [*Bureau Order* n.7].

The agreement sets forth the methodology for calculating each party's rate for attachments on either party's joint use poles. It compares the amounts due from each party, and then Duke— which owns more poles than AT&T—issues a bill to AT&T for the net rental amount that AT&T owes Duke. [*Bureau Order* ¶5].

Under the agreement, Duke charges AT&T much higher rates than it charges cable providers and CLECs for attachments on the same poles. The record showed that between 2017 and 2019, Duke charged AT&T between [redacted] per pole while charging CLECs and cable companies between [redacted] per pole. As a result, AT&T pays [redacted] more than other entities with attachments on the same pole under the joint use agreement. [*Bureau Order* ¶6].

On September 1, 2020, AT&T filed a complaint with the Commission against Duke, alleging that the rates that it pays for use of Duke's poles are unjust and unreasonable within the meaning of section 224 of the Act and the Commission's rules and

19

orders. [Complaint]. AT&T asked the Commission to require Duke to reduce its pole attachment rate to the New Telecom Rate, and order Duke to refund any amounts it had collected in excess of that rate, consistent with the applicable statute of limitations. [Complaint at 27-28, 39-42].

### A.   The *Bureau Order*

The Enforcement Bureau, acting on authority delegated by the Commission, issued an Order on September 21, 2021, to "resolve several issues disputed by" AT&T and Duke. [*Bureau Order* ¶1].

The Bureau determined that for the period starting on January 1, 2020, the *2018 Order* supplied the standard for reviewing the parties' joint use agreement. January 1, 2020, was the date that the joint use agreement "automatically renewed" for the first time after the effective date of the regulations amended by the *2018 Order*, which was March 11, 2019. [*Bureau Order* ¶9].

The Bureau determined, however, that while AT&T was entitled to relief under the *2018 Order*, Duke had rebutted the presumption that AT&T is "similarly situated" to other attachers

on Duke's poles by showing that the parties' joint use agreement provides AT&T with a number of "material[] advantages," which the Bureau proceeded to describe in detail. [*Bureau Order* ¶¶15-35]; 47 C.F.R. § 1.1413.

*Guaranteed Pole Access.* The Bureau first found that the joint use agreement requires Duke to reserve and maintain space for AT&T on all joint use poles, including any that are newly erected or newly acquired, so long as those attachments comply with generally applicable safety standards and engineering practices and do not "unreasonably interfere" with Duke's use of a pole. [*Bureau Order* ¶¶17-18]. Other entities with attachments on Duke's poles do not enjoy a similar space guarantee. [*Bureau Order* ¶17].

*Ability to Use Additional Space on Poles.* The joint use agreement also generally allows Duke and AT&T to use an unspecified amount of space on each other's poles—an arrangement that is not provided to other attachers. [*Bureau Order* ¶20].

21

*No Requirement to Remove Attachments on Termination.* The agreement provides that even if terminated, it remains in force with respect to AT&T's existing attachments on all poles jointly used by the parties. As a result, Duke cannot force AT&T to remove its attachments from Duke's poles. In contrast, other attachers are required to remove all of their lines and equipment upon termination of their pole attachment agreements with Duke. [*Bureau Order* ¶21].

*Predictable Billing for Pole Replacements.* The agreement provides that if Duke replaces a pole for AT&T, AT&T will pay a "scheduled cost" set forth in the agreement. By contrast, when Duke replaces a pole for a cable provider or a CLEC, it charges them the "'actual, work order costs." [*Bureau Order* ¶24]. Without passing on Duke's claim that AT&T thus enjoys a "cost advantage," [*Bureau Order* ¶26], the Bureau found that because of the agreement's "list of scheduled pole replacement costs," AT&T does not "need to wait for an estimate or invoice to learn the cost of each pole replacement job," which provides it a "budgeting and planning

advantage over its competitors, whose licensing agreements do not contain scheduled costs." [*Bureau Order* ¶27].

*No Additional Permitting Fees or Requirements.* Unlike other attachers, AT&T is not required under the agreement to obtain Duke's approval, or pay a permitting fee, when it attaches its lines to Duke's poles. [*Bureau Order* ¶28].

*Lowest Position on Poles.* Finally, the Bureau noted, AT&T's lines currently occupy the lowest position on Duke's poles, and the joint use agreement gives AT&T the right to maintain its existing attachments in that position. [*Bureau Order* ¶31]. The Bureau thus found that AT&T, unlike its competitors, had the right to choose its location, which "benefitted AT&T by providing a consistent and predictable space on each pole." [*Bureau Order* ¶33].

Given the "variety of unique benefits that materially advantage AT&T over" other attachers on Duke's poles, the Bureau concluded that AT&T was entitled to a rate no greater than the Old Telecom Rate for the timeframe covered by the *2018 Order*. [*Bureau Order* ¶35].

The Bureau separately determined that the *2011 Order* "provides the relevant standard for reviewing the [joint use agreement] rates" prior to January 1, 2020. [*Bureau Order* ¶36]. Finding that "AT&T ha[d] demonstrated that it 'genuinely lacks the ability to terminate the joint use agreement and obtain a new agreement,'" the Bureau concluded that the agreement is subject to review under the *2011 Order*. [*Bureau Order* ¶37] (quoting *2011 Order*, 26 FCC Rcd at 5336, ¶ 216); [*Bureau Order* ¶40].

The Bureau, however, denied AT&T's request to pay a rate not to exceed the New Telecom Rate. The Bureau pointed out that it had just found that AT&T receives "material advantages that are not afforded to" other attachers "on the same poles." [*Bureau Order* ¶41]. On that basis, it "conclude[d] that AT&T has not demonstrated that it is similarly situated to such other attachers" and "thus is not entitled to the New Telecom Rate." [*Bureau Order* ¶41].

Nonetheless, the Bureau determined that the benefits that AT&T receives "do not justify the [joint use agreement] rates." [*Bureau Order* ¶42]. "In particular," the Bureau found that "the

24

rate AT&T pays Duke under the [joint use agreement] is disproportionate to the amount of space each uses on a pole," and that "AT&T pays far more than Duke on a per-foot basis." [*Bureau Order* ¶42]. The Bureau was unpersuaded by Duke's attempt to show that the rates it charged AT&T are justified by AT&T's "advantages" under the agreement. [*Bureau Order* ¶43]. Though Duke "attempt[ed] to calculate the monetary value" of those benefits, the Bureau concluded that Duke's "calculations [were] speculative and unsupported by reliable evidence." [*Bureau Order* ¶43]. Because neither AT&T nor Duke had "provided a credible valuation of the advantages that AT&T receives under the [joint use agreement]," the Bureau decided that prior to January 1, 2020, AT&T was "entitled to a rate" not to exceed the Old Telecom Rate. [*Bureau Order* ¶47].

The Bureau also resolved disputes about how to calculate the Old Telecom Rate. First, it rejected Duke's attempt to allocate more space on a pole to AT&T than the Commission's rules allow. The Commission's rules presume that a telecommunications or cable pole attachment "occupies" one foot of space on a utility pole.

[*Bureau Order* ¶¶49-51]; *see* 47 C.F.R. § 1.1410. The Bureau thus found that Duke erred in allocating the 40-inch "safety space" on a utility pole to AT&T. Because "AT&T's attachments do not occupy the safety space," the Commission explained, "Duke may not charge AT&T for that space." [*Bureau Order* ¶51].

Second, the Bureau found that Duke had rebutted the presumptions in the Commission's rules about the number of attachers on a pole (*i.e.*, five attachers in urban areas and three attachers in rural areas). [*Bureau Order* ¶53]; *see* 47 C.F.R. § 1.1409(c). (The average number of attachers on a pole is an input into the Old Telecom Rate formula, *see* 47 C.F.R. § 1.1409(c).)

In line with these determinations, the Bureau directed AT&T and Duke to "negotiate a new reciprocal joint use agreement" that is "consistent with" its decision that AT&T is entitled to a rate that "may equal but not exceed the Old Telecom Rate." [*Bureau Order* ¶64]. It further held that AT&T is "entitled to a refund and interest extending for a period of three years prior to the filing of the Complaint," and it directed the parties "to negotiate in good

26

faith…the amount of AT&T's refund consistent with" its rulings. [*Bureau Order* ¶64].

### B.  The *Order* on Review

AT&T filed an application for review of the *Bureau Order* with the Commission, and Duke filed a petition for reconsideration with the Bureau. The Commission consolidated both. On review, it denied Duke's petition in its entirety, and denied AT&T's petition on the merits but granted a request for clarification included in its application. [*Order* ¶1].

#### 1.  Duke's Issues

The Commission rejected Duke's challenges to the Bureau's determination that the pole attachment rate AT&T paid Duke was not just and reasonable.

First, the Commission affirmed the Bureau's determination that AT&T was entitled to relief under the *2011 Order* for the period prior to January 1, 2020. [*Order* ¶¶17, 20]. It agreed with the Bureau that the rate AT&T paid Duke was unjust and unreasonable because it was (1) higher than the Old and New Telecom Rates; (2) higher than the rates AT&T charges CLECs and cable operators to attach to its poles; and (3) disproportionate to

the amount of space AT&T and Duke each uses on the poles. [*Order* ¶24].

Second, the Commission agreed with the Bureau that AT&T was not required to calculate the value of its benefits under the joint use agreement in order to establish that the pole attachment rate it paid Duke was unjust and unreasonable. [*Order* ¶25]. In doing so, the Commission "reject[ed]" the Bureau's earlier decision in *Verizon Florida LLC v. Florida Power and Light Company*, 30 FCC Rcd 1140 (EB 2015) (*Verizon Florida*) "to the extent that" it could "be read to require a party in a pole attachment complaint proceeding…to quantify the value of individual benefits an [ILEC] receives under a joint use agreement," finding such an "'interpretation…impracticable, especially in the absence of any rules prescribing a methodology for valuing such benefits.'" [*Order* ¶25] (quoting *Verizon Maryland LLC v. The Potomac Edison Co.*, 2022 WL 990572, ¶ 14 (2022) (*Verizon Maryland Reconsideration Order*)).

Third, the Commission affirmed the Bureau's determination that AT&T's rate should not exceed the Old Telecom Rate. The

Commission rejected Duke's assertion that under the *2011 Order*, the Old Telecom Rate is only a "reference point" for rates in new agreements. [*Order* ¶27]. The Commission explained that it already looked to the Old Telecom Rate for guidance in setting a "just and reasonable" rate for an ILEC with an existing joint use agreement because that rate accounts for any material advantages afforded to ILECs. [*Order* ¶27]. It also noted the benefits of using the Old Telecom Rate as a "reference point," including that it is more "administrable" to use that rate than to set a new rate in each complaint case. [*Order* ¶28].

Fourth, the Commission upheld the Bureau's determination that in calculating the Old Telecom Rate, Duke may not charge AT&T the cost of the safety space on Duke's poles. The Commission explained that it "has held" for decades "that 'the safety space is effectively usable space occupied by' the electric lines" because that space "'would otherwise be usable space' but for the presence of" those lines. [*Order* ¶42] (quoting *Amendment of Rules and Policies Governing Pole Attachments*, 15 FCC Rcd 6453, 6468, ¶ 22 (2000) (*2000 Fee Order*)).

29

2.   **AT&T's Issues**

The Commission also was unpersuaded by AT&T's argument that the Bureau erred in finding that, because AT&T is not similarly situated to other attachers on Duke's poles, AT&T's rate should not be capped at the New Telecom Rate.

To start, the Commission rejected AT&T's argument that the Bureau should have considered the statutory and regulatory rights that other attachers have to access utility poles. The Commission explained that, in making the comparison between AT&T and other attachers, it is proper to examine the parties' contract terms. [*Order* ¶48].

Next, the Commission upheld the Bureau's determination that AT&T's joint use agreement with Duke provides AT&T five material advantages that are not available to other attachers on Duke's poles. [*Order* ¶¶46-54].

First, the Commission agreed with the Bureau that AT&T's contract right to access Duke's poles is superior to those of other attachers, because Duke cannot deny AT&T access to its poles when it can deny access to other attachers. [*Order* ¶¶47-48].

30

Second, the Commission affirmed the Bureau's determination that AT&T was advantaged by its right to use more space on Duke's poles without paying more money. It pointed out that even if other attachers have an unlimited right to space on a pole, as AT&T contended, those attachers have to pay for more than one foot of space, whereas AT&T does not. [*Order* ¶50].

Third, the Commission rejected AT&T's argument that there was no evidence in the record that its scheduled cost to replace a pole is greater than the actual cost paid by other attachers. The Commission pointed out that while the Bureau "made no finding on the dollar difference," it properly determined that the cost schedule in the joint use agreement provided AT&T a "budgeting and planning advantage." [*Order* ¶51].

Fourth, the Commission upheld the Bureau's determination that AT&T's ability to place attachments on Duke's poles without filing an application or paying a fee benefitted AT&T. The Commission reasoned that even if AT&T and other attachers have to compile the same information for their records, AT&T still has free and immediate access to Duke's poles. [*Order* ¶52].

31

Fifth, the Commission was not persuaded by AT&T's argument that its position as the lowest attacher was disadvantageous, pointing out that "AT&T never sought to abandon" that location. [*Order* ¶53]. It also agreed with the Bureau that AT&T's claim that its attachments faced a greater risk of vandalism and other damage were "'mostly unsupported' by evidence." [*Order* ¶53] (quoting [*Bureau Order* ¶33 & n.103]).

The Commission separately denied AT&T's request that it overrule the Bureau's decision to permit Duke to use different "number of attachers" inputs in calculating the Old Telecom Rate paid by AT&T and the New Telecom Rate paid by other attachers on Duke's poles. The Commission determined that because the "number of attachers" has no effect on the New Telecom Rate, Duke reasonably relied on the presumptive number of attachers in the Commission's regulations in calculating that rate. By making that choice, the Commission explained, Duke did not forfeit its right to rebut that number in calculating the Old Telecom Rate, where that input has a "significant effect." [*Order* ¶55].

32

## SUMMARY OF ARGUMENT

The Commission in the *Order* carefully balanced the interests
of the parties to ensure that AT&T pays a just and reasonable rate
that compensates Duke for the pole attachment terms it provides
AT&T while at the same time treating all attachers on Duke's
poles fairly. The Commission's determinations are faithful to the
Act and to the agency's precedent and regulations, are supported
by substantial evidence, and are reasonable. The Court should
deny both petitions for review.

A. Duke's arguments have been waived and otherwise lack
merit.

1. Duke's challenge to the Commission's authority to regulate
ILEC pole attachments is barred by the doctrine of issue
preclusion. Duke's parent corporation raised (unsuccessfully)
precisely the same issue in *American Electric Power*, 708 F.3d at
186-88. Duke is barred from relitigating the same issue in light of
its corporate parent's failure to prevail in that earlier case.

Duke's challenge in any event fails even if the Court were to
reach its merits. Section 224(b)(1), of the Act, 47 U.S.C. § 224(b)(1),

33

provides that "the Commission shall regulate the rates, terms, and conditions for pole attachments," and a "pole attachment" is "any attachment by a cable television system or provider of telecommunications service to a pole…owned or controlled by a utility," 47 U.S.C. § 224(a)(4). More than a decade ago, the Commission concluded that under section 224(b)(1), it may regulate the rates that ILECs pay for pole attachments, because ILECs are "provider[s] of telecommunications service." *2011 Order*, 26 FCC Rcd at 5328-33, ¶¶ 204-212. The D.C. Circuit upheld the Commission's reasonable interpretation of the Act, and the Ninth Circuit agreed. *See American Electric Power*, 708 F.3d at 186-88; *City of Portland*, 969 F.3d at 1052-53.

2. Duke contends that the Commission cannot interpret the Act to provide it jurisdiction over the rates that utilities charge ILECs because the Act does not also provide it jurisdiction over the rates that ILECs charge utilities. That argument is not before the Court because Duke did not first raise it before the Commission. 47 U.S.C. § 405(a). Regardless, it lacks merit. The Commission takes account of the pole attachment rates that ILECs charge utilities in

34

determining whether the rates that ILECs pay are just and reasonable. The Commission here reasonably determined that once the parties negotiated a new just and reasonable rate for AT&T with the guidance provided in the *Order*, they could negotiate a proportional decrease in the rate AT&T charges Duke.

3. Relying on a Bureau decision (*Verizon Florida*), Duke contends that the Commission applied a new legal standard in upholding the Bureau's analysis of AT&T's pole attachment complaint. But it is well-established that staff decisions do not bind the Commission. Accordingly, the Commission did not apply a new standard when it declined to follow the Bureau's reasoning. In any event, the Commission explained why it would not take the same approach as the Bureau had, which is all that the law would have required even if the Commission had previously adopted the Bureau's position.

Finally, whether or not *Verizon Florida* established a new standard, no manifest injustice results from ordering Duke to pay AT&T a refund. Duke has been on notice since 2011 that it could be

liable for a refund if the Commission found, as here, that the rates it charges an ILEC like AT&T are unjust and unreasonable.

4. The Court should decline Duke's request to overturn settled precedent assigning the safety space on utility poles to utilities, not attachers, in calculating pole attachment rates. More than 20 years ago, the Commission determined that the safety space on a utility pole is "used and usable" by a utility, and for that reason, the utility should assume the cost of that space. The Bureau's assignment of the safety space to Duke in this case followed that longstanding determination, which is supported by the record.

B. AT&T's arguments also lack merit.

1. The Commission reasonably concluded that AT&T was not similarly situated to other attachers on Duke's poles based on express terms of the joint use agreement that AT&T negotiated with Duke, not on any "immutable ILEC traits." The Bureau identified five terms in the agreement that materially advantaged AT&T. Because of those material advantages, the Commission correctly found that AT&T must pay the Old Telecom Rate, since

that rate accounts for the benefits its agreement with Duke afforded AT&T.

2. The Commission properly upheld the Bureau's analysis, which compared the terms in AT&T's joint use agreement to the terms in Duke's pole attachment agreements with other attachers on Duke's poles. Though AT&T would prefer for the Commission also to consider cable providers' and CLECs' statutory and regulatory rights—notably, their right to attach to utility poles in section 224(f)(1) of the Act—nothing in the Commission's regulations or precedent requires that comparison.

3. The Commission reasonably permitted Duke to use a different "number of attachers" in calculating the Old Telecom Rate paid by AT&T and the New Telecom Rate paid by other entities with attachments on Duke's poles. Because the "number of attachers" has no effect on the New Telecom Rate, the Commission permitted Duke to use the presumptive number of attachers set forth in the Commission's regulations in calculating that rate. But it also agreed with the Bureau that Duke did not have to use the same presumptive numbers in the Old Telecom Rate formula,

37

where the number of attachers does have a significant effect on the calculated rate. Nothing in the Commission's regulations or precedent requires a utility to use the same presumption in different rate formulas.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, "a court will set aside an agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs*, 828 F.3d 316, 321 (4th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)), or if the action is "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).

"[R]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *King v. Burwell*, 759 F.3d 358, 373 (4th Cir. 2014) (cleaned up), *aff'd*, 576 U.S. 473 (2015). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Ohio Valley*, 828 F.3d at 321 (cleaned up). And deference to the Commission's "expert policy judgment" is

especially appropriate where the "subject matter…is technical, complex, and dynamic." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Svcs.*, 545 U.S. 967, 1002-03 (2005) (cleaned up).

The Commission's interpretation of section 224 of the Act "is entitled to deferential review under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984)." *Montgomery Cnty, Md. v. FCC*, 811 F.3d 121, 129 (4th Cir. 2015). Of course, if "Congress has directly spoken to the precise question at issue," the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue, the question" for the Court is whether the agency has adopted "a permissible construction of the statute." *Id.* at 843; *see also City of Arlington v. FCC*, 569 U.S. 290, 307 (2013).

Lastly, "[s]ubstantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ceres Marine Terminals, Inc. v. Green*, 656 F.3d 235, 239 (4th Cir. 2011) (cleaned up). Substantial evidence "requires more than a mere scintilla but less than a preponderance." *Id.*

(cleaned up). Federal courts do not undertake to "re-weigh conflicting evidence, make credibility determinations, or substitute [their] judgment" for that of the agency. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.1996). The Court is "bound by the [Commission's] factual findings unless any reasonable adjudicator would be compelled to conclude to the contrary." *Herrera-Martinez v. Garland*, 22 F.4th 173, 186 (4th Cir. 2022) (cleaned up).

## ARGUMENT

### I. SEVERAL OF DUKE'S CHALLENGES TO THE ORDER ARE NOT PROPERLY BEFORE THIS COURT; ALL LACK MERIT

#### A. The Commission Has Jurisdiction over the Pole Attachment Rates that ILECs Pay Utilities, and It Reasonably Exercised that Authority in Resolving AT&T's Complaint

More than a decade ago, the Commission determined that it has authority under the Communications Act to ensure that the pole attachment rates ILECs pay utilities are just and reasonable. The D.C. Circuit in *American Electric Power*, and the Ninth Circuit in *City of Portland*, have since agreed. Nonetheless, Duke challenges the Commission's authority for a third time in this Court, because in its view, those cases were wrongly decided. Br.

40

40; *id.* at 40-45. Duke's jurisdictional challenge is barred by the doctrine of issue preclusion. But even if the Court were to reach the question, the Court should reject Duke's challenge, because the Commission's interpretation of section 224 of the Act is reasonable and well founded.

### 1. Issue Preclusion Bars Duke from Challenging the Commission's Jurisdiction over the Pole Attachment Rates Paid by ILECs

Duke's challenge to the Commission's jurisdiction over the pole attachment rates paid by ILECs is barred by issue preclusion. Duke is a wholly owned subsidiary of Duke Energy Corporation, which challenged the Commission's jurisdiction over ILEC pole attachment rates in precisely the same way in *American Electric Power* and *City of Portland* and lost. Duke in this case cannot relitigate that issue on its corporate parent's behalf to avoid the D.C. Circuit's and the Ninth Circuit's adverse decisions.

Issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgill*, 553

U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). By precluding persons from raising issues "that they have had a full and fair opportunity to litigate, *id*. at 892 (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)), the doctrine protects against "the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana*, 440 U.S. at 153-54.

In this circuit, issue preclusion bars a party from relitigating an issue decided adversely to it when five conditions are met: "the issue sought to be precluded is identical to one previously litigated"; "the issue was actually determined in the prior proceeding"; "the issue's determination was a critical and necessary part of the decision in the prior proceeding"; "the prior judgment is final and valid"; and "the party against whom collateral estoppel is asserted 'had a full and fair opportunity to litigate the issue in the previous forum." *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006). The first four conditions have indisputably been satisfied here. Duke avers that "[t]he D.C. Circuit's decision

42

affirming the FCC's authority to determine just and reasonable rates for ILECs (as first asserted by the FCC in the *2011 Order*) was wrongly decided," and for that reason, "this Court should not apply that decision under the specific facts here." Duke Br. 14.

The fifth condition is satisfied as well. Although issue preclusion generally only applies to parties to the earlier litigation, "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy. Preclusion is thus in order when a person who did not participate in a litigation later brings suit as the designated representative of a person who was a party to the prior adjudication." *Taylor*, 553 U.S. at 895. That exception applies here. Duke Energy Corporation (Duke's parent) was a party in *American Electric Power*, and it challenged the Commission's determination in the *2011 Order* that section 224(b)(1) of the Act provides the agency statutory authority to regulate the pole attachment rates paid by ILECs. *See* Brief of Petitioners, *American Electric Power Service Corporation et al. v. FCC*, D.C. Cir. No. 11-1146, at pp. i, iv, 19-34 (filed Jan. 13, 2012) (listing Duke Energy Corporation as one of the petitioners in the proceeding). Duke

Energy Corporation also challenged the Commission's statutory authority to regulate ILEC pole attachments in *City of Portland*. Joint Opening Brief of Petitioners, *American Electric Service Power Corporation et al. v. FCC*, 9th Cir. No. 18-72689(L), 19-70490, at pp. 1, 51-56 (filed June 24, 2019). In support of its position, Duke Energy Corporation in both cases made the same legal arguments that Duke sets forth in its brief in this case. *Compare id.*, pp. 19-25 *with* Duke Br. 40-46.

Duke Energy Corporation thus "has had an ample day in court," and issue preclusion bars it from having a third bite at the apple in this case via its subsidiary.[2] *Gulf Power Co. v. FCC*, 669 F.3d 320, 324 (D.C. Cir. 2012) (issue preclusion barred an electric utility from relitigating an issue that had been decided against its sister company by another federal circuit court of appeals); *see*

---

[2] Duke cannot circumvent the issue preclusion bar by reframing its argument as whether the *American Electric Power* correctly upheld the Commission's authority to regulate the pole attachment rates paid by ILECs. "[I]f an issue can be turned into a new issue merely by asking whether it had been rightly decided, collateral estoppel would never apply." *Gulf Power Co. v. FCC*, 669 F.3d at 324.

*Whitehead v. Viacom*, 233 F.Supp.2d 715, 721 (D. Md. 2002)

(parent company and subsidiary are in privity for purposes of res

judicata); *Saudi v. V. Ship Switzerland, S.A.*, 93 Fed.Appx. 516,

520 (4th Cir. 2004) (same).[3]

### 2. The Commission Has Jurisdiction over the Pole Attachment Rates that ILECs Pay Utilities

Even if the Court were to entertain Duke's challenge, it

should reaffirm the Commission's jurisdiction over ILEC pole

attachment rates. Section 224(b)(1) of the Act, 47 U.S.C.

§ 224(b)(1), provides that "the Commission shall regulate the rates,

terms, and conditions for pole attachments to provide that such

rates, terms, and conditions are just and reasonable." A "pole

attachment," in turn, is "any attachment by a cable television

---

[3] Preclusion is particularly appropriate here. Duke Energy Corporation also has wholly-owned subsidiaries in the United States Courts of Appeals for the Sixth, Seventh, and Eleventh Circuits. Duke Power Corporation 2023 SEC 10-K at page 1-1. If this Court considers and rejects the merits of Duke's challenge to the Commission's authority over ILEC pole attachments, under Duke's theory, one of its sister companies could again raise the issue before the Commission, and ultimately seek judicial review in another circuit. Issue preclusion is designed to prevent such duplicative litigation.

system or provider of telecommunications services to a pole…owned or controlled by a utility." 47 U.S.C. § 224(a)(4). The Commission in the *2011 Order* reasonably concluded that under section 224(b)(1), it may regulate the rates that ILECs pay for pole attachments, because ILECs indisputably are "provider[s] of telecommunications services." *2011 Order*, 26 FCC Rcd at 5328-33, ¶¶ 204-212.

Here, Duke presents the same argument that the D.C. Circuit found unpersuasive in *American Electric Power*, 708 F.3d at 186-88. It focuses on the definition of "telecommunications carrier," which, for most purposes, is defined as "any provider of telecommunications services." 47 U.S.C. § 153(51). "For purposes of [section 224]," however, "the term telecommunications carrier' (as defined in [section 153]) does not include" ILECs. 47 U.S.C. § 224(a)(5). In Duke's view, the statute's exclusion of ILECs from the definition of "telecommunications carrier" must also mean that ILECs are excluded from the term "provider of telecommunications service." Duke Br. 40-43. But that implication does not follow, as *American Electric Power* held.

46

As the D.C. Circuit explained, 708 F.3d at 187, it was "error" to "insert" section 153(51)'s definition of "telecommunications carrier" "into [section] 224(a)(5)'s exclusion of ILECs." Section 153(51), the court pointed out, "is the general definition of telecommunications carrier, not the one tailored to [section] 224." *Id*. By contrast, section 224 excludes ILECs from the term "telecommunications carrier," 47 U.S.C. § 224(a)(5), but does not contain a comparable exclusion in the term "provider of telecommunications services," even though the latter term appears ("cheek by jowl") in the immediately preceding subsection, *see* 47 U.S.C. § 224(a)(4). *Id*. Recognizing an "entirely intentional character in § 224(a)(4)'s use of the broader term," the court upheld the Commission's view that ILECs are "providers of telecommunications services" whose attachments are covered by the statute's "just and reasonable" rate requirement. *Id*.; *see* 47 U.S.C. § 224(b)(1). The Ninth Circuit subsequently followed the D.C. Circuit in *City of Portland*, 969 F.3d at 1053.

Undaunted, Duke argues that the D.C. Circuit's reasoning was flawed. In Duke's view, section 224(a)(5)'s cross-reference to

section 153(51) makes the terms "telecommunications carrier" and "provider of telecommunications services" in section 224(a)(4) "interchangeable." Duke Br. 41. Duke's reading, which the D.C. Circuit rejected in *American Electric Power*, fails here too. Though section 224(a)(5) cross-references the definition of telecommunications carrier in section 153(51), the definition of "pole attachment" in section 224(a)(4) does not. Because Congress restricted the definition of "telecommunications carrier" in section 224(a)(5) to exclude ILECs, but it did not impose a similar restriction on "provider of telecommunications services" in section 224(a)(4), the latter term retained its conventional meaning— which unquestionably includes ILECs. *See American Electric Power*, 708 F.3d at 187. If Congress wanted to establish a broad exclusion of ILEC attachments from section 224, as Duke contends, "it easily could have written" the definition of "pole attachment" in section 224(a)(4) to refer to any attachment by a "telecommunications carrier," rather than the "broader term"— "provider of telecommunications services." *Id. See Burgess v. United States*, 553 U.S. 124, 130 (2008).

48

It is also notable that Congress elsewhere in section 224 did not use "telecommunications carrier" and "provider of telecommunications service" interchangeably. For example, the pole attachment rate formula in section 224(e) only sets rates for attachments used by "telecommunications carriers to provide telecommunications services." 47 U.S.C. § 224(e). Also, "cable television system[s]" and "telecommunications carrier[s]"—but not ILECs—have a statutory right to nondiscriminatory access on utility poles. 47 U.S.C. § 224(f)(1). Congress's use of "provider of telecommunications services" and "telecommunications carrier" in section 224 to define separate statutory rights shows that Congress "used the distinct terms very deliberately." *Corley v. United States*, 556 U.S. 303, 315 (2009).

Duke contends that the D.C. Circuit erred by "ignoring the essential legislative history of the 1996 Act." Duke Br. 43. Of course, statutory language ordinarily controls over legislative history. *U.S. v. Mitchell*, 39 F.3d 465, 468-69 (4th Cir. 1994). In any event, while Duke cites the 1996 Act's general goal of introducing competition into the telecommunications market, it cites no

49

legislative history "that suggests Congress intended to limit" the Commission's authority to regulate ILEC pole attachments. *United States v. Lund*, 853 F.2d 242, 248 (4th Cir. 1988); *see Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 298-99 (D.C. Cir. 2003).

Nor does Duke get any mileage from the Commission's original interpretation of "provider of telecommunications services" to exclude ILECs. Duke Br. 45-46. The Commission can change its position so long as it can show that the change "is permissible under the statute, that there are good reasons for it, and the agency believes it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). In the *2011 Order*, the Commission revisited its original interpretation of section 224(a)(4) in response to evidence showing that ILEC pole ownership was declining, and for that reason, ILECs may have no longer "be[en] in an equivalent bargaining position with electric utilities in pole attachment negotiations." *2011 Order*, 26 FCC Rcd at 5328-29, ¶ 206. To ensure that ILECs would pay just and reasonable pole attachment rates going forward, the Commission reasonably reinterpreted "provider of telecommunications services." On review, the D.C.

50

Circuit found that the Commission's "new view satisfie[d] *Fox*'s requirements," noting that it "very much doubt[ed]" that the Commission's "prior interpretation was reasonable." *American Electric Power*, 708 F.3d at 188.

Duke separately asserts that the Commission's interpretation of section 224 creates an impermissible "regulatory gap," because the agency does not also have jurisdiction over the rates the ILECs charge utilities. Duke Br. 48. Duke's argument is not properly before the Court because Duke did not first present it to the Commission.

Section 405(a) of the Act, 47 U.S.C. § 405(a), provides that the filing of a petition for reconsideration with the Commission is a "condition precedent to judicial review" of any "questions of fact or law upon which the Commission…has been afforded no opportunity to pass." Duke did not challenge the Commission's jurisdiction on this ground in its application for review of the *Bureau Order*, nor did it raise it in a petition for reconsideration of the *Order*. *See NTCH, Inc. v. FCC*, 841 F.3d 497, 507-08 (D.C. Cir. 2016) (section

51

405(a) bars a court's consideration of an issue that "was never reasonably flagged for the FCC"). Thus, the argument is waived.

In any event, even if the argument had not been waived, it lacks merit. The Commission, in exercising its statutory authority to ensure that the rates paid by ILECs are "just and reasonable," *see* 47 U.S.C. § 224(b)(1), does take account of the rates that ILECs charge utilities. The Commission has stated that "[it] would be skeptical of a complaint by an [ILEC] seeking a proportionately lower rate to attach to an electric utility's poles than the rate the [ILEC] is charging the electric utility to attach its poles." *2011 Order*, 26 FCC Rcd at 5337, ¶ 218. In "such circumstances," the Commission decided, a just and reasonable rate "would be the same proportionate rate charged the electric utility, given the incumbent LEC's relative usage of the pole." *Id.*, n.662. Accordingly, when the agency has ordered a utility to lower the pole attachment rate that it charges an ILEC, it has ordered both parties to "negotiate" a new agreement "that reflects proportional reciprocal rates" for each party's attachments on the other's poles. *Id. See, e.g., Verizon Maryland LLC v. The Potomac Edison Co.*, 35

52

FCC Rcd 13607, 13630, ¶ 52 (2020) (*Verizon Maryland Order*). The
Commission issued the same directive to Duke and AT&T in this
case. [*Bureau Order* ¶64].

AT&T has itself committed to reducing the pole attachment
rates that it charges Duke so that its rates are proportional to the
new, lower, just and reasonable rate that Duke must charge AT&T.
[*Order* ¶24, n.88]. Should AT&T renege on that commitment, Duke
can seek relief from the Commission, since the agency's regulations
allow utilities, as well as attachers, to file pole complaints. *See* 47
C.F.R. § 1.1402(d) (defining "complaint" to include "a filing by…a
utility"); *id*. at § 1.1402(e) (defining "complainant" to include "a
utility"). Duke could thus file a complaint alleging that the newly
reduced pole attachment rate that AT&T pays Duke is unjust and
unreasonable in light of AT&T's refusal to make a reciprocal
reduction in the rate it charges Duke. The Commission would then
have the opportunity (upon a persuasive showing) to revisit its
determination in the *Order* that AT&T's just and reasonable rate
must be less than the amount it was paying Duke under the
parties' joint use agreement. [*Order* ¶24].

### 3. The Commission Reasonably Exercised Its Jurisdiction over the Pole Attachment Rates that Duke Charges AT&T

Duke further argues that even if the Commission has jurisdiction over the rates that utilities charge ILECs, it was arbitrary and capricious for the Commission to regulate the rates that Duke charges AT&T. Duke Br. 49-51. According to Duke, the Commission "cannot resolve either the amount of refund" Duke owes AT&T "or the going-forward net rental methodology" without setting the rate that AT&T can charge Duke. *Id.* at 50. Duke never raised that argument before the Commission, however, so it is waived. *See* 47 U.S.C. § 405(a); *NTCH*, 841 F.3d at 507-08.[4]

Duke is also incorrect. First, as noted above, AT&T has agreed to charge Duke a proportional new rate for access to AT&T's poles. Second, as Duke itself points out, Duke Br. 47, the Commission rejected the same argument in an earlier pole attachment complaint case, where it decided that "[i]dentifying the

---

[4] Before the agency, Duke did not raise the statutory argument presented in its brief. Rather, it argued that "the Bureau erred in viewing the rate each party pays on a 'proportional' 'per-foot-of-space-occupied' basis." [*Order* ¶24]; *see* [Duke Petition for Reconsideration at 3-4].

54

rate [the ILEC] pays will enable better informed negotiations between the parties to resolve their dispute." *Verizon Maryland Order*, 35 FCC Rcd at 13629-30, ¶ 51.

Here, too, the Commission reasonably decided that after the parties negotiate a just and reasonable rate for AT&T's attachments, they can determine the amount of a reciprocal reduction in the rate for Duke's attachments. The Commission "need not address all problems in one fell swoop." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004) (cleaned up).

For the same reason, there is no merit to Duke's claim that the Commission failed to take account of the cost of Duke's poles relative to AT&T's in ordering the parties to negotiate "proportional reciprocal rates for Duke's attachments to AT&T's poles." Duke Br. 50-51; *see* [*Bureau Order* ¶64]. Through negotiations, AT&T and Duke can agree to reciprocal pole attachment rates that account for their different pole costs. In any event, Duke recognized that there were "differential cost bases" underlying the rates in its joint use agreement with AT&T. [Duke Answer 34-35]. It was not unreasonable for the Commission to

require AT&T to offer Duke a proportional decrease in the rate
that Duke had already agreed to pay in a voluntarily negotiated
agreement.

### B. The Commission Did Not Retroactively Apply a New Standard in Resolving AT&T's Pole Attachment Complaint Against Duke

Duke asserts that the Commission, without explanation,
retroactively applied a "new" standard in reviewing AT&T's pole
attachment complaint. Duke Br. 18-22. Duke's argument lacks
merit, for three reasons. First, the standard Duke contends the
Commission changed is based on the Bureau's decision in *Verizon
Florida*. But under well-established precedent, the Commission is
not bound by a staff decision or its reasoning. Second, the
Commission reasonably explained its decision not to follow *Verizon
Florida*. Third, Duke could not reasonably have assumed that if the
Commission had followed *Verizon Florida*, the utility would not
have faced refund liability. Since 2011, the Commission has made
clear that utilities like Duke can be directed to issue refunds where
the pole attachment rates that they charge ILECs are not just and
reasonable.

1.  **The Commission Did Not Adopt a New Standard by Declining to Follow a Decision Issued by Its Staff**

The *2011 Order* placed "the burden" on ILECs with agreements negotiated after that order to show that they were "similarly situated" to other attachers and thus were entitled to "comparable" rates, terms, and conditions. *See* 47 C.F.R. § 1.1424 (2011). If an ILEC could make that showing, it would be entitled to the New Telecom Rate. But if the record showed that the agreement provided the ILEC net benefits relative to other attachers, the ILEC would be required to pay a "different rate." In that circumstance, the Commission explained, the Old Telecom Rate would be a "reference point" in determining the just and reasonable ILEC pole attachment rate. *2011 Order,* 26 FCC Rcd at 5336, ¶ 218.

The Bureau properly applied the Commission's guidance from the *2011 Order* in this case. It concluded that the rate that AT&T paid Duke under the parties' joint use agreement (which is considered an "existing" agreement for purposes of the *2011 Order*) was not just and reasonable. [*Bureau Order* ¶8]. But it further

57

determined that the agreement provided AT&T "material advantages" relative to other attachers on Duke's poles. The Bureau thus found that AT&T was entitled to a pole attachment rate not to exceed the Old Telecom Rate for the period covered by the *2011 Order*. [*Bureau Order* ¶47] (citing *2011 Order*, 26 FCC Rcd at 5337, ¶ 218). The Commission reasonably upheld the Bureau's findings. [*Order* ¶¶24-37].

Relying on the Bureau's 2015 decision in *Verizon Florida*, Duke contends that the Bureau (and, on affirmance, the Commission) applied the wrong analysis. Duke Br. 18-22. Duke distills two requirements from *Verizon Florida*: First, "where the agreement provides competitive advantages to the ILEC, the ILEC must demonstrate that the 'monetary value' of those competitive advantages does not justify the rate the ILEC is charged under the…agreement," Duke Br. 20, and second, "the Old Telecom Rate serves as a 'reference point' only in rate disputes involving 'new' agreements—not 'existing agreements,'" Duke Br. 21. Because the Bureau did not apply those two requirements in its review of

AT&T's complaint, Duke argues that the Commission adopted a new standard when it upheld the *Bureau Order*. *Id*. at 18-21.

Duke's argument fails at the outset, because the *Verizon Florida* decision was issued by the Bureau—not the Commission. And because no party sought full Commission review of it, the Commission never had an opportunity to consider the Bureau's reasoning. *See Verizon Maryland Reconsideration Order*, 2022 WL 990572, ¶ 14.

It is "well-established…that an agency is not bound by the actions of its staff if the agency has not endorsed those actions." *Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004); *see Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (same); *cf. Nat'l Fed. of the Blind v. U.S. Abilityone Comm'n*, 421 F.Supp.3d 102, 143 (D. Md. 2019) ("Agency leadership may permissibly depart from the views of subordinate staff as long as the agency's ultimate decision is based on the relevant factors and is satisfactorily explained.") (citing *Dep't of Commerce v. New York*, ⸺ U.S. ⸺ 139 S. Ct. 2551, 2570–71 (2019)). A non-binding staff decision like

*Verizon Florida* therefore cannot establish a legal standard that

the Commission must apply.[5]

>    **2.    The Commission Reasonably Declined to
>          Follow an Earlier Staff-Level Decision and
>          Fully Explained Its Decision Not to Do So**

Because the Commission is not bound by the decisions of its

staff, it is not required to explain its decision not to follow them.

*See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1037

(D.C. Cir. 2017); *Amor Family Broad. Group v. FCC*, 918 F.2d 960,

962-963 (D.C. Cir. 1990). Indeed, the Commission can "disavow"

without distinguishing prior staff actions that could be read to be

inconsistent with Commission's own. *SNR Wireless*, 868 F.3d at

1038. Nonetheless, the Commission provided a lengthy explanation

for why it would not follow *Verizon Florida*, and its decision was

reasonable.

First, the Commission pointed out that it had already

explained that it would not interpret *Verizon Florida* to require "a

party in a pole attachment complaint proceeding…to quantify the

_____

   [5] Indeed, the Commission had already declined to follow *Verizon
Florida* in a different pole attachment complaint case for that
reason. *See Verizon Maryland Reconsideration Order* ¶ 14 & n.63.

60

value of individual benefits an incumbent LEC receives under a joint use agreement" because "that interpretation" is "impracticable, especially in the absence of any rules prescribing a methodology for valuing such benefits." [*Order* ¶25] (*quoting Verizon Maryland Reconsideration Order*, 2022 WL 990572, ¶ 14).

Second, the Commission reasonably explained why it concluded that the Old Telecom Rate should serve as a reference point in setting just and reasonable rates in new joint use agreements *and* existing agreements. [*Order* ¶27]. It pointed out that it had already used the Old Telecom Rate as a "reference point" in the same circumstances. [*Order* ¶27]; *Verizon Maryland Order*, 35 FCC Rcd at 13169, ¶ 30. In the *Verizon Maryland Order*, the Commission concluded that the Old Telecom Rate is an appropriate benchmark for existing agreements because it "accounts for" the material advantages provided to ILECs. *Verizon Maryland Order*, 35 FCC Rcd at 13619, ¶ 30. The Commission also reiterated the advantages of using the Old Telecom Rate—for example, it is "more administrable to look to [it]…than to attempt to develop…an entirely new rate" in each pole attachment

complaint case. *See* [*Order* ¶28] (citing *2011 Order*, 26 FCC Rcd at 5337, ¶ 218).

Duke responds that because the *2011 Order* stated that the Old Telecom Rate is a reference point for rates in new agreements, it cannot also be a reference point for rates in existing agreements. Duke Br. 21-22. But the *2011 Order* does not prohibit the Commission from using that rate as a benchmark for existing agreements— it does not address that issue at all. In fact, nothing in the Commission's precedent—including *Verizon Florida*—barred the Commission, after examining the record, from setting AT&T's just and reasonable rate at an amount no greater than the Old Telecom Rate based on the joint use agreement and the parties' submissions. Furthermore, the Commission explained that the reasons for looking to the Old Telecom Rate in setting rates in new joint use agreements apply equally to existing agreements. [*Order* ¶28]; *see Verizon Maryland Order*, 35 FCC Rcd at 13169, ¶ 30. Duke does not engage with the substance of the Commission's explanation. Duke Br. 21-22.

Thus, even if *Verizon Florida* was binding Commission precedent—which it is not—the Commission satisfied its obligation under the Administrative Procedure Act to provide a reasoned explanation for its change in position. *Fox*, 556 U.S. at 516.

### 3. There Is No Basis to Depart from the Presumption that Adjudicatory Actions Are Retroactive

Retroactivity is the "norm in agency adjudications no less than judicial adjudications," *AT&T Corp. v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006); *see SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947), and "[i]n cases in which there are new applications of existing law, clarifications, and additions, the courts start with a presumption in favor of retroactivity." *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (cleaned up); *ARA Svcs., Inc. v. NLRB*, 71 F.3d 129, 135 (4th Cir. 1995) (observing the retroactive application of a new rule is appropriate where it "attempts to fill a void in an unsettled area of law") (cleaned up). Courts only "depart" from that presumption "when to do otherwise would lead to manifest injustice." *AT&T*, 454 F.3d at 332; *see ARA Services*, 71 F.3d at 135.

Here, Duke "cannot point…to a settled" standard "on which it reasonably relied" that the Commission changed in the *Order*. *AT&T*, 454 F.3d at 332. As we have explained, the Bureau in *Verizon Florida* could not establish a standard that the Commission was required to apply in reviewing pole attachment complaints brought by ILECs against utilities. *See* pp. 60-61, above. Because "there was no such preexisting [standard], most of the force has gone out of [Duke's] appeal to fairness." *Cassell v. FCC*, 154 F.3d 478, 486 (D.C. Cir. 1998).

Regardless, even if *Verizon Florida* established a standard that the Commission must employ, Duke could not have reasonably assumed that it was insulated from refund liability. Duke Br. 24-25. Though *Verizon Florida* could be interpreted to "impose[] a relatively high evidentiary standard on ILECs challenging rates within 'existing agreements,'" *id.* at 25; *see* [*Order* ¶ 25], Duke concedes that it still faced refund liability if an ILEC like AT&T made the requisite evidentiary showing, Duke Br. at 25. And, even if the Old Telecom Rate is not a "reference point" for "existing agreements," *id.*, that just gives the Commission more discretion to

64

set a just and reasonable pole attachment rate for an ILEC with an existing joint use agreement.

Any "financial burden" on Duke thus results from its own assumption of risk. Duke "gamble[d]" that AT&T could not make the evidentiary showing that it contends the Bureau required in *Verizon Florida*; "it was not a sure bet." *Cassell*, 154 F.3d at 486; *see AT&T*, 454 F.3d at 333. And "[a]lthough hope springs eternal, hope is no surrogate for reliance." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1084 (D.C. Cir. 1987).

Furthermore, Duke has not identified any other Commission (or, for that matter, Bureau) decision that applies the Bureau's reasoning in *Verizon Florida*. "[T]he longer and more consistently an agency has followed one view of the law, the more likely it is that private parties have reasonably relied to their detriment on that view." *Clark-Cowlitz*, 826 F.2d at 1082-1083; *cf. ARA Services*, 71 F.3d at 135. Conversely, an agency "ruling in [a] solitary proceeding can scarcely be viewed as 'well established.'" *Clark-Cowlitz*, 826 F.2d at 1083. Any reliance Duke placed on *Verizon*

65

USCA4 Appeal: 23-1096    Doc: 28        Filed: 07/06/2023    Pg: 76 of 147

*Florida*—which was an outlier among the agency's decisions resolving ILEC pole attachment complaints—is insubstantial. *Id.*

Indeed, as Duke itself points out, both the Bureau and the Commission have repeatedly declined to follow the Bureau's reasoning in *Verizon Florida* in other pole attachment complaint cases—two of which were resolved in Commission-level decisions released prior to the *Order* on review. Duke Br. 26-27. That undercuts rather than bolsters Duke's retroactivity argument, because it shows that in rejecting Duke's interpretation of *Verizon Florida*, the Commission merely followed its own precedent, which is what agencies are expected to do.[6]

---

[6] Duke's assertion that "[t]here is minimal statutory interest in retroactively applying the new standard" is without merit. Duke Br. 27. Section 224(b) of the Act provides that the Commission "shall regulate the rates…for pole attachments to provide that" they "are just and reasonable, and shall adopt procedures…to hear and resolve complaints concerning such rates." 47 U.S.C. § 224(b)(1). The authority to provide for refunds naturally flows from the power to resolve pole attachment complaints. Exercising that authority, the Commission amended its rules to "allow monetary recovery in a pole attachment action to extend back as far as the applicable statute of limitations allows." *2011 Order*, 26 FCC Rcd at 5289, ¶ 110; 47 C.F.R. § 1.1410(c) (2011); 47 C.F.R. § 1.1407(a)(2) (2018).

## C. The Commission Properly Allocated the Cost of the Safety Space to Duke

Duke contends that the Commission erred in upholding the Bureau's determination that Duke cannot charge AT&T for the 40 inches of safety space on its poles in calculating the Old Telecom Rate. Duke Br. 32-39. Duke's argument, however, contradicts settled precedent that the cost of the safety space should be assigned to the utility in calculating pole attachment rates because that space is "used and usable" by the electric utility. Indeed, the record showed that Duke was actually using the safety space on some of its poles to mount streetlights. As for Duke's argument that the Commission's allocation violates the statute, it has been waived, because Duke did not raise it before the Commission. *See* 47 U.S.C. § 405(a). In any event, section 224 of the Act is better read to support the Commission's determination that the safety space should be assigned to Duke, the electric utility.

67

1.  **The Commission Reasonably Determined that Duke Must Assume the Cost of the Safety Space**

In 2000, the Commission held that utility pole owners, not attachers, should bear the cost of the safety space on a pole. The Commission determined that "'the presence of' a utility's "potentially hazardous electric lines…makes the safety space necessary,'" and but for those lines, that space "'would otherwise be usable space.'" [*Order* ¶42] (quoting *2000 Fee Order*, 15 FCC Rcd at 6467, ¶ 22). Because the safety space "'is effectively usable space occupied by' the electric lines," the Commission determined that its cost should be assigned to the utility. [*Order* ¶42]. The Commission "affirmed this holding on reconsideration in 2001,'" [*Order* ¶42] (citing *Amendment of Rules and Policies Governing Pole Attachments*, 16 FCC Rcd 12103, 12130, ¶ 51 (2001)), and "re-affirmed" it "in the *2011 Order*," [*Order* ¶42] (citing *2011 Order*, 26 FCC Rcd at 5320, ¶ 180). To be sure, the Commission has recognized that ILECs (unlike cable providers and CLECs) often obtain pole attachments under cost-sharing arrangements. Duke Br. 37-38; *see 2011 Order*, 26 FCC Rcd at 5333, ¶ 214; *2018 Order*,

68

33 FCC Rcd 7768, ¶ 124. But that distinction "does not alter the Commission's rationale—*i.e.*, the presence of hazardous electric lines—for attributing the safety space to the electric utility." [*Order* ¶44].

Duke now asks this Court to overrule that "settled precedent." Duke Br. 33. Duke's view is that "[t]he [safety] space is only required on [its] poles because of communications facilities." *Id*. To the contrary, the Commission has reasonably assigned the safety space to the utility because the utility needs 40 inches of space to separate its electric lines from cable and telecommunications attachments on the same pole. *2000 Fee Order*, 15 FCC Rcd at 6467, ¶ 22. By contrast, when AT&T attaches its telecommunications lines to a pole, its facilities occupy the same presumptive amount of physical space (one foot) whether or not Duke places an electric line on the same pole. *See id*.; 47 C.F.R. § 1.1410.

Moreover, Duke is the only entity on a pole that can use the safety space, and it does so—the record shows that Duke "mounts streetlights in the safety space." *See* [*Order* n.167]; *Adoption of*

69

*Rules for the Regulation of Cable TV Pole Attachments*, 72 FCC 2d 59, 71 ¶ 24 (1979) (*1979 Order*) (noting the "common practice of electric utility companies to mount[] street light support" in the safety space). In any event, "[t]he issue is not whether the space is actually *used*, but whether it is *usable*." *Adoption of Rules for the Regulation of Cable TV Pole Attachments*, 77 FCC 2d 187, 190-91, ¶ 10 (1980) (emphasis in original).[7]

## 2. Duke's Statutory Argument Is Waived and Otherwise Lacks Merit

Finally, Duke asserts that the Commission's assignment of the safety space to Duke is based on an "erroneous interpretation of the Act." Duke Br. 38. That argument fails, too.

---

[7] Duke argues that the reasoning of the *1979 Order* excluding cable providers from sharing the costs of the safety space does not support the agency's decision to exclude telecommunications carriers. Duke Br. 32-38. But the *1979 Order* did not and could not speak to the allocation of safety space costs to telecommunications carriers, because those entities did not gain a statutory right to attach facilities to utility poles until Congress amended section 224 in 1996. The Commission properly relied on its more recent precedent addressing pole attachments for telecommunications carriers in assigning the safety space to Duke. [*Order* ¶42, nn.160-161].

The Commission's regulations define "'space occupied'" on a pole to mean that space is "'actually occupied'" by an attacher. [*Order* n.158] (quoting *BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Florida Power and Light*, 35 FCC Rcd 5321, 5330, ¶ 16 (EB 2020) (*AT&T Florida I*). Having previously determined that "'AT&T's attachments do not actually occupy the communications safety space,'" the Commission concluded that space (or a portion thereof) should not be assigned to AT&T in calculating AT&T's just and reasonable pole attachment rate. [*Order* n.158] (quoting *AT&T Florida I*, 35 FCC Rcd at 5330, ¶ 16).

Here, Duke asserts that the "space occupied" restriction in the Commission's regulations can only apply to cable attachments. Duke Br. 39-40; *see id.* at 34-35. Duke points to section 224's allocation of space on a pole: The cable rate formula (section 224(d)(1)) allocates usable space on a pole based on the "space occupied by an attachment", whereas the telecommunications rate formula (section 224(e)) allocates that space according to the "space required for each entity." According to Duke, AT&T should "pay for at least a portion of the [safety space]" because that space is

"'required' by the presence of [its] attachments on Duke's poles." *Id.* at 39.

Duke's statutory argument is not properly before this Court because Duke did not first present it to the Commission. 47 U.S.C. § 405(a). Before the agency, Duke never argued that the Bureau misinterpreted the Act when it declined to assign a portion of the safety space to AT&T, *see* [Duke Petition for Reconsideration at 10], nor did Duke file a petition for reconsideration of the Commission's decision to affirm that holding in the *Bureau Order*.

In any event, Duke's argument fails. The Commission made clear in the *2011 Order* that ILEC pole attachment rates are not subject to section 224(e)(1) of the Act, because that provision prescribes rates paid by "telecommunications carriers." *2011 Order*, 26 FCC Rcd at 5333, ¶ 213; *see American Electric Power*, 708 F.3d at 186. Pole attachment rates for ILECs are set by a rule (47 C.F.R. § 1.1413(b)) that the Commission promulgated under section 224(b)(1) of the Act. *2011 Order*, 26 FCC Rcd at 5240, 5333, ¶ 213. Section 224(e) thus does not prevent the Commission from assigning the safety space to utilities instead of ILECs, like AT&T.

72

Duke appears to argue that because AT&T pays rates that are equivalent to the rates paid by telecommunications carriers (*i.e.*, the Old Telecom Rate or the New Telecom Rate), the "space required" assignment in section 224(e)(1) should also apply to the rates paid by AT&T. *See* Duke Br. 39 ("To the extent AT&T is entitled to a regulated rate at all, AT&T would only be entitled to the Section 224(e) rate."). But Duke fails to demonstrate that the difference in language in sections 224(d)(1) and 224(e)(1) requires different space allocations. There is no evidence that a telecommunications attachment "requires" space that it "does not physically occupy[]." The Commission's rules thus sensibly treat those statutory terms as interchangeable. *See* 47 C.F.R. § 1.1406(d)(1), (2). Though Duke may believe that it has "a better" interpretation of "space required" that would assign some or all the costs of the safety space to AT&T, it has "failed to carry [its] burden" of showing that the Commission's statutory interpretation is unreasonable. *Montgomery County*, 811 F.3d at 133.

For all of those reasons, this Court should decline Duke's invitation to re-litigate the Commission's longstanding policy of

assigning the cost of the safety space to electric utilities, which the Commission correctly applied in assigning it to Duke.

## II.  AT&T'S CHALLENGES TO THE ORDER ARE MERITLESS

### A.  The Commission Properly Determined that AT&T Should Pay the Old Telecom Rate Because It Is Not Similarly Situated to Other Entities with Attachments on Duke's Poles

The Commission reasonably upheld the Bureau's determination that AT&T should pay the Old Telecom Rate because AT&T enjoys material advantages that are not available to other attachers on Duke's poles. The Bureau's conclusion was based on the terms in AT&T's joint use agreement, not the "traits that constitute an ILEC." AT&T Br. 18; *see id.* at 25-30. Also, consistent with the Commission's regulations and precedent, the Bureau only compared contract terms, not other attachers' statutory and regulatory rights.

#### 1.  Substantial Evidence Supports the Commission's Conclusion Regarding AT&T's Material Advantages over Other Attachers

As the Bureau (and later the Commission) explained, the terms in AT&T's joint use agreement with Duke provide AT&T

74

with five material advantages over other attachers on Duke's poles.

Specifically,

- AT&T has guaranteed access to Duke's poles and a right to remain on those poles after the parties terminate the joint use agreement. By contrast, other attachers are not guaranteed space on new poles, and they are required to remove their attachments after their agreements with Duke terminate. [*Order* ¶25]; [*Bureau Order* ¶¶21-23].

- Unlike other attachers, AT&T's rate is not based on the amount of space it occupies; thus, it can "expand the space it occupies on a pole at no additional cost." [*Order* ¶50]; [*Bureau Order* ¶20].

- Duke provides AT&T a "schedule" of the costs to replace a pole, whereas other attachers must wait for Duke to provide an estimate or an invoice. That provides AT&T a "budgeting and planning advantage." [*Order* ¶51]; [*Bureau Order* ¶¶24-27].

- AT&T is permitted to place attachments on Duke's poles without prior approval from Duke and without paying a permitting fee, unlike other attachers on Duke's poles. [*Order* ¶52]; [*Bureau Order* ¶26].

- AT&T's attachments can remain at the lowest position on Duke's poles, which allows AT&T to access its attachments "without needing to work through the lines of other attachers." [*Order* ¶53]; [*Bureau Order* ¶¶31-33].

Though AT&T criticizes some of the agency's specific findings about the benefits it receives from its joint use agreement with Duke, it has not established that the Commission's decision is

unsupported by substantial evidence or otherwise arbitrary and capricious. Thus, its "arguments are reduced to no more than a substantive disagreement with" the Commission. *Ohio Valley Env't Coal. Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 129 (4th Cir. 2013).

To start, the Commission did not "depart[] from its precedent and regulation" by requiring AT&T to establish that it was similarly situated to cable providers and CLECs instead of requiring Duke to establish that it was not. AT&T Br. 34-35. The majority of the complaint period is subject to review under the *2011 Order*, which meant that to pay the New Telecom Rate, it was AT&T's burden to demonstrate that it is comparable to other attachers on Duke's poles. *See* pp. 18, 21, 24-25, 28, above; *2018 Order*, 33 FCC Rcd at 7768, ¶ 127, n.478; *BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Florida Power and Light Company*, 2022 WL 2104259, ¶ 8 (2022) (*AT&T Florida II*) (holding that an ILEC pole attachment complaint was reviewable under the *2011 Order* for the period prior to the effective date of the *2018 Order*). However, even when AT&T was

presumed to be comparable to other attachers, the record evidence established that it was not. [*Order* ¶¶46-54]; [*Bureau Order* ¶¶16-33].

Moreover, it is irrelevant that Duke "was unable to prove it incurs a single unreimbursed cost because of the alleged advantages" provided AT&T. AT&T Br. 35. Neither the *2018 Order* nor the relevant Commission regulation (47 C.F.R. § 1.1413) requires a utility to calculate a value for each of an ILEC's material advantages to establish that the ILEC is not entitled to the New Telecom Rate. [*Order* ¶46]; *see also* pp. 28-29, 61-62, above.

AT&T's remaining arguments challenge the Commission's determination that the joint use agreement provides AT&T benefits that are not available to other attachers on Duke's poles. AT&T Br. 35-40. They all lack merit.

First, the Commission reasonably concluded that AT&T's right to access Duke's poles is a material advantage. Unlike other attachers, AT&T has guaranteed access to Duke's poles and a right to remain on those poles in the event the parties terminate the agreement. [*Order* ¶25]; [*Bureau Order* ¶¶21-23]. Unlike AT&T,

other attachers must remove their facilities in the event their agreements are terminated. [*Order* ¶25]; [*Bureau Order* ¶¶21-23]. Nor did the Commission err by "ignoring the statutorily-guaranteed access rights of AT&T's competitors." AT&T Br. 35. The Commission's regulations and precedent only compare contract terms, not statutory and regulatory rights. *See* pp. 93-96, below.

AT&T asserts that the Commission's determination that AT&T's right to access Duke's poles is superior to that of other attachers [*Order* ¶¶47-49] cannot be squared with the Commission's statement that Duke can "deny AT&T access to the same poles for the very same reasons" that Duke can deny access to cable providers and CLECs under section 224(f)(1) of the Act. AT&T Br. 36. AT&T misreads the *Order*. The Commission's point—which AT&T has not rebutted—is that Duke can exclude cable operators and CLECs, but it cannot exclude AT&T. Whereas section 224(f)(1) of the Act permits a utility to deny access "where there is insufficient capacity and for reasons of safety, reliability, and generally applicable engineering purposes," "under the [joint use agreement], Duke's poles must have sufficient capacity to

78

accommodate AT&T's attachments and replace insufficiently tall or strong poles." [*Order* ¶48].

The Commission also did not err in rejecting AT&T's argument that it was disadvantaged because the joint use agreement permits either party to terminate the other's right to make additional attachments. [*Order* ¶49]. As the Commission explained, "[b]ecause this right is reciprocal, and Duke needs to attach to AT&T's new pole lines," "Duke is unlikely to terminate AT&T's access to new poles and has, in fact, refrained from doing so for more than two decades." [*Order* ¶49].

AT&T contends that any analysis of an ILEC's advantages is limited to "the terms of the [joint use agreement]," not the "likelihood that the electric utility may enforce those terms." AT&T Br. 36. As a practical matter, that contention makes little sense. It is also belied by the Commission's precedent and regulations. The Commission in the *2011 Order* predicted that "electric utilities are unlikely" to require ILECs to remove attachments from poles "given the likelihood that incumbent LECs would, in response, deny electric utilities access to their poles." 26 FCC Rcd at 5335,

n.655. Further, the Commission's regulations require a utility to present "clear and convincing evidence that the [ILEC] receives benefits under its pole attachment agreement…that materially advantage[]" it "over other" attachers "on the same poles." 47 C.F.R. § 1.1413(b). That the termination provision is reciprocal and has never been enforced is strong evidence that it does not disadvantage AT&T.

Second, the Commission reasonably determined AT&T was materially advantaged by the rate in the joint use agreement, which is not based on the amount of space that AT&T occupies on a pole. [*Order* ¶ 50]. AT&T counters that because the Commission "invalidate[d]" that rate in the *Order*, and replaced it with a rate that is based on the space that it occupies, the Commission cannot "consider" that rate "an advantage to AT&T." AT&T Br. 37. AT&T never raised that argument before the agency, so it is waived. *See* 47 U.S.C. § 405(a).

Regardless, those two determinations are easily reconciled. The Commission concluded that the pole attachment *rate* paid by AT&T under the joint use agreement was not just and reasonable

[*Order* ¶24], but it separately determined that *terms* in the agreement—like a guaranteed right to access poles—afforded AT&T material advantages over other attachers. AT&T still retains valuable benefits in the joint use agreement, which is why the Commission decided that AT&T should pay a rate not to exceed the Old Telecom Rate. The fact that the Old Telecom Rate (like the New Telecom Rate) is based on the space occupied is irrelevant. That rate is the *result* of the Commission's determination that AT&T is materially advantaged; it does not foreclose the Commission from considering the advantages that led to that determination.

Third, the Commission properly determined that AT&T has a "budgeting and planning advantage" because the amount it pays to replace one of Duke's poles is based on a "schedule" in the joint use agreement. [*Order* ¶51]; [*Bureau Order* ¶¶24-27]. AT&T contends that the Commission "cannot conclude…that there is any advantage" from AT&T's access to a pole replacement cost schedule because Duke failed to provide reliable evidence that the amount AT&T pays is less than the amounts other attachers pay for the

81

same work. AT&T Br. 37. But "[t]he Bureau made no finding on the dollar difference between actual and scheduled costs." [*Order* ¶51]. Instead, the Bureau determined that AT&T "benefits" from the cost schedule because it permits AT&T to "determine, in advance, the cost of needed pole replacements without having to request estimates and invoices from Duke," as other attachers "must do." [*Order* ¶51]. "AT&T d[id] not dispute this benefit" below, *id.*, nor does it here.

Fourth, the Commission reasonably upheld the Bureau's conclusion that the joint use agreement materially advantages AT&T by allowing it to place attachments on Duke's poles without prior approval from Duke and without paying a permitting fee, unlike other attachers on Duke's poles, who must do both. [*Order* ¶52]; *see* [*Bureau Order* ¶26]. Prior to the *Order*, the Commission had already decided that "material benefits may include no advance approval to attach to a pole owner's poles." [*Order* ¶52]; *see 2018 Order*, 33 FCC Rcd at 7771 ¶ 128 (recognizing that "material benefits may include…'no advance approval to make attachments'") (quoting *2011 Order*, 26 FCC Rcd at 5335, n.654)

82

(cleaned up); *see AT&T Florida II*, 2022 WL 2104259, ¶ 17.

Consistent with that earlier finding, the Commission agreed with

the Bureau that AT&T "enjoys" a "significant advantage" over

other attachers because it has "immediate access to Duke's poles

without having to submit an application, pay a fee, and then wait

for Duke to either approve the application, conditionally approve it

subject to make-ready requirements, or deny it." [*Order* ¶52].[8]

Nor did the Commission "incorrectly shift[] the burden to

AT&T to demonstrate that it is *not* advantaged" by the joint use

agreement. AT&T Br. 38. Under the agency's rules, the party filing

an application for Commission review of a Bureau order carries the

burden to show that the Bureau erred and that its decision should

be overruled. 47 C.F.R. § 1.115; *KGAN Licensee*, 30 FCC Rcd 7664,

7665, ¶ 3 (2015). When the Commission stated that AT&T did not

---

[8] In doing so, the Commission did not rely on the findings in the *2018 Order* about how the one-touch-make-ready process (which is only available to cable providers and CLECs) expedites pole access. AT&T Br. 38. The Commission merely cited that portion of the *2018 Order* in support of the general proposition that "when the attacher is in control of the process, the process almost certainly takes less time and costs less money." [*Order* ¶52 & n.208].

"sufficiently explain" the delays that it allegedly encounters when it attaches to Duke's poles, the Commission was examining the arguments and evidence submitted by AT&T in support of its contention that the Bureau had erred. [*Order* ¶52, n.208] (citing [AT&T Application for Review at 12-13]); *see* [*Bureau Order* ¶¶28-30].

Fifth, the Commission correctly concluded that the joint use agreement materially advantages AT&T by permitting its attachments to remain at the lowest position on Duke's poles. [*Order* ¶53]; *see* [*Bureau Order* ¶¶31-33]; *AT&T Florida II*, 2022 WL 2104259, ¶ 14 (because its attachments occupy the lowest position, "AT&T's employees work in a safer area of the pole and can more easily identify and access AT&T's attachments").

The Commission did not "flip[] the burden of proof" to AT&T. AT&T Br. 39. Rather, the Commission determined that AT&T's application for review failed to provide a sufficient basis to overturn the *Bureau Order*. Though AT&T asserts that its pole location is costlier and riskier, AT&T Br. 39, the Bureau found that

AT&T "provide[d] scant information" in support of its position.
[*Bureau Order* ¶33 n.103].

AT&T nonetheless contends that it "substantiated some of those costs by submitting aerial damage reports", which allegedly "show[] that its location on the pole is…more vulnerable to vandalism and damage." AT&T Br. 39. But the Bureau pointed out that AT&T did not provide data establishing that any actual harm occurred to AT&T's attachments because of their position at the bottom of Duke's poles. [*Bureau Order* ¶33 n.103]. The court "may not displace the [Commission's] choice between two fairly conflicting views" of the evidence before the agency. *NLRB v. Grand Canyon Min. Co.*, 116 F.3d 1039, 1044 (4th Cir. 1997) (cleaned up).

There is likewise no merit to AT&T's assertion that the Commission erred in finding that AT&T's "'consistent and predictable space on each pole' provides" AT&T "a competitive advantage," AT&T Br. 39 (quoting [*Order* ¶53]), because "AT&T's competitors…also enjoy a consistent and predictable location on the pole." AT&T Br. 39 (citing [*Bureau Order* ¶33 n.98]).

AT&T misunderstands the agency's findings. The Bureau found that AT&T's and Duke's "desire to avoid the physical damage that would result if facilities crisscrossed mid-span makes it unlikely that Duke would seek to change the position of future AT&T attachments." [*Bureau Order* ¶33 n.98]. Thus, Duke had no incentive to make AT&T relocate to a higher position on its poles, and AT&T had no incentive to move.[9] Indeed, the Bureau observed that AT&T "has never sought to abandon its right to the lowest position in the communications space"—even though it could request a higher position—which corroborated the Commission's

---

[9] The Bureau also noted that "AT&T concede[d] that consistency in placement of facilities allows all companies, including AT&T, to readily identify the ownership of particular attachments and avoids physical damage that would result if facilities crisscrossed mid-span. Thus, the record reflects that, unlike its competitors, AT&T's position on the pole is by choice and that choice has benefited AT&T by providing a consistent and predictable space on each pole in a position of its choosing." [*Bureau Order* ¶33]. Though it recognized that "consistency of placement" may benefit all attachers, generally speaking, AT&T Br. 36, the Bureau determined that AT&T is materially advantaged by the joint use agreement, because unlike other attachers on Duke's poles, it is guaranteed consistent placement—in AT&T's case, the lowest position on a pole. [*Bureau Order* ¶33].

determination that AT&T's current location is advantageous.

[*Bureau Order* ¶33, n.98] (cleaned up).

Finally, the Commission followed its policy of deciding ILEC pole attachment complaints on a case-by-case basis. AT&T contends that it did not, because in its view, the Commission's analysis ended when it found the joint use agreement included the *type* of terms that may provide benefits to ILECs. AT&T Br. 40. But the Commission's analysis went further. It considered the specific language of the terms in the agreement and the parties' performance under it. *See, e.g.*, [*Order* ¶53] (observing that "[t]he record shows that the [joint use agreement] ensures AT&T's right to occupy the bottom position of the poles and that AT&T never sought to abandon that right.").

### 2. The Commission Determined that AT&T Was Not Similarly Situated to Other Attachers on Duke's Poles Based on the Terms in the Joint Use Agreement, Not "ILEC Traits"

AT&T contends that the comparative benefits identified by the Commission are the "very traits that constitute an ILEC." AT&T Br. 18. AT&T's argument rests on two allegedly "immutable characteristics of ILECs": (1) AT&T "obtains 'pole access' by

87

contract rather than by statutory right of access" and (2) AT&T's
attachments are located at the bottom of a pole. AT&T Br. 27; *see
id.* at 30. According to AT&T, defining those "traits" as "benefits"
"precludes ILECs from *ever* qualifying for the new telecom rate"
and "contravenes" the *2018 Order*'s presumption that ILECs are
comparable to cable providers and CLECs.

AT&T's argument is meritless. "[E]ach of the[] benefits"
identified by the Bureau and the Commission "[is] based on the
express terms of the [joint use agreement]" that AT&T negotiated
with Duke, "not on any 'immutable' traits of incumbent LECs."
[*Order* n.183]. For instance, "obtain[ing] access to poles pursuant to
contract terms," AT&T Br. 26, is not unique to ILECs. All entities
that attach equipment to electric poles do so through some type of
agreement with the utility. Even cable providers and CLECs, who
have a statutory right to access utility poles (*see* 47 U.S.C.
§ 224(f)(1)), negotiate pole attachment agreements. *2011 Order*, 26
FCC Rcd at 5336, ¶ 217; *2018 Order*, 33 FCC Rcd at 7768, ¶ 124.

What mattered to the Bureau (and later the Commission) was
that the terms in AT&T's joint use agreement with Duke provide it

five material advantages over other attachers on Duke's poles (only two of which are what AT&T describes as ILEC "traits"). All of those benefits are afforded by contract terms that AT&T could renegotiate with Duke. For instance, AT&T could agree to a pole attachment rate that is based on the amount of space on a pole that it actually uses. [*Order* ¶50]. Or it could allow its attachments to be relocated to a different position on the pole. [*Order* ¶53]. Instead, AT&T seeks an entitlement to the New Telecom Rate while at the same time retaining its advantageous terms. That is akin to a passenger seated in first class demanding the basic economy fare, and it is not what the Commission intended. As the Commission has explained, "[j]ust as considerations of competitive neutrality counsel in favor of similar treatment of similarly situated providers, so too should differently situated providers be treated differently." *2011 Order*, 26 FCC Rcd at 5336-5337, ¶ 218; *see 2018 Order*, 33 FCC Rcd at 7770-71, ¶¶ 127-128.

AT&T's remaining arguments lack merit.

To start, AT&T is wrong that the Commission's reliance on an "ILEC's contractual access and its location on a pole" render the

presumption that "ILECs are comparable to their competitors…a nullity." AT&T Br. 28. That presumption applies only to the eight months of AT&T's complaint covered by the *2018 Order*. The remainder is subject to review under the *2011 Order*, which placed the burden on ILECs to rebut the presumption that they are *not* similarly situated to other attachers in order to pay comparable pole rates.[10] *2011 Order*, 26 FCC Rcd at 5336, ¶ 217. *See* pp. 18, 21, 24-25, 28, 77, above. In any event, the presumption is still available. AT&T just has to take pole access and pole location on similar terms as other attachers so that Duke cannot rebut the presumption and deny AT&T the New Telecom Rate.

Similarly, AT&T's assertion that the Commission "intended most ILECs to pay the new telecom rate as of 2011," is contradicted

_____

[10] Quoting paragraph 208 of the *2011 Order*, AT&T contends that the Commission "intended most ILECs to pay the new telecom rate as of 2011." AT&T Br. 28. That paragraph only discussed the public interest benefits that could result if ILECs paid *just and reasonable* pole attachment rates under section 224(b)(1); it did not further find that ILECs should pay the New Telecom Rate. Indeed, AT&T's statement is contradicted by paragraph 216 of the *2011 Order*, 26 FCC Rcd at 5335, where the Commission presumed that ILECs would rarely, if ever, be entitled to the New Telecom Rate.

by the Commission's decisions. AT&T Br. 28. The Commission has consistently held that an ILEC can be denied the New Telecom Rate when the ILEC enjoys material advantages that are not provided to other attachers on the same pole, and that these advantages may include guaranteed space and a preferential location on the pole. *2011 Order*, 26 FCC Rcd at 5337, ¶ 218; *2018 Order*, 33 FCC Rcd at 7771, ¶ 128; *see id.* at 7768, ¶ 124. In such a case, the ILEC pays the Old Telecom Rate, which "accounts for" those "net advantages." *2011 Order*, 26 FCC Rcd at 5337, ¶ 218.

If, as AT&T contends, ILECs must pay the New Telecom Rate—irrespective of their common or inherent advantages—the rebuttable presumption that ILECs are similarly situated to other attachers is transformed into an across-the-board determination that they are always similarly situated. That defies the Commission's rulings in the *2011 Order* and the *2018 Order,* and would foreclose the opportunity the Commission's rules grant to rebut the presumption. *See* 47 C.F.R. § 1.1413(b); 47 C.F.R. § 1.1424 (2011).

Finally, AT&T's assertion that the Commission has "crystalliz[ed] the competitive rate disparities that it has long sought to eliminate" wrongly presumes that ILECs should invariably pay the New Telecom Rate. AT&T Br. 29. As we have explained, the Commission has always provided that ILECs should pay the higher Old Telecom Rate when they are not similarly situated to other attachers on utility poles. *See* pp. 13-15, 17-18. The Bureau therefore did not "depart from [the Commission's] established policy" in finding that AT&T should pay the Old Telecom Rate, given the advantageous terms that are contained in its joint use agreement with Duke. AT&T Br. 30.

### 3. The Commission Correctly Limited Its Analysis to a Comparison of Terms in Pole Attachment Agreements

The Commission properly upheld the Bureau's analysis comparing the terms in AT&T's joint use agreement to the terms in Duke's pole attachment agreements with other attachers on its poles. The Commission's regulations provide that "[a] utility can rebut" the presumption that an ILEC is entitled to the New Telecom Rate "with clear and convincing evidence that the [ILEC]

receives *benefits under its pole attachment agreement*…that materially advantage[]" the ILEC "over other telecommunications carriers or cable television systems providing telecommunications services on the same poles." 47 C.F.R. § 1.1413(b) (emphasis added). The regulation does not mention the "statutory, regulatory, and contractual rights and benefits" of other attachers, AT&T Br. 32; rather, the benefits that it identifies are those that an ILEC receives "under its pole attachment agreement."

The Commission's approach is reasonable. Because the regulation requires a utility to establish that an ILEC's "*pole attachment agreement* with a utility" "materially advantages" the ILEC "over other" attachers "on the same poles," the Commission has determined that other attachers' agreements with utilities are the relevant point of comparison. That apples-to-apples (contract-to-contract) comparison fits more comfortably within the language of the rule than AT&T's apples-to-oranges (contract-to-statutory and regulatory rights) alternative. The Commission has taken the same approach in other pole attachment complaint cases. *Verizon Maryland Reconsideration Order*, 2022 WL 990572, ¶¶ 6-8.

Contrary to AT&T's view, AT&T Br. 31-32, comparing agreement terms rather than statutory and regulatory rights also comports with Commission precedent. The Commission in the *2018 Order* held that a utility can rebut the presumption that an ILEC is entitled to the New Telecom Rate if it "can demonstrate that the [ILEC] receives significant material benefits beyond basic pole attachment or other rights given to another telecommunications attacher." *2018 Order*, 33 FCC Rcd at 7771, ¶ 128. Because the utility's showing is based on "benefits beyond basic pole attachment," neither the ILEC's contractual right to pole access nor cable providers' and CLECs' statutory right to pole access are relevant points of comparison. *Verizon Maryland Reconsideration Order*, 2022 WL 990572, ¶ 7. The Commission also observed that "material benefits may include" rights-of-way obtained by the utility, guaranteed space on the pole, and preferential locations on the pole. *2018 Order*, 33 FCC Rcd at 7771, ¶ 128; *see id.* at 7768, ¶ 124 (observing that "joint use agreements may provide benefits to [ILECs]…such as lower make ready costs, the right to attach without advance utility approval, and use of the rights-of-way

94

obtained by the utility."). All of those benefits are provided by contract, not by statute or the Commission's regulations. *See Verizon Maryland Reconsideration Order*, 2022 WL 990572, ¶ 8.

Nor was it arbitrary and capricious for the Commission to decline to consider the statutory and regulatory rights of cable providers and CLECs—specifically, their right to access poles under section 224(f)(1) of the Act, 47 U.S.C. § 224(f)(1). AT&T Br. 26-27, 30, 33. As the Commission found, AT&T's attachment rights under the joint use agreement are superior to cable providers' and CLECs' attachment right under section 224(f)(1). Thus, AT&T retains an advantage even taking the statutory access rights of cable operators and CLECs into account. [*Order* ¶¶48-49].

For all of these reasons, the Commission reasonably decided to only consider contract terms in assessing whether an ILEC is comparable to other attachers on the same utility pole.

## B. The Commission Reasonably Permitted Duke to Use the Actual "Number of Attaching Entities" on Its Poles in Calculating the Old Telecom Rate Paid by AT&T

The Commission reasonably upheld the Bureau's determination that Duke could use the actual number of attachers

on its poles—rather than the presumptive number in the Commission's rules—in calculating the Old Telecom Rate paid by AT&T. AT&T Br. 41-46; [*Order* ¶55].

Section 224(e)(2) of the Act provides that in establishing a telecommunications carrier's pole attachment rate, "[a] utility shall apportion…two-thirds of the costs of providing" the unusable space on a pole "equal[ly]…among all…entities" with attachments on the pole. 47 U.S.C. § 224(e)(2).

The Commission in carrying out Congress' directive has taken two different approaches. The Old Telecom Rate formula apportions two-thirds of the cost of the unusable space on a pole among all attachers on the pole. 47 C.F.R. § 1.1409(e)(2)(2011); *see Ameren*, 865 F.3d at 1011. Consequently, as the number of attachers increases, each attacher's respective share of the cost of the unusable space decreases, and vice versa. *See Implementation of Section 703(e) of the Telecommunications Act of 1996*, 13 FCC Rcd 6777, 6800, ¶ 45 (1998). And the more cost allocated to an attacher, the higher its pole attachment rate. The Old Telecom Rate formula also allocates the cost of usable space based on the

96

fraction of the usable space that an attacher occupies on a pole. 47 C.F.R. § 1.1409(e)(2)(2011).

The New Telecom Rate formula takes a different approach. It multiplies the cumulative cost of the usable and unusable space on a pole allocated to an attacher by a percentage that is determined by the average number of attachers on poles in a utility's service area (*e.g.*, 66 percent in service areas with an average of five attachers, 56 percent in areas with an average of four attachers, *etc*.). 47 C.F.R. § 1.1406(d); *see Ameren*, 865 F.3d at 1011-12. By employing those percentages, the New Telecom Rate formula calculates the same New Telecom Rate, regardless of the number of attachers on a pole.

The Commission reasonably permitted Duke to calculate the New Telecom Rate using the presumptive number of attachers in the Commission's regulations rather than "expending time and money surveying its poles," which "would have only a minimal, if any, effect on the rate." [*Order* ¶55]. But the Commission further found that in making that choice, Duke did not forfeit its right to rebut that presumptive number in calculating the Old Telecom

97

Rate, where that input has a "significant effect." [*Order* ¶55]. The Commission also noted that AT&T never "challenge[d] the reliability of the audit data Duke submitted." [*Order* ¶55].

AT&T nonetheless contends that Duke must use the same presumptive number of attachers in calculating the Old and New Telecom Rates. AT&T Br. 41-46. Nothing in the Commission's regulations or its precedent require that, however. *See AT&T Florida II*, 2022 WL 2104259, ¶ 21. AT&T's assertion notwithstanding, AT&T Br. 46, neither the *2011 Order* nor the *2018 Order* mentions the inputs to be used in calculating the Old Telecom Rate formula, let alone states that the Commission intended for utilities to apply the presumptive average number of attachers in the Commission's rules.

AT&T also asserts that "the only way to derive pole attachment rates that *equally* apportion the cost of unusable space on a pole among all attachers is to use the same number of attaching entities input when calculating all of their rates." AT&T Br. 42 (emphasis in original). AT&T, however, misunderstands how pole attachment rates are calculated. The "cost" apportioned by the

Old Telecom Rate formula is not the same as the "cost" apportioned by the New Telecom Rate formula, and by design, the number of attachers has a "significant effect" only in the former, but not the latter. [*Order* ¶ 55]; *see Ameren*, 865 F.3d at 1011-12. Consequently, in almost all cases, the cost of unusable space on a pole will *not* be equally apportioned between an attacher that pays the Old Telecom Rate and an attacher that pays the New Telecom Rate. Instead, the cost of the unusable space on a pole can only be equally apportioned among entities paying rates derived from the same rate formula.

By pointing out that the number of attachers on a pole only has a significant impact on the Old Telecom Rate, [*Order* ¶55], the Commission addressed AT&T's contention that under the Act and the Commission's regulations, Duke must use the same input for all attachers to the same pole. AT&T Br. 44. That difference occurs because formulas used to calculate the Old Telecom Rate and the New Telecom Rate allocate the unusable space on a pole *unequally*. *Mountain Valley Pipeline LLC v. N. Carolina Dept. of Env't Quality*, 990 F.3d 818, 832 (4th Cir. 2021) ("[e]ven without direct

citations to State code," the court could "reasonably discern from the Department's language" that its decision relied on state law).

Nor is AT&T entitled to the same treatment as cable providers and CLECs with attachments on Duke's poles. AT&T Br. 45. AT&T pays the Old Telecom Rate because the Commission properly determined that it is *not* similarly situated to those entities. [*Order* ¶¶46-54].

In short, Duke had no reason to rebut the presumptive number of attachers in the Commission's regulation in calculating the New Telecom Rate, because whether the average number of attachers is two, three, four, or five, the rate would be the same. But the actual average number of attachers made a difference in calculating the Old Telecom Rate to be paid by AT&T. The Commission reasonably permitted Duke to avail itself of the opportunity to rebut the Commission's presumptions where it was in Duke's economic interest to do so.

# CONCLUSION

The court should dismiss and otherwise deny Duke's petition for review. It should deny AT&T's petition for review in its entirety.

Respectfully submitted,

JONATHAN S. KANTER
ASSISTANT ATTORNEY GENERAL

ROBERT B. NICHOLSON
ROBERT J. WIGGERS
ATTORNEYS

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

/s/ Maureen K. Flood

MAUREEN K. FLOOD
COUNSEL

FEDERAL COMMUNICATIONS
   COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

July 6, 2023

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒  this document contains <u>18,318</u> words, *or*

    ☐  this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word in Office 365 in 1</u>4-point <u>Century Schoolbook</u>, *or*

    ☐  this document has been prepared in a monospaced spaced typeface using _____ with _____.

*/s/ Maureen K. Flood*

Maureen K. Flood
Counsel

Federal Communications
Commission
Washington, D.C.  20554
(202) 418-1740

## CERTIFICATE OF FILING AND SERVICE

I, Maureen K. Flood, hereby certify that on July 6, 2023, I filed the foregoing Page-Proof Opening Brief of Respondents with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Maureen K. Flood*

Maureen K. Flood
Counsel

Federal Communications
Commission
Washington, D.C. 20554
(202) 418-1740

# Statutory and Regulatory Appendix

## TABLE OF CONTENTS

47 U.S.C. § 153 ..................................................................... 1

47 U.S.C. § 224 ..................................................................... 2

47 U.S.C. § 251 ..................................................................... 8

47 U.S.C. § 405 ..................................................................... 9

47 C.F.R. § 1.115 .................................................................. 11

47 C.F.R. § 1.1402 ................................................................ 16

47 C.F.R. § 1.1406 ................................................................ 19

47 C.F.R. § 1.1407 ................................................................ 23

47 C.F.R. § 1.1409 (Current) ................................................ 24

47 C.F.R. § 1.1409 (2011) .................................................... 26

47 C.F.R. § 1.1410 (Current) ................................................ 30

47 C.F.R. § 1.1410 (2011) .................................................... 31

47 C.F.R. § 1.1413 ................................................................ 32

47 C.F.R. § 1.1424 (2011) .................................................... 33

## 47 U.S.C. § 153

For the purposes of this chapter, unless the context otherwise requires--

\*\*\*

(51) Telecommunications carrier

The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

\*\*\*

# 47 U.S.C. § 224

(a) Definitions

As used in this section:

(1) The term "utility" means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State.

(2) The term "Federal Government" means the Government of the United States or any agency or instrumentality thereof.

(3) The term "State" means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

(4) The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

(5) For purposes of this section, the term "telecommunications carrier" (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title.

(b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole

2

attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of this title.

(2) The Commission shall prescribe by rule regulations to carry out the provisions of this section.

(c) State regulatory authority over rates, terms, and conditions; preemption; certification; circumstances constituting State regulation

(1) Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f), for pole attachments in any case where such matters are regulated by a State.

(2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the Commission that--

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

(3) For purposes of this subsection, a State shall not be considered to regulate the rates, terms, and conditions for pole attachments--

(A) unless the State has issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments; and

(B) with respect to any individual matter, unless the State takes final action on a complaint regarding such matter--

(i) within 180 days after the complaint is filed with the State, or

(ii) within the applicable period prescribed for such final action in such rules and regulations of the State, if the prescribed period does not extend beyond 360 days after the filing of such complaint.

(d) Determination of just and reasonable rates; "usable space" defined

(1) For purposes of subsection (b) of this section, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(2) As used in this subsection, the term "usable space" means the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment.

(3) This subsection shall apply to the rate for any pole attachment used by a cable television system solely to provide cable service. Until the effective date of the regulations required under subsection (e), this subsection shall also apply to the rate for any pole attachment used by a cable system or any telecommunications carrier (to the extent

such carrier is not a party to a pole attachment agreement) to provide any telecommunications service.

(e) Regulations governing charges; apportionment of costs of providing space

(1) The Commission shall, no later than 2 years after February 8, 1996, prescribe regulations in accordance with this subsection to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges. Such regulations shall ensure that a utility charges just, reasonable, and nondiscriminatory rates for pole attachments.

(2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

(3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

(4) The regulations required under paragraph (1) shall become effective 5 years after February 8, 1996. Any increase in the rates for pole attachments that result from the adoption of the regulations required by this subsection shall be phased in equal annual increments over a period of 5 years beginning on the effective date of such regulations.

(f) Nondiscriminatory access

(1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.

(2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory[1] basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

(g) Imputation to costs of pole attachment rate

A utility that engages in the provision of telecommunications services or cable services shall impute to its costs of providing such services (and charge any affiliate, subsidiary, or associate company engaged in the provision of such services) an equal amount to the pole attachment rate for which such company would be liable under this section.

(h) Modification or alteration of pole, duct, conduit, or right-of-way

Whenever the owner of a pole, duct, conduit, or right-of-way intends to modify or alter such pole, duct, conduit, or right-of-way, the owner shall provide written notification of such action to any entity that has obtained an attachment to such conduit or right-of-way so that such entity may have a reasonable opportunity to add to or modify its existing attachment. Any entity that adds to or modifies its existing attachment after receiving such notification shall bear a proportionate share of the costs incurred by the owner in making such pole, duct, conduit, or right-of-way accessible.

(i) Costs of rearranging or replacing attachment

An entity that obtains an attachment to a pole, conduit, or right-of-way

6

shall not be required to bear any of the costs of rearranging or replacing its attachment, if such rearrangement or replacement is required as a result of an additional attachment or the modification of an existing attachment sought by any other entity (including the owner of such pole, duct, conduit, or right-of-way).

# 47 U.S.C. § 251

\*\*\*

(h) "Incumbent local exchange carrier" defined

(1) Definition

For purposes of this section, the term "incumbent local exchange carrier" means, with respect to an area, the local exchange carrier that—

(A) on February 8, 1996, provided telephone exchange service in such area; and

(B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or

(ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

\*\*\*

# 47 U.S.C. § 405

(a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition

for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

(b)(1) Within 90 days after receiving a petition for reconsideration of an order concluding a hearing under section 204(a) of this title or concluding an investigation under section 208(b) of this title, the Commission shall issue an order granting or denying such petition.

(2) Any order issued under paragraph (1) shall be a final order and may be appealed under section 402(a) of this title.

# 47 C.F.R. § 1.115

(a) Any person aggrieved by any action taken pursuant to delegated authority may file an application requesting review of that action by the Commission. Any person filing an application for review who has not previously participated in the proceeding shall include with his application a statement describing with particularity the manner in which he is aggrieved by the action taken and showing good reason why it was not possible for him to participate in the earlier stages of the proceeding. Any application for review which fails to make an adequate showing in this respect will be dismissed.

(b)(1) The application for review shall concisely and plainly state the questions presented for review with reference, where appropriate, to the findings of fact or conclusions of law.

(2) The application for review shall specify with particularity, from among the following, the factor(s) which warrant Commission consideration of the questions presented:

(i) The action taken pursuant to delegated authority is in conflict with statute, regulation, case precedent, or established Commission policy.

(ii) The action involves a question of law or policy which has not previously been resolved by the Commission.

(iii) The action involves application of a precedent or policy which should be overturned or revised.

(iv) An erroneous finding as to an important or material question of fact.

(v) Prejudicial procedural error.

(3) The application for review shall state with particularity the respects in which the action taken by the designated authority should be changed.

(4) The application for review shall state the form of relief sought and, subject to this requirement, may contain alternative requests.

(c) No application for review will be granted if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass.

Note: Subject to the requirements of § 1.106, new questions of fact or law may be presented to the designated authority in a petition for reconsideration.

(d) Except as provided in paragraph (e) of this section and in § 0.461(j) of this chapter, the application for review and any supplemental thereto shall be filed within 30 days of public notice of such action, as that date is defined in § 1.4(b). Opposition to the application shall be filed within 15 days after the application for review is filed. Except as provided in paragraph (e)(1) of this section, replies to oppositions shall be filed within 10 days after the opposition is filed and shall be limited to matters raised in the opposition.

(e)(1) Applications for review of an order designating a matter for hearing that was issued under delegated authority shall be deferred until exceptions to the initial decision in the case are filed, unless the presiding officer certifies such an application for review to the Commission. A matter shall be certified to the Commission if the presiding officer determines that the matter involves a controlling question of law as to which there is substantial ground for difference of opinion and that immediate consideration of the question would materially expedite the

ultimate resolution of the litigation. A request to certify a matter to the Commission shall be filed with the presiding officer within 5 days after the designation order is released. A ruling refusing to certify a matter to the Commission is not appealable. Any application for review authorized by the presiding officer shall be filed within 5 days after the order certifying the matter to the Commission is released or such a ruling is made. Oppositions shall be filed within 5 days after the application for review is filed. Replies to oppositions shall be filed only if they are requested by the Commission. Replies (if allowed) shall be filed within 5 days after they are requested. The Commission may dismiss, without stating reasons, an application for review that has been certified, and direct that the objections to the order designating the matter for hearing be deferred and raised when exceptions in the initial decision in the case are filed.

(2) Applications for review of final staff decisions issued on delegated authority in formal complaint proceedings on the Enforcement Bureau's Accelerated Docket (see, e.g., § 1.730) shall be filed within 15 days of public notice of the decision, as that date is defined in § 1.4(b). These applications for review oppositions and replies in Accelerated Docket proceedings shall be served on parties to the proceeding by hand or facsimile transmission.

(f) Applications for review, oppositions, and replies shall conform to the requirements of §§ 1.49, 1.51, and 1.52, and shall be submitted to the Secretary, Federal Communications Commission, Washington, DC 20554. Except as provided below, applications for review and oppositions thereto shall not exceed 25 double-space typewritten pages. Applications for review of interlocutory actions in hearing proceedings (including designation orders) and oppositions thereto shall not exceed 5 double-spaced typewritten pages. When permitted (see paragraph (e)(1) of this section), reply pleadings shall not exceed 5 double-spaced typewritten pages. The application for review shall be served upon the parties to the proceeding. Oppositions to the application for review shall be served on the person seeking review and on parties to the proceeding. When permitted (see paragraph (e)(1) of this section), replies to the opposition(s) to the application for review shall be served on the person(s)

13

opposing the application for review and on parties to the proceeding.

(g) The Commission may grant the application for review in whole or in part, or it may deny the application with or without specifying reasons therefor. A petition requesting reconsideration of a ruling which denies an application for review will be entertained only if one or more of the following circumstances is present:

(1) The petition relies on facts which related to events which have occurred or circumstances which have changed since the last opportunity to present such matters; or

(2) The petition relies on facts unknown to petitioner until after his last opportunity to present such matters which could not, through the exercise of ordinary diligence, have been learned prior to such opportunity.

(h)(1) If the Commission grants the application for review in whole or in part, it may, in its decision:

(i) Simultaneously reverse or modify the order from which review is sought;

(ii) Remand the matter to the designated authority for reconsideration in accordance with its instructions, and, if an evidentiary hearing has been held, the remand may be to the person(s) who conducted the hearing; or

(iii) Order such other proceedings, including briefs and oral argument, as may be necessary or appropriate.

(2) In the event the Commission orders further proceedings, it may stay the effect of the order from which review is sought. (See § 1.102.) Following the completion of such further proceedings the Commission

may affirm, reverse or modify the order from which review is sought, or it may set aside the order and remand the matter to the designated authority for reconsideration in accordance with its instructions. If an evidentiary hearing has been held, the Commission may remand the matter to the person(s) who conducted the hearing for rehearing on such issues and in accordance with such instructions as may be appropriate.

Note: For purposes of this section, the word "order" refers to that portion of its action wherein the Commission announces its judgment. This should be distinguished from the "memorandum opinion" or other material which often accompany and explain the order.

(i) An order of the Commission which reverses or modifies the action taken pursuant to delegated authority is subject to the same provisions with respect to reconsideration as an original order of the Commission. In no event, however, shall a ruling which denies an application for review be considered a modification of the action taken pursuant to delegated authority.

(j) No evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission believes should have been taken in the original proceeding shall be taken on any rehearing ordered pursuant to the provisions of this section.

(k) The filing of an application for review shall be a condition precedent to judicial review of any action taken pursuant to delegated authority.

# 47 C.F.R. § 1.1402

(a) The term utility means any person that is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person that is cooperatively organized, or any person owned by the Federal Government or any State.

(b) The term pole attachment means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

(c) With respect to poles, the term usable space means the space on a utility pole above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment, and which includes space occupied by the utility. With respect to conduit, the term usable space means capacity within a conduit system which is available, or which could, with reasonable effort and expense, be made available, for the purpose of installing wires, cable and associated equipment for telecommunications or cable services, and which includes capacity occupied by the utility.

(d) The term complaint means a filing by a cable television system operator, a cable television system association, a utility, an association of utilities, a telecommunications carrier, or an association of telecommunications carriers alleging that it has been denied access to a utility pole, duct, conduit, or right-of-way in violation of this subpart and/or that a rate, term, or condition for a pole attachment is not just and reasonable. It also means a filing by an incumbent local exchange carrier (as defined in 47 U.S.C. 251(h)) or an association of incumbent local exchange carriers alleging that a rate, term, or condition for a pole attachment is not just and reasonable.

(e) The term complainant means a cable television system operator, a

16

cable television system association, a utility, an association of utilities, a telecommunications carrier, an association of telecommunications carriers, an incumbent local exchange carrier (as defined in 47 U.S.C. 251(h)) or an association of incumbent local exchange carriers who files a complaint.

(f) The term defendant means a cable television system operator, a utility, or a telecommunications carrier against whom a complaint is filed.

(g) The term State means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

(h) For purposes of this subpart, the term telecommunications carrier means any provider of telecommunications services, except that the term does not include aggregators of telecommunications services (as defined in 47 U.S.C. 226) or incumbent local exchange carriers (as defined in 47 U.S.C. 251(h)).

(i) The term conduit means a structure containing one or more ducts, usually placed in the ground, in which cables or wires may be installed.

(j) The term conduit system means a collection of one or more conduits together with their supporting infrastructure.

(k) The term duct means a single enclosed raceway for conductors, cable and/or wire.

(l) With respect to poles, the term unusable space means the space on a utility pole below the usable space, including the amount required to set the depth of the pole.

17

(m) The term attaching entity includes cable system operators, telecommunications carriers, incumbent and other local exchange carriers, utilities, governmental entities and other entities with a physical attachment to the pole, duct, conduit or right of way. It does not include governmental entities with only seasonal attachments to the pole.

(n) The term inner-duct means a duct-like raceway smaller than a duct that is inserted into a duct so that the duct may carry multiple wires or cables.

(o) The term make-ready means the modification or replacement of a utility pole, or of the lines or equipment on the utility pole, to accommodate additional facilities on the utility pole.

(p) The term complex make-ready means transfers and work within the communications space that would be reasonably likely to cause a service outage(s) or facility damage, including work such as splicing of any communication attachment or relocation of existing wireless attachments. Any and all wireless activities, including those involving mobile, fixed, and point-to-point wireless communications and wireless internet service providers, are to be considered complex.

(q) The term simple make-ready means make-ready where existing attachments in the communications space of a pole could be transferred without any reasonable expectation of a service outage or facility damage and does not require splicing of any existing communication attachment or relocation of an existing wireless attachment.

(r) The term communications space means the lower usable space on a utility pole, which typically is reserved for low-voltage communications equipment.

## 47 C.F.R. § 1.1406

(a) The complainant shall have the burden of establishing a prima facie case that the rate, term, or condition is not just and reasonable or that the denial of access violates 47 U.S.C. 224(f). If, however, a utility argues that the proposed rate is lower than its incremental costs, the utility has the burden of establishing that such rate is below the statutory minimum just and reasonable rate. In a case involving a denial of access, the utility shall have the burden of proving that the denial was lawful, once a prima facie case is established by the complainant.

(b) The Commission shall determine whether the rate, term or condition complained of is just and reasonable. For the purposes of this paragraph, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way. The Commission shall exclude from actual capital costs those reimbursements received by the utility from cable operators and telecommunications carriers for non-recurring costs.

(c) The Commission shall deny the complaint if it determines that the complainant has not established a prima facie case, or that the rate, term or condition is just and reasonable, or that the denial of access was lawful.

(d) The Commission will apply the following formulas for determining a maximum just and reasonable rate:

(1) The following formula shall apply to attachments to poles by cable operators providing cable services. This formula shall also apply to attachments to poles by any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) or cable operator providing telecommunications services until February 8,

19

2001:

$$\frac{Maximum}{Rate} = Space\ Factor \times \frac{Net\ \text{Cost of}}{a\ \text{Bare Pole}} \times \frac{Carrying}{\text{Charge Rate}}$$

$$\text{Where } Space\ Factor = \frac{\text{Space Occupied by Attachment}}{Total\ \text{Usable Space}}$$

(2) With respect to attachments to poles by any telecommunications carrier or cable operator providing telecommunications services, the maximum just and reasonable rate shall be the higher of the rate yielded by paragraphs (d)(2)(i) or (d)(2)(ii) of this section.

(i) The following formula applies to the extent that it yields a rate higher than that yielded by the applicable formula in paragraph (d)(2)(ii) of this section:

Rate = Space Factor x Cost

Where Cost

in Service Areas where the number of Attaching Entities is 5 = 0.66 x (Net Cost of a Bare Pole x Carrying Charge Rate)

in Service Areas where the number of Attaching Entities is 4 = 0.56 x (Net Cost of a Bare Pole x Carrying Charge Rate)

in Service Areas where the number of Attaching Entities is 3 = 0.44 x (Net Cost of a Bare Pole x Carrying Charge Rate)

in Service Areas where the number of Attaching Entities is 2 = 0.31 x (Net Cost of a Bare Pole x Carrying Charge Rate)

in Service Areas where the number of Attaching Entities is not a whole number = N x (Net Cost of a Bare Pole x Carrying Charge Rate), where N is interpolated from the cost allocator associated with the nearest whole numbers above and below the number of Attaching Entities.

$$\text{Where Space Factor} = \left[ \frac{\left( \frac{\text{Space}}{\text{Occupied}} \right) + \left( \frac{2}{3} \times \frac{\text{Unusable Space}}{\text{No. of Attaching Entities}} \right)}{\text{Pole Height}} \right]$$

(ii) The following formula applies to the extent that it yields a rate higher than that yielded by the applicable formula in paragraph (d)(2)(i) of this section:

$$\text{Rate} = \text{Space Factor} \times \text{Net Cost of a Bare Pole} \times \left[ \frac{\text{Maintenance and Administrative}}{\text{Carrying Charge Rate}} \right]$$

$$\text{Where Space Factor} = \left[ \frac{\left( \frac{\text{Space}}{\text{Occupied}} \right) + \left( \frac{2}{3} \times \frac{\text{Unusable Space}}{\text{No. of Attaching Entities}} \right)}{\text{Pole Height}} \right]$$

21

(3) The following formula shall apply to attachments to conduit by cable operators and telecommunications carriers:

$$\begin{array}{c}\text{\textit{Maximum}}\\ \text{\textit{Rate} per}\\ \text{\textit{Linear} ft./m.}\end{array} = \underbrace{\left[\frac{1}{\text{\textit{Number} of Ducts}} \times \frac{1\,\text{Duct}}{\text{\textit{No.} of Inner Ducts}}\right]}_{\text{(Percentage of Conduit Capacity)}} \times \underbrace{\left[\frac{\text{\textit{No.} of}}{\text{Ducts}} \times \frac{\text{\textit{Net} Conduit Investment}}{\text{System Duct Length (ft./m.)}}\right]}_{\text{(Net Linear Cost of a Conduit)}} \times \begin{array}{c}\text{Carrying}\\ \text{Charge}\\ \text{Rate}\end{array}$$

simplified as:

$$\begin{array}{c}\text{\textit{Maximum Rate}}\\ \text{Per \textit{Linear} ft./m.}\end{array} = \frac{1\,\text{Duct}}{\text{\textit{No.} of Inner Ducts}} \times \frac{\text{\textit{Net} Conduit Investment}}{\text{System Duct Length (ft./m.)}} \times \begin{array}{c}\text{Carrying}\\ \text{Charge}\\ \text{Rate}\end{array}$$

(4) If no inner-duct is installed the fraction, "1 Duct divided by the No. of Inner–Ducts" is presumed to be ½.

(e) A price cap company, or a rate-of-return carrier electing to provide service pursuant to § 61.50 of this chapter, that opts-out of part 32 of this chapter may calculate attachment rates for its poles, ducts, conduits, and rights of way using either part 32 accounting data or GAAP accounting data. A company using GAAP accounting data to compute rates to attach to its poles, ducts, conduits, and rights of way in any of the first twelve years after opting-out must adjust (increase or decrease) its annually computed GAAP–based rates by an Implementation Rate Difference for each of the remaining years in the period. The Implementation Rate Difference means the difference between attachment rates calculated by the carrier under part 32 and under GAAP as of the last full year preceding the carrier's initial opting-out of part 32 USOA accounting requirements.

22

## 47 C.F.R. § 1.1407

(a) If the Commission determines that the rate, term, or condition complained of is not just and reasonable, it may prescribe a just and reasonable rate, term, or condition and may:

    (1) Terminate the unjust and/or unreasonable rate, term, or condition;

    (2) Substitute in the pole attachment agreement the just and reasonable rate, term, or condition established by the Commission; and/or

    (3) Order a refund, or payment, if appropriate. The refund or payment will normally be the difference between the amount paid under the unjust and/or unreasonable rate, term, or condition and the amount that would have been paid under the rate, term, or condition established by the Commission, plus interest, consistent with the applicable statute of limitations.

(b) If the Commission determines that access to a pole, duct, conduit, or right-of-way has been unlawfully denied or delayed, it may order that access be permitted within a specified time frame and in accordance with specified rates, terms, and conditions.

## 47 C.F.R. § 1.1409 (Current)

(a) With respect to the formula referenced in § 1.1406(d)(2), a utility shall apportion the cost of providing unusable space on a pole so that such apportionment equals two-thirds of the costs of providing unusable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

(b) All attaching entities attached to the pole shall be counted for purposes of apportioning the cost of unusable space.

(c) Utilities may use the following rebuttable presumptive averages when calculating the number of attaching entities with respect to the formula referenced in § 1.1406(d)(2). For non-urbanized service areas (under 50,000 population), a presumptive average number of attaching entities of three. For urbanized service areas (50,000 or higher population), a presumptive average number of attaching entities of five. If any part of the utility's service area within the state has a designation of urbanized (50,000 or higher population) by the Bureau of Census, United States Department of Commerce, then all of that service area shall be designated as urbanized for purposes of determining the presumptive average number of attaching entities.

(d) A utility may establish its own presumptive average number of attaching entities for its urbanized and non-urbanized service area as follows:

(1) Each utility shall, upon request, provide all attaching entities and all entities seeking access the methodology and information upon which the utilities presumptive average number of attachers is based.

(2) Each utility is required to exercise good faith in establishing and updating its presumptive average number of attachers.

24

(3) The presumptive average number of attachers may be challenged by an attaching entity by submitting information demonstrating why the utility's presumptive average is incorrect. The attaching entity should also submit what it believes should be the presumptive average and the methodology used. Where a complete inspection is impractical, a statistically sound survey may be submitted.

(4) Upon successful challenge of the existing presumptive average number of attachers, the resulting data determined shall be used by the utility as the presumptive number of attachers within the rate formula.

# 47 C.F.R. § 1.1409 (2011)

(a) In its consideration of the complaint, response, and reply, the Commission may take notice of any information contained in publicly available filings made by the parties and may accept, subject to rebuttal, studies that have been conducted. The Commission may also request that one or more of the parties make additional filings or provide additional information. Where one of the parties has failed to provide information required to be provided by these rules or requested by the Commission, or where costs, values or amounts are disputed, the Commission may estimate such costs, values or amounts it considers reasonable, or may decide adversely to a party who has failed to supply requested information which is readily available to it, or both.

(b) The complainant shall have the burden of establishing a prima facie case that the rate, term, or condition is not just and reasonable or that the denial of access violates 47 U.S.C. § 224(f). If, however, a utility argues that the proposed rate is lower than its incremental costs, the utility has the burden of establishing that such rate is below the statutory minimum just and reasonable rate. In a case involving a denial of access, the utility shall have the burden of proving that the denial was lawful, once a prima facie case is established by the complainant.

(c) The Commission shall determine whether the rate, term or condition complained of is just and reasonable. For the purposes of this paragraph, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(d) The Commission shall deny the complaint if it determines that the complainant has not established a prima facie case, or that the rate, term or condition is just and reasonable, or that the denial of access was lawful.

26

(e) When parties fail to resolve a dispute regarding charges for pole attachments and the Commission's complaint procedures under Section 1.1404 are invoked, the Commission will apply the following formulas for determining a maximum just and reasonable rate:

(1) The following formula shall apply to attachments to poles by cable operators providing cable services. This formula shall also apply to attachments to poles by any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) or cable operator providing telecommunications services until February 8, 2001:

$$\text{Maximum Rate} = \text{Space Factor} \times \text{Net Cost of a Bare Pole} \times \text{Carrying Charge Rate}$$

$$\text{Where Space Factor} = \frac{\text{Space Occupied by Attachment}}{\text{Total Usable Space}}$$

(2) Subject to paragraph (f) of this section the following formula shall apply to attachments to poles by any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) or cable operator providing telecommunications services beginning February 8, 2001:

$$\text{Maximum Rate} = \text{Space Factor} \times \text{Net Cost of a Bare Pole} \times \begin{bmatrix} \text{Carrying} \\ \text{Charge} \\ \text{Rate} \end{bmatrix}$$

$$\text{Where Space Factor} = \frac{\left[ \left( \begin{array}{c} \text{Space} \\ \text{Occupied} \end{array} \right) + \left( \frac{2}{3} \times \frac{\text{Unusable Space}}{\text{No. of Attaching Entities}} \right) \right]}{\text{Pole Height}}$$

(2) With respect to attachments to poles by any telecommunications carrier or cable operator providing telecommunications services, the maximum just and reasonable rate shall be the higher of the rate yielded by paragraphs (e)(2)(i) or (e)(2)(ii) of this section.

27

(i) The following formula applies to the extent that it yields a rate higher than that yielded by the applicable formula in paragraph 1.1409(e)(2)(ii) of this section:

Rate = Space Factor x Cost

Where Cost

in Urbanized Service Areas = 0.66 x (Net Cost of a Bare Pole x Carrying Charge Rate)

in Non–Urbanized Service Areas = 0.44 x (Net Cost of a Bare Pole x Carrying Charge Rate).

$$\text{Where Space Factor} = \left[ \frac{\left( \begin{array}{c} \text{Space} \\ \text{Occupied} \end{array} \right) + \left( \frac{2}{3} \times \frac{\text{Unusable Space}}{\text{No. of Attaching Entities}} \right)}{\text{Pole Height}} \right]$$

(ii) The following formula applies to the extent that it yields a rate higher than that yielded by the applicable formula in paragraph 1.1409(e)(2)(i) of this section:

$$\text{Rate} = \text{Space Factor} \times \text{Net Cost of a Bare Pole} \times \left[ \begin{array}{c} \text{Maintenance and Administrative} \\ \text{Carrying Charge Rate} \end{array} \right]$$

$$\text{Where Space Factor} = \left[ \frac{\left( \begin{array}{c} \text{Space} \\ \text{Occupied} \end{array} \right) + \left( \frac{2}{3} \times \frac{\text{Unusable Space}}{\text{No. of Attaching Entities}} \right)}{\text{Pole Height}} \right]$$

(3) The following formula shall apply to attachments to conduit by cable operators and telecommunications carriers:

$$\begin{matrix}\text{Maximum}\\\text{Rate per}\\\text{Linear ft./m.}\end{matrix} = \underbrace{\left[\frac{1}{\text{Number of Ducts}} \times \frac{1 \text{ Duct}}{\text{No. of Inner Ducts}}\right]}_{\text{(Percentage of Conduit Capacity)}} \times \underbrace{\left[\begin{matrix}\text{No. of}\\\text{Ducts}\end{matrix} \times \frac{\text{Net Conduit Investment}}{\text{System Duct Length (ft./m.)}}\right]}_{\text{(Net Linear Cost of a Conduit)}} \times \begin{matrix}\text{Carrying}\\\text{Charge}\\\text{Rate}\end{matrix}$$

simplified as:

$$\begin{matrix}\text{Maximum Rate}\\\text{Per Linear ft./m.}\end{matrix} = \frac{1 \text{ Duct}}{\text{No. of Inner Ducts}} \times \frac{\text{Net Conduit Investment}}{\text{System Duct Length (ft./m.)}} \times \begin{matrix}\text{Carrying}\\\text{Charge}\\\text{Rate}\end{matrix}$$

If no inner-duct is installed the fraction, "1 Duct divided by the No. of Inner–Ducts" is presumed to be ½.

(f) Paragraph (e)(2) of this section shall become effective February 8, 2001 (i.e., five years after the effective date of the Telecommunications Act of 1996). Any increase in the rates for pole attachments that results from the adoption of such regulations shall be phased in over a period of five years beginning on the effective date of such regulations in equal annual increments. The five-year phase-in is to apply to rate increases only. Rate reductions are to be implemented immediately. The determination of any rate increase shall be based on data currently available at the time of the calculation of the rate increase.

## 47 C.F.R. § 1.1410 (Current)

With respect to the formulas referenced in § 1.1406(d)(1) and (d)(2), the space occupied by an attachment is presumed to be one foot. The amount of usable space is presumed to be 13.5 feet. The amount of unusable space is presumed to be 24 feet. The pole height is presumed to be 37.5 feet. These presumptions may be rebutted by either party.

## 47 C.F.R. § 1.1410 (2011)

If the Commission determines that the rate, term, or condition complained of is not just and reasonable, it may prescribe a just and reasonable rate, term, or condition and may:

(a) If the Commission determines that the rate, term, or condition complained of is not just and reasonable, it may prescribe a just and reasonable rate, term, or condition and may:

    (1) Terminate the unjust and/or unreasonable rate, term, or condition;

    (2) Substitute in the pole attachment agreement the just and reasonable rate, term, or condition established by the Commission;

    (3) Order a refund, or payment, if appropriate. The refund or payment will normally be the difference between the amount paid under the unjust and/or unreasonable rate, term, or condition and the amount that would have been paid under the rate, term, or condition established by the Commission, plus interest, consistent with the applicable statute of limitations; and

(b) If the Commission determines that access to a pole, duct, conduit, or right-of-way has been unlawfully denied or delayed, it may order that access be permitted within a specified time frame and in accordance with specified rates, terms, and conditions.

(c) Order a refund, or payment, if appropriate. The refund or payment will normally be the difference between the amount paid under the unjust and/or unreasonable rate, term, or condition and the amount that would have been paid under the rate, term, or condition established by the Commission from the date that the complaint, as acceptable, was filed, plus interest.

## 47 C.F.R. § 1.1413

(a) A complaint by an incumbent local exchange carrier (as defined in 47 U.S.C. 251(h)) or an association of incumbent local exchange carriers alleging that it has been denied access to a pole, duct, conduit, or right-of-way owned or controlled by a local exchange carrier or that a utility's rate, term, or condition for a pole attachment is not just and reasonable shall follow the same complaint procedures specified for other pole attachment complaints in this part.

(b) In complaint proceedings challenging utility pole attachment rates, terms, and conditions for pole attachment contracts entered into or renewed after the effective date of this section, there is a presumption that an incumbent local exchange carrier (or an association of incumbent local exchange carriers) is similarly situated to an attacher that is a telecommunications carrier (as defined in 47 U.S.C. 251(a)(5)) or a cable television system providing telecommunications services for purposes of obtaining comparable rates, terms, or conditions. In such complaint proceedings challenging pole attachment rates, there is a presumption that incumbent local exchange carriers (or an association of incumbent local exchange carriers) may be charged no higher than the rate determined in accordance with § 1.1406(d)(2). A utility can rebut either or both of the two presumptions in this paragraph (b) with clear and convincing evidence that the incumbent local exchange carrier receives benefits under its pole attachment agreement with a utility that materially advantages the incumbent local exchange carrier over other telecommunications carriers or cable television systems providing telecommunications services on the same poles.

## 47 C.F.R. § 1.1424 (2011)

Complaints by an incumbent local exchange carrier (as defined in 47 U.S.C. 251(h)) or an association of incumbent local exchange carriers alleging that a rate, term, or condition for a pole attachment is not just and reasonable shall follow the same complaint procedures specified for other pole attachment complaints in this Part, as relevant. In complaint proceedings where an incumbent local exchange carrier (or an association of incumbent local exchange carriers) claims that it is similarly situated to an attacher that is a telecommunications carrier (as defined in 47 U.S.C. 251(a)(5)) or a cable television system for purposes of obtaining comparable rates, terms or conditions, the incumbent local exchange carrier shall bear the burden of demonstrating that it is similarly situated by reference to any relevant evidence, including pole attachment agreements. If a respondent declines or refuses to provide a complainant with access to agreements or other information upon reasonable request, the complainant may seek to obtain such access through discovery. Confidential information contained in any documents produced may be subject to the terms of an appropriate protective order.