CASE NOS. 22-2220(L), 23-1096          PUBLIC

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

DUKE ENERGY PROGRESS, LLC,

*Petitioner/Intervenor*

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents,*

BELLSOUTH TELECOMMUNICATIONS, LLC,
d/b/a AT&T North Carolina, d/b/a AT&T South Carolina

*Intervenor/Petitioner,*

ON APPEAL FROM THE FEDERAL COMMUNICATIONS COMMISSION

## PUBLIC PAGE-PROOF
## RESPONSE/REPLY BRIEF OF PETITIONER/INTERVENOR

Eric B. Langley
Robin F. Bromberg
R. Rylee Zalanka
LANGLEY & BROMBERG LLC
2700 US Highway 280, Suite 350E
Birmingham, AL 35223
205-783-5750

*Counsel for Petitioner/Intervenor*
*Duke Energy Progress, LLC*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................iv

GLOSSARY ..............................................................................................ix

SUMMARY OF THE ARGUMENT .........................................................1

ARGUMENT ............................................................................................4

I.    By Retroactively Applying a New Legal Standard to AT&T's
      Claim for Refunds under the *2011 Order*, the FCC Acted
      Arbitrarily, Capriciously, and Otherwise Contrary to Law.......................4

      A. Despite the FCC's and AT&T's Claims to the Contrary, the
         FCC Adopted a New Standard by Refusing to Follow the *2011
         Order* and *Verizon Florida*..................................................................4

         1. *The FCC Adopted a New Standard When It Applied the 2011
            Order's Legal Standard for "New" Agreements to the
            Parties' "Existing" Agreement.*.........................................................4

         2. *The FCC Adopted a New Standard When It Disregarded
            Verizon Florida and Threw Its Enforcement Bureau Under
            the Bus.*...............................................................................................7

            a. Inapposite Case Law Does Not Justify the FCC's
               Departure from *Verizon Florida* .................................................8

      B. The FCC and AT&T Have Failed to Identify a Reasoned
         Explanation for the FCC's Departure from the Legal Standard
         for "Existing" Agreements, as Established by the *2011 Order*
         and *Verizon Florida*............................................................................13

      C. The FCC and AT&T Have Not Shown that Retroactively
         Applying the *2011 Order's* Legal Standard for "New"
         Agreements to the Parties' "Existing" Agreement Is
         Permissible under *RWDSU*..................................................................18

i

II.   The FCC Acted Arbitrarily and Capriciously by Assigning the Cost of the Communication Worker Safety Zone to Duke Because That Space Would Not Exist on Duke's Poles but for the Presence of AT&T and Other Communications Attachers. ........................24

   A. The FCC's and AT&T's Position is Neither Logical nor Based Upon "Settled Precedent."................................................................24

   B. The FCC is Neither Bound by its Prior Interpretation of the Phrase "Space Occupied" nor did Duke Waive this Argument. .........27

   C. There is No Evidence to Suggest that the Communication Worker Safety Zone is Either "Used" by Duke or "Unusable" by AT&T. ......................................................................................30

III.  The FCC's Exercise of Jurisdiction Over the Rates AT&T Pays Duke Is *Ultra Vires* and Arbitrary and Capricious Given the FCC's Inability to Adjust the Rate Duke Pays AT&T. .......................................32

   A. Issue Preclusion Does Not Bar Duke's Claim. ...................................32

   B. The FCC's and AT&T's Arguments Reinforce that the FCC Should Not Assert Jurisdiction Over the Rates AT&T Pays Duke Where It Lacks Jurisdiction over the Rates Duke Pays AT&T. ......................................................................................39

      1. *Duke Did Not Waive This Argument.* ..............................................39

      2. *The FCC's Acknowledgment that it Lacks Jurisdiction Over the Rates Duke Pays AT&T Crystalizes the FCC's Lack of Statutory Authority over This Dispute.* ..........................................40

      3. *The FCC's Post-Hoc Attempt to Fill the Regulatory Gap is Unavailing.*....................................................................................41

IV.   The FCC Correctly Held that the Joint Use Agreement Provided AT&T with Net Material Advantages and Correctly Adopted the ■ Average Attaching Entities Input. ...................................................45

A. The FCC Correctly Determined that AT&T was not Entitled to the New Telecom Rate ........................................................................ 45

B. The FCC Correctly Adopted ⬛ as the Average Attaching Entities Input to the Old Telecom Rate. ............................................... 49

CONCLUSION ................................................................................................. 51

CERTIFICATE OF COMPLIANCE ........................................................... 53

ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*AFGE, Local 2924 v. FLRA*,
    470 F.3d 375 (D.C. Cir. 2006) ......................................................... 26

*Allen v. Zurich Ins. Co.*,
    667 F.2d 1162 (4th Cir. 1982) ....................................................... 33

*American Electric Power Service Corp. v. FCC*,
    708 F.3d 183 (D.C. Cir. 2013) .................................................. *passim*

*Amor Family Broadband Group v. FCC*,
    918 F.2d 960 (D.C. Cir. 1990) .......................................... 10, 11, 12

*ANR Storage Co. v. FERC*,
    904 F.3d 1020 (D.C. Cir. 2018) ..................................................... 28

*ARA Servs. v. NLRB*,
    71 F.3d 129 (4th Cir. 1995) ........................................................... 19

*Atlantic Richfield Co. v. DOE*,
    769 F.2d 771 (D.C. Cir. 1984) ...................................................... 30

*Avail Vapor, LLC v. FDA*,
    55 F.4th 409 (4th Cir. 2022) ......................................................... 16

*Barlow v. Collins*,
    397 U.S. 159 (1970) ...................................................................... 29

*Cassell v. FCC*,
    154 F.3d 478 (D.C. Cir. 1998) ................................................ 19, 23

*CentraArchy Restaurant Management Co. v. Angelo*,
    806 F. App'x 176 (4th Cir. 2020) ............................................. 32-33

*City of Portland v. United States*,
    969 F.3d 1020 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2855 (2021) .............. 33

*Clark-Cowlitz Joint Operating Agency v. FERC*,
    826 F.2d 1074 (D.C. Cir. 1987) .................................................... 22

*Comcast Corp. v. FCC*,
    526 F.3d 763 (D.C. Cir. 2008) ........................................... 9, 10, 11

*Consol Buchanan Mining Co. v. Sec'y of Labor*,
　841 F.3d 642 (4th Cir. 2016) ............................................................. 16

*Conway Corp. v. Fed. Power Com.*,
　510 F.2d 1264 (D.C. Cir. 1975) ...................................................... 39, 41

*Encino Motorcars, LLC v. Navarro*,
　579 U.S. 211 (2016) ...................................................................... 13, 23

*FCC v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009) ................................................................ 13, 14-15

*Gamefly, Inc. v. Postal Regulatory Comm'n*,
　704 F.3d 145 (D.C. Cir. 2013) ............................................................. 26

*Gulf Power Co. v. FCC*,
　669 F.3d 320 (D.C. Cir. 2012) ............................................................. 37

*Midtec Paper Corp. v. United States*,
　857 F.2d 1487 (D.C. Cir. 1988) ......................................................... 37

*Mozilla Corp. v. FCC*,
　940 F.3d 1 (D.C. Cir. 2019) ................................................................ 43

*Nat'l Res. Def. Council v. EPA*,
　824 F.2d 1146 (D.C. Cir. 1987) ..................................................... 29, 40

*Qwest Corp. v. FCC*,
　252 F.3d 462 (D.C. Cir. 2001) ....................................................... 36, 37

*Retail, Wholesale & Dep't Store Union v. NLRB*,
　466 F.2d 380 (D.C. Cir. 1972) ............................................... 18, 19, 23

*SNR Wireless LicenseCo, LLC v. FCC*,
　868 F.3d 1021 (D.C. Cir. 2017) ..................................................... 8, 9, 11

*Sorenson Communications, Inc. v. FCC*,
　765 F.3d 37 (D.C. Cir. 2014) .............................................................. 36

*United States v. Hoechst Celanese Corp.*,
　128 F.3d 216 (4th Cir. 1997) ......................................................... 15-16

*Vernal Enters., Inc. v. FCC*,
　355 F.3d 650 (D.C. Cir. 2004) ..................................................... 8, 9, 11

v

*W. Va. by McGraw v. HHS*,
No. 2:97-0245, 1999 U.S. Dist. LEXIS 20568 (S.D.W. Va. Mar. 31, 1999) ... 29

*Yamaha Corp. of Am. v. United States*,
961 F.2d 245 (D.C. Cir. 1992) .......................................................... 35

## Statutes

47 U.S.C. § 155 ................................................................................. 11

47 U.S.C. § 224 ............................................................................. *passim*

## FCC Authority

*Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment,* Third Report and Order and Declaratory Ruling, WC Docket No. 17-84, WT Docket No. 17-79, 33 FCC Rcd 7705 (Aug. 3, 2018) (hereinafter, "*2018 Order*") ...........................................12

*Adoption of Rules for the Regulation of Cable Television Pole Attachments*, First Report and Order, CC Docket No. 78-114, 68 F.C.C.2d 1585 (Aug. 11, 1978) ("*1978 Order*") ...........................................12

*Adoption of Rules for the Regulation of Cable Television Pole Attachments*, Memorandum Opinion and Order, CC Docket No. 78-144, 77 F.C.C.2d 187 (Mar. 10, 1980) ("*1980 Order*") ...........................................26

*Amendment of Rules and Policies Governing Pole Attachments*, Report and Order, CS Docket No. 97-98, 15 FCC Rcd 6453 (Apr. 3, 2000) ("*2000 Order*") ...........................................24, 25, 26

*BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Florida Power & Light Co.*, Memorandum Opinion and Order, Proceeding No. 19-187, Bureau ID No. EB-19-MD-006, 35 FCC Rcd 5321 (May 20, 2020) ("*Florida Power & Light*") ...........................................13, 25

*BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Duke Energy Florida, LLC*, Memorandum Opinion and Order, Proceeding No. 20-276, Bureau ID No. EB-20-MD-003, 2021 FCC LEXIS 3240 (Aug. 27, 2021) ("*Duke Energy Florida*") ......................................................................25

*Comcast Corporation; Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules; Implementation of Section 304 of the Telecommunications Act of 1996; Commercial Availability of Navigation Devices; Application for Review*, Memorandum Opinion and Order, CSR-7012-Z, CS Docket No. 97-80, 22 FCC Rcd 17113 (Sep. 4, 2007) ("*In re Comcast Corp.*") ..............................................................................10

*Consolidated Requests for Waiver of Section 76.1204(a)(1) of the Commission's Rules; Implementation of Section 304 of the Telecommunications Act of 1996; Commercial Availability of Navigation Devices*, Memorandum Opinion and Order, CS Docket No. 97-80, 22 FCC Rcd 11780 (Jun. 29, 2007) ("*Consolidated Request for Waiver*") ........................10

*Fee Decisions of the Managing Director Available to the Public*, Public Notice, Release No. DA 00-275 15 FCC Rcd 2826, 2829 (Feb. 14, 2000) (*"Fee Decisions"*) ......................................................................9

*Implementation of Section 224 of the Act; Nat'l Broadband Plan*, Order on Reconsideration, WC Docket No. 07-245, GN Docket No. 09-51, 30 FCC Rcd 13731 (Nov. 24, 2015) ("*2015 Order*") ..........................................50

*Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*, Report and Order and Order on Reconsideration, WC Docket No. 07-245, GN Docket No. 09-51, 26 FCC Rcd 5240 (Apr. 7, 2011) ("*2011 Order*") ...............................................................................passim

*Verizon Florida LLC v. Florida Power & Light Company*, Memorandum Opinion and Order, Docket No. 14-216, File No. EB-14-MD-003, 30 FCC Rcd 1140 (Feb. 11, 2015) ("*Verizon Florida*") ................................................passim

*Verizon Maryland LLC v. Potomac Edison Co.*, Memorandum Opinion and Order, Proceeding No. 19-355, Bureau ID No. EB-19-MD-009, 35 FCC Rcd 13607 (Nov. 23, 2020) ("*Verizon Maryland*") ......................................13

*Verizon Maryland LLC v. Potomac Edison Co.*, Order on Reconsideration, Proceeding No. 19-355, Bureau ID No. EB-19-MD-009, 2022 FCC LEXIS 4280 (Mar. 31, 2022) ("*Verizon Maryland Reconsideration Order*") ....................23

*Verizon Virginia, LLC v. Virginia Electric and Power Company d/b/a Dominion Virginia Power*, Memorandum Opinion and Order, Proceeding No. 15-190, Bureau ID No. EB-15-MD-006, 32 FCC Rcd 3750 (May 1, 2017) ("*Verizon Virginia*") ..........................................................................6, 13, 37

## Other Authorities

47 C.F.R. § 1.117 ........................................................................... 11

47 C.F.R. § 1.1406 ........................................................................ 50

Merriam-Webster Dictionary ............................................... 22

Institute of Electrical and Electronics Engineers, Inc., 2017 NESC Handbook, Premier Edition (2016) ........................................24, 31, 32

Institute of Electrical and Electronics Engineers, Inc., National Electrical Safety Code (2017 ed.) ...........................................24

# **GLOSSARY**

| | |
|---|---|
| Act | This term refers to the Pole Attachments Act, 47 U.S.C. § 224, as amended. |
| Answer | This term refers to the November 13, 2020 answer that Duke filed with the FCC in response to AT&T's complaint. |
| AT&T | This term refers to BellSouth Telecommunications, LLC d/b/a AT&T North Carolina and AT&T South Carolina. AT&T was the complainant in the proceeding below, an intervenor in Proceeding No. 22-2220 and the petitioner in Proceeding No. 23-1096. |
| CATV | This term refers to a cable television system. Originally, the Act applied only to attachments made by CATVs to poles owned by telephone and electric utilities. |
| CLEC | This term refers to competitive local exchange carriers (i.e., non-ILEC telecommunications carriers). |
| Communication Worker Safety Zone | This term comes from the NESC and refers to the separation space (typically 40") required between the lowest electric facility and the highest communications attachment on a pole. |
| Complaint | This term refers to the pole attachment complaint that AT&T filed with the FCC on September 1, 2020. The Complaint alleges, inter alia, that the rate AT&T pays for using Duke's poles is not "just and reasonable." |
| Duke | This term refers to Duke Energy Progress, LLC. Duke is the petitioner in Proceeding No. 22-2220 and an intervenor in Proceeding No. 23-1096. |
| EB Order | The September 21, 2021 memorandum opinion and order issued by the FCC's Enforcement Bureau in the complaint proceeding underlying this appeal. |
| FCC | This term refers to the Federal Communications Commission. |
| ILEC | This term refers to an incumbent local exchange carrier, as defined by 47 U.S.C. § 251(h). ILECs are, in essence, the legacy telephone companies and include the former Bell telephone companies, such as AT&T. |
| NESC | National Electrical Safety Code, Institute of Electrical and Electronics Engineers, Inc. (2017). |
| New Telecom Rate | The annual pole attachment rate applicable to attachments made by non-ILEC telecommunications carriers, pursuant to 47 |

| | U.S.C. § 224(e), for the period following the effective date of the *2011 Order*. |
|---|---|
| Old Telecom Rate | The annual pole attachment rate applicable to attachments made by non-ILEC telecommunications carriers, pursuant to 47 U.S.C. § 224(e), for the period preceding the effective date of the *2011 Order*. The Old Telecom Rate is higher than the New Telecom Rate. |
| Order | The November 17, 2022 order on reconsideration and review entered by the FCC in the complaint proceeding underlying this appeal. |

## SUMMARY OF THE ARGUMENT

**Retroactivity Issue:** The FCC's and AT&T's argument that the FCC did not retroactively apply a new legal standard in this case proves the FCC, in fact, retroactively applied a new legal standard. The FCC and AT&T both defend the Order on grounds that it applied the *2011 Order's* legal standard for "new" agreements to the parties' "existing" agreement even though the *2011 Order* unambiguously established separate standards for "new" and "existing" agreements. The FCC and AT&T also attempt to explain away the FCC's disregard of *Verizon Florida* by claiming the FCC is never bound by its staff-level decisions. However, the case law cited by the FCC and AT&T for this proposition is inapposite, as the staff-level decisions in those cases are substantively and contextually distinguishable from *Verizon Florida*. Finally, the FCC and AT&T failed to show that it was permissible to give retroactive effect to the new legal standard.

**Communication Worker Safety Zone Issue:** The FCC and AT&T argue that the FCC's decision to allocate the entire cost of the communication worker safety zone to Duke is reasonable and based on "settled precedent." Untrue. As its name implies, and as the undisputed evidence shows, the communication worker safety zone would not exist on Duke's poles if there were no communication attachments present. This undisputed evidence illustrates the illogic of the "settled precedent" upon which the FCC and AT&T rely. The context of the "settled precedent" also

undermines their argument in that the "settled precedent" was developed in the bygone era when ILECs and electric utilities shared the cost of this space through joint use agreements like the agreement at issue here. Finally, the FCC erroneously found that it was constrained by its prior interpretation of the phrase "space occupied" in Section 224(d) when it analyzed AT&T's space allocation under Section 224(e) (which, unlike Section 224(d), does not use the term "space occupied"). Instead of meaningfully addressing this statutory distinction, the FCC and AT&T attempt to avoid it by arguing waiver. But waiver is not appropriate because the language of Section 224(e) is an issue the FCC either considered, or should have considered, when implementing a Section 224(e) rate for AT&T.

**Jurisdictional Issue:** The FCC and AT&T argue that the D.C. Circuit has already determined that Section 224 provides it with the authority to regulate AT&T's attachments to Duke's poles, and that issue preclusion bars Duke from raising a jurisdictional challenge in this forum. The FCC and AT&T are wrong on both counts. Unlike the jurisdictional challenge litigated in the D.C. Circuit, which presented a facial challenge based on the black letter of Section 224, Duke has asserted an as-applied challenge in this proceeding that raises an entirely different issue: whether the FCC's assertion of jurisdiction over the parties' joint use agreement is *ultra vires* or arbitrary and capricious where the FCC cannot exercise jurisdiction over the rates Duke pays AT&T. The FCC has adjusted the rate AT&T

pays Duke from approximately $█ pole to $█ pole, but it has not adjusted (because it cannot adjust) the $█/pole rate that Duke pays for access to 31,000 AT&T poles. As it did in the underlying Order, the FCC's brief all but concedes that it lacks jurisdiction over the rate Duke pays AT&T. Without this authority, the FCC can attempt to nudge the parties towards a negotiated resolution, but it cannot adjudicate this dispute to an actual conclusion. The "regulatory gap" presented here not only overcomes issue preclusion but also defeats the basis for FCC jurisdiction over this dispute.

**AT&T's Challenges to the Order:** Notwithstanding AT&T's three "weight of the evidence" arguments to the contrary, the FCC's finding that the joint use agreement provides AT&T with material advantages was well supported by both the record and the law. The FCC also correctly adopted █ as the average number of attaching entities for purposes of calculating AT&T's new rate. AT&T does not dispute the accuracy of this figure but nevertheless argues that it was unfair for the FCC to adopt a value of █ average attaching entities for purposes of AT&T's rate when Duke uses a different input for calculating the New Telecom Rate for other attachers. AT&T's argument is much ado about nothing because the New Telecom Rate is, by design, virtually unaffected by this input.

## ARGUMENT

**I.    By Retroactively Applying a New Legal Standard to AT&T's Claim for Refunds under the *2011 Order*, the FCC Acted Arbitrarily, Capriciously, and Otherwise Contrary to Law.**

    **A. Despite the FCC's and AT&T's Claims to the Contrary, the FCC Adopted a New Standard by Refusing to Follow the *2011 Order* and *Verizon Florida*.**

        *1.  The FCC Adopted a New Standard When It Applied the 2011 Order's Legal Standard for "New" Agreements to the Parties' "Existing" Agreement.*

In arguing that the FCC did not retroactively apply a new legal standard to the portion of AT&T's claim governed by the *2011 Order*, the FCC and AT&T focus exclusively on the FCC's departure from the Enforcement Bureau's decision in *Verizon Florida*.  *See* FCC Br. at 57-60; AT&T Br. at 48-50.  However, Duke's retroactivity argument does not turn solely on *Verizon Florida*; Duke has also challenged the FCC's departure from the applicable legal standard under the *2011 Order*.  *See, e.g.,* [Petition_for_Reconsideration_pp._4-6]; Duke Br. at 22 ("Had the FCC applied the prior standard, as established under the *2011 Order* and further articulated in *Verizon Florida*, the FCC would have dismissed AT&T's claim for relief under the *2011 Order*.").

As explained in Duke's initial brief, the *2011 Order* unambiguously established separate legal standards for "new" and "existing" agreements.  With respect to "existing" agreements, the FCC expressly stated that it was "unlikely" to disturb the rates within such agreements:

4

> [W]e question the need to second guess the negotiated resolution of arrangements entered into by parties with relatively equivalent bargaining power. **Consistent with the foregoing, the Commission is unlikely to find the rates, terms and conditions in existing joint use agreements unjust or unreasonable**.

*2011 Order*, 26 FCC Rcd at 5335, ¶ 216 (emphasis added). In fact, the header in the *2011 Order* for the above-referenced quote was, "*Existing vs. New Agreements*." *Id.* at 5334, ¶ 216 (italics in original).

Because the FCC determined that ILECs no longer possessed sufficient bargaining power to secure just and reasonable rates through negotiation, *id.* at 5327, ¶ 199, the *2011 Order* established a more scrupulous standard for "new" agreements (i.e., agreements entered into after the *2011 Order*). In particular, if an ILEC with a "new" agreement could show that it was "similarly situated" to CATV and CLEC attachers, the ILEC would be entitled to the New Telecom Rate. *See id.* at 5336, ¶ 217. If, on the other hand, an ILEC with a "new" agreement was not "similarly situated" to other attachers (in other words, where the new agreement provided material benefits to the ILEC as compared to other attachers), the *2011 Order* explains that the ILEC should pay a higher rate, with the Old Telecom Rate serving as a "reference point." *Id.* at 5336-37, ¶ 218. The *2011 Order* made clear that the legal standard outlined in the preceding two sentences applied solely to "new" agreements. *Id.* at 5336, ¶ 216. Furthermore, only two decisions addressing ILEC complaints were issued during the period governed by the *2011 Order*, and both of

5

those decisions acknowledged the different legal standards for "new" and "existing" agreements under the *2011 Order*. *See Verizon Florida*, 30 FCC Rcd at 1149, ¶ 23; *Verizon Virginia*, 32 FCC Rcd at 3755, ¶ 10.

There is no dispute that the joint use agreement at issue in this case is an "existing" agreement under the *2011 Order*. Yet, in determining that AT&T was entitled to a refund for the period governed by the *2011 Order*, the FCC applied the legal standard for "new" agreements. In fact, in arguing that the "Bureau properly applied the Commission's guidance from the *2011 Order* in this case," the FCC actually demonstrates that it applied the legal standard for "new" agreements to the parties' "existing" agreement. The FCC's brief states:

> The *2011 Order* placed "the burden" on ILECs with agreements **negotiated after that order** to show that they were "similarly situated" to other attachers and thus were entitled to "comparable" rates, terms, and conditions. If an ILEC could make that showing, it would be entitled to the New Telecom Rate. But if the record showed that the agreement provided the ILEC net benefits relative to other attachers, the ILEC would be required to pay a "different rate." In that circumstance, the Commission explained, the Old Telecom Rate would be a "reference point" in determining the just and reasonable ILEC pole attachment rate.

> The Bureau properly applied the Commission's guidance from the *2011 Order* in this case. It concluded that the rate AT&T paid Duke under the parties' joint use agreement (**which is considered an "existing" agreement** for purposes of the *2011 Order*) was not just and reasonable. But it further determined that the agreement provided AT&T "material advantages" relative to other attachers on Duke's poles. The Bureau thus found that AT&T was entitled to a pole attachment rate not to exceed the Old Telecom Rate for the period covered by the *2011 Order*.

6

FCC Br. at 57-58 (internal citations omitted) (bold/underline emphasis added); *see also* AT&T Br. at 50-51 (arguing that there was no departure from the *2011 Order* because the FCC applied the Old Telecom Rate as a "reference point"). This is either a classic *non sequitur* or an admission that the FCC *did* adopt and retroactively apply the standard for "new" agreements to the to the parties' "existing" agreement.

2. *The FCC Adopted a New Standard When It Disregarded Verizon Florida and Threw Its Enforcement Bureau Under the Bus.*

As explained in Section I.A.1. *supra*, the FCC expressed great reluctance in the *2011 Order* to disturb rates within "existing" agreements. 26 FCC Rcd at 5335, ¶ 216. The Enforcement Bureau, in its *Verizon Florida* decision, accounted for the FCC's expressly stated reluctance by imposing a relatively high evidentiary standard on ILEC rate disputes involving "existing" agreements. 30 FCC Rcd at 1149-50, ¶ 24 (requiring ILECs to demonstrate the "monetary value" of the benefits they receive under "existing" agreements). There is no dispute that AT&T failed to meet its burden of proof under *Verizon Florida*. *See* [EB_Order_¶_47 ("[N]either party has provided a credible valuation of the advantages that AT&T receives under the [joint use agreement]….")]; [Order_¶_26_n.97]. But the FCC did not apply *Verizon Florida*. Instead, the FCC found that AT&T had met its burden under an entirely different standard. *See* Duke Br. at 20-21.

7

a. <u>Inapposite Case Law Does Not Justify the FCC's Departure from *Verizon Florida*.</u>

The FCC and AT&T dispute that the FCC adopted a new standard by ignoring (and later repudiating) *Verizon Florida*. They argue that, because it was issued by the Enforcement Bureau, the FCC was not bound by *Verizon Florida*. *See* FCC Br. at 59-60; AT&T Br. at 48. Their arguments rely on four cases decided by the D.C. Circuit, which generally stand for the following proposition: "an agency is not bound by the actions of its staff if the agency has not endorsed those actions." *See* FCC Br. at 59 (quoting *Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004)). An examination of the underlying staff-level decisions in the cases cited by the FCC and AT&T reveals that those cases are substantively and contextually distinguishable from *Verizon Florida*.

In *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1035-36 (D.C. Cir. 2017), the petitioners challenged the FCC's denial of their applications for "bidding credits" in a spectrum license auction, arguing that the denial was contrary to precedent because their applications were "materially identical" to applications that were recently approved by the FCC's Wireless Bureau. The Court rejected the petitioners' argument and found that the "FCC is not bound to treat the provisions of agreements filed with a pair of long-form applications, which the Wireless Bureau **administratively granted without opinion or any public statements of reasons**, as if those provisions established a Commission position from which it could not

8

deviate without reasoned explanation." *Id.* at 1037.  Essential to the Court's finding was the fact that "[e]ach of the two applications…that petitioners highlight was approved by the Bureau with a one-word action communicating that the application was 'granted'…." *See id.* at 1035.

In *Vernal Enterprises*, the petitioners challenged the FCC's denial of their request for a refund of their application fees.  355 F.3d at 653-54.  The petitioners argued that the denial constituted disparate treatment because the FCC's Office of Managing Director had recently granted an identical refund request.  *See id.* at 654. Like the staff-level decisions cited in *SNR Wireless*, the decision from the Office of Managing Director in *Vernal Enterprises* was a "one-word action" communicating that the other refund request had been granted.  *See id.* at 654 (citing *Fee Decisions*, 15 FCC Rcd at 2829 ("Request for refund of the application fees for a new FM station at Brookville, PA. **Granted**.") (emphasis in original)).  The staff-level decisions in *Vernal Enterprises* were also issued "in error" and "without authorization from the Commission."  *See id.* at 654, 661.

In *Comcast Corp. v. FCC*, 526 F.3d 763 (D.C. Cir. 2008), the petitioner challenged the denial of its waiver request, arguing, in part, that the FCC's Media Bureau had "granted waivers to several other video providers (some of which involved the exact same boxes at issue in this case)." *Id.* at 769.  The Court rejected the petitioner's challenge, holding that "an agency is not bound by the actions of its

staff if the agency has not endorsed those actions." *Id.* The staff-level decisions cited by the petitioner in *Comcast*, though, were merely a few of the many, variable decisions that the Media Bureau issued regarding this type of waiver request. *See In re Comcast Corp.*, 22 FCC Rcd at 17131-32 (McDowell, Adelstein concurring) (noting that the denial of Comcast's waiver request was merely one in a series of inconsistent Media Bureau decisions). For instance, in just one of the staff-level decisions cited by the petitioner in *Comcast*, the Media Bureau bulk-granted waiver requests for thirteen different entities. *See id.* at 17127, ¶ 20 n.99 (citing *Consolidated Requests for Waiver*, 22 FCC Rcd 11780).

In *Amor Family Broadband Group v. FCC*, 918 F.2d 960, 960-61 (D.C. Cir. 1990), the petitioner challenged the FCC's dismissal of a rulemaking petition for a radio channel allotment where no interested party filed expressions of interest within the designated timeframe (but where the petitioner filed its expression of interest six months after the comment period had closed). On appeal, the petitioner, citing two decisions wherein the FCC's Mass Media Bureau accepted late filings, argued that the dismissal deviated from FCC policy. *See id.* at 961-62. The Court rejected the petitioner's argument because, *inter alia*, the contradictory Mass Media Bureau decisions upon which the petitioner relied were released *after* the FCC's "dismissal of the case at hand." *Id.* at 962.

10

The Enforcement Bureau's decision in *Verizon Florida* stands apart from the staff-level decisions cited in *SNR Wireless, Vernal Enterprises, Comcast* and *Amor Family Broadband*.  First, *Verizon Florida* is a detailed adjudicatory opinion that was issued by the Enforcement Bureau pursuant to its delegated authority.  *See* 47 U.S.C. § 155(c)(3) ("Any order, decision, report or action made or taken pursuant to any such delegation, unless reviewed as provided in paragraph (4), shall have the same force and effect, and shall be made, evidenced, and enforced in the same manner, as orders, decisions, reports, or other actions of the Commission.").  This distinguishes *Verizon Florida* from the "one-word" decisions in *SNR Wireless* and *Vernal Enterprises*.  Furthermore, *Verizon Florida* was the first implementation of the *2011 Order's* legal standard for "existing" agreements.  It was also the only interpretative guidance that stakeholders were provided during the entire period governed by the *2011 Order*.  Therefore, unlike the staff-level decisions in *SNR Wireless*, *Vernal Enterprises*, *Comcast* and *Amor Family Broadband*, *Verizon Florida* was not just one of many variable staff-level decisions—it was the sole interpretation of the *2011 Order*.[1]  This fact also further distinguishes *Verizon*

---

[1] The circumstances surrounding *Verizon Florida* strongly suggest that the FCC endorsed the Enforcement Bureau's decision at the time it was released.  As noted above, *Verizon Florida* marked the **first time ever** that the FCC adjudicated an ILEC rate dispute.  Moreover, the issuance of the *2011 Order* was a watershed moment for the FCC, as it marked the first time the FCC asserted jurisdiction over ILEC pole attachments.  Therefore, it is reasonable to assume that the FCC paid close attention to the inaugural application of the *2011 Order*.  Moreover, the FCC had the power

*Florida* from the staff-level decision in *Amor Family Broadband*, as *Verizon Florida* was not issued after (or in conflict with) an existing FCC decision on the issue. Fundamentally, *Verizon Florida* stands apart because it was not only reasonable for stakeholders like Duke to rely upon it—it was entirely foreseeable that *Verizon Florida* would foster reliance.[2]

Because the case law cited by the FCC and AT&T is inapposite, the Court should find that the FCC's refusal to follow *Verizon Florida* in this case constitutes a departure from existing FCC policy. The FCC's attempt to disavow its Enforcement Bureau should also be rejected on policy grounds. First, the vast majority of FCC pole attachment precedent has been issued by the Enforcement Bureau (and its predecessor, the Cable Services Bureau). If bureau-level decisions are found to lack precedential value, as the FCC and AT&T contend, it will set the FCC's pole attachment framework back by decades.[3] Second, the FCC itself has

---

to modify *Verizon Florida sua sponte*. *See* 47 C.F.R. § 1.117(c). Yet, the Commission let *Verizon Florida* stand for the entire period of time governed by the *2011 Order*.

[2] For all it appears, AT&T also relied upon *Verizon Florida*. Despite its right to file a complaint since the effective date of the *2011 Order*, AT&T did not even request to renegotiate (or otherwise object) to the contract rates until *after* the effective date of the *2018 Order*. *See* [EB_Order_¶_37_n.114 (acknowledging that first notice of rate dispute was given to Duke on May 2019 (citing [Joint_Statement_6-7]))].

[3] The notion that bureau-level decisions lack precedential value is also at odds with the essence of pole attachment regulation. That is, pole attachment regulation is (and always has been) a *complaint-based* form of regulation. *See 1978 Order*, 68 F.C.C.2d at 1600, ¶ 45 (characterizing pole attachment regulation as a "complainant form of regulation"). This is particularly true with respect to the regulation of ILEC

12

liberally cited bureau-level decisions to justify its decision in this proceeding.  *See, e.g.,* [Order_¶_22_n.85 (citing Enforcement Bureau decisions in *Verizon Virginia*, *Florida Power & Light*, and *Verizon Maryland*)]; FCC Br. at 61, 71 (citing Enforcement Bureau decisions in *Verizon Maryland* and *Florida Power & Light*).  It would be patently unfair for bureau-level decisions to have precedential value when cited by the FCC, but no precedential value when cited against the FCC.

**B.  The FCC and AT&T Have Failed to Identify a Reasoned Explanation for the FCC's Departure from the Legal Standard for "Existing" Agreements, as Established by the *2011 Order* and *Verizon Florida*.**

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  There are instances, however, when a change in an agency's policy requires a more detailed justification: "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy…."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  As explained in Section I.A.1., the FCC applied the legal standard for "new" agreements to the parties' "existing" agreement.  The factual findings underpinning the legal standard for "existing" agreements contradict those underpinning the legal standard for "new" agreements.  The *2011 Order* stated:

---

pole attachments.  *See, e.g., 2011 Order*, 26 FCC Rcd at 5334, ¶ 214 ("We therefore decline at this time to adopt comprehensive rules governing [ILEC's] pole attachments, finding it more appropriate to proceed on a case-by-case basis.").

> *Existing vs. New Agreements*. The record reveals that [ILECs] frequently have access to pole attachments pursuant to joint use agreements today. Although some [ILECs] express concerns about existing joint use agreements, these long-standing agreements generally were entered into at a time when [ILECs] concede they were in a more balanced negotiating position with electric utilities, at least based on relative pole ownership. As explained above, we question the need to second guess the negotiated resolution of arrangements entered into by parties with relatively equivalent bargaining power. **Consistent with the foregoing, the Commission is unlikely to find the rates, terms and conditions in existing joint use agreements unjust or unreasonable**.

26 FCC Rcd at 5334-35, ¶ 216 (emphasis added). In stark contrast, the FCC justified a more scrupulous legal standard for "new" agreements based on its factual finding that a decline in relative ILEC pole ownership had left ILECs "in an inferior bargaining position":

> The record demonstrates that [ILECs] own fewer poles now than in the past, and this relative change in pole ownership may have left [ILECs] in an inferior bargaining position to other utilities. As a result, at least in some circumstances, market forces and independent negotiations may not be alone sufficient to ensure just and reasonable rates, terms and conditions for [ILECs] pole attachments.

*Id.* at 5327, ¶ 199. The FCC failed to reconcile these contradictory factual findings when it applied the legal standard for "new" agreements to the parties' "existing" agreement (e.g., no factual findings were made with respect to AT&T's bargaining power at the time the parties' "existing" agreement was struck). *See Fox Television Stations*, 556 U.S. at 516 ("[A] reasoned explanation is needed for disregarding

14

facts…that underlay…the prior policy.").  This omission, alone, renders the FCC's refund award under the *2011 Order* arbitrary and capricious.

Instead of acknowledging and reconciling the fact that the *2011 Order* articulated different standards for "new" and "existing" agreements, the FCC now contends that the *2011 Order* not only permits the FCC to apply the legal standard for "new" agreements to the parties' "existing" agreement, *see* FCC Br. at 62 ("[T]he *2011 Order* does not prohibit the Commission from using [the Old Telecom Rate] as a benchmark for existing agreements—it does not address that issue at all."), but also that the *2011 Order* actually provides the FCC with *more* discretion to adjust rates downward within "existing" agreements.  *See id.* at 64-65 ("[E]ven if the Old Telecom Rate is not a 'reference point' for 'existing agreements,' that just gives the Commission more discretion to set a just and reasonable pole attachment rate for an ILEC with an existing joint use agreement.").  In other words, the FCC now claims that rates within "existing" agreements are entitled to less deference than rates within "new" agreements.  This interpretation turns the *2011 Order* upside down.

If the FCC's interpretation is accepted as true, the legitimacy of the *2011 Order* itself is at stake, as it in no way provided fair notice to electric utilities of the FCC's unbridled discretion over agreements that were—in the FCC's own words— "unlikely" to be found unjust or unreasonable.  *See, e.g., United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 226 (4th Cir. 1997) ("[I]n addressing whether a party

15

has received fair notice, we look at the facts as they appear to the party entitled to notice, not to the agency."); *Consol Buchanan Mining Co., LLC v. Sec'y of Labor*, 841 F.3d 642, 650 (4th Cir. 2016) ("[A]n affirmative statement from a regulatory body empowered to implement and enforce a particular regulatory scheme may be sufficient to deprive regulated parties of clear notice of a later, conflicting interpretation."); *Avail Vapor, LLC v. FDA*, 55 F.4th 409, 423 (4th Cir. 2022) ("It is a bedrock principle of administrative law that agencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires.") (brackets in original; internal quotation marks omitted).

Notwithstanding the foregoing, AT&T and the FCC maintain that the FCC "fully explained" its decision to abdicate *Verizon Florida*. First, citing several cases from the D.C. Circuit, the FCC argues that it can "disavow without distinguishing" *Verizon Florida* because it is a non-binding, bureau-level decision. FCC Br. at 60. As explained in Section I.A.2. *supra*, however, the staff-level decisions in the cases cited by the FCC are clearly distinguishable from *Verizon Florida*. Thus, the cited authority does not shield the FCC from its obligation to provide a reasoned explanation for breaking with *Verizon Florida*.

Second, AT&T and the FCC argue that the FCC did, in fact, provide a reasoned explanation for not following *Verizon Florida*. FCC Br. at 60-61; AT&T Br. at 49-50. In particular, they point to language in the Order that states: "to the

16

extent *Verizon Florida* 'can be read to require a party in a pole attachment complaint proceeding…to quantify the value of individual benefits an [ILEC] receives under a joint use agreement, we reject that interpretation as impracticable, especially in the absence of any rules prescribing a methodology for valuing such benefits.'" FCC Br. at 61 (citing [Order ¶ 25]); AT&T Br. at 49-50. This explanation is disingenuous and inadequate. In *Verizon Florida*, the Enforcement Bureau found that, without a quantification of the "monetary value" of the benefits that an ILEC receives under an "existing" agreement, there was no way for it to determine whether the rate under an "existing" agreement is unjust or unreasonable. *See* 30 FCC Rcd at 1140-41, ¶¶ 2-3, *see also id.* at 1150, ¶ 24. This finding was dispositive of the ILEC's complaint in *Verizon Florida*—it was not, as the FCC and AT&T contend, but one possible interpretation of *Verizon Florida*. Furthermore, even assuming *arguendo* that the FCC is correct and that it is "impracticable" to require ILECs to quantify the value of benefits under "existing" agreements, this explanation does not explain how the FCC can now assess the justness and reasonableness of rates under "existing" agreements without such evidence.

Third, the FCC argues that it provided a reasoned explanation for applying the Old Telecom Rate as a "reference point" to the parties' existing agreement by: (1) pointing out that the Enforcement Bureau had previously applied the Old Telecom Rate as a "reference point" to an "existing" agreement in another proceeding; (2)

noting that the Enforcement Bureau had previously determined that the Old Telecom Rate "accounts for" the material advantages provided by "existing" agreements to ILECs; and (3) explaining that it is "more administrable to look to [the Old Telecom Rate]…than to attempt to develop…an entirely new rate" for "existing" agreements. *See* FCC Br. at 61-62; *see also* AT&T Br. at 50-51.  All of these points miss their mark because, as explained above, they fail to grapple with the contradictory factual findings underlying the *2011 Order's* separate legal standards for "new" and "existing" agreements.  Moreover, two of the FCC's three points leverage Enforcement Bureau decisions—decisions that, according to AT&T and the FCC, lack precedential value.  *See* FCC Br. at 59-60; AT&T Br. at 48.  And the third point (i.e., that the Old Telecom Rate is more administrable) is a direct quote from the *2011 Order*'s articulation of the legal standard for "new" agreements.  *See* Duke Br. at 31 ("[T]he FCC sought to explain its application of the Old Telecom Rate as a 'reference point'…on the rate charged under the parties' 'existing' agreement through liberal quotation of a portion of the *2011 Order* that established the Old Telecom Rate as a 'reference point' solely for 'new' agreements.").

### C. The FCC and AT&T Have Not Shown that Retroactively Applying the *2011 Order's* Legal Standard for "New" Agreements to the Parties' "Existing" Agreement Is Permissible under *RWDSU*.

Courts have imposed an important safeguard on the retroactive application of new rules or policies adopted through agency adjudications.  As explained in Duke's

18

opening brief, courts apply the five-factor test in *RWDSU* to determine whether retroactive application of a new rule is permissible. *See* Duke Br. at 22-27; *Retail, Wholesale & Dep't Store Union ("RWDSU") v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972); *ARA Servs. v. NLRB*, 71 F.3d 129, 135 (4th Cir. 1995) (applying *RWDSU* factors). These factors "boil down…to a question of concerns grounded in notions of equity and fairness." *Cassell v. FCC*, 154 F.3d 478, 487 (D.C. Cir. 1998).

AT&T and the FCC dispute that the FCC's refund award for the period governed by the *2011 Order* is the product of impermissible retroactivity. First, AT&T and the FCC argue that Duke has failed to identify a "settled standard" from which the FCC departed in its Order. FCC Br. at 64; AT&T Br. at 51 ("Duke has not identified a disconnect between the 2011 standard and the standard the FCC applied to [the period governed by the *2011 Order*].""). As explained in Section I.A.1 *supra*, Duke *has* identified a "settled standard" from which the FCC abruptly departed—i.e., the *2011 Order's* legal standard for "existing" agreements, as further articulated by *Verizon Florida*. This standard governed during the entire period in which electric utilities were exposed to liability under the *2011 Order*. The FCC, as it now candidly concedes in its brief, departed from this "settled standard" by applying the *2011 Order's* legal standard for "new" agreements to the parties' "existing" agreement. FCC Br. at 57-58.

19

Second, the FCC argues that, "even if *Verizon Florida* established a standard that the Commission must employ, Duke could not have reasonably assumed that it was insulated from refund liability." FCC Br. at 64; *see also* AT&T Br. at 51. In making this argument, however, the FCC overlooks the fact that no "assumptions" are necessary here. In the Order, the FCC conclusively found that AT&T failed to meet the evidentiary standard under *Verizon Florida*. *See* [Order_¶_26_n.97 ("[N]either party had provided a credible valuation of the advantages that AT&T receives under the [joint use agreement].")]. In other words, had the FCC applied the *2011 Order* as further articulated by *Verizon Florida*, Duke would have prevailed on AT&T's claim for refunds under the period governed by the *2011 Order*.

Furthermore, even assuming *arguendo* that the FCC is not bound by *Verizon Florida*, the FCC's application of the *2011 Order's* legal standard for "new" agreements *did* create a "new liability" for Duke. As explained in Section I.A.1., the *2011 Order* limited application of the Old Telecom Rate as a "reference point" to "new" agreements:

| Legal Standards under *2011 Order* | | |
|---|---|---|
| **"New" Agreement *without* Competitive Advantages** | **"New" Agreement *with* Competitive Advantages** | **"Existing" Agreement** |
| "Where [ILECs] are attaching to other utilities' poles on terms and conditions that are comparable to those that apply under our rules—competitive neutrality counsels in favor of affording [ILECs] **the same rate as the comparable provider**." *2011 Order*, 26 FCC Rcd at 5336, ¶ 217 (emphasis added). | "[W]e find it reasonable to look to **the [Old Telecom Rate] as a reference point** in complaint proceedings involving a pole owner and an [ILEC] that is not similarly situated…to a cable or telecommunications attacher." *Id.* at 5337, ¶ 218 (emphasis added). | "[W]e question the need to second guess the negotiation resolution of arrangements entered into by parties with relatively equivalent bargaining power. …[T]he Commission is **unlikely to find the rates, terms and conditions in existing joint use agreements unjust or unreasonable**. *Id.* at 5335, ¶ 216 (emphasis added). |

The only plausible reading of the *2011 Order* is that the "reference point" for "existing" agreements, if one can be teased out of the *2011 Order* at all, would be something *higher* than the Old Telecom Rate. By applying the Old Telecom Rate as both a "reference point" and a "hard cap" to the rate Duke charged AT&T during the period governed by the *2011 Order*, *see* [Order_¶_27], the FCC's refund award is necessarily higher than permissible under any legitimate interpretation of the *2011 Order*. This additional refund exposure is a new liability from which Duke was shielded under the *2011 Order's* legal standard for "existing" agreements.

Third, the FCC contends that it was unreasonable for Duke to rely on *Verizon Florida*. FCC Br. 65. Specifically, the FCC characterizes *Verizon Florida* as an

"outlier" and argues that Duke "has not identified any other Commission (or, for that matter, Bureau) decision that applies the Bureau's reasoning in *Verizon Florida*." *Id.* *Verizon Florida* is, by definition, not an "outlier." An "outlier" is "a statistical observation that is markedly different in value from the others of the sample." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.meriam-webster.com/dictionary/outlier (accessed Aug. 1, 2023). During the period governed by the *2011 Order*, *Verizon Florida* was the **<u>entire</u>** sample—i.e., there were no other decisions addressing "existing" agreements. Furthermore, the FCC cites *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1084 (D.C. Cir. 1987) in arguing that detrimental reliance is measured by how long and how consistently an agency has followed one view of the law. FCC Br. at 65. The policy at issue in *Clark-Cowlitz* was incredibly "short-lived" and subjected to immediate legal challenge. *See* 826 F.2d at 1084 ("[T]he period during which [Clark-Cowlitz] could have relied on FERC's prior interpretation spanned no more than six months."). In contrast, *Verizon Florida* remained undisturbed for seven years and served as the **<u>only</u>** guidance for rate disputes involving "existing" agreements during the entire period governed by the *2011 Order*. Therefore, while reliance on the

short-lived policy in *Clark-Cowlitz* may have been a "gamble," FCC Br. at 65, Duke's reliance on *Verizon Florida* was reasonable and foreseeable.[4]

The FCC's repeated refusal to acknowledge and apply *Verizon Florida* also underscores the arbitrariness and capriciousness of the FCC's actions. The FCC did not squarely address and repudiate *Verizon Florida* until the *Verizon Maryland Reconsideration Order*, which was not issued until after the Enforcement Bureau's decision in this proceeding. Until the *Verizon Maryland Reconsideration Order*, the Enforcement Bureau and the FCC simply ignored *Verizon Florida sub silentio*. *See Encino Motorcars, LLC*, 579 U.S. at 221 (noting that an agency "must at least 'display awareness that it is changing its position' and 'show that there are good reasons for the new policy'").

To reiterate, the *RWDSU* factors "boil down…to a question of concerns grounded in notions of equity and fairness." *Cassell*, 154 F.3d at 486. There is nothing fair or equitable about retroactively applying a legal standard that the *2011 Order* expressly reserved for "new" agreements to the parties' "existing" agreement. There is also nothing fair or equitable about the FCC's *ex post facto* dismissal of the

---

[4] The implication of the FCC's argument at pp. 64-66 of its brief is that Duke "gambled and lost" by relying upon AT&T's inability to meet the *Verizon Florida* evidentiary standard. However, the Enforcement Bureau found that AT&T failed to provide "a credible valuation of the advantages that [it] receives under the [joint use agreement]." [EB_Order_¶_47]; *see also* [Order_¶_26_n.97]. Therefore, if Duke was "gambling" at all, it "won" but for a retroactive change in house rules.

23

*Verizon Florida* evidentiary standard, especially considering that it was the only standard by which Duke could ascertain the potential for refund liability during the period in which Duke was actually exposed to liability under the *2011 Order*.

## II. The FCC Acted Arbitrarily and Capriciously by Assigning the Cost of the Communication Worker Safety Zone to Duke Because That Space Would Not Exist on Duke's Poles but for the Presence of AT&T and Other Communications Attachers.

### A. The FCC's and AT&T's Position is Neither Logical nor Based Upon "Settled Precedent."

The cost at issue, here, is the cost to construct and maintain what the NESC calls the "communication worker safety zone." NESC, Rules 235.C.4. and 238.E. This space is called the "communication worker safety zone" because, as its name implies, it exists to protect communications workers. *See* Duke Br. at 32 (citing *NESC Handbook* at 428). Duke referred to this space in its initial brief by its actual name—the "communication worker safety zone." The FCC and AT&T, on the other hand, never once called this space by its actual name. Instead, the FCC and AT&T opted for a less revealing moniker—the "safety space." There is a reason for this: the mere name of the space is indicative of its purpose and cause.

The FCC and AT&T both lean heavily on what they frame as "settled precedent"—in particular, a statement from the FCC's *2000 Order* that "[i]t is the presence of the potentially hazardous electric lines that makes the safety space necessary and but for the presence of those lines, the space could be used by cable

24

and telecommunications attachers." AT&T Br. at 53-54 (quoting *2000 Order*, 15 FCC Rcd at 6467, ¶ 22); FCC Br. at 68 (same). As an initial matter, this issue is definitely not a matter of "settled precedent." The first instance in which the FCC determined in an ILEC complaint proceeding that the electric utility was exclusively responsible for the cost of the communication worker safety zone was in November 2022—in the Order at issue here.[5]

In any event, the statement from the *2000 Order* on which the FCC and AT&T lean so heavily in their briefs is even more backwards today than it was 23 years ago (long before the FCC asserted jurisdiction over ILEC pole attachments). First, there is no need for the communication worker safety zone on Duke's poles unless there are communications attachers present. Stated otherwise, without communications attachers, there would be no communication worker safety zone on Duke's poles. This fact is undisputed in this case. Duke Br. at 33-34. Whatever twisted logic or ambiguous record may have led to the statement in the *2000 Order* upon which the FCC and AT&T rely is simply not present in the case at bar. Second, 23 years ago— when the FCC made this statement—the cost of the communication worker safety

---

[5] The Order cites two preceding Enforcement Bureau decisions on this issue from 2020 and 2021, respectively. *See* [Order_¶_42_n.159 (citing *Duke Energy Florida*, 2021 FCC LEXIS 3240, at *84, ¶ 49; *Florida Power & Light*, 35 FCC Rcd at 5330,¶ 16)]. However, the FCC's position in this case is that Enforcement Bureau decisions are non-binding. FCC Br. at 59-60 ("A non-binding staff decision…cannot establish a legal standard that the Commission must apply."). Thus, by the FCC's own logic, there was no precedent at all on this question prior to the Order.

zone was widely shared between ILECs and electric utilities pursuant to privately negotiated joint use agreements.  Duke Br. at 37-38 (quoting *1980 Order*, 77 F.C.C.2d at 190, ¶ 9).  Rather than actually examining the facts of this case (which the FCC dismissed as irrelevant) or re-examining the (il)logic of its *2000 Order* given the change in circumstances, the FCC merely doubled down on its 23-year-old error.

The FCC's brief reveals its fundamental misunderstanding of this issue when it claims that Duke "needs that space to protect its electric lines" and "needs 40 inches of space to separate its electric lines from cable and telecommunications attachments on the same pole."  FCC Br. at 4, 69.  Duke does not need the space; communications attachers (like AT&T) need the space.  Duke Br. at 33-34.  An agency decision that is illogical on its face is arbitrary and capricious.  *See, e.g., Gamefly, Inc. v. Postal Regulatory Comm'n*, 704 F.3d 145, 149 (D.C. Cir. 2013) ("Certainly, if the result reached is illogical on its own terms, the Authority's order is arbitrary and capricious.") (quoting *Am. Fed'n of Gov't Emps. v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006)).

The Order also claims that "the safety space should be allocated to the electric utility because that space could be used by communications attachers but for the presence of the electric lines," as if to suggest the communication worker safety zone would exist in the absence of communications attacher.  [Order_¶_42_n.160].  As

26

set forth above, these findings are not only illogical but also at odds with the undisputed facts in this case. Those statements may, indeed, be true as it relates to poles owned by AT&T. But this case is about poles owned by **Duke**.

### B. The FCC is Neither Bound by its Prior Interpretation of the Phrase "Space Occupied" nor did Duke Waive this Argument.

The FCC separately contends that its hands are tied when it comes to equitable allocation of the communication worker safety zone because its regulations define "'space occupied' on a pole to mean that space is 'actually occupied' by an attacher" and "that 'AT&T's attachments do not actually occupy the communications safety space.'" FCC Br. at 71 (citing [Order_¶_42_n.158]).[6] Whether or not this is a correct understanding of the phrase "space occupied," the FCC's rigid adherence to its regulations promulgated pursuant to Sections 224(d) and (e) in the context of ILEC ratemaking is at odds with its statement that, "Pole attachment rates for ILECs are set by a rule…that the Commission promulgated under section **224(b)(1)** of the Act." FCC Br. at 72 (citing *2011 Order*, 26 FCC Rcd at 5333, ¶ 213) (emphasis added). In other words, the FCC contends that it is not bound by the formulas promulgated under Section 224(d) (the cable rate formula) or 224(e) (the telecom

---

[6] Oddly enough, though refusing to allocate any portion of the communication worker safety zone to AT&T because it does not "actually occupy" that space, the FCC nonetheless found that "[b]ecause the safety space 'would otherwise be usable space' but for the presence of the electric lines" the "safety space is effectively usable space *occupied by*" Duke. [Order_¶_42 (emphasis added)].

rate formula) but is nonetheless bound by the way it has previously interpreted the phrase "space occupied" in its regulations promulgated pursuant to those provisions. This type of internal inconsistency and contradiction is a hallmark of arbitrary and capricious agency decision making. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) ("Because FERC's decision is internally inconsistent, it is arbitrary and capricious.")

In the proceedings below, Duke argued six ways to Sunday that the FCC's failure to allocate any portion of the communication worker safety zone to AT&T was unreasonable, counterintuitive, unlawful and unfair.  In response to the FCC's fixation on its previous interpretation of the phrase "space occupied," Duke pointed-out in its initial brief that the concept of space "occupied" does not actually appear in Section 224(e)—the statutory formula the FCC was purportedly applying in this case.  Instead, Section 224(e) allocates the usable space on a pole based on the space "required for" an entity.  Duke Br. at 39 (citing 47 U.S.C. § 224(e)(3)).  The FCC contends that because Duke did not frame this argument in precisely the manner framed in its initial brief, the argument has been waived.  FCC Br. at 72; AT&T Br. at 54-55.  As an initial matter, Duke should not have to specifically argue that, in purporting to apply a formula promulgated under Section 224(e), the FCC ought to consider the language of Section 224(e).  This should be assumed.  Moreover, Duke's point was not that the FCC was bound by the precise language of Section 224(e) but

instead that the FCC was not so rigidly bound to its previous interpretation of the phrase "space occupied" (which traces its roots to Section 224(d)).

Even if Duke's argument that the FCC should have considered the language of Section 224(e) when implementing a Section 224(e) rate is viewed as "new," there are exceptions to the general rule upon which the FCC relies. One exception is where the agency has, in fact, already considered the issue. *See Nat. Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1150-51 (D.C. Cir. 1987) ("*NRDC*"). Here, though the FCC claims that it was exercising its general ratemaking authority under Section 224(b)(1), there is no dispute that the rate formula upon which the FCC relied was the Section 224(e) rate formula. Given this, it should stand to reason that the FCC in fact considered the language of Section 224(e)—a consideration that would fairly include the point made by Duke.

Second, to the extent the FCC frames this issue as one of statutory interpretation, this is a strictly legal issue that need not be presented before the agency. *See W. Va. by McGraw v. HHS*, 1999 U.S. Dist. LEXIS 20568, at *19 (S.D. W. VA. Mar. 31, 1999) ("Because the courts are 'relatively more expert' in ascertaining the meaning of statutory terms, review would not impermissibly displace agency skill or invade the field of agency discretion.") (citing *Barlow v. Collins*, 397 U.S. 159, 166 (1970), *superseded by statute on other grounds*).

29

Third, and perhaps more importantly, issue exhaustion does not apply where it would have been futile to raise the issue before the agency. *Atlantic Richfield Co. v. DOE*, 769 F.2d 771, 782 (D.C. Cir. 1984) ("[E]xhaustion is not required where, as here, it is 'highly unlikely that the [agency] would change its position if the case were remanded to it.' '[W]hen resort to the agency would in all likelihood be futile, the cause of overall efficiency will not be served by postponing judicial review, and the exhaustion requirement need not be applied."). The "futility" exception is particularly applicable here, where it cannot be credibly contended that the FCC might have reached a different result had it been more squarely presented with the argument at issue. In any event, and as set forth above, Duke does not contend that the resolution of its argument regarding the communication worker safety zone turns on the language of Section 224(e). Instead, Duke contends that the FCC's rigid focus on its previous interpretation of the phrase "space occupied" was neither necessary nor reasonable under the facts of this case.

### C. There is No Evidence to Suggest that the Communication Worker Safety Zone is Either "Used" by Duke or "Unusable" by AT&T.

The FCC and AT&T also contend that Duke should bear the entire cost of the communication worker safety zone on its own poles because the space is "used and usable" by Duke. AT&T Br. at 53; FCC Br. at 67. There is no record evidence in this case to support the notion that the communication worker safety zone is actually "used" by Duke on any meaningful number of poles, and no party contends

30

otherwise. Thus, the FCC and AT&T rely principally on the contention that the communication worker safety zone is "usable" by Duke and, in turn, "unusable" by AT&T (or other communications attachers). There are two problems with this argument.

First, though the space might indeed be "usable" by Duke under some circumstances, "usability" has never been the FCC's basis for the allocation of pole costs. Instead, the FCC's cost allocation principles are tied to whether the space is "occupied by" or "required for" an attachment. The mere fact that space is "usable" by an attaching entity is not enough. For example, if there were two feet of extra space within the communications space on a Duke pole jointly used by AT&T, AT&T would bristle at the notion of being assigned the cost of those two feet of space, even though they are "usable" by AT&T.

Second, neither the FCC nor AT&T cite any record evidence to support the claim that AT&T cannot "use" the communication worker safety zone. As the *NESC Handbook* explains, the communication worker safety zone is required "when communication workers use communication work rules, tools, equipment and methods." *NESC Handbook* at 428. It is AT&T's **choice** to use "communications workers" (as opposed to qualified electric workers) along with "communication work rules, tools, equipment and methods"—and not any imaginary prohibition— that limits AT&T's ability to use the communication worker safety zone. *NESC*

*Handbook* at 383 ("The communication worker safety zone is only needed if the communication utility chooses to use communication work rules and equipment (see Rule 224A).").

## III. The FCC's Exercise of Jurisdiction Over the Rates AT&T Pays Duke Is *Ultra Vires* and Arbitrary and Capricious Given the FCC's Inability to Adjust the Rate Duke Pays AT&T.

### A. Issue Preclusion Does Not Bar Duke's Claim.

The FCC argues that "Duke's challenge to the Commission's jurisdiction over the pole attachment rates paid by ILECs is barred by issue preclusion." FCC Br. at 41-45; *cf.* AT&T Br. at 60-61; *see also* USTelecom Br. at 4-7. But the issue raised here—whether the Commission acted *ultra vires* or arbitrarily and capriciously in asserting jurisdiction over the rates paid by AT&T under the joint use agreement where the FCC lacks jurisdiction over half the net rental equation—has never been litigated before.

As stated by this Court in *CentraArchy Restaurant Management Co. v. Angelo*:

> To establish issue preclusion, a party must demonstrate that: (1) that the issue sought to be precluded is identical to one previously litigated[;] (2) that the issue was actually determined in the prior proceeding[;] (3) that the issue's determination was a critical and necessary part of the decision in the prior proceeding[;] (4) that the prior judgment is final and valid[;] and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the previous forum[.]

806 Fed. App'x 176, 178 (4th Cir. 2020) (internal quotation marks omitted; brackets in original). "The burden is on the party asserting collateral estoppel to establish its predicates, and this of course includes presenting an adequate record for the purpose." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982).

The FCC argues that "[t]he first four conditions [of issue preclusion] have indisputably been satisfied here" because Duke's affiliate previously "challenged the Commission's jurisdiction over ILEC pole attachment rates" in *American Electric Power Service Corp. v. FCC*, 708 F.3d 183 (D.C. Cir. 2013) ("*AEP*") and *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2855 (2021). FCC Br. at 41, 42; AT&T Br. at 58-60. As an initial matter, the issue presented in *City of Portland* was:

> Whether the FCC's new ILEC complaint rule—which adopts a presumption that ILECs are "similarly situated to" "telecommunications carriers" (even though 47 U.S.C. § 224(a)(5) expressly excludes ILECs from the meaning of "telecommunications carrier" for purposes of § 224)—is inconsistent with the plain language of the Act and the underlying record?

Pet'rs Joint Opening Br. at 3-4, *City of Portland*, 969 F.3d 1020 (No. 19-70490). The Ninth Circuit upheld the rule at issue on grounds that "the FCC provided an adequate justification for setting the same presumptive rates for all telecommunications providers." *City of Portland*, 969 F.3d at 1053. The issue resolved in *City of Portland* had nothing to do with the FCC's underlying jurisdiction

over ILEC pole attachment rates.  Thus, the FCC's issue preclusion argument really boils down to whether the issue was litigated and resolved in *AEP*.  It was not.

*AEP* was a facial challenge to the FCC's determination in the *2011 Order* that it could assert jurisdiction *at all* over the rates, terms, and conditions for ILEC pole attachments.  The issue there was whether "the FCC's extension of pole attachment rights to ILECs [was] contrary to the Act or otherwise unlawful where the Act expressly excludes ILECs from its definition of 'telecommunications carriers' that are entitled to such rights?"  Pet'rs Opening Br. at 2, *AEP*, 708 F.3d 183 (No. 11-1146).  The D.C. Circuit upheld this part of the *2011 Order*, stating:

> …§ 224(a)(4)'s reference to any "provider of telecommunications services" embraces ILECs rather than excludes them.
>
> ….
>
> …Section 224(a)(4), defining pole attachment to include an attachment by a "provider of telecommunications services," is cheek by jowl with § 224(a)(5), with its restricted definition of telecommunication carrier. This proximity suggests an entirely intentional character in § 224(a)(4)'s use of the broader term.

*AEP*, 708 F.3d at 187-188.  In other words, the D.C. Circuit's narrow holding was that ILECs are "providers of telecommunications service" for purposes of Section 224(a)(4).  However, the D.C. Circuit reached this conclusion in a vacuum, relying solely on statutory interpretation to address the petitioners' facial challenge.  Nowhere in the *AEP* decision did the D.C. Circuit consider—much less determine— whether the FCC could or should assert jurisdiction over ILEC pole attachment rates

in an as-applied context where (as here) the rate the electric utility pays to the ILEC is an essential component of the resolution of a dispute.

In the case at bar, the issue is as follows:

Whether the FCC acted in violation of 47 U.S.C. § 224, arbitrarily or capriciously by exercising jurisdiction over AT&T's pole attachment complaint, given that:

A. AT&T is an ILEC, and ILECs are expressly excluded from the definition of "telecommunications carrier" with rights under Section 224; and

B. The FCC lacks jurisdiction over the rates for attachments by Duke to utility poles owned by AT&T, which makes it impossible for the FCC to provide complete relief in this dispute?

Duke Br. at 2. Part (B) was neither raised nor decided by *AEP*.

Intervenor/Amicus USTelecom recognizes that the "argument Duke raises here" is indeed "different" than those advanced in *AEP*. USTelecom Br. at 7. USTelecom nevertheless argues that Duke's claim is barred by issue preclusion because "once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." USTelecom Br. at 7 (emphasis in original) (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)). However, *Yamaha* is not applicable here. In *Yamaha*, the court found that Yamaha-America (the American subsidiary of Yamaha, Corp., a Japanese company) was precluded from relitigating the issue of whether it had any rights under Section 526 of the Tariff Act or Section 42 of the

Lanham Act based upon the gray market importation of genuine Yamaha Corp. goods. In the case at bar, Duke is not merely seeking to relitigate the issue of whether an ILEC is a "provider of telecommunications service" as that term is used in section 224(a)(4) of the Pole Attachments Act. Instead, Duke is raising a broader challenge to the FCC's exercise of jurisdiction over the joint use agreement between Duke and AT&T premised upon the FCC's inability to adjust the rate that Duke pays AT&T. These are facts and issues of law that could not have been litigated in *AEP* because they can only arise (in judicially ripe manner) in an as-applied challenge.

USTelecom also cites *Sorenson Communications, Inc. v. FCC*, 765 F.3d 37 (D.C. Cir. 2014) and *Qwest Corp. v. FCC*, 252 F.3d 462 (D.C. Cir. 2001) for the proposition that a litigant may not use an as-applied challenge to relitigate an issue that it has already litigated and lost. USTelecom Br. at 6-7. In *Sorensen*, the precluded issues all related to what constituted "compensable expenses" for purposes of video relay service ratemaking. 765 F.3d at 43-44. Perhaps more importantly, the *Sorenson* Court found that certain challenges in the subsequent litigation were not precluded, including but not limited to its challenge to the "end result" of the subsequent ratemaking order. *Id*. at 46. In *Qwest Corp.*, the D.C. Circuit found that issue preclusion barred the ILEC petitioners' argument that a paging company's sole remedy for violation of an FCC rule regarding pager traffic compensation was state-managed negotiation and arbitration pursuant to Section 251

36

where the Eighth Circuit had previously found that the FCC rule at issue was grounded in Section 332, which indisputably allowed for filing of complaints at the FCC. 252 F.3d at 463-64.

The case at bar differs from *Sorenson* and *Qwest Corp.* in that Duke is not bringing a renewed facial challenge under the guise of an as-applied challenge. The FCC did not issue its first order adjudicating an ILEC complaint proceeding until well after *AEP* was decided. *See Verizon Virginia,* 32 FCC Rcd 3750. Thus, it was unknown until at least that time whether or how the FCC would apply its newfound jurisdiction over ILEC pole attachment rates in the context of an actual joint use agreement involving reciprocal rental obligations. *See Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1496 (D.C. Cir. 1988) (declining to apply issue preclusion where previous, unsuccessful facial challenge did not involve application of previously challenged rule to specific facts at issue in the parties' dispute).

The FCC argues that Duke cannot avoid issue preclusion by "reframing its argument as whether *AEP* correctly upheld the Commission's authority to regulate the pole attachment rates paid by ILECs." FCC Br. at 44 n.2; *see also id.* ("[I]f an issue can be turned into a new issue merely by asking whether it had been rightly decided, collateral estoppel would never apply.") (quoting *Gulf Power Co. v. FCC*, 669 F.3d 320, 324 (D.C. Cir. 2012)). Though Duke still contends that *AEP* was wrongly decided, that is not the primary thrust of Duke's present challenge. The

37

issue here is not so much whether *AEP* was wrongly decided, but instead whether

the rational of *AEP* can hold water in an as-applied challenge where the FCC is

powerless to adjust the $██ pole rate that Duke pays for access to 31,000 AT&T

poles.

Even assuming, *arguendo*, that the *AEP* court was correct (as a matter of pure

statutory interpretation) that ILECs are "providers of telecommunications service"

under Section 224(a)(4), that does not mean it is permissible for the FCC to apply

that jurisdiction under all possible factual scenarios. For example, if AT&T attached

to Duke's poles pursuant to a non-reciprocal pole license agreement like the

agreements Duke has with CLECs and CATVs, then treating ILECs as "providers

of telecommunications service" for purposes of Section 224(a)(4) might be a

permissible construction of the Act. But here, where treating ILECs as "providers

of telecommunications service" under Section 224(a)(4) leaves a gaping hole in the

resolution of the parties' dispute, it is not a permissible or rational construction of

the Act. Moreover, Duke's challenge in this case does not rest solely on the issue of

whether the FCC's exercise of jurisdiction was statutorily permissible. As explained

in Duke's opening brief, Duke Br. at 49-51, even if it was statutorily permissible,

the FCC's exercise of jurisdiction in this case was arbitrary and capricious—an as-

applied issue that *AEP* could not have addressed.

38

**B.     The FCC's and AT&T's Arguments Reinforce that the FCC Should Not Assert Jurisdiction Over the Rates AT&T Pays Duke Where It Lacks Jurisdiction over the Rates Duke Pays AT&T.**

      1.  *Duke Did Not Waive This Argument.*

In its initial brief, as part of its as-applied challenge, Duke explained that "it is not rational to assume that Congress intended for the FCC to have jurisdiction over the rates paid by one of the parties to joint use agreements (ILECs), but not over the rates paid by the other party (electric utilities)."  *See* Duke Br. at 48-49 (citing *Conway Corp. v. Fed. Power Com.*, 510 F.2d 1264, 1272 (D.C. Cir. 1975) ("A legislative intention to achieve such a regulatory gap is not to be presumed unless expressly presented.")).  The FCC contends that Duke waived that argument because "Duke did not first present it to the Commission."  FCC Br. at 51.  However, Duke raised the "incomplete" nature of the FCC's jurisdiction, and its impact on the jurisdictional issue in this case, in several ways.  In its Answer to the Complaint, Duke stated:

> The dispute between the parties involves at least four "buckets" of substantive issues: (1) the rates AT&T pays for access to [Duke's] poles; (2) **the rates [Duke] pays for access to AT&T's poles**; (3) AT&T's access rights to [Duke's] poles; and (4) [Duke's] access rights to AT&T's poles. The Commission's jurisdiction extends only to the first of these four "buckets" of issues.

[Answer_¶_5].  In its Petition for Reconsideration, Duke wrote:

> The **awkward**, unjust and **incomplete** result reached by the Bureau in this case further demonstrates that exercising jurisdiction over ILEC

attachments on electric utility poles was never a good idea, even if it was lawful (which it was not).

[Petition_for_Reconsideration_p._25 (emphasis added)].

Further, the FCC was clearly aware of the regulatory gap created by its incomplete jurisdiction. The FCC ordered the parties to "amend the [joint use agreement]" to include "a rate no higher than the Old Telecom Rate" for AT&T's use of Duke's poles. Order_¶_56. However, with respect to Duke's use of AT&T's poles, the FCC merely (and vaguely) directed the parties to negotiate a rate "that reflects proportional reciprocal rates for Duke's attachments to AT&T's poles." [EB Order_¶_64(b)]; [Order_¶_24 (upholding this part of EB Order)]. Because the FCC exhibited its awareness of the incomplete nature of its jurisdiction, Duke cannot have waived that argument. *See NRDC*, 824 F.2d 1150-51 (noting exception to the general waiver rule where the issue is actually considered by the agency in the underlying proceeding).

2. *The FCC's Acknowledgment that it Lacks Jurisdiction Over the Rates Duke Pays AT&T Crystalizes the FCC's Lack of Statutory Authority over This Dispute.*

In its response brief, the FCC never asserts that it has jurisdiction over the rates Duke pays AT&T. *See* FCC Br. at 40-56. This should end the inquiry. The fact that the FCC lacks jurisdiction over the rates Duke pays AT&T, combined with the fact that there is no express statement in the Pole Attachments Act that Congress intended to create a regulatory gap, can lead to only one rational conclusion: that

40

Congress never intended for the FCC to regulate joint use relationships between ILECs and electric utilities where net joint use rental is exchanged. *See Conway Corp.,* 510 F.2d at 1272.

AT&T, for its part, claims that "The FCC *could* have provided 'the parties with a full resolution of their dispute' as Duke now seeks…by enforcing AT&T's right to just and reasonable rates and leaving Duke's contract rates untouched." AT&T Br. at 62; *see also* USTelecom Br. at 10. AT&T's statement spotlights why— in the context of the joint use agreement at issue here—the FCC's interpretation of Section 224(a)(4) is unlawful. The text of the statute contains no direct expression of Congressional intent to grant the FCC authority to reduce the contractual rate for AT&T's attachments on Duke's poles (from $█/pole to █/pole) while binding Duke to the $█/pole contractual rate for its attachments to 31,000 AT&T's poles.

### 3. The FCC's Post-Hoc Attempt to Fill the Regulatory Gap is Unavailing.

In an attempt to address the regulatory gap, the FCC argues that it can regulate the rates Duke pays AT&T indirectly. The FCC notes its previous statement that it would be "skeptical of a complaint by an [ILEC] seeking a proportionally lower rate to attach to an electric utility's poles than the rate the [ILEC] is charging the electric utility to attach [to] its poles." FCC Br. at 52 (citing *2011 Order*, 26 FCC Rcd at 5337, ¶ 218) (brackets in original). However, the FCC's order in this case makes clear that the foregoing statement is toothless. In its Order, the FCC reduced

41

AT&T's rate to "around $▇ per pole, while leaving the $▇ pole contractual rate paid by Duke to AT&T undisturbed.  *See* AT&T's Br. at 16; FCC Br. 52-53; [EB_Order_¶_64]; [Order_¶_56].

The FCC also argues it has not created a regulatory gap because: (1) the Enforcement Bureau ordered the parties to negotiate a new rate for Duke's attachments to AT&T's poles and; (2) the FCC has previously stated that a just and reasonable rate for an electric utility's attachments to an ILEC's pole "would be the same proportionate rate charged the electric utility, given the [ILEC's] relative usage of the pole."  FCC Br. at 52 (citing *2011 Order*, 26 FCC Rcd at 5337, ¶ 218 n.662).  However, as set forth in Duke's opening brief, the FCC "entirely failed to consider" an "important aspect of the problem"—the disparity between Duke's pole costs and AT&T's pole costs.  *See* Duke Br. at 50-51.  The FCC, in its response brief, now appears to agree that such disproportionate costs *are* relevant to the rates Duke pays AT&T, and thus to the overall resolution of the dispute, stating: "AT&T and Duke can agree to reciprocal pole attachment rates that account for their different pole costs."  FCC Br. at 55.

This admission by the FCC is significant because it highlights the arbitrary and capricious nature of the FCC's assertion of jurisdiction over the rate AT&T pays Duke.  The Enforcement Bureau found that AT&T was entitled to relief in part because:

[W]e find that the rates that AT&T and Duke pay under the [joint use agreement] are disproportionate to the amount of space each uses on the poles…. [R]ather than each party paying "the same proportionate rate" given its relative usage of the pole (such as the same rate per foot of occupied space)," AT&T pays far more than Duke on a per-foot basis.

[EB_Order_¶_42]. In its Order, the FCC stated:

Duke argues that the Bureau erred in viewing the rate each party pays on a "proportional" "per-foot-of-space-occupied basis." We disagree. In the *2011 Order*, the Commission found it appropriate to evaluate the justness and reasonableness of a rate sought by an [ILEC] by considering whether it is "the same proportionate rate charged the electric utility, given the [ILEC's] relative usage of the pole (such as the same rate per foot of occupied space)."

[Order_¶_24]. Thus, both the Enforcement Bureau's Order and the Order on Reconsideration hinged in part on the parties' allegedly unequal usage of space on the other's poles. But both orders wholly failed to consider that the space on those poles was not of equal value because of the parties' differing pole costs.

Further, the FCC's statement in its brief that AT&T's pole costs are, indeed, relevant illustrates that the FCC failed to give "reasoned consideration" to how such rates should be calculated. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 66, 67 (D.C. Cir. 2019) (finding that FCC acted arbitrarily and capriciously where it failed to exhibit "reasoned consideration" of the impact on broadband pole attachments of reclassifying broadband internet as an information service and only "offered, at best, scattered and unreasoned observations" on that issue).

The FCC also attempts to account for its lack of jurisdiction over the rates Duke pays AT&T by arguing that AT&T has already "committed to reducing the pole attachment rates that it charges Duke so that its rates are proportional to the new, lower, just and reasonable rate that Duke must charge AT&T." FCC Br. at 53. This is like trusting the fox to guard the henhouse. AT&T states in its response brief that Duke "does not have a federal right to 'just and reasonable' pole attachment rates for use of AT&T's poles" and that the FCC could leave "Duke's contract rates untouched." AT&T Br. at 62. These statements are in direct tension with AT&T's unenforceable "commitment" to reduce the contractual rate Duke pays "so that it is proportional to the rate the FCC set for AT&T, accounting for the greater amount of space Duke uses on a pole." *Id.* Notably, nowhere does AT&T commit to accounting for the fact that AT&T's pole costs are much lower than (roughly ███ of) Duke's pole costs.

The FCC also states, "Should AT&T renege on that commitment, Duke can seek relief from the Commission, since the agency's regulations allow utilities, as well as attachers, to file pole complaints." FCC Br. at 53. Even assuming that Duke could file a complaint with the FCC in the event AT&T fails to adequately reduce the contractual rates charged to Duke, this supposed solution highlights the FCC's inability to provide the parties with a full and fair resolution of their dispute. According to the FCC, Duke would have to file a new complaint against AT&T. *Id.*

If, after yet another round of pleadings, discovery and briefing, the FCC agreed with Duke, then the FCC would presumably be relegated to readjusting the rate that **AT&T pays Duke** (rather than the rate that Duke pays AT&T). *Id.* ("The Commission would then have the opportunity…to revisit its determination in the *Order* that AT&T's just and reasonable rate must be less than the amount it was paying Duke under the parties' joint use agreement."). In other words, at the end of the day, the FCC could **never** actually set the rates AT&T charges Duke. This sort of duplicative and unduly burdensome procedure cannot be what Congress intended.

## IV. The FCC Correctly Held that the Joint Use Agreement Provided AT&T with Net Material Advantages and Correctly Adopted the ▇ Average Attaching Entities Input.

While Duke's challenge to the Order relates to either the legal premises upon which the Order is based or the FCC's failure to evaluate *any* evidence, AT&T's challenge to the Order relates primarily to the manner in which the FCC weighed the voluminous record evidence. Duke agrees with the FCC that the evidence in this case firmly established that AT&T was **not** entitled to the New Telecom Rate. Duke also agrees with the FCC that, to the extent the Old Telecom Rate is applicable, the proper average attaching entities input is ▇.

### A. The FCC Correctly Determined that AT&T was not Entitled to the New Telecom Rate

AT&T first claims that the FCC relied on the "immutable characteristics of ILECs," rather than the terms of the joint use agreement, in determining that AT&T

45

was not entitled to the New Telecom Rate.  AT&T Br. at 25-30.  The FCC explained why this is not the case in both the Order and in its brief.  FCC Br. at 87-89; Order ¶ 46 n.183.  But AT&T—in a bit of a "tell"—claims, "And in any event, reliance upon express terms in the [joint use agreement] actually underscores that they are immutable ILEC traits…."  AT&T Br. at 30.  In other words, AT&T concedes that the FCC relied upon the express terms of the joint use agreement but claims that those terms are merely indicia of the "immutable characteristics of ILECs." *See* AT&T Br. at 25-30.  Of course, there is no evidence in the record (and AT&T cites none) to support the notion that all, or even most, joint use agreements between electric utilities and ILECs are identical to the joint use agreement at issue in this case.  Even if there were such evidence, it would only mean that those ILECs—like AT&T—have enjoyed the enormous advantages that come with joint use agreements.

The fact that the FCC has, in each case in which it has examined a record, determined that the joint use agreement at issue provided the ILEC with material advantages speaks more to the questionable nature of the presumptions upon which AT&T's argument relies than it does the manner in which the FCC has weighed the evidence in any case (including this one).  Perhaps more importantly, the two allegedly "immutable characteristics of ILECs" upon which AT&T's argument turns—an ILEC's "contractual access" rights and its contractually protected

"location on the pole," *see* AT&T Br. at 28—are only two of the many advantages of the joint use agreement upon which the FCC relied in this case.  [Order, ¶¶ 46-53]; FCC Br. at 74-87.

AT&T next claims that the FCC erred in comparing AT&T's contractual rights under the joint use agreement to the contractual rights of Duke's CATV and CLEC attachers, rather than comparing AT&T's contractual rights to the alleged statutory and regulatory rights of Duke's CATV and CLEC attachers.  AT&T Br. at 31-34.  As the FCC explained in the Order and in its brief, the contract-to-contract comparison is the proper apples-to-apples comparison.  [Order, ¶ 48]; FCC Br. at 93-94.  Aside from being consistent with the FCC's own precedent regarding the proper analytical framework, the contract-to-contract comparison makes practical sense because Duke has no control over the statutory and regulatory rights granted by Congress or the FCC to CATV and CLEC attachers; Duke can only control the contractual rights it grants to the entities attached to its poles.  Stated otherwise, the favor with which government chooses to treat CATVs and CLECs cannot be held against Duke.

Further, as part of its argument on this point, AT&T claims, "It is impossible to eliminate 'market distortions' without considering *all* market conditions, including rights created by statute and regulation."  AT&T Br. at 32-33 (emphasis in original).  This argument, even if relevant, is duplicitous.  AT&T cannot claim,

47

on the one hand, that the allegedly extracontractual "immutable characteristics of ILECs" should not be considered in the analysis, but on the other hand claim that the extracontractual statutory and regulatory rights of CATVs and CLECs *should* be considered in the analysis. It is either a contract-to-contract analysis or an "all market conditions" to "all market conditions" analysis. Either way, AT&T has an immense advantage over Duke's CATV and CLEC attachers.

Finally, though AT&T frames its argument as whether the FCC applied the correct evidentiary standard, its actual argument relates exclusively to the manner in which the FCC *weighed* the evidence. And in doing so, AT&T imagines a non-existent standard and distorts the facts. For example, AT&T claims that it was entitled to the New Telecom Rate because "Duke was unable to prove it incurs a single unreimbursed cost" under the joint use agreement. AT&T Br. at 35. This statement is neither true nor relevant. The portion of the Enforcement Bureau order cited by AT&T for this proposition addresses something entirely different (the value of the advantages under the agreement—not Duke's unreimbursed costs). *Id.* (citing [EB_Order_¶_43]). But even if this statement were true, it has never been Duke's burden to prove unreimbursed costs in order to obtain a rate in excess of the New Telecom Rate. *See* FCC Br. at 77. The irony of AT&T's argument is not lost on Duke given that, for the period governed by the *2011 Order*, AT&T was required to prove that the "monetary value of those advantages [of the joint use agreement] is

less than the difference between the Agreement Rates and the New or Old Telecom Rates over time." *Verizon Florida*, 30 FCC Rcd at 1149-50, ¶ 24.  In other words, the imaginary burden that AT&T wishes upon Duke is akin to the actual burden (under the *2011 Order*) that AT&T failed to meet.  *See supra* Section I.A.2.

AT&T also alleges that the FCC erred by ignoring "the admission of Duke's witness that an ILEC's contractual access is 'a material *disadvantage* compared to [the statutory access rights of] CLECs and [cable companies].'"  AT&T Br. at 35-36 (emphasis and brackets in original).  This is a material misrepresentation of the testimony.  What Duke's witness actually said was: "Without a contractual obligation for a utility to provide access, such as the terms in the [joint use agreement], ILECs are at a material disadvantage compared to CLECs and CATVs." *See* [Answer_Exh._E_DEP000329].  In other words, the **absence** of a contractual access right—as opposed to the contractual access right itself—is what the witness testified would disadvantage AT&T.

### B. The FCC Correctly Adopted ███ as the Average Attaching Entities Input to the Old Telecom Rate.

AT&T argues that it was unfair for the FCC to adopt a value of ███ average attaching entities for purposes of the Old Telecom Rate when Duke utilizes the presumptive value of 5 attaching entities for purposes of calculating the New Telecom Rate.  AT&T Br. at 41-46.  Importantly, AT&T does not challenge the accuracy of the ███ value.  FCC Br. at 98 (citing [Order_¶_55]).  As the FCC noted

in the Order, though, "the number of attaching entities has…little effect on the New Telecom Rate, regardless of whether the Commission's presumptions apply." [Order_¶_55]. The reason for this is that the cost allocators within the New Telecom Rate formula are specifically designed to neutralize the impact of a lower number of attaching entities (and thus, bring the New Telecom Rate down to approximately the cable rate). *See 2015 Order*, 30 FCC Rcd at 13739, ¶ 19; 47 C.F.R. § 1.1406(d)(2)(i). So, for example, where the number of attaching entities is 5, the cost allocated through the formula is 66% of the actual cost; where the number of attaching entities is 3, the cost allocated through the formula is 44% of the actual cost; and where the number of attaching entities is 2, the cost allocated through the formula is 31% of the actual cost. *See* 47 C.F.R. § 1.1406(d)(2)(i).

Where, as here, "the number of Attaching Entities is not a whole number," the cost to be allocated through the formula "is interpolated from the cost allocator associated with the nearest whole numbers above and below the number of Attaching Entities." *See id.* Thus, where the number of attaching entities is ▮▮▮ the cost to be allocated through the New Telecom Rate formula is ▮▮▮% of the actual cost. The following chart demonstrates the mathematic result of the New Telecom Rate formula (and the cable rate formula) based upon a hypothetical annual pole cost of $100:

| Cable Rate | $7.41 |
| New Telecom Rate (█ Attaching Entities) | $█ |
| New Telcom Rate (5 Attaching Entities) | $7.39 |

In short, and as explained by the FCC in its brief, the average number of attaching entities simply does not matter for purposes of the New Telecom Rate. FCC Br. at 95-100. AT&T's argument on this issue is much ado about nothing.

## CONCLUSION

For the reasons set forth in Section IV, the Court should deny AT&T's Petition. In addition, for the reasons set forth in Sections I-III, the Court should find that the FCC lacks jurisdiction over this dispute and set aside the Order in its entirety, or in the alternative, find that the FCC acted arbitrarily, capriciously, in violation of the Act and/or otherwise in violation of the law and set aside the following FCC findings: (1) that AT&T is entitled to a refund for the period governed by the *2011 Order*; and (2) that Duke should bear the entire cost of the communication worker safety zone on its own poles.

Respectfully submitted,

/s/ Eric B. Langley
Eric B. Langley
Robin F. Bromberg
R. Rylee Zalanka
LANGLEY & BROMBERG LLC
2700 U.S. Highway 280
Suite 350E
Birmingham, Alabama 35223
(205) 783-5750
eric@langleybromberg.com
robin@langleybromberg.com
rylee@langleybromberg.com

*Counsel for Petitioner/Intervenor,*
*Duke Energy Progress, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Response/Reply Brief of Petitioner/Intervenor Duke Energy Progress, LLC ("Response/Reply Brief") complies with the type-volume requirement set forth in Federal Rule of Appellate Procedure 32. The word count feature in Microsoft Word reports that the Response/Reply Brief contains 12,958 words, excluding the items exempted under Federal Rule of Appellate Procedure 32(f).

The Response/Reply Brief also complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.

/s/ Eric B. Langley
Eric B. Langley

53

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on August 7, 2023, I electronically filed the foregoing Page-Proof Response/Reply Brief of Petitioner/Intervenor Duke Energy Progress, LLC with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system.  The participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

I further certify that, on August 7, 2023, I served the Sealed version of the foregoing brief, via USPS, on counsel listed below:

Claire J. Evans
Christopher Huther
Frank Scaduto
WILEY REIN, LLP
2050 M Street, NW
Washington, DC 20036
*Counsel for Intervenor/Petitioner BellSouth Telecommunications, LLC*

Maureen K. Flood
Jacob M. Lewis
P. Michelle Ellison
FEDERAL COMMUNICATIONS COMMISSION
Office of General Counsel
45 L Street, NE
Washington, DC 20554
*Counsel for Respondent Federal Communications Commission*

Daniel Edward Haar
Robert B. Nicholson
Robert J. Wiggers
U.S. DEPARTMENT OF JUSTICE
Antitrust Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
*Counsel for Respondent United States of America*

54

ADDENDUM

## <u>ADDENDUM TABLE OF CONTENTS</u>

<u>Page</u>

Excerpt from NESC Handbook ......................................................... Add. 1

Excerpts from 2017 NESC.................................................................Add. 8

Excerpt from Petitioner's Brief in *AEP v. FCC* ..............................Add. 15

Excerpt from Petitioners' Brief in City of Portland ........................Add. 17

*West Virginia by McGraw v. United States*
  HHS_ 1999 U.S. Dist. LEXIS 20568 ........................................Add. 20

# 2017 NESC® Handbook
## Premier Edition

A presentation of contributor commentary on the
2017 NESC, including a representation of the Code








The 2017 Code added Footnote 12 to Table 235-5 to clarify that the pairs of specified facilities with specified clearances are the usual relationships over or under one another. Where those facilities are located in the opposite position, the same clearances are to be used. In other words, unless specified, there is no penalty for one facility being placed above rather than below another, or vice-versa.

No value is specified for clearances between line conductors of the same circuit rated above 50 kV; thus Rule 012C applies. Flashover characteristics of lines above 50 kV vary significantly with configuration and with various base impulse level (BIL) control methods. Therefore, it is not appropriate for the NESC to specify clearances between conductors of the same circuit as the voltage exceeds 50 kV. The 50 kV clearance would be the base clearance plus the appropriate voltage adders.

There is often a question about what voltage to use for high-voltage transmission lines. Such lines are almost always wye-connected at the source, with the center point grounded with a high-impedance connection to limit ground fault currents. The maximum ground fault voltage is phase-to-ground voltage, not phase-to-phase. Note that Table 235 columns and rows use phase-to-ground voltages, but the calculation within the table uses phasor difference voltages (see Rule 235A3).

---

**CAUTION:** *The clearances and voltage adders of Rule 235C and Table 235-5 do apply to clearances between circuits of any voltage and any other circuit, regardless of ownership.*

---

The general discussions of Rules 232B and 232D apply to this rule.

The basic vertical clearance required between high-voltage conductors that are operated by different utilities is greater than the vertical clearance required between those operated by the same utility. The lack of familiarity of the employees of one utility with the property of another often necessitates a greater clearance.

It may be necessary to increase these vertical clearances under some conditions, such as when conductors on different support arms have materially different sag increases under load or high temperatures. The values given in Table 235-5 (Table 11 of the 1968 Code and prior editions) are minimum values, except as covered in the Footnotes to the table.

Where supply conductors of the same circuits are arranged vertically on separate crossarms, the vertical clearances are determined by the highest voltage concerned or, after 1987, by the *greater of* the phase-to-ground or phasor-difference voltage (see the discussion of Rule 235A3).

Although Table 235-5 requires, in some cases, a greater vertical clearance between two conductors in different consecutive voltage classifications than between two conductors of the higher voltage classification, it should not be interpreted as applying to the condition shown in Figure H235-1, where the conductors of different voltages are on opposite sides of the pole. In this arrangement, the vertical clearance is that for the higher voltage.



**Figure H235-1**
**Vertical arrangement of circuits**

Copyright © 2016 IEEE. All rights reserved.

On joint-use structures, a *communication worker safety zone* of 1 m (40 in.) between communication and supply conductors of up to (1) 8700 V to ground for effectively grounded circuits or (2) 8700 V between conductors for other circuits is generally considered an appropriate value. The *communication worker safety zone* terminology has been in long use and was codified in the 2002 Code. The communication worker safety zone is only needed if the communication utility chooses to use communication work rules and equipment (see Rule 224A). Experience has shown that, with span lengths of 45 m (150 ft) or less, such as are commonly found in urban joint-use construction, a 1 m (40 in.) clearance at the structure will generally minimize the possibility of accidental contacts between the usual types of supply conductors and communication cables in the spans, even when the supply conductors are loaded with ice. This clearance is also generally sufficient to limit contact in situations where ice may fall or be jarred off communication cables in the lower position while the supply conductors are still under load. Such clearance also provides a clear working space between the two types of facilities so that (1) line workers working on supply wires at about waist level will have clear leg room below such wires and (2) communications workers will be provided with clear headroom while working on their facilities. Increased clearances are required with increased voltage.

Experience indicates that adequate clearance at the supports is a fundamental requirement for safety where joint-use construction is employed. While the rules provide for a minimum clearance of 1 m (40 in.), greater clearances are required where spans exceed 45 m (150 ft) in length and for higher voltages. For application of Rule 235C2a, the calculation of voltage is intended to require the two circuits to be considered as being 180° out of phase, as in all similar calculations in the Code.

Where direct-current feeder circuits of voltages in excess of 750 V to ground are installed above communication conductors, particular attention should be given to the sags. Because of their size and weight, it is somewhat difficult to deadend them under some conditions and they are often given large sags. Consequently, the vertical clearance between these trolley feeders and communication conductors at the supports should be increased over what is usually provided for supply conductors of equal voltage.

*EXCEPTION 2* of Rule 235C1 was added in the 1968 Code solely to encourage the use of common crossing poles for communication service drops crossing under supply lines. *EXCEPTION 2* applies only where a communication drop from one *line* crosses under an effectively grounded supply neutral of another line and is attached to the structure of the other line. It was intended to recognize that many existing supply lines built solely for supply facilities would not have sufficient height to allow both the normal supply/communication clearances and the required ground clearances at the same time. It was concluded that, because multi-grounded neutrals do not ordinarily represent a safety hazard, and because relatively few operations on such service drops would be required by communications workers, the greater safety of a joint-crossing pole justified the reduced clearance allowed in this special instance. *EXCEPTION 2* does not apply to joint-use or colinear construction. *EXCEPTION 3* was added in the 1981 Code.

*EXCEPTION 3* of Rule 235C1 was added in the 1981 Code to reflect appropriate standard practice.

The 1981 Code modified Rule 235C3 to show that it applied when one or both of the circuits exceeds 98 kV to ground.

Table 235-5 was extensively revised in the 1987 Code. Phase-to-ground voltage values are normally used in the column and row headings to enter the table. However, where a calculation is required within the table, Rule 235A3 applies and the greater of phasor difference voltage or phase-to-ground voltage is used. This recognizes that the worst case for conductors of similar voltage and phase relationships may be when one line is turned off and grounded for maintenance.

The vertical clearances of Table 235-5 are from the horizontal plane of the lowest surface of the upper conductor at its attachment point. This is a "square box" concept; vertical clearances are intended to be exactly that; they are not diagonal clearances (see Rule 235D).

A new *EXCEPTION* under Rule 235C2b(1)(a) was added in the 1987 Code that allows neutrals meeting Rule 230E1 to be attached with a clearance from communication of 750 mm (30 in.) at the structure *if* it maintains a clearance from communication of 300 mm (12 in.) or more at all points in the span. This change was coordinated with Rule 238. The requirement that the neutral be bonded with the communication messenger was added in the 1990 Code.

The 2002 Code added *EXCEPTION 2* to Rule 235C2b(1)(a) to allow different utilities to use the clearances for the same utility, if they both agreed to do so. The 2012 Code moved both *EXCEPTION*s to the end of the rule and applied them to both Rule 235C2b(1)(a) and Rule 235C2b(1)(b).

383

Copyright © 2016 IEEE. All rights reserved.

New Rule 230F of the 1990 Code allows certain fiber-optic supply cables to be treated in the same manner as a supply neutral meeting Rule 230E1. If the fiber-optic supply cable meets Rule 230F1b, it is entirely dielectric and, therefore, bonding of the messenger to the communication messengers is not required.

The 2007 Code augmented *EXCEPTION 1* of Rule 235C2b(1)(a) to add the items allowed by Rule 230F to be treated the same as a neutral meeting Rule 230E1 for clearances purposes into *EXCEPTION 1* for easier use. Now fiber-optic cables meeting either Rule 230F1a or 230F1b, insulated communication cables located in the supply space and supported on an effectively grounded messenger are shown directly in *EXCEPTION 1*. This *EXCEPTION* was revised in the 2017 Code in response to IR 571 issued 17 December 2012 to clearly indicate which facilities, and the conditions under which those facilities, are allowed to have a clearance as low as 0.75 m (12 in) at midspan.

Rule 235C2b(1) is the so-called *75% rule*: it requires midspan clearances to be not less than 75% of that required at the structure at any time. Thus, for wires, conductors, or cables of greatly differing sag characteristics or electrical loadings, significant increases in vertical clearances are required at the structure to keep them apart at midspan. For example, if Figure H235C2b represents the closest approach condition when the supply secondary has a maximum sag of 1270 mm (50 in.) and the communication below has a minimum sag of 254 mm (10 in.), the clearance at the pole cannot be less than 760 mm (30 in.) (i.e., 75% of value in Table 235-5 for clearance at the structure) plus 1.02 m (40 in.) (i.e., difference in sags) = 1.78 m (70 in.) at the pole. Because this assumes no errors in stringing sags, designers would typically add an appropriate amount to account for such errors.



**Figure H235C2b**
**Clearance at pole based upon closes-approach midspan clearance**

A requirement was added in the 1990 Code to consider ice loading in Rule 235C2b(1). Both summer and winter sag mismatches must be checked. For a check of the potential midspan mismatch in sags during the winter (in icing areas), the upper conductor is assumed to be loaded with the radial ice required by Rule 250B for the loading district, while the lower conductor has dropped its ice and has no electrical loading. Both are assumed to be in the same ambient air (temperature).

It should be noted that, if the upper line has enough electrical loading to heat the conductor up to 0 °C (32 °F) while covered with ice during a period of –18 °C (0 °F), –9 °C (15 °F), or similar ambient air temperature below freezing, the greatest mismatch will occur with the upper wire electrically loaded with temperature at 0 °C (32 °F) about to melt the ice off, with the ambient air temperature (and, thus, the lower conductor) at –18 °C (0 °F), –9 °C (15 °F) or other applicable temperature.

This requirement was added because of problems in much of the middle and upper east coast, portions of the Rocky Mountains, and other areas which have sunny days following ice storms. In many areas, the combination of reflected solar energy and radiant energy from the earth will often melt ice off the lower cables and conductors before the upper ones. If the clearances do not plan for this, the conductors can touch (leading to burndown after repeated contacts over time) and cable lashing wires can be damaged enough to drop cables. Depending upon the relative conductor sizes and span lengths, it only takes from 2.5 mm (0.1 in.) to 7.5 mm (0.3 in.) difference in radial ice thickness to place conductors at the same level that are installed at the vertical values of Table 235-5 without considering icing differentials.

Copyright © 2016 IEEE. All rights reserved.

An *EXCEPTION* to Rule 235C3b(1), including this requirement to consider ice on the upper conductor and not on the lower conductor, was added in the 1997 Code. The *EXCEPTION* applies only to conductors of the same size, type, sag, tension, and ownership. This *EXCEPTION* only works where significant differentials in ice do not occur or where the original vertical clearance was 1.2 m (4.0 ft) or more, not at the 410 mm (16 in.) value of Table 235-5. The 2002 Code revised the rule for clarity creating a new Rule 235C2b(1)(c) and modifying the *EXCEPTION* so that it does not apply in areas that experience differentials in ice between conductors.

The 2007 Code modified the sag temperature conditions contained in Rule 235C2b(1)(c) for the summer sag check. Previously, the upper conductor was required to be at maximum conductor operating temperature under electrical loading and the lower conductor at the same ambient air conditions (air temperature, insolation, and wind speed) without electrical loading. Whereas Rules 232 and 234 require the use of a minimum temperature of 50 °C (120 °F) for the maximum operating temperature even if the maximum operating temperature could not exceed that value, Rule 235 did not do so before 2007.

As of 2007, the same 50 °C (120 °F) becomes the base floor for maximum operating temperature for the *upper* conductor in Rule 235. This change reflects common usage in the industry; many electric supply utilities have traditionally used 50 °C (120 °F) in this calculation to assure that appropriate clearance would be installed to allow for a small amount of electrical heating due to splitting of single-phase transformer return current or imbalanced three-phase loads between the earth and the neutral between transformer locations or other grounding points. Given that communication messengers bonded to the effectively grounded supply neutral share that load to some extent (steel messengers have a higher impedance and, thus, will carry a lesser portion of the neutral current—but steel heats more than copper or aluminum for the same level of current), many utilities have also traditionally used 50 °C (120 °F) for the minimum summer design condition temperature for a communication cable on a messenger in the upper position. Of course, in some areas of the southwest, such cables may exceed 50 °C (120 °F) without electrical loading on hot summer days.

The 2012 Code added an *EXCEPTION* to Rule 235C2b(1)(c)i that does not require consideration of different temperatures between the upper and lower conductors when the conductors meet the following requirements.

(1) They are of the same circuit (owned by the same utility).
(2) They are installed at the same sag and tension.
(3) They will be without electrical loading simultaneously.

The main Rule 235C2b(1)(c)i applies when the upper conductor can have a significantly different temperature due to line losses resulting from differences in electrical loading, such as when the lower phase trips out under fault loading or is de-energized for work and the upper phase continues under load. The *EXCEPTION* applies when both conductors will be taken out of service at the same time. Most multiphase supply circuits are balanced well enough that the temperatures of the phase conductors of the same circuit are not significantly different when all are loaded. However, if conductor loads are not kept reasonably balanced, the temperatures (and, thus, sags) can be different enough to cause a clearance problem—even if protected by three-phase devices—if the relative difference of temperatures in normal operation is not taken into account.

Rule 235C2b(1)(c) was revised in 2017 to coordinate with the changes in sag definitions that occurred in that edition in response to IR 566 issued 26 March 2012.

In the 1993 Code, Table 235-5 was revised to be consistent with the changes to Rule 224 and 230F. Specifically, the requirements for the location of communication cables in the supply space or the communication space on a joint-use pole is predicated upon the qualifications of those working upon the cables and the limits on the voltage that might be present. What kind of signal or data is carried is not a safety issue.

Note that a fully dielectric fiber-optic cable carried on a nonmetallic messenger is considered as a supply neutral meeting Rule 230E1 (if located in the supply space) or an ordinary communication cable (if located in the communication space). Such cables must be located either in the supply space or the communication space, *not* in the safety zone between the two spaces.

Footnote 9 of Table 235-5 in the 2002 Code had been added as Footnote 10 in the 1993 Code to recognize the lack of voltage potential between neutral conductors meeting Rule 230E1 and effectively grounded communication messengers located in the supply space. Electrically, a grounded communication messenger is part of the supply neutral and requires no clearance thereto. While a 900 mm (1 ft) clearance is often used to limit the opportunity for a lashing machine to damage the

Copyright © 2016 IEEE. All rights reserved.

neutral as it spirals around the communication cable and messenger, no clearance to a supply neutral is specified when a communication cable or grounded messenger is located in the supply space.

Footnote 10 of Table 235-5 in the 2002 Code had been added as Footnote 11 in the 1997 Code to allow entirely dielectric fiber-optic supply cables (i.e., located in the supply space) meeting Rule 230F1b to have no specified clearance to supply cables and conductors. This allows entirely dielectric fiber-optic supply cables to get close to supply cables and conductors, with less clearance than would otherwise be required. However, this is not intended to allow them to be so close as to interfere with each other. Entirely dielectric fiber-optic cable meeting Rule 230F1b can be "wrapped around" or can be part of an energized supply conductor. While Footnote 10 states that no clearance is specified between such fiber-optic cables and supply conductors, the intent of the rules is that they should be either:

(1)  cabled together or otherwise constructed without separation, or
(2)  separately supported far enough apart so as to not physically contact each other in the span during expected wind and sag conditions.

As a practical matter, they should not be installed closer than would be allowed by Rule 235G. If lesser clearances are desired, consideration should be given to directly attaching the fiber-optic supply cable to the supply cable or conductor, as allowed under Rule 230F1d. The 2012 Code revised Footnotes 9 and 10 of Table 235-5 to allow attachment of the messenger of communication cables allowed in the supply space directly to a supply neutral meeting Rule 230E1 anywhere in the span. Like the requirements of Rule 235G3 for supply cables meeting Rule 230C3, the mechanical connection of the communication cable in the supply space is allowed to the supply neutral only if the cable is positioned away from the neutral to avoid abrasion damage. If the cable is not so attached to the neutral, it must maintain the spacing of Rule 235G at midspan.

Note that if the communication cable wire is to be located in the communication space, Rule 238 and Rule 235C2b(1)(a) *EXCEPTION* allows a clearance between the supply neutral and the communication cable of 750 mm (30 in.) at the pole and a 300 mm (12 in.) in the span if the communication messenger is bonded to the supply method. Figure H235C shows the basic clearances from Table 235-5 and the *EXCEPTION* in Rule 235C23b(1)(a). Two locations are shown for fiber-optic supply cables (FOSC). Fiber-optic cables generally have much less sag than supply secondary conductors or cables. Thus FOSC Position B is deliberately sagged in with greater sag than normal to match the secondary sag and maintain the minimum clearances of Rule 235G to prevent mechanical contact. Often, heavy messengers are used and/or weights are added to achieve the desired sag. From a sag standpoint, FOSC Position B is usually better, but is often less desirable because the FOSC workers (using supply work rules to meet Rule 224A) must climb past the supply secondary.



**Figure H235C**
**Two possible positions of fiber-optic cable in the supply space**

In 2002, Footnote 2 of Table 235-5 was deleted (1) because it is not necessary with the restrictions now placed on communications installed in the supply space by Rule 224A and Rule 235 and (2) for consistency with recent changes in other rules that deleted clearance differentials based on which was above the other.

Footnote 5 of Table 235-5 was modified in 2002 (Footnote 6 of the 1997 Code and prior editions) to add entirely dielectric fiber-optic supply cables to the list to save the code user from having to go

Copyright © 2016 IEEE. All rights reserved.

C. Clearances for span wires or brackets

Span wires or brackets carrying luminaires, traffic signals, or trolley conductors shall have vertical clearances from communications lines and equipment not less than the values specified in Table 238-2.

**Table 238-2—Vertical clearance of span wires and brackets
from communication lines and equipment**
(See also Rule 238C.)

|  | Carrying luminaires, traffic signals, or trolley conductors | | | |
|  | Not effectively grounded | | Effectively grounded | |
|  | (mm) | (in) | (mm) | (in) |
|---|---|---|---|---|
| Above communication support arms | 1000 | 40 | 500 | 20 ① |
| Below communication support arms | 1000 | 40 | 600 | 24 |
| Above messengers carrying communication cables | 1000 | 40 | 100 | 4 |
| Below messengers carrying communication cables | 1000 | 40 | 100 | 4 |
| From terminal box of communication cable | 1000 | 40 | 100 | 4 |
| From communication brackets, bridle wire rings, or drive hooks | 1000 | 40 | 100 | 4 |

① This may be reduced to 300 mm (12 in) for either span wires or metal parts of brackets at points 1.0 m (40 in) or more from the structure surface.

D. Clearance of drip loops associated with luminaires and traffic signals

If a drip loop of conductors entering a luminaire, a luminaire bracket, or a traffic signal bracket is above a communication cable, the lowest point of the loop shall be not less than 300 mm (12 in) above the highest (1) communication cable or (2) through bolt or other equipment.

*EXCEPTION:* The above clearance may be reduced to 75 mm (3 in) if the loop is covered by a suitable nonmetallic covering that extends at least 50 mm (2 in) beyond the loop.

E. Communication worker safety zone

The clearances specified in Rules 235C and 238 create a communication worker safety zone between the facilities located in the supply space and facilities located in the communication space, both at the structure and in the span between structures. Except as allowed by Rules 238C, 238D, and 239, no supply or communication facility shall be located in the communication worker safety zone.

**Rule 238E.** *(New in the 2002 Code.)*
See the companion discussion of Rule 235C4 and Rule 224A. The communication worker safety zone is required between the supply space and communication space when communication workers use communication work rules, tools, equipment, and methods. The communication worker safety zone creates headroom for communication workers. When communication workers keep all parts of their bodies below the lowest supply facility, this zone allows safe working space for communication workers observing communication work rules.

428
Copyright © 2016 IEEE. All rights reserved.

Add. 7

# 2017 National Electrical Safety Code® (NESC®)

## C2-2017





NESC 100TH ANNIVERSARY EDITION



3 Park Avenue, New York, NY 10016-5997, USA

    b.   Limit

The clearance derived from Rule 235B3a shall not be less than the basic clearances given in Table 235-1 computed for 169 kV ac.

C.   Vertical clearance at the support for line conductors and service drops

All line wires, conductors, cables, and service drops located at different levels on the same supporting structure shall have vertical clearances not less than the following:

1.   Basic clearance for line wires, conductors, and cables, and service drops of same or different circuits

    a.   Between supply lines of the same or different circuits

The clearance requirements given in Table 235-5 shall apply to supply wires, conductors, or cables of 0 to 50 kV attached to supports. No value is specified for clearances between conductors of the same circuit exceeding 50 kV or between ungrounded open supply conductors 0 to 50 kV of the same phase and circuit of the same utility.

    b.   Between supply lines and communication lines

The clearance requirements given in Table 235-5 shall apply.

    c.   Between communication lines located in the communication space

The clearance and spacing requirements of Rule 235H shall apply to communication lines located in the communication space.

    d.   Between communication lines located in the supply space

The clearance requirements of Table 235-5 shall apply to communication lines located in the supply space.

*EXCEPTION 1:* Line wires, conductors, or cables on vertical racks or separate brackets placed vertically and meeting the requirements of Rule 235G may have spacings as specified in that rule.

*EXCEPTION 2:* Where communication service drops cross under supply conductors on a common crossing structure, the clearance between the communication conductor and an effectively grounded supply conductor may be reduced to 100 mm (4 in) provided the clearance between the communication conductor and supply conductors not effectively grounded meets the requirements of Rule 235C as appropriate.

*EXCEPTION 3:* Supply service drops of 0 to 750 V running above and parallel to communication service drops may have a clearance of not less than 300 mm (12 in) at any point in the span including the point of their attachment to the building or structure being served provided that the nongrounded conductors are insulated and that the clearance as otherwise required by this rule is maintained between the two service drops at the pole.

*EXCEPTION 4:* This rule does not apply to conductors of the same circuit meeting Rule 230D.

2.   Additional clearances

Greater clearances than those required (by Rule 235C1) and given in Table 235-5 shall be provided under the following conditions. The increases are cumulative where more than one is applicable.

    a.   Voltage related clearances

       (1)  For voltages between 50 and 814 kV, the clearance between line wires, conductors, or cables of different circuits shall be increased 10 mm (0.4 in) per kilovolt in excess of 50 kV.

          *EXCEPTION:* For voltages to ground exceeding 98 kV ac or 139 kV dc, clearances less than those required above are permitted for systems with known switching-surge factors. (See Rule 235C3.)

          *EXAMPLES:* Calculations of clearances required by Rule 235C2a for a 69.7 kV maximum operating voltage phase-to-ground conductor above a 7.2 kV phase-to-ground conductor, assuming conductors are 180° out of phase.

          Rule 235C2a: Clearance required at support

Copyright © 2016 IEEE. All rights reserved.

Add. 9

(a) Same utility [basic clearance = 0.41 m (16 in)]:

SI units: $\{0.41 + [(50 - 8.7) \times 0.01]\} + [(69.7 + 7.2 - 50) \times 0.01] = 1.09$ m. No rounding required in this example.

Customary units: $\{16.0 + [(50 - 8.7) \times 0.4]\} + [(69.7 + 7.2 - 50) \times 0.4] = 43.3$ in. Round up to 44 in.

(b) Different utilities [basic clearance = 1.00 m (40 in)]:

SI units: $\{1.00 + [(50 - 8.7) \times 0.01]\} + [(69.7 + 7.2 - 50) \times 0.01] = 1.68$ m. No rounding required in this example.

Customary units: $\{40.0 + [(50 - 8.7) \times 0.4]\} + [(69.7 + 7.2 - 50) \times 0.4] = 67.3$ in. Round up to 68 in.

(2) The increase in clearance for voltages in excess of 50 kV specified in Rule 235C2a(1) shall be increased 3% for each 300 m (1000 ft) in excess of 1000 m (3300 ft) above mean sea level.

(3) All clearances for lines over 50 kV shall be based on the maximum operating voltage.

(4) No value is specified for clearances between conductors of the same circuit.

b. Sag-related clearances

(1) Line wires, conductors, and cables supported at different levels on the same structures shall have vertical clearances at the supporting structures so adjusted that the clearance at any point in the span shall be not less than any of the following:

(a) For voltages less than 50 kV between conductors, 75% of that required at the supports by Table 235-5.

(b) For voltages more than 50 kV between conductors, use the value as calculated by the following appropriate formula:

If the basic value is 0.41 m (16 in): 0.62 m (24.4 in) plus 10 mm (0.4 in) per kV in excess of 50 kV.

If the basic value is 1.0 m (40 in):1.08 m (42.4 in) plus 10 mm (0.4 in) per kV in excess of 50 kV.

The increase in clearance for voltages in excess of 50 kV specified in Rule 235C2b(1)(b) shall be increased 3% for each 300 m (1000 ft) in excess of 1000 m (3300 ft) above mean sea level.

All clearances for lines over 50 kV shall be based on the maximum operating voltage.

*EXAMPLES*: Calculations of clearances required by Rule 235C2b(1)(b) for a 69.7 kV maximum operating voltage phase-to-ground conductor above a 7.2 kV phase-to-ground conductor, assuming conductors are 180 degrees out of phase.

Rule 235C2b(1)(b): Clearance required at any point in the span

(i) Same utility [basic clearance = 0.41m (16 in)]:

SI units: $\{0.41 + [(50 - 8.7) \times 0.01]\} \times 0.75 + [(69.7 + 7.2 - 50) \times 0.01] = 0.89$ m. No rounding required in this example.

Customary units: $\{16.0 + [(50 - 8.7) \times 0.4]\} \times 0.75 + [(69.7 + 7.2 - 50) \times 0.4] = 35.2$ in. Round up to 36 in.

(ii) Different utilities [basic clearance = 1.00 m (40 in)]:

SI units: $\{1.00 + [(50 - 8.7) \times 0.01]\} \times 0.75 + [(69.7 + 7.2 - 50) \times 0.01] = 1.33$ m. No rounding required in this example.

Customary units: $\{40.0 + [(50 - 8.7) \times 0.4]\} \times 0.75 + [(69.7 + 7.2 - 50) \times 0.4] = 53.2$ in. Round up to 54 in.

Copyright © 2016 IEEE. All rights reserved.

Add. 10

*EXCEPTION 1:* For Rules 235C2b(1)(a) and 235C2b(1)(b), the following conductors/cables may have a clearance of not less than 300 mm (12 in) at any point in the span from communication cables located in the communication space provided (a) the supply neutral meeting Rule 230E1 or messenger is bonded to the communication messenger at intervals specified in Rule 092C1, and (b) a clearance of not less than 0.75 m (30 in) is maintained at the supporting structures between the supply conductors and cables located in the supply space and communication cables located in the communication space:

(1) Neutral conductors meeting Rule 230E1,

(2) Fiber-optic supply cables meeting Rule 230F1a or 230F1b,

(3) Insulated communication cables located in the supply space and supported by an effectively grounded messenger, and

(4) Supply cables meeting Rule 230C1 (including their support brackets) in the supply space running above and parallel to communication cables in the communications space.

Bonding is not required for entirely dielectric cables meeting Rule 230F1b.

*EXCEPTION 2:* For Rules 235C2b(1)(a) and 235C2b(1)(b), when all parties involved are in agreement, for supply conductors of different utilities, vertical clearance at any point in the span need not exceed 75% of the values required at the support for the same utility by Table 235-5.

(c) For purposes of this determination the vertical clearances required in Rules 235C2b(1)(a) and 235C2b(1)(b) apply to the following conductor temperature and loading conditions specified below in i or ii, whichever produces the greater vertical clearance at the structure.

    i.   The upper conductor is at final sag at 50 °C (120 °F) or the maximum operating temperature for which the line is designed to operate. The lower conductor is at final sag without electrical loading at the same ambient conditions that are used to determine the operating temperature of the upper conductor

        *EXCEPTION:* Rule 235C2b(1)(c)i does not apply to conductors of the same utility when the upper and lower conductors are of the same circuit, the same size and type, installed at the same sag and tension, and will be without electrical loading simultaneously.

    ii.   The upper conductor is at final sag at 0 °C (32 °F) with the radial thickness of ice, if any, specified in Table 230-1 for the zone concerned. The lower conductor is at final sag without electrical loading and without ice loading at the same ambient conditions as the upper conductor.

        *EXCEPTION:* Rule 235C2b(1)(c)ii does not apply where experience in an area has shown that different ice conditions do not occur between the upper and lower conductors.

        *NOTE:* The ambient temperature may be less than the 0 °C (32 °F) used for the upper conductor due to the electrical loading that produced the 0 °C (32 °F) used for the upper conductor temperature.

If both *EXCEPTIONS* in Rule 235C2b(1)(c) can be used, then Rule 235C2b does not apply. See Rule 012C.

(2) Sags should be readjusted when necessary to accomplish the foregoing, but not reduced sufficiently to conflict with the requirements of Rule 261H1. In cases where conductors of different sizes are strung to the same sag for the sake of appearance or to maintain unreduced clearance throughout storms, the chosen sag should be such as will keep the smallest conductor involved in compliance with the sag requirements of Rule 261H1.

Copyright © 2016 IEEE. All rights reserved.

(3) For span lengths in excess of 45 m (150 ft), vertical clearance at the structure between open supply conductors and communication cables or conductors shall be adjusted so that under conditions of conductor temperature of 15 °C (60 °F), no wind displacement and final sag, no open supply conductor of over 750 V but less than 50 kV shall be lower in the span than a straight line joining the points of support of the highest communication cable or conductor.

*EXCEPTION: Effectively grounded supply conductors associated with systems of 50 kV or less need meet only the provisions of Rule 235C2b(1).*

3. Alternate clearances for different circuits where one or both exceed 98 kV ac, or 139 kV dc to ground

The clearances specified in Rules 235C1 and 235C2 may be reduced for circuits with known switching-surge factors, but shall not be less than the crossing clearances required by Rule 233C3.

4. Communication worker safety zone

The clearances specified in Rules 235C and 238 create a *communication worker safety zone* between the facilities located in the supply space and facilities located in the communication space, both at the structure and in the span between structures. Except as allowed by Rules 238C, 238D, and 239, no supply or communication facility shall be located in the communication worker safety zone.

D. Diagonal clearance between line wires, conductors, and cables located at different levels on the same supporting structure

No wire, conductor, or cable may be closer to any other wire, conductor, or cable than defined by the dashed line in Table 235-1, where V and H are determined in accordance with other parts of Rule 235.

E. Clearances in any direction at or near a support from line conductors to supports, and to vertical or lateral conductors, service drops, and span or guy wires, attached to the same support

1. Fixed supports

Clearances shall be not less than those given in Table 235-6.

*EXCEPTION: For voltages exceeding 98 kV ac to ground or 139 kV dc to ground, clearances less than those required by Table 235-6 are permitted for systems with known switching-surge factor. (See Rule 235E3.)*

*NOTE 1: For clearances in any direction from supply line conductors to communication antennas in the supply space attached to the same supporting structure, see Rule 235I.*

*NOTE 2: For antennas in the communication space, see Rule 236D1 and Rule 238.*

2. Suspension insulators

Where suspension insulators are used and are not restrained from movement, the clearance shall be increased so that the string of insulators may swing transversely throughout a range of insulator swing up to its maximum design swing angle without reducing the values given in Rule 235E1. The maximum design swing angle shall be based on a 290 Pa (6 lb/ft$^2$) wind on the conductor at final sag at 15 °C (60 °F). This may be reduced to a 190 Pa (4 lb/ft$^2$) wind in areas sheltered by buildings, terrain, or other obstacles. Trees are not considered to shelter a line. The displacement of the wires, conductors, and cables shall include deflection of flexible structures and fittings, where such deflection would reduce the clearance.

3. Alternate clearances for voltages exceeding 98 kV ac to ground or 139 kV dc to ground

The clearances specified in Rules 235E1 and 235E2 may be reduced for circuits with known switching-surge factors but shall not be less than the following:

a. Alternate clearances to anchor guys, surge-protection wires, and vertical or lateral conductors

The alternate clearances shall be not less than the crossing clearances required by Rule 233B3 and Rules 233C3a and 233C3b for the conductor voltages concerned. For the

163
Copyright © 2016 IEEE. All rights reserved.

F.    Working clearances from energized equipment

All parts of equipment such as switches, fuses, transformers, surge arresters, luminaires and their support brackets, etc., or other connections that may require operation or adjustment while energized and exposed at such times, shall be so arranged with respect to each other, other equipment, vertical and lateral conductors, and portions of the supporting structure, including supporting platforms or structural members, that in adjustment or operation no portion of the body, including the hands, need be brought closer to any exposed energized parts or conductors than permitted in Part 4, Rule 441 or 446 of this Code.



**Figure 237-1—Obstruction of working space by buckarm**

## 238. Vertical clearance between specified communications and supply facilities located on the same structure

A.    Equipment

For the purpose of measuring clearances under this rule, equipment shall be taken to mean non-current-carrying metal parts of equipment, including metal supports for cables or conductors, metal support braces that are attached to metal supports or are less than 25 mm (1 in) from transformer cases or hangers that are not effectively grounded, and metal or nonmetallic supports or braces associated with communication cables or conductors. Antennas, photovoltaic panels, power supplies, loading coils, etc., shall also be considered equipment for the purpose of measuring clearances under this rule.

B.    Clearances in general

Vertical clearances between supply conductors and communications equipment, between communication conductors and supply equipment, and between supply and communications equipment shall be not less than the values specified in Table 238-1, except as provided in Rules 238C and 238D.

C.    Clearances for span wires or brackets

Span wires or brackets carrying luminaires, traffic signals, or trolley conductors shall have vertical clearances from communications lines and equipment not less than the values specified in Table 238-2.

D.    Clearance of drip loops associated with luminaires and traffic signals

If a drip loop of conductors entering a luminaire, a luminaire bracket, or a traffic signal bracket is above a communication cable, the lowest point of the loop shall be not less than 300 mm (12 in) above the highest (1) communication cable, or (2) through bolt or other equipment.

*EXCEPTION:* The above clearance may be reduced to 75 mm (3 in) if the loop is covered by a suitable nonmetallic covering that extends at least 50 mm (2 in) beyond the loop.

Copyright © 2016 IEEE. All rights reserved.

238E                     Part 2: Safety Rules for Overhead Lines                     T-238-2

E.   Communication worker safety zone

The clearances specified in Rules 235C and 238 create a communication worker safety zone between the facilities located in the supply space and facilities located in the communication space, both at the structure and in the span between structures. Except as allowed by Rules 238C, 238D, and 239, no supply or communication facility shall be located in the communication worker safety zone.

**Table 238-1—Vertical clearance between supply conductors and communications equipment, between communication conductors and supply equipment, and between supply and communications equipment**

(Voltages are phase to ground for effectively grounded circuits and those other circuits where all ground faults are cleared by promptly de-energizing the faulted section, both initially and following subsequent breaker operations. See the definitions section for voltages of other systems. See also Rule 238B.)

| Supply voltage (kV) | Vertical clearance | |
|---|---|---|
| | (m) | (in) |
| 1. Grounded conductor and messenger hardware and supports | 0.75 | 30 |
| 2. 0 to 8.7 | 1.00 [1] | 40 [1] |
| 3. Over 8.7 | 1.00 plus 0.01 per kV [1] in excess of 8.7 kV | 40 plus 0.4 per kV [1] in excess of 8.7 kV |

[1]Where non-current-carrying parts of supply equipment are effectively grounded and the associated neutral meeting Rule 230E1 or supply cables meeting Rule 230C1 (including the support brackets) are bonded to communication messengers at intervals meeting Rule 092C through out well-defined areas and where communication is at lower levels, clearances may be reduced to 0.75 m (30 in).

**Table 238-2—Vertical clearance of span wires and brackets from communication lines and equipment**

(See also Rule 238C.)

| | Carrying luminaires, traffic signals, or trolley conductors | | | |
|---|---|---|---|---|
| | Not effectively grounded | | Effectively grounded | |
| | (mm) | (in) | (mm) | (in) |
| Above communication support arms | 1000 | 40 | 500 | 20 [1] |
| Below communication support arms | 1000 | 40 | 600 | 24 |
| Above messengers carrying communication cables | 1000 | 40 | 100 | 4 |
| Below messengers carrying communication cables | 1000 | 40 | 100 | 4 |
| From terminal box of communication cable | 1000 | 40 | 100 | 4 |
| From communication brackets, bridle wire rings, or drive hooks | 1000 | 40 | 100 | 4 |

[1]This may be reduced to 300 mm (12 in) for either span wires or metal parts of brackets at points 1.0 m (40 in) or more from the structure surface.

Copyright © 2016 IEEE. All rights reserved.

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**No. 11-1146**

# In the
# United States Court of Appeals
# for the District of Columbia Circuit

♦

**AMERICAN ELECTRIC POWER SERVICE CORPORATION, et al.,**

*Petitioners,*

v.

**FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,**

*Respondents.*

♦

**BRIEF OF PETITIONERS**

♦

**On Petition for Review from the Federal Communications Commission
FCC 11-50 (Apr. 7, 2011), 76 Fed. Reg. 26620 (May 9, 2011)**

**Attorneys for Petitioners**

Sean B. Cunningham
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue NW
Washington, D.C. 20037-1701
Telephone: (202) 955-1500
Facsimile:  (202) 861-3694

J. Russ Campbell
Eric B. Langley
Jason B. Tompkins
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203-2015
Telephone: (205) 251-8100
Facsimile:  (205) 226-8798

**Initial Brief:  January 3, 2012**

## ISSUES PRESENTED FOR REVIEW

I.    Is the FCC's extension of pole attachment rights to ILECs contrary to the Act or otherwise unlawful where the Act expressly excludes ILECs from its definition of "telecommunications carriers" that are entitled to such rights?[5]

II.    Is the FCC's "reinterpretation" of §224(e) so that the Telecom Rate will "approximate" the more favorable Cable Rate contrary to the Act or otherwise unlawful?[6]

III.    Is the FCC's extension of the "refund" period back to an undefined starting point prior to the filing of a pole attachment complaint contrary to the Act or otherwise unlawful?[7]

## STATEMENT REGARDING ADDENDUM

Pertinent statutes and regulations are set forth in the addendum bound hereto in accordance with D.C. Cir. R. 28(a)(5).

---

[5] *See* revised Rules 1.1401, 1.1402(d)&(e), new Rule 1.1424, and ¶¶ 199-220 of the Order [JA_____].

[6] *See* revised Rule 1.1409(e)(2) and ¶¶ 135-198 of the Order [JA_____].

[7] *See* revised Rule 1.1410 and ¶¶ 110-112 of the Order [JA_____].

2

**Docket Nos. 18-72689 (L), 19-70490**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

AMERICAN ELECTRIC POWER SERVICE CORPORATION,
CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC, DUKE ENERGY CORPORATION,
ENTERGY CORPORATION, ONCOR ELECTRIC DELIVERY COMPANY LLC,
SOUTHERN COMPANY, TAMPA ELECTRIC COMPANY,
VIRGINIA ELECTRIC AND POWER COMPANY and XCEL ENERGY SERVICES INC.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents,*

VERIZON and USTELECOM-THE BROADBAND ASSOCIATION,

*Respondents-Intervenors.*

---

*On Petition for Review of Order of the Federal Communications Commission, No. 18-111*

## JOINT OPENING BRIEF FOR PETITIONERS

ERIC B. LANGLEY, ESQ.
ROBIN F. BROMBERG, ESQ.
LANGLEY & BROMBERG LLC
2700 U.S. Highway 280, Suite 240E
Birmingham, Alabama 35223
(205) 783-5750 Telephone

*Attorneys for Petitioners,*
*American Electric Power Service Corporation,*
*Duke Energy Corporation, Entergy Corporation,*
*Oncor Electric Delivery Company LLC,*
*Southern Company, and Tampa Electric*
*Company*

BRETT H. FREEDSON, ESQ.
CHARLES A. ZDEBSKI, ESQ.
ROBERT J. GASTNER, ESQ.
ECKERT SEAMANS CHERIN
& MELLOTT, LLC
1717 Pennsylvania Avenue NW 12th Floor
Washington, District of Columbia 20006-4604
(202) 659-6600 Telephone

*Attorneys for Petitioners,*
*CenterPoint Energy Houston Electric, LLC and*
*Virginia Electric and Power Company d/b/a*
*Dominion Energy Virginia and d/b/a Dominion*
*Energy North Carolina*

***Additional Counsel Listed Inside Cover***

---

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER

## STATEMENT OF THE ISSUES

1) Whether the FCC's new "preexisting violation" rules—which prohibit an electric utility pole owner from denying access to a pole, delaying completion of make-ready, or preventing an attacher from overlashing because of a "preexisting violation" on the pole—conflict with the plain language of 47 U.S.C. § 224(f)(2), which allows electric utilities to deny access "where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes"?

2) Whether the FCC's new rules regarding overlashing— which purport to prevent an electric utility from a) denying the proposed overlashing for those reasons set forth in 47 U.S.C. § 224(f)(2), b) requiring the overlasher to provide the technical and engineering specifications of the materials it intends to overlash, and c) recovering the cost of performing an engineering evaluation of the overlashing—are inconsistent with § 224 and/or arbitrary and capricious?

3) Whether the FCC's new "self-help" remedy in the electric supply space— which allows an attacher to move electric facilities in the electric supply space on a utility pole where the electric utility has not performed make-ready within the deadlines set forth in the FCC's rules—exceeds the FCC's authority under 47 U.S.C. § 224 and/or is arbitrary and capricious?

4) Whether the FCC's new ILEC complaint rule—which adopts a presumption that ILECs are "similarly situated to" "telecommunications carriers"

3

(even though 47 U.S.C. § 224(a)(5) expressly excludes ILECs from the meaning of "telecommunications carrier" for purposes of § 224)—is inconsistent with the plain language of the Act and the underlying record?

 Neutral

As of: August 6, 2023 8:09 PM Z

# West Virginia by McGraw v. United States HHS

United States District Court for the Southern District of West Virginia

March 31, 1999, Decided ; March 31, 1999, Entered

Civil Action No. 2:97-0245

**Reporter**

1999 U.S. Dist. LEXIS 20568 *

STATE OF WEST VIRGINIA, by DARRELL V. McGRAW, JR., ATTORNEY GENERAL AND JAMES W. TEETS, SECRETARY OF THE WEST VIRGINIA DEPARTMENT OF ADMINISTRATION, Plaintiffs v. UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES AND DONNA E. SHALALA, SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendants

**Subsequent History:** Motion granted by, Motion denied by West Virginia ex rel. McGraw v. United States HHS, 1999 U.S. Dist. LEXIS 20599 (S.D. W. Va., Mar. 31, 1999)

**Disposition: [*1]** Plaintiffs' motion for summary judgment granted with respect to Count III of complaint and denied in all other respects. Case remanded to United States Department of Health and Human Services. Defendants' motion for summary judgment granted with respect to Counts I, II, and V of complaint and denied in all other respects.

## Core Terms

audit, federal agency, disallowance, contributions, funds, aggregate, offset, regulations, programs, consumer, calculations, overcharges, itemization, employees, notice, costs, Collection, exhaustion, interest rate, federal government, agency's action, pre-disallowance, withdrawals, capricious, deposited, agencies, estimate, pension, agency expertise, summary judgment

## Case Summary

### Procedural Posture

Plaintiffs, representing West Virginia, sought judicial review of a decision by defendant agency, the U.S. Department of Health and Human Services, that West Virginia had improperly claimed and received excessive federal matching funds for its employer contributions to its Public Employees Retirement System. The parties made cross motions for summary judgment.

### Overview

The United States provided West Virginia with matching funds for contributions the state made to its retirement pension plan for public employees, the Public Employees Retirement System (PERS). Defendant agency, the U.S. Department of Health and Human Services, decided that West Virginia had improperly claimed and received excessive federal matching funds. Plaintiffs, representing West Virginia,

1999 U.S. Dist. LEXIS 20568, *1

sought judicial review of the decision. The parties made cross-motions for summary judgment. The court granted plaintiffs' motion with respect to Count III, that defendant agency did not have statutory authority to impose pre-disallowance interest against the state. The court granted defendants' motion with respect to Counts I, II, and V concerning, respectively, defendant agency's authority to assert an aggregate disallowance against the state on behalf of other federal agencies, whether defendant agency's determination of the federal share of the unauthorized withdrawals from PERS was arbitrary and capricious, and defendant agency's authority to deny the state's offset claim without undertaking an audit of the state's Public Employees Insurance Agency Fund or itemizing its findings.

**Outcome**

The court granted plaintiffs' motion for summary judgment with respect to Count III of the complaint, that defendant agency did not have statutory authority to impose pre-disallowance interest against the state. Generally determining whether or not defendant agency acted in an arbitrary and capricious manner, the court granted defendants' motion for summary judgment with respect to Counts I, II, and V, and remanded as to Count IV.

## LexisNexis® Headnotes

Governments > Federal Government > Claims By & Against

Pensions & Benefits Law > Governmental Employees > State Pensions

Public Contracts Law > Costs & Prices > Cost Principles

*HN1*[⬇]  **Federal Government, Claims By & Against**

Some Public Employee Retirement System (PERS) beneficiaries work in joint federal-state programs. On behalf of those employees, the United States provides matching funds for the state's contributions to PERS. The determination as to what portion of the state's costs are reimbursable by the federal government, or "allowable," is made by the United States Department of Health and Human Services (DHHS) pursuant to the guidelines set forth in the Office of Management and Budget's Circular A-87, Cost Principles for State and Local Governments (Circular A-87). Circular A-87 applies to all federal agencies responsible for administering federally-funded grants and contracts, including DHHS. Circular A-87 is incorporated by reference into DHHS's regulations at 45 C.F.R. § 74.27(a). Thus, it carries the force of a substantive regulation.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement

1999 U.S. Dist. LEXIS 20568, *1

as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

**HN2[⬇]** **Summary Judgment, Opposing Materials**

Under Fed. R. Civ. P. 56(c), a party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Material facts are those necessary to establish the elements of a party's cause of action. If a party fails to establish an essential element of the cause of action, the opposing party is entitled to summary judgment. That is, a defendant satisfies its requirement of showing that it is entitled to judgment as a matter of law by demonstrating that there is an absence of evidence to support the plaintiff's claims. A defendant is also entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the plaintiff.

Administrative Law > Judicial

Review > Reviewability > Factual Determinations

Environmental Law > Administrative Proceedings & Litigation > Judicial Review

Governments > Legislation > Statutory Remedies & Rights

Administrative Law > ... > Hearings > Right to Hearing > Statutory Rights

Administrative Law > Judicial Review > General Overview

Administrative Law > Judicial Review > Reviewability > Questions of Law

Administrative Law > Judicial Review > Standards of Review > General Overview

**HN3[⬇]** **Reviewability, Factual Determinations**

Under 5 U.S.C.S. § 706(2)(A)-(D), the Administrative Procedure Act provides the following standard for judicial review of final, informal agency actions. The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or (D) without observance of procedure required by law. Informal agency actions are those actions that may be taken by an agency without the benefit of a statutorily required hearing and the

1999 U.S. Dist. LEXIS 20568, *1

creation of a formal record.

Administrative Law > Judicial Review > Standards of Review > General Overview

Administrative Law > Judicial Review > General Overview

**HN4**[⬇]  **Judicial Review, Standards of Review**

An agency rule may be deemed arbitrary, capricious, or an abuse of discretion if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Although the scope of judicial review under this standard is narrow and deferential, a reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. But a reviewing court cannot substitute its judgment for that of the agency, particularly when that determination is propelled by the agency's expertise.

Administrative Law > Judicial Review > Standards of Review > General Overview

**HN5**[⬇]  **Judicial Review, Standards of Review**

In reviewing agency actions under the Administrative Procedure Act, the court must heed several well-established limitations. First, the agency's actions are presumed to be lawful and correct. Second, the agency's conclusions can be overturned only if arbitrary and capricious, giving due deference to the agency's expertise and judgment. Third, the agency's legal interpretations are controlling if they are reasonable with regard to statutes, or not plainly erroneous with regard to the agency's own regulations.

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies

Administrative Law > Judicial Review > Reviewability > Preservation for Review

**HN6**[⬇]  **Reviewability, Exhaustion of Remedies**

It is inappropriate for courts to consider arguments not raised before the administrative agency on appeal of the agency decision, because doing so usurps the agency's function.

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies

**HN7**[⬇]  **Reviewability, Exhaustion of Remedies**

Issue exhaustion is a judge-made, common law prudential principle, which need not be invoked in all circumstances. Because of its discretionary nature, the doctrine has become subject to several exceptions. One such exception, established by the United States Court of Appeals for the District of

1999 U.S. Dist. LEXIS 20568, *1

Columbia Circuit, applies when the issues raised for the first time before a district court are strictly legal. Under such circumstances, no factual development or application of agency expertise will aid the court's decision. Because the courts are "relatively more expert" in ascertaining the meaning of statutory terms, review would not impermissibly displace agency skill or invade the field of agency discretion.

Governments > Federal Government > Claims By & Against

### HN8[⬇] Federal Government, Claims By & Against

Although the U.S. Department of Labor is the agency responsible for performing the audits required by the Single Audit Act of 1984, 31 U.S.C.S. §§ 7501-7507, the U.S. Department of Health and Human Services is the cognizant agency responsible for negotiating state-wide cost allocation plans for all states under Office of Management and Budget's Circular A-87, Cost Principles for State and Local Governments.

Governments > Federal Government > Claims By & Against

### HN9[⬇] Federal Government, Claims By & Against

Under 31 U.S.C.S. § 7503, aside from the annual audit required by the Single Audit Act of 1984, 31 U.S.C.S. §§ 7501-7507, a federal agency shall conduct any additional audits which are necessary to carry out its responsibilities under federal law or regulation.

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Governments > Federal Government > Claims By & Against

Civil Procedure > Remedies > Judgment Interest > General Overview

### HN10[⬇] Judgment Interest, Prejudgment Interest

The United States Supreme Court has expressly upheld the authority of an agency to impose prejudgment interest on debts owed by the states.

Administrative Law > Judicial Review > Standards of Review > Exceeding Statutory Authority

Environmental Law > Administrative Proceedings & Litigation > Judicial Review

Administrative Law > Judicial Review > Standards of Review > General Overview

### HN11[⬇] Standards of Review, Exceeding Statutory Authority

Under 5 U.S.C.S. § 7606, a reviewing court is to hold unlawful and set aside agency action, findings, and conclusions found to be not in accordance with law or in excess of statutory authority.

Governments > Federal Government > Claims By & Against

*HN12*[⬇]  **Federal Government, Claims By & Against**

An agency may assess a rate of interest higher than the current value of funds rate if it reasonably determines that a higher rate is necessary to protect the interests of the United States.

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

*HN13*[⬇]  **Reviewability, Exhaustion of Remedies**

The doctrine of issue exhaustion is akin to a jurisdictional requirement. Questions concerning subject matter jurisdiction may be raised at any time by either party.

**Counsel:** For STATE OF WEST VIRGINIA, JAMES W. TEETS, plaintiffs: Victor S. Woods, Darrell V. McGraw, Jr., Attorney General, OFFICE OF ATTORNEY GENERAL, Charleston, WV.

For STATE OF WEST VIRGINIA, DARRELL V. MCGRAW, JR., JAMES W. TEETS, plaintiffs: Silas B. Taylor, Rory L. Perry, II, Esquire, ASSISTANT ATTORNEY GENERAL, Charleston, WV.

For DARRELL V. MCGRAW, JR., plaintiff: Darrell V. McGraw, Jr., Esquire, OFFICE OF ATTORNEY GENERAL,

State of West Virginia, Charleston, WV.

For UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DONNA E. SHALALA, defendants: Michael L. Keller, Assistant United States Attorney, Charleston, WV.

For UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DONNA E. SHALALA, defendants: Rebecca A. Betts, Esquire, United States Attorney, Charleston, WV.

For UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DONNA E.  **[*2]**  SHALALA, defendants: Frank W. Hunger, Asst. AG, Sheila M. Lieber, Lisa A. Olson, Department of Justice, Washington, DC.

**Judges:** JOHN T. COPENHAVER, JR., United States District Judge.

**Opinion by:** JOHN T. COPENHAVER, JR.

# Opinion

*MEMORANDUM ORDER*

This matter is before the court on the parties' cross motions for summary judgment, filed by both plaintiffs and defendants on February 10, 1998. Plaintiffs, (hereinafter the "State"), seek summary judgment on Counts I through IV of their complaint. Defendants seek judgment on all five Counts.

I. Introduction

The United States provides the State of West Virginia with

1999 U.S. Dist. LEXIS 20568, *2

federal matching funds for the contributions the State makes to its retirement pension plan for public employees, the Public Employees Retirement System ("PERS"). (Administrative Record, at 46 (hereinafter cited as "AR")). This lawsuit seeks judicial review of a decision by the United States Department of Health and Human Services ("DHHS") that the State had improperly claimed and received $ 8,131,865 in federal matching funds for its employer contributions to PERS. DHHS also found that the State had improperly withdrawn funds from the PERS account and used them for unauthorized purposes [*3] to the extent of $ 3,821,670 in federal matching funds, that the State could not offset its debt by the amount the United States had allegedly underfunded the State's Public Employees Insurance Agency Fund (the "Insurance Agency Fund"), and that the State was liable for pre- and post-disallowance interest on the improperly claimed funds.

PERS provides a retirement pension plan for public employees in West Virginia. (AR, 46). Its membership includes employees of the State and participating counties and municipalities. (*Id.*). Under PERS, employees contribute 4.5 percent of their salaries to the plan and the employer contributes 9.5 percent. (*Id.*).

*HN1*[⬆] Some PERS beneficiaries work in joint federal-state programs. On behalf of those employees, the United States provides matching funds for the State's contributions to PERS. The determination as to what portion of the State's costs are reimbursable by the federal government, or "allowable," is made by DHHS pursuant to the guidelines set forth in the Office of Management and Budget's Circular A-

87, Cost Principles for State and Local Governments ("Circular A-87"). [1] For costs to be allowable under a federal matching program, they must [*4] be "consistent with policies, regulations, and procedures that apply uniformly to both federally assisted and other activities of the unit of government of which the grantee is a part." (*Id.*, Att. A., P C.1.d.). DHHS interprets this requirement to mean that the United States will contribute to PERS at the same rate as the State. (AR, 37-38, 43).

Contributions to PERS must be "net of all applicable credits." (Circular A-87, Att. A., P C.1.f.). "Applicable credits" are "those receipts or reduction of expenditure [*5] type transactions which offset or reduce expense items allocable to grants as direct or indirect costs." (*Id.*, P C.3.a.). Here, the disallowance made by DHHS of the State's overcharges constitutes an applicable credit that the State must deduct from its claim for matching funds from the federal government. (*See Id.*).

In or around September of 1989, DHHS informed the State of its intent to commence an audit of PERS and the Insurance Agency Fund to determine the propriety of costs charged by the State to various federal programs administered by a number of federal agencies between July 1, 1985, and June 30, 1989. (AR, 47). It is not clear from the record which or how many federal agencies were involved. In September of

---

[1] Circular A-87 applies to all federal agencies responsible for administering federally-funded grants and contracts, including DHHS. Circular A-87, Att. A, P A.3; 45 C.F.R. § 74.27(a). Circular A-87 has been incorporated by reference into DHHS's regulations at 45 C.F.R. § 74.27(a). Thus, it carries the force of a substantive regulation. *Pennsylvania Dep't of Pub. Welfare v. Heckler*, 730 F.2d 923, 925 n.1 (3d Cir. 1984) (referring to the predecessor regulation, 45 C.F.R. § 74.171).

1999 U.S. Dist. LEXIS 20568, *5

1990, an audit was completed by DHHS with respect to excess pension costs charged to federal programs by PERS during the period in question. (AR, 42). The audit concluded that the United States was overcharged $ 12,741,426 as a result of the State requesting matching funds for PERS at a higher contribution rate than that authorized by Circular A-87. (AR, 49). DHHS also determined that the United States had lost $ 3,161,690 in interest income because of the excessive **[*6]** PERS charges. (*Id.*).

The audit further found that the State had withdrawn $ 15,171,377 from PERS to fund the general obligations of the State and $ 3,936,973 to pay for health insurance premiums for its retirees, aggregating $ 19,108,350. (*Id.*). DHHS determined that twenty-percent of these withdrawals, or $ 3,821,670, was attributable to past federal contributions to PERS and would have to be returned to the United States. (*Id.*). DHHS did not complete an audit of the Insurance Agency Fund, and no mention of the Fund was made in the audit. [2]

The State elected to have the Insurance Agency Fund audited at its expense, and submitted its audit findings to DHHS. The State claimed its audit established that the United States underfunded the Insurance Agency Fund by $ 9,541,125, and asked DHHS to allow the State to offset **[*7]** this amount against the monies owed with respect to PERS. (Complaint, PP 75-77). The State does not specify which federal agency or agencies has underfunded the Insurance Agency Fund.

_____

[2] According to defendants, the audit was discontinued because there was no indication that the Insurance Agency Fund had overcharged the United States. (Defendants' Response, at 15).

The findings and conclusions contained in the audit were adopted by DHHS, by letter dated March 13, 1991, when it formally disallowed the excessive charges found above. (AR, 37-40). By separate letter bearing the same date, DHHS also informed the State that it would not be permitted to offset the funds allegedly owed by the United States to the Insurance Agency Fund to satisfy the debts owed by the State with respect to PERS because allowance of such an offset would circumvent federal regulations. (AR, 207-8). In reaching this conclusion, DHHS relied upon Circular A-87, P C.2.b, which provides that "any cost allocable to a particular grant or cost objective under the principles provided for in this Circular may not be shifted to other Federal grant programs to overcome fund deficiencies." *Id.*

The State subsequently requested, pursuant to 45 C.F.R. § 75, that DHHS reconsider its findings. Specifically, the state claimed that:

> A. The Audit failed to consider pension contributions made from **[*8]** special funds when it calculated the State's overall contribution rate, thus resulting in an overcalculation of the pension-cost disallowance;
> B. DHHS had no authority to impose interest charges for the period preceding the disallowance, and in any event the interest should be calculated on the "actual interest earnings" of PERS rather than the "average annual yield" figures utilized by the audit;
> C. The Audit overestimated the amount of federal funds withdrawn from PERS, and also failed to account for the fact that a portion of the withdrawn funds were used to fund the federal share of retiree medical insurance costs;

and

D. The disallowances should be offset against the federal share of costs incurred by the State to remedy underfunding of PEIA.

(Plaintiff's Memorandum, at 3-4 (*citing* AR, 68-136)).

In support of its request, the State re-submitted to DHHS its independent auditor's report. Again, the State claimed it was entitled to an offset against its debts because of an alleged underfunding of the Insurance Agency Fund.

DHHS completed its reconsideration and issued its decision on June 25, 1993. DHHS agreed that contributions to PERS from special funds [*9] should be included when calculating the amount the State had overcharged the United States. Thus, DHHS accepted the State's calculation that the overcharge was $ 8,131,865 rather than $ 12,724,786. (AR, 5). DHHS also accepted the methodology proposed by the State to calculate pre-disallowance interest. [3] (AR, 6). DHHS upheld the audit findings in all other respects. (AR, 7).

On administrative appeal, DHHS's Appeals Board upheld the agency's earlier determinations, finding that:

West Virginia may not properly use its [Insurance Agency Fund] claims against the federal government to offset the disallowance taken here.

* * *

West Virginia must pay the federal government $ 8,131,865 due as a result of overcharges made to PERS. West Virginia must remit the interest earned on the amount the federal government was overcharged.

* * *

West Virginia must remit the federal share, or $ 3,821,670, of the [*10] funds it withdrew from PERS during the period in question.

(AR, 291). [4]

The State filed this lawsuit on March 12, 1997. The complaint contains five counts. Count I alleges that DHHS had no authority to assert an aggregate disallowance against the State on behalf of other federal agencies. Count II alleges that DHHS's determination of the federal share of the unauthorized withdrawals from PERS was arbitrary and capricious. Count III challenges DHHS's authority to assess interest at a rate of 15.75% against the State, and Count IV challenges DHHS's authority to assess any pre-disallowance interest whatsoever. Count V challenges DHHS's authority to deny the State's offset claim without undertaking an audit of the Insurance Agency Fund or itemizing its findings, and seeks a declaration that the State may offset monies allegedly owed by the United States against its own debt.

II. Summary [*11] Judgment Standard

*HN2*[⬆] A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to

---

[3] The State nevertheless maintains that it is not liable for any pre-disallowance interest.

[4] On March 21, 1997, DHHS demanded payment of $ 25,163,582.41, an amount which included accrued interest, from the State.

USCA4 Appeal: 23-1096     Doc: 35     Filed: 08/07/2023     Pg: 96 of 110

Page 10 of 24
1999 U.S. Dist. LEXIS 20568, *11

establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If a party fails to establish an essential element of the cause of action, the opposing party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). That is, a defendant satisfies its requirement of showing that it is entitled to judgment as a matter of law by demonstrating that there is an absence of evidence to support the plaintiff's claims. *Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994), *cert. denied*, 513 U.S. 1191, 115 S. Ct. 1254, 131 L. Ed. 2d 135 (1995). A defendant is also entitled to **[\*12]** summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the plaintiff. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

III. Judicial Review Standard

The State's cause of action arises under the Administrative Procedure Act ("APA"), § 5 U.S.C. 706. *HN3*[⬆] The APA provides the following standard for judicial review of final, informal agency actions: [5]

The reviewing court shall--

\* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;. . . .

§ 5 U.S.C. § 706(2)(A)-(D); *Fishermen's Dock Cooperative, Inc. v. Brown*, 75 F.3d 164, 167 (4th Cir. 1996).

 **[\*13]** Here, the State claims that a multitude of the actions taken by DHHS were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The State bears the burden on all issues in this case-- it must show that the agency's actions were arbitrary, capricious, an abuse of discretion, or contrary to law, or its claims must fail. *The Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 548 (8th Cir. 1996).

*HN4*[⬆] An agency rule may be deemed arbitrary, capricious or an abuse of discretion "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr's Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983). Although the scope of judicial review under this standard is narrow and deferential, a

---

[5] Informal agency actions are those actions, as are at issue here, that may be taken by an agency without the benefit of a statutorily required hearing and the creation of a formal record. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971).

reviewing court must be certain that an agency has considered all the important **[*14]** aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id.; See also Natural Resources Defense Council, Inc. v. SEC*, 196 U.S. App. D.C. 124, 606 F.2d 1031, 1049 (D.C. Cir. 1979). But, a reviewing court cannot "substitute its judgment for that of the agency," *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971), particularly when that determination is propelled by the agency's expertise. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 76 L. Ed. 2d 437, 103 S. Ct. 2246 (1983); *Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 30 L. Ed. 2d 600, 92 S. Ct. 637 (1972).

*HN5*[⬆] In reviewing agency actions under the APA, the court must heed several well-established limitations. First, the agency's actions are presumed to be lawful and correct. *Overton Park*, 401 U.S. at 416. Second, the agency's conclusions can be overturned only if arbitrary and capricious, giving due deference to the agency's expertise **[*15]** and judgment. *Id.; Baltimore Gas*, 462 U.S. at 103. Third, the agency's legal interpretations are controlling if they are reasonable with regard to statutes, *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984), or not plainly erroneous with regard to the agency's own regulations. *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 89 L. Ed. 1700, 65 S. Ct. 1215 (1945).

IV. DHHS's Authority to Impose an Aggregate Disallowance

In Count I of its complaint, the State argues for the first time that DHHS did not have the statutory authority to assess an aggregate disallowance against the State on behalf of all federal agencies, and, in the alternative, that DHHS must break its aggregate disallowance down into itemized findings indicating the amounts overcharged to each federal program. Defendants argue that DHHS has the authority to impose an aggregate disallowance and that it need not issue itemized findings. Defendants also argue that the court cannot consider the State's claims with respect to DHHS's audit authority because they were not raised before DHHS during the agency **[*16]** proceedings.

A. The State's Introduction of New Issues Before this Court

The Supreme Court has long held that *HN6*[⬆] it is inappropriate for courts to consider arguments not raised before the administrative agency on appeal of the agency decision, because doing so usurps the agency's function. *Unemployment Compensation Comm. of Territory of Alaska v. Aragon*, 11 Alaska 236, 329 U.S. 143, 155, 91 L. Ed. 136, 67 S. Ct. 245, (1946); *see also, Perales v. Heckler*, 611 F. Supp. 333, 344, *aff'd*, 762 F.2d 226 (2d Cir. 1985). As the Court stated in *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 97 L. Ed. 54, 73 S. Ct. 67 (1952):

> Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

*Id.* at 36.

This doctrine serves numerous goals: implementing congressional intent to delegate authority to the agency; protecting agency autonomy by allowing [*17] the agency to apply its special expertise and correct its errors; furthering efficient judicial review by permitting the parties to develop the facts of the case in the agency proceedings; promoting judicial economy by avoiding repetition of administrative and judicial fact finding; and conserving judicial resources. Jon C. Dubin, *Torquemada Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine to Inquisitorial Administrative Proceedings*, 97 COLUM. L. REV. 1289, 1307 (1997); *see also, e.g., Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996); *Abbey v. Sullivan*, 978 F.2d 37, 44-45 (2d Cir. 1992).

As explained by two notable commentators, there are three different types of circumstances where the doctrine comes into play:

> First, a litigant may seek court review of a claim that he or she has never submitted to the agency. This is the classical situation of exhaustion . . . . [and] it presents the strongest reasons for requiring exhaustion. Second, a litigant may seek court review of a claim that he or she has presented to the agency, which has rejected it. However, the controversy includes other claims that are the [*18] subject of ongoing agency proceedings and have not yet been decided. This is the problem of interlocutory review. Third, a litigant may seek court review of a claim when agency proceedings are over, and where he or she did not raise (or did not pursue) the claim before the agency.

Stephen G. Breyer & Richard B. Stewart, ADMINISTRATIVE LAW AND REGULATORY POLICY, 1115 (3d ed. 1992). This third form of exhaustion, called "issue exhaustion," provides the basis of defendants' argument in this case. Defendants contend that, because the State did not challenge DHHS's authority to perform an audit on behalf of all affected federal agencies during the administrative proceedings, the court may not consider such a challenge here.

HN7[⬆] Issue exhaustion is a judge made, common law prudential principle, which need not be invoked in all circumstances. *See Pleasant Valley Hospital, Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994). Because of its discretionary nature, the doctrine has become subject to several exceptions. One such exception, established by the United States Court of Appeals for the District of Columbia Circuit, applies when the issues raised for the first time before [*19] a district court are strictly legal. *E.g., Atlantic Richfield Co. v. U.S. Dep't of Energy*, 248 U.S. App. D.C. 82, 769 F.2d 771, 782 (D.C. Cir. 1984); *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 228 U.S. App. D.C. 80, 707 F.2d 1485, 1488-1489 (D.C. Cir. 1983). Under such circumstances, no factual development or application of agency expertise will aid the court's decision. *See McKart v. United States*, 395 U.S. 185, 200, 23 L. Ed. 2d 194, 89 S. Ct. 1657 (1969). Because the courts are "relatively more expert" in ascertaining the meaning of statutory terms, review would not impermissibly displace agency skill or invade the field of agency discretion. *Barlow v. Collins*, 397 U.S. 159, 166, 25 L. Ed. 2d 192, 90 S. Ct. 832 (1970), *quoting Hardin v. Kentucky Utils. Co.*, 390 U.S. 1, 14, 19 L. Ed. 2d 787, 88 S. Ct. 651 (1968) (dissenting

opinion).

DHHS relies considerably on *Pleasant Valley Hospital v. Shalala* in support of its contention that issue exhaustion should be invoked here to bar the State's claim. In *Pleasant Valley*, a medicare provider sought review of a Health Care Financing Administration **[\*20]** decision that interest earned on a particular account could not be used as a shelter against a claimed offset. On appeal to the district court, the provider challenged, for the first time, the validity of the relevant regulations, arguing that the agency had failed to comply with the notice and comment provisions of the APA when promulgating the regulations. *Pleasant Valley*, 32 F.3d at 69.

The district court held that it did not have subject matter jurisdiction over the provider's claim because the claim had not been raised before the agency. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") affirmed the district court's decision. The court stated that, as a general rule, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved. *Id.* at 70. The court then held that:

> While this general rule is not a strict jurisdictional bar, it is a prudential one which we invoke here. In this instance . . . the [agency's] expertise is relevant.
>
> Specifically, the [agency's] expertise would be relevant in determining whether the agency had **[\*21]** properly promulgated the [regulations]. Because [the agency] has [not] had occasion to issue a final decision on this aspect of Pleasant Valley's claim, the district court properly

declined to decide the APA issue.

*Id.*

The circumstances of *Pleasant Valley* are, however, distinguishable from those alleged in Count I of the State's Complaint. In *Pleasant Valley*, the challenge made for the first time before the district court involved allegations that the proper procedures were not followed when promulgating the regulations -- a distinctly factual issue. Here, the State challenges DHHS's authority to perform an audit and assess an aggregate disallowance -- a purely legal issue. That being the case, the State's claim falls outside the parameters of *Pleasant Valley* and squarely within the exception relied upon by the District of Columbia Circuit in *Atlantic Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d at 782, and *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d at 1488-1489. Because Count I involves a purely legal issue, the court can review it without usurping agency function. Accordingly, the court must now **[\*22]** determine whether DHHS had the authority to audit PERS and impose an aggregate disallowance upon the State on behalf of all federal agencies, and whether DHHS must itemize its findings.

B. DHHS's Audit Authority

The State contends that the United States Department of Labor ("DOL"), not DHHS, is the "cognizant agency" empowered to audit PERS and impose an aggregate disallowance. Defendants contend that DHHS is, in fact, empowered to audit PERS and impose an aggregate disallowance, pursuant to the audit provisions of 45 C.F.R. Part 74, App. J, OMB Circular A-128 (1993), and pursuant to

its authority to negotiate state-wide cost allocation plans on behalf of all federal agencies under OMB Circular A-87. DHHS argues that, as the agency required to ensure that the United States contributes the proper amount to federally subsidized programs each year pursuant to Circular A-87, it has the right and the responsibility to audit such programs. Otherwise, says DHHS, it would be unable to carry out its obligations under the Circular.

It is undisputed that the authority exercised by DHHS's in this case derives, if at all, from OMB Circular A-87 [6] and OMB Circular A-128. Circular A-128 was issued **[*23]** pursuant to the Single Audit Act of 1984, 31 U.S.C. §§ 7501-7507, which establishes audit requirements for state and local governments that receive federal aid, and defines federal responsibilities for implementing and monitoring those requirements. Circular A-128, P 1. Circular A-128 provides that state or local governments that receive $ 100,000 or more in federal financial assistance during a particular year shall be audited for that year. *Id.*, P 5. The Director of the Office of Management and Budget shall specify the "cognizant" federal agencies authorized to perform these yearly audits. 31 U.S.C. § 7504 (1984). The cognizant agency is responsible, among other things, for ensuring that the audits are performed and for coordinating audits made by other federal agencies with respect to various programs which are in addition to the audits performed pursuant to the Single Audit Act. Circular A-128, PP 10, 11.b.(1), (6). The DOL has been named the cognizant agency responsible for performing the yearly audits required

by the Single Audit Act in West Virginia and for coordinating audits made by other federal agencies. Circular A-87, **[*24]** 50 Fed. Reg. 52,406 (1985).

*HN8*[⬆] Although DOL is the agency responsible for performing the audits required by the Single Audit Act, DHHS is the cognizant agency responsible for negotiating state-wide cost allocation plans for all states under Circular A-87. That is, DHHS is responsible for ensuring that the cost principles set forth in Circular A-87 are followed so that the United States only pays its fair share of funding for federally subsidized pension programs such as PERS. As the cognizant federal agency, DHHS is responsible for negotiating the rates of federal contributions to a particular program, including PERS, on behalf of all federal agencies contributing to the program. Circular A-87 P J.4.a. According to defendants, this responsibility carries with it a duty to audit costs West Virginia charges to the federal **[*25]** government for federally assisted programs to ensure that they are properly reimbursable. *Id.* Among these costs are employee pension benefits. *Id.*, Att. B, P B.13.b.

Circular A-128 specifically contemplates the performance of audits in addition to the yearly audit required by the Single Audit Act. With respect to such additional audits, the Circular states:

> The Single Audit Act provides that an audit made in accordance with [Circular A-128] shall be in lieu of any financial or financial compliance audit required under individual Federal assistance programs. To the extent that a single audit provides Federal agencies with information and assurances they need to carry out their

---

[6] As stated above, supra note 1, Circular A-87 has been incorporated by reference into DHHS's regulations at 45 C.F.R. § 74.27(a). Thus, it carries the force of a substantive regulation.

1999 U.S. Dist. LEXIS 20568, *25

overall responsibilities, they shall rely upon and use such information. However, a Federal agency shall make any additional audits which are necessary to carry out its responsibilities under federal law and regulation. Any additional Federal audit effort shall be planned and carried out in such a way as to avoid duplication.

Circular A-128, P 10. Circular A-128 also specifically contemplates audit findings which affect the programs of more than one federal agency, requiring the cognizant [*26] agency to "monitor the resolution of audit findings that affect the programs of more than one federal agency." Circular A-128, P 14. Pursuant to these provisions, DHHS informed the DOL, by letter dated June 29, 1989, of its intention to "build upon the single audit recently conducted" by auditing PERS to determine whether the State had acted in accordance with Circular A-87. [7] (Plaintiff's Response, Ex. A). DHHS then audited PERS to determine whether the State had overcharged federal programs committed to contributing matching funds to PERS, and, finding that it had, asserted the aggregate disallowance against the State.

The court finds that DHHS's actions were necessary to carry out its overall responsibilities under Circular A-87. DHHS is the agency entrusted with the task of negotiating state-wide cost allocation plans consistent with the provisions of Circular A-87. To ensure that funds are properly allocated between the [*27] states and the United States on a yearly basis, DHHS must have access to information regarding the specific sums contributed by each state to programs entitled to federal

matching funds. An audit would efficiently provide that information, and is an appropriate exercise of DHHS's authority under Circular A-87.

Moreover, although Circular A-128 names DOL as the agency empowered to conduct the annual audits required by the Single Audit Act, it does not preclude audits by other agencies. In fact, by its own terms, the Circular may not be relied upon to "limit the authority of Federal agencies to make, or contract for audits and evaluations of Federal financial assistance programs," or to "authorize any State or local government . . . to constrain Federal agencies, in any manner, from carrying out additional audits." Circular A-128, PP 10(b), (c).

Accordingly, the court finds that DHHS had the authority, pursuant to Circulars A-87 and A-128, to conduct an audit of DHHS and, as further set forth infra, pages 25-27, to issue an aggregate disallowance on behalf of all federal agencies affected by the State's wrongdoing.

C. Itemization of Findings

The State argues that DHHS is required [*28] to itemize its audit findings by individual federal program. The State cites to P 13.a.1 of Circular A-128 in support of its argument. That paragraph states that audit reports must include "a schedule of Federal assistance, showing the total expenditures for each Federal assistance program. . . ." Paragraph 13.a.1, however, applies to the yearly audit required by the Single Audit Act and governed by Circular A-128, not to all audits prepared by all agencies. Paragraph 13 governs audits "made in accordance with the provisions of [Circular A-128]." Circular

---

[7] The scope of the "recently conducted" audit cannot be discerned from the record.

1999 U.S. Dist. LEXIS 20568, *28

A-128 only governs the annual audits of certain programs required by and performed pursuant to the Single Audit Act of 1984. Circular A-128, P 1. The PERS audit was not an annual audit required by the Single Audit Act. Rather, it was an audit performed by DHHS pursuant to its duty, established by Circular A-87, to ensure that the cost principles set forth in Circular A-87 are followed so that the United States only pays its fair share of funding for programs such as PERS. In addition to the authority of Circular A-128 at P 10 (*infra* at 22), such audits are specifically contemplated by the Single Audit Act. It provided, at all **[*29]** times relevant to this lawsuit, that, *HN9*[⬆] aside from the annual audit required by the Act, "a Federal agency shall conduct any additional audits which are necessary to carry out its responsibilities under Federal law or regulation." 31 U.S.C. § 7503. Thus, paragraph 13 does not apply to the PERS audit.

Plaintiffs also cite to 45 C.F.R. § 95.519(b)(1) in support of its contention. That section is also not applicable here. It pertains only to those public assistance programs listed in 45 C.F.R. § 95.503. [8]

In any event, it appears that **[*30]** imposing an itemization requirement upon DHHS would burden the agency with an unnecessary expense. Circular A-87 requires DHHS to negotiate cost allocation plans for federally subsidized programs on an aggregate basis. DHHS's task is, thus, to determine the contribution rate for all federal agencies contributing to the particular program. Contributions must be consistent with the rate selected by DHHS after negotiations with the grantee. If questions arise over the appropriateness of the chosen rate, DHHS may audit the program. Such an audit will compare the aggregate contributions by a state and its employees to the contributions made by the United States. If the ratio indicates one group is bearing more than its fair share, the contribution rate will be adjusted. An itemization of agency-by-agency contributions is not necessary to perform this analysis. All DHHS must determine is that the United States, as a whole, is bearing only its fair share of costs.

Plaintiffs have advanced no other authority or reasons supporting their conclusion that an itemization of State overcharges is necessary in this case. Accordingly, the lack of such an itemization in the PERS audit is not fatal. **[*31]** [9] Having determined that DHHS had the authority to audit PERS, issue an aggregate disallowance, and issue a report without itemized findings, the court holds that the defendants are entitled to summary judgment on Count I of the State's complaint.

V. Federal Share of State Withdrawals

Aside from revealing State overcharges, the PERS audit found that West Virginia had used $ 15,171,377 unlawfully withdrawn from PERS to fund general obligations of the State and $ 3,936,973 of PERS funds unlawfully withdrawn to finance health insurance premiums for retired state

---

[8] Part 95 of Title 45 of the Code of Federal Regulations only applies to State agency costs applicable to awards made under Titles I, IV-A, IV-B, IV-C, IV-D, IV-E, X, XIV, XVI (AABD), and XIX of the Social Security Act, under the Refugee Act of 1980, Title IV, Chapter 2 of the Immigration and Nationality Act (8 U.S.C. 1521 et seq.), and under Title V of Pub. L. 96-422, the Refugee Education Assistance Act of 1980. 45 C.F.R. § 95.503.

[9] As will be seen, however, the failure of DHHS to itemize the overcharges impedes its ability to impose interest on the aggregate disallowance at rates unavailable to other federal agencies.

1999 U.S. Dist. LEXIS 20568, *31

employees, aggregating $ 19,108,350. (AR, 286). The State does not dispute this finding, and acknowledges that it must refund the federal share of PERS funds used for state purposes, which DHHS calculates to be twenty-percent or $ 3,821,670. In Count II, the State **[*32]** takes exception to DHHS's calculation of the federal share of the withdrawn funds.

In the draft audit report, the auditor stated his conclusion with respect to the federal share of the unauthorized withdrawals as follows:

> The State could not provide us with the actual federal share of the $ 19,108,350 withdrawn from PERS. The Office of Inspector General['s] experience is that in lieu of exact figures provided by States, a conservative estimate of the federal share of salary and related expenditures, such as pension costs, is 20 percent. In the absence of more precise data, we used 20 percent and estimated the Federal share of the transferred funds to be $ 3,821,670.

(AR, 58).

This reasoning was accepted by DHHS and incorporated into the formal disallowance dated March 13, 1991. (AR, 39). Upon reconsideration, DHHS performed an additional analysis of the twenty-percent estimate. To test its reasonableness, Stephen Virbitsky, a DHHS auditor, compared the twenty-percent estimate with the ratio of federal PERS contributions to total contributions made by the State during the four year audit period. (AR, 276). During that period, all state employer contributions, including **[*33]** all federal contributions, were deposited into a division of the

PERS called the State Employer Accumulation Fund ("EAF State Fund"). (AR, 276). Contributions by county and local governments were deposited into a different division called the Non-State Employer Accumulation Fund ("EAF Non-State Fund"). (*Id.*). Contributions by employees were deposited into yet another division -- the "Member Funds." (*Id.*).

Because all federal and State funds were deposited only into the EAF State Fund, Mr. Virbitsky limited his analysis to that particular division. Using the amounts actually deposited into the EAF State Fund, he computed the federal share of total contributions for the years 1986-89. His results indicated that the federal share of employer contributions was 20.52% in 1986, 33.69% in 1987, 23.45% in 1988, and 20.34% in 1989, averaging 22.84%. (AR, 277).

The DHHS Appeals Board expressly endorsed this analysis in its decision, and undertook a further analysis of its own. (AR, 287-90). The Appeals Board chose to test the reasonableness of Mr. Virbitsky's calculations by comparing the amount of federal funds deposited to the sum of State funds actually deposited into the EAF State **[*34]** Fund plus the amount the State would have contributed had it properly funded PERS. (AR, 289). The Appeals Board concluded that "since the ratios derived from this comparison would range from 18.4 percent to 26.3 percent, these calculations also support the 20 percent as a reasonable estimate for the four year period." (*Id.*).

The State claims that DHHS's estimate is "arbitrary and capricious because (1) the agency failed to take into account

1999 U.S. Dist. LEXIS 20568, *34

the entire PERS fund, including contributions made by non-state employers and employees, and (2) it aggregated both allowed and disallowed federal contributions to establish the ratio of federal-to-State contributions to PERS, where State pension funding [for the four year audit period] was conceded to be anomalously low. . . ." (Plaintiff's Memorandum, at 12).

DHHS's conclusions can be overturned only if they are found to be arbitrary and capricious, giving due deference to the agency's expertise and judgment. *Overton Park*, 401 U.S. at 416; *Baltimore Gas*, 462 U.S. at 103. Agency action may be deemed arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to **[*35]** consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr's Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983)

The agency's decision not to include the EAF Non-State Fund and the Member's Fund in its analysis was not arbitrary or capricious. DHHS chose to base its calculations on the only account subject to unauthorized withdrawals that contained both federal and state funds. There is no indication in the record that the State withdrew any monies from the Member Funds. (AR, 288). DHHS also determined that the exclusion of any unauthorized withdrawals from the EAF Non-State Fund from its calculations was appropriate because no federal funds were deposited into that account. (*Id.*).

Similarly, the inclusion of both allowed and disallowed contributions in the calculations was not arbitrary or capricious. The State's unauthorized withdrawals from the EAF **[*36]** State Fund included both allowed and disallowed contributions. Thus, to be accurate, any estimate of the federal share of those withdrawals should include both types of contributions. (AR, 192).

The court finds that DHHS properly explained the basis of its twenty-percent estimate and based its conclusions on the evidence before the agency. Accordingly, for the reasons stated, DHHS's estimate of the federal share of unauthorized withdrawals was not arbitrary or capricious. Defendant's motion for summary judgment with respect to Count II of the State's complaint will be granted.

VI. The State's Challenges to DHHS's Imposition of Interest

As correctly noted by defendants, there are two assessments of interest at issue in this case. First, DHHS has claimed interest due on the PERS overcharges for the period running from July 1, 1985, through June 30, 1989. DHHS calculated this pre-disallowance interest to be $ 897,321. The calculation itself is not in dispute. (Plaintiffs' First Motion to Supplement the Administrative Record, at 1). DHHS also claims interest, at the rate of 15.75%, which began to accrue thirty days after March 13, 1991, when official notice of the debt was issued. The **[*37]** State argues that DHHS cannot impose prejudgment interest upon the State's debt and cannot impose interest at the consumer rate.

A. DHHS's Imposition of Pre-disallowance Interest

In Count III of its complaint, the State contends that DHHS

1999 U.S. Dist. LEXIS 20568, *37

has no authority to impose pre-disallowance interest against it in this case. Defendants respond that DHHS has authority to assess pre-disallowance interest based upon *United States v. Texas*, 507 U.S. 529, 123 L. Ed. 2d 245, 113 S. Ct. 1631 (1993), and upon the DHHS claims collection regulations, 45 C.F.R. §§ 30 *et seq.*, promulgated pursuant to the Debt Collection Act of 1982, 31 U.S.C. §§ 3701 *et seq.* [10] For the reasons that follow, the court finds merit in the State's claim.

 [*38] The claims collection regulations prescribe standards and procedures for the DHHS personnel charged with collection and disposition of debts owed to the United States. 45 C.F.R. § 30.1. "Debts" include, among other things, overpayments arising from audit disallowances. *Id.* at § 30.2. The regulations expressly provide for the collection of interest on unpaid debts. "Interest will accrue on all debts from the date notice of the debt and the interest requirement is first mailed to the last known address or hand-delivered to the debtor if the debt is not paid within 30 days from the date of mailing of the notice." *Id.* at § 30.13(a)(1). The regulatory preamble to the claims collection regulations provides that interest will be charged under § 30.13 to state and local governments the same as any other debtor. 52 Fed. Reg. 260, 261 (1987).

*HN10*[⬆] The United States Supreme Court has expressly

upheld the authority of an agency to impose prejudgment interest on debts owed by the states. *United States v. Texas*, 507 U.S. at 539. *Texas* involved a challenge to an imposition of prejudgment interest on debt owed by a state to the United States. As is the case [*39] here, the interest was imposed by a federal agency (the Food and Nutrition Service), and began to accrue thirty days after notice of the debt was issued. The state of Texas challenged the imposition of interest, arguing that the Debt Collection Act had abrogated the agency's common law authority to make such an imposition. The Court rejected the state's argument, and held that the Debt Collection Act left in place the States' federal common-law obligation to pay prejudgment interest on debts owed to the Federal Government. *Texas*, 507 U.S. at 538.

Similar circumstances are presented here. By letter dated March 13, 1991, DHHS issued the notice contemplated by 45 C.F.R. § 30.13(a)(1). The notice set out the final decision of DHHS's Office of Inspector General/Office of Audit Services, and then read:

> This letter constitutes the initial notification of a claim by the United States as required by the Federal Claims Collection Standards. If payment is not received within 30 days from the date of this notification, interest at the current Private Consumer Rate from the date of this notice will be assessed in accordance with Department Regulations, 45 C.F.R. Part [*40] 30.13 . . . If your organization elects to appeal, we will suspend collection action. However, if the final decision of the appeals process is determined in favor of the federal government (fully or partially) interest will be assessed on the upheld

---

[10] Defendants also claim, as they did with respect to the State's arguments regarding DHHS's audit authority, that the court may not consider the State's two challenges to the imposition of interest because they were not raised before the agency. Those challenges, however, raise purely legal issues. Accordingly, they may be considered for the first time here. *Atlantic Richfield Co. v. U.S. Dep't of Energy*, 248 U.S. App. D.C. 82, 769 F.2d 771, 782 (D.C. Cir. 1984); *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 228 U.S. App. D.C. 80, 707 F.2d 1485, 1488-1489 (D.C. Cir. 1983).

1999 U.S. Dist. LEXIS 20568, *40

amount from the date of this notification.

(AR, 40).

*United States v. Texas* clearly permits such agency action. Moreover, DHHS's regulation, 45 C.F.R. § 30.13, expressly authorizes the imposition of prejudgment interest against the State beginning the date notice was issued. What is not clear, however, is how 45 C.F.R. § 30.13 supports DHHS's imposition of interest for the period running from July 1, 1985, through June 30, 1989. Defendants rely exclusively on that section and *Texas* in support of their pre-disallowance interest assessment. (Defendants' Memorandum, at 30-32, Defendant's Response, at 6). Nothing in either authority, however, indicates that interest may be imposed for any period before notice of a debt is issued.

*HN11*[↑] A reviewing court is to hold unlawful and set aside agency action, findings, and conclusions found to be not in accordance with law or in excess of statutory authority. 5 U.S.C. § 7606 **[*41]** (a), (c). DHHS having failed to specify any valid authority for its imposition of $ 897,321 in pre-disallowance interest, the court concludes that DHHS has acted in excess of its statutory authority and that its imposition of pre-disallowance interest must be set aside. Plaintiffs' motion for summary judgment with respect to Count III is accordingly granted.

B. Imposition of the Consumer Interest Rate Upon the State's Debt

In Count IV of its complaint, the State also challenges DHHS's imposition of a 15.75% interest rate upon the total debt owed on the following grounds: (1) that 45 C.F.R. § 30.13 conflicts with the common law rule that required a consideration of competing state and federal interests before prejudgment interest may be imposed by a court against a state, (2) that government-wide policies require the use of the current value of funds rate, not the private consumer rate, and (3) that even if DHHS has the authority to impose interest at the consumer rate, that authority only extends to debts owed to DHHS, not those owed to other federal agencies.

The first two of the State's arguments were addressed and rejected in *Commonwealth of Pennsylvania Dept. of Public Welfare v. United States Dept. of Health and Human Services*, 101 F.3d 939 (3d. Cir. 1996) **[*42]** ("*Pennsylvania v. DHHS*"). The court finds the reasoning of *Pennsylvania v. DHHS* persuasive.

In that case, DHHS, pursuant to 45 C.F.R. § 30.13(a), began charging interest at the rate of 15.125 percent per annum on a debt owed by the Pennsylvania Department of Public Welfare to DHHS thirty days after notice of the debt was issued. Section 30.13 provides that "the Secretary [of DHHS] shall charge an annual rate of interest as fixed by the Secretary of the Treasury after taking into consideration private consumer rates of interest prevailing on the date that . . . [DHHS] becomes entitled to recovery." The 15.125% amount represented the consumer rate of interest at the time notice was given. Id. at 941.

In attacking the propriety of the 15.125 percent rate, Pennsylvania, as does the State here, relied upon language in *United States v. Texas* which states that "courts," when awarding prejudgment interest, are to "weigh competing

1999 U.S. Dist. LEXIS 20568, *42

federal and state interests." *Texas*, 507 U.S. at 536. Pennsylvania argued that Section 30.13(a) "violates the common law because it fails to require a case-by-case determination of whether or not interest is appropriate **[*43]** and, if so, how much interest should be charged. *Id.* at 942.

The Third Circuit found the reference to "courts" in the quoted language significant, noting that "the Court neither said, nor implied, anything about whether or not an agency could pre-specify the rate it was going to charge states that were delinquent on a particular class of debts." *Id.* at 943. Finding no other authority supporting Pennsylvania's argument, the Third Circuit went on to hold that:

> Pennsylvania has not given us a basis to read into the federal government's common law right to charge the states interest the costly and cumbersome obligation that a federal agency make an individualized determination as to the appropriate interest rate in every case where a state owes a debt. To impose such additional costs on federal agencies would undermine their right to charge interest by significantly increasing the cost of charging such interest.

*Id.*

A similar result is warranted here. The State has not presented to the court any authority, other than *Texas*, supporting its claim that DHHS must balance federal and state interests before imposing interest. Inasmuch as the agency is not required **[*44]** to undertake such an analysis under the common law, and inasmuch as Section 30.13 does not require such an analysis, DHHS may impose interest without

weighing competing federal and state interests.

The State also argues that government-wide policies require the use of the current value of funds rate, and that DHHS acted arbitrarily and capriciously in charging the private consumer rate. This argument is also without merit. As stated in *Pennsylvania v. DHHS*, the federal claims collection standards provide the framework within which agencies must collect debts owed to the federal government, whether the agency is collecting a debt pursuant to the Debt Collection Act of 1982, the common law, or other statutory authority. *Pennsylvania*, 101 F.3d at 943-44. Interest on debts is to accrue from the date on which notice of the debt and the interest requirements is first mailed or hand-delivered to the debtor. *Id.* at § 102.13(b). The rate of interest typically assessed on such debts is the rate of the current value of funds to the United States Treasury (i.e., the Treasury tax and loan account rate), as prescribed and published by the Secretary of the Treasury in the **[*45]** Federal Register and the Treasury Fiscal Requirements Manual Bulletins. *Id.* at § 102.13(c). *HN12*[⬆️] An agency, however, may assess a rate of interest higher than the current value of funds rate if it reasonably determines that a higher rate is necessary to protect the interests of the United States. *Id.; Pennsylvania v. DHHS*, 101 F.3d at 944. Pursuant to this authority, DHHS promulgated 45 C.F.R. § 30.13, which allows the imposition of interest at the consumer rate, as established from time to time by the Secretary of the Treasury. That is "almost per se reasonable, but is doubly so where the agency in question is seeking to provide its debtors with incentives to clear their debts promptly." *Pennsylvania v. DHHS*, 101 F.3d at 944.

1999 U.S. Dist. LEXIS 20568, *45

The court is not empowered to substitute its judgment for that of the agency unless the agency's action was irrational, not based on relevant factors, or outside statutory authority. *Overton Park*, 401 U.S. 402, 416, 28 L. Ed. 2d 136, 91 S. Ct. 814, (1971). None of those conditions are present here, where the agency acted pursuant to express regulatory authority. Accordingly, DHHS may charge interest on debts owed to it at the consumer **[*46]** rate of interest.

What DHHS may lack authorization to do, however, is charge the consumer rate of interest on debts owed to other agencies. It is undisputed that the DHHS disallowance represents an aggregate of overcharges made by the State to a number of federal agencies. (AR, 282). Chapter 45, Parts 30.1-30.35 of the Code of Federal Regulations applies to debts owed to the United States being collected by the Department of Health and Human Services. 45 C.F.R. § 30.1(a). The regulation itself provides that its standards and procedures will only be applied where a statute, regulation, or contract does not prescribe different standards or procedures. *Id.* at § 30.1(b).

In this case, DHHS made no findings with respect to what portions of the aggregate disallowance are attributable to what specific federal agencies. It is unclear what portions of the disallowance represents overcharges made to DHHS, if any, and what portions represent overcharges made to other agencies. Accordingly, it is not possible for the court to determine, as required by 45 C.F.R. § 30.1(b), whether "a statute, regulation or contract" prescribes "different standards or procedures" in this case.

That being **[*47]** so, the court finds that DHHS's reliance on

45 C.F.R. § 30.13 to impose the consumer rate of interest on an aggregate disallowance, without making proper findings as to the specific components of the disallowance, was arbitrary and capricious. Without such findings, neither DHHS nor the court can determine whether any other law governs the imposition of interest, in whole or in part, in this lawsuit. Accordingly, the court must set aside the agency's imposition of interest at the consumer rate and remand the case for further findings. If the agency wishes to impose interest at the consumer rate, it must, on remand, specifically determine how the aggregate disallowance is divided among the affected federal agencies and then discern whether those agencies must impose interest charges based on practices and procedures other than 45 C.F.R. § 30.13.

VII. Offset

The State claims in Count V of its complaint that the PERS disallowance should be offset by the amount the United States allegedly owes the State's Insurance Agency Fund. The State asks that the court set aside DHHS's denial of the State's offset request as contrary to law. The State argues that DHHS's failure to itemize its **[*48]** disallowance on a program-specific basis renders its denial of the State's offset claim unlawful, inasmuch as the State cannot, based on information at hand, ascertain whether the agencies that are owed money by the State also owe money to the State.

The court has already concluded that DHHS had no obligation to itemize its audit findings so that the State could determine what portion of the disallowance was allocable to each affected federal agency. Accordingly, its failure to do so does not render its denial of the State's offset claim arbitrary,

capricious, or an abuse of discretion.

The State further contends that DHHS's failure to audit the Insurance Agency Fund estop it from denying the State's offset request. Defendants argue that the State cannot raise its estoppel argument here because it was not raised before the agency. In response, the State contends that DHHS waived the exhaustion defense by failing to plead it in its answer. As noted by defendants, however, *HN13*[⬆] the doctrine of issue exhaustion is akin to a jurisdictional requirement. *Ibarra v. United States*, 120 F.3d 472, 476 (4th Cir. 1997) (affirming dismissal for lack of subject matter jurisdiction on **[*49]** exhaustion grounds); *See also Pleasant Valley Hospital, Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994) (stating that issue exhaustion is a prudential jurisdictional bar, and affirming dismissal for lack of subject matter jurisdiction on the basis of failure to raise an issue before the agency). Questions concerning subject-matter jurisdiction may be raised at any time by either party. *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997). It is thus appropriate for defendants to raise their exhaustion arguments in their motion for summary judgment.

The State urges that it did raise the estoppel issue before the agency. The citations to the Administrative Record proffered by the State in support of its argument, however, indicate such is not the case. (Plaintiffs' Response, at 31 (*citing* AR 19-21, 75-76, 93-95)). Although these portions of the record indicate that the State requested an offset of alleged Insurance Agency Fund debts against its disallowance, there is no mention of estoppel. Rather, the State simply argued that an offset was proper in light of the United States' alleged debt to the Insurance Agency Fund.

Consequently, the court finds **[*50]** that the State did not raise its estoppel argument before the agency. In the absence of an applicable exception, the doctrine set forth in *Pleasant Valley* is controlling. Under these circumstances, no such exception can be applied. Unlike the purely legal arguments raised with respect to DHHS's audit authority and DHHS's authority to impose interest, the State's estoppel argument creates a mixed question of law and fact. It would be inappropriate for the court to apply the exception explained in *Atlantic Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d at 782 and *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d at 1488-1489. No other potential exceptions are presented by the State. Thus, the court is without subject matter jurisdiction to address the state's estoppel argument. [11] *Pleasant Valley Hospital*, 32 F.3d at 70.

 **[*51]** In any event, the State does not have the right to require the offset it desires in this case. Circular A-87, which governs DHHS's administration of federal grants, as well as administration performed by other agencies, provides that "any cost allocable to a particular grant or cost objective under the principles provided for in this Circular may not be shifted to other federal grant programs to overcome fund deficiencies, avoid restrictions imposed by law or grant

---

[11] Even if the court had jurisdiction to hear the State's estoppel claim, it appears that the State cannot prove, as required, that it detrimentally relied on DHHS's initiation of the Insurance Agency Fund audit. When the State discovered the Insurance Agency Fund audit had been terminated, it performed its own audit, and submitted the audit findings to DHHS. The findings were in the hands of DHHS throughout the agency proceedings. Additionally, as noted by DHHS, the State has not filed a formal claim for the alleged debt. Nor has it sought a waiver of any limitations period which may apply to its claim.

agreements, or for other reason." Circular A-87, P C.2.b. A "grant" is defined as any agreement between the United States and a State, local, or Indian tribal government whereby the United States provides funds to carry out specified programs. *Id.* P B.7. A "grant program" is defined as "those activities and operations of the grantee which are necessary to carry out the purpose of the grant." *Id.* B.8. At issue in this case are costs which were originally allocated by a grant to PERS, a grant program designed to provide pension benefits to state employees. After it was discovered that the funds allocated to PERS were in excess of proper amounts, the State sought to have the excess funds shifted to the Insurance Agency **[*52]** Fund, a grant program which provides medical insurance to state employees. Such shifting is impermissible under P C.2.b. Accordingly, the State's offset request is precluded by DHHS's own regulations.

The defendants are, therefore, entitled to summary judgment with respect to Count V of the State's complaint. [12]

VIII. Conclusion

For the reasons stated, it is ORDERED that plaintiffs' motion for summary judgment be, and it hereby is, granted with respect to Count III of the complaint, and denied in all other respects. It is further ORDERED **[*53]** that this case be, and it hereby is, remanded to the United States Department of Health and Human Services for the purpose of allowing the agency, if it wishes to impose post-disallowance interest upon the State's debt, whether at the consumer rate or otherwise, to specifically determine, within four months from the entry date of this order, how the aggregate disallowance imposed against the State is divided among each affected federal agency and to determine the rate and amount of interest, together with the rationale therefor, applicable as to the sums owing to each such agency. It is further ORDERED that defendants' motion for summary judgment be, and it hereby is, granted with respect to Counts I, II, and V of the complaint and denied in all other respects. Judgment shall be entered accordingly.

The Clerk is directed to forward copies of this order to all counsel of record.

DATED: March 31, 1999

JOHN T. COPENHAVER, JR.

United States District Judge

_____

End of Document

_____

[12] DHHS also argues that allowing debts owed by the State to one federal subsidized program (PERS) to be offset by debts owed to the State by another (the Insurance Agency Fund) would violate the Appropriations Clause of the United States Constitution. U.S. Const. Art. 1, § 9, cl. 7. Inasmuch as the court has concluded, on other grounds, that DHHS is not required to recognize the State's claimed offset within the parameters of this case, the court need not address that issue.